ADR-106

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address): | | FOR COURT USE ONLY |
|---|---|---|
| FOLGER LEVIN & KAHN LLP<br>Michael A. Kahn (SB# 057432)<br>J. Daniel Sharp (SB# 131042)<br>Steven Wilson (SB# 240843) | Embarcadero Center West<br>275 Battery Street, 23rd Floor<br>San Francisco, CA 94111 | **ENDORSED**<br>**F I L E D**<br>San Francisco County Superior Court |

TELEPHONE NO.: (415) 986-2800    FAX NO. (Optional): (415) 986-2827
E-MAIL ADDRESS (Optional): dsharp@flk.com
ATTORNEY FOR (Name): Petitioner, David C. Soward, et. al.

**JUL 2 7 2007**

**GORDON PARK-LI, Clerk**
PARAM NATT
BY: _____
Deputy Clerk

SUPERIOR COURT OF CALIFORNIA, COUNTY OF   San Francisco
STREET ADDRESS: 400 McAllister Street
MAILING ADDRESS: 400 McAllister Street
CITY AND ZIP CODE: San Francisco, CA 94102-4514
BRANCH NAME: San Francisco Civic Center Courthouse

PETITIONER: David C. Soward, et. al.
RESPONDENT: Leonard Bosack; Sandy Lerner, et. al.

**PETITION TO** [X] **CONFIRM** [ ] **CORRECT** [ ] **VACATE**
**CONTRACTUAL ARBITRATION AWARD**

**Jurisdiction** (check all that apply):
[ ] **Action is a limited civil case**
Amount demanded [ ] does not exceed $10,000
[ ] exceeds $10,000, but does not exceed $25,000
[X] **Action is an unlimited civil case** (exceeds $25,000)

CASE NUMBER: CPF-07-507456

**NOTICE: You may use this form to request that the court confirm, correct, or vacate an award in an arbitration conducted pursuant to an agreement between the parties that is subject to Code of Civil Procedure section 1285 et seq. and that does not involve an attorney-client fee dispute. If you are requesting court action after an attorney-client fee arbitration award, please read Alternative Dispute Resolution form ADR-105, *Information Regarding Rights After Attorney-Client Fee Arbitration.***

1. **Petitioner and respondent.** Petitioner (name each):   David C. Soward, et. al (see Attachment 1)

   alleges and requests relief against respondent (name each):   Leonard Bosack; Sandy Lerner, et. al. (see Attachment 1)

2. **Contractual arbitration.** This petition requests the court to confirm, correct, or vacate an award in an arbitration conducted according to an agreement between the parties that is subject to Code of Civil Procedure section 1285 et seq.

3. **Pending or new action.**
   a. [ ] A court case is already pending, and this is a petition filed in that action. (If so, proceed to item 4.)
   b. [X] This petition commences a new action. (If so, complete items 3b(1) through 3b(4).)
   (1) **Petitioner's capacity.** Each petitioner named in item 1 is an individual,
       [X] except petitioner (state name and complete one or more of the following):   & Management Company
       (a) [X] is a corporation qualified to do business in California.
       (b) [ ] is an unincorporated entity (specify):
       (c) [ ] is a representative (specify):
       (d) [ ] is (specify other capacity):

   (2) **Respondent's capacity.** Each respondent named in item 1 is an individual,
       [X] except respondent (state name and complete one or more of the following):   Please see Attachment 1 for capacity of Respondents.
       (a) [ ] is a business organization, form unknown.
       (b) [ ] is a corporation.
       (c) [ ] is an unincorporated entity (specify):
       (d) [ ] is a representative (specify):
       (e) [ ] is (specify other capacity):

Page 1 of 3

**PETITION TO CONFIRM, CORRECT, OR VACATE**
**CONTRACTUAL ARBITRATION AWARD**
**(Alternative Dispute Resolution)**

Code of Civil Procedure, § 1285 et seq.

American LegalNet, Inc.
www.USCourtForms.com

| PETITIONER: David C. Soward, et. al. | CASE NUMBER: |
|---|---|
| RESPONDENT: Leonard Bosack; Sandy Lerner; et. al. | |

3. b.  (3) **Amount or property in dispute.** This petition involves a dispute over *(check and complete all that apply)*:
    (a) [ x ] the following amount of money *(specify amount)*: $ 22,971,504.90 plus interest and costs
    (b) [   ] property *(if the dispute involves property, complete both of the following)*:
        (i) consisting of *(identify property in dispute)*:
        (ii) having a value of *(specify value of property in dispute)*: $

  (4) [ x ] **Venue.** This court is the proper court because *(check (a) or (b))*:
    (a) [ X ] this is the court in the county in which the arbitration was held.
    (b) [   ] the arbitration was not held exclusively in any county of California, or was held outside of California, **and** *(check one or more of the following)*:
        (i) [   ] this is the court in the county where the agreement was made.
        (ii) [   ] this is the court in the county where the agreement is to be performed.
        (iii) [   ] the agreement does not specify a county where it is to be performed and was not made in any county in California, and the following party resides or has a place of business in this county *(name of party)*:

        (iv) [   ] the agreement does not specify a county where it is to be performed and was not made in any county in California, and no party to this action resides or has a place of business in California.

4. **Agreement to arbitrate.**
  a. **Date.** Petitioner and respondent entered into a written agreement on or about *(date)*: January 30, 2001 (effective January 1, 1999)
  b. [ x ] **Attachment.** A copy of the agreement is submitted as Attachment 4(b) and incorporated herein by this reference.
  c. **Arbitration provision.** Paragraph ___9___ of the agreement provides for arbitration of disputes arising out of the agreement as follows *(either copy the arbitration provision in full or summarize the provision)*:
    Arbitration: In the event of any dispute between the parties concerning any provision in this Agreement, it shall be resolved by arbitration under the rules of the American Arbitration Association. The arbitration shall be conducted in San Francisco, California, or in such other place as the parties may mutually agree. The arbitrator(s) shall have the authority to make an award based on the equities of the dispute, and such award may include attorneys' fees and costs to the party whom the arbitrator(s) determines to be equitably entitled to such attorneys' fees as the party primarily prevailing in such dispute.

5. **Dispute subject to arbitration.** A dispute arose between petitioner and respondent concerning the following matter covered by the agreement to arbitrate *(summarize the dispute)*:
    Petitioner sought contractual compensation owed plus the return of his interest in investment partnerships, which Respondents tortiously withheld and converted to their use. Respondents filed various counterclaims in an attempt to offset the amounts owed.

6. **Arbitrator.** The following person was duly selected or appointed as arbitrator *(name of each arbitrator)*:
    J. Lani Bader            Zela G. Claiborne
    1335 Sutter Street        70 Twain Avenue
    San Francisco, CA 94109    Berkeley, CA 94708

7. **Arbitration hearing.** The arbitration hearing was conducted as follows *(complete both of the following)*:
  a. **Date** *(each date of arbitration)*: There were 62 days of arbitration hearings commencing on August 8, 2005 and ending June 29, 2007.
  b. **Location** *(city and state where arbitration was conducted)*: San Francisco, CA

8. **Arbitration award.**
  a. **Date of award.** The arbitration award was made on *(date)*: July 27, 2007
  b. **Terms of award.** The arbitration award *(check one or more of the following)*:
    (1) [ X ] requires [   ] petitioner [ x ] respondent to pay the other party this amount: $ 22,971,504.90 plus interest and costs
    (2) [   ] requires neither party to pay the other anything.
    (3) [   ] is different as to different petitioners and respondents.
    (4) [   ] provides *(specify other terms or check item 8(c) and attach a copy of the award)*:

  c. [ X ] **Attachment of Award.** A copy of the award is submitted as Attachment 8(c).

9. **Service of award.**
  a. The signed award or an accompanying document indicates that the award was served on petitioner on *(date)*: July 27, 2007
  b. [   ] Petitioner alleges that a signed copy of the award was actually served on *(date)*:

**PETITION TO CONFIRM, CORRECT, OR VACATE
CONTRACTUAL ARBITRATION AWARD
(Alternative Dispute Resolution)**

| PETITIONER: David C. Soward, et. al. | CASE NUMBER: |
|---|---|
| RESPONDENT: Leonard Bosack; Sandy Lerner; et. al. | |

10. **Petitioner requests that the court** *(check all that apply):*
   a. [ X ] **Confirm the award, and enter judgment according to it.**
   b. [   ] **Correct the award and enter judgment according to the corrected award, as follows:**
     (1) The award should be corrected because *(check all that apply):*
       (a) [   ] the amount of the award was not calculated correctly, or a person, thing, or property was not described correctly.
       (b) [   ] the arbitrator exceeded his or her authority.
       (c) [   ] the award is imperfect as a matter of form.
     (2) The facts supporting the grounds for correcting the award alleged in item 10b(1) are as follows *(if additional space is required, check here [   ] and submit facts on an attachment labeled 10b(2)):*
     (3) The award should be corrected as follows *(if additional space is required, check here [   ] and describe requested correction on an attachment labeled 10b(3)):*

   c. [   ] **Vacate (cancel) the award.**
     (1) The award should be vacated because *(check all that apply):*
       (a) [   ] the award was obtained by corruption, fraud, or other unfair means.
       (b) [   ] an arbitrator was corrupt.
       (c) [   ] the misconduct of a neutral arbitrator substantially prejudiced petitioner's rights.
       (d) [   ] the arbitrator exceeded his or her authority, and the award cannot be fairly corrected.
       (e) [   ] the arbitrator unfairly refused to postpone the hearing or to hear evidence useful to settle the dispute.
       (f) [   ] an arbitrator failed to disclose within the time for disclosure a ground for disqualification of which the arbitrator was then aware.
       (g) [   ] an arbitrator should have disqualified himself or herself after petitioner made a demand to do so.
     (2) The facts supporting the grounds for vacating the award alleged in item 10c(1) are as follows *(if additional space is required, check here [   ] and submit facts on an attachment labeled 10c(2)):*
     (3) Petitioner [   ] does [   ] does not request a new arbitration hearing.
   d. [ X ] **Award petitioner interest** from *(date):* July 27, 2007
     (1) [ X ] at the statutory rate.
     (2) [   ] at rate of _____ % per year.
   e. [ X ] **Award petitioner costs of suit:**
     (1) [   ] in the amount of: $
     (2) [ X ] according to proof.
   f. [ X ] **Award petitioner attorney fees incurred in this action** *(check only if attorney fees are recoverable in this action according to statute or the parties' agreement):*
     (1) [   ] in the amount of: $
     (2) [ X ] according to proof.
   g. [   ] **Award petitioner the following other relief** *(describe relief requested; if additional space is required, check here [   ] and describe relief on an attachment labeled 10g):*

11. **Pages and attachments.** Number of pages attached: 48

Date: July 27, 2007

J. Daniel Sharp
(TYPE OR PRINT NAME)

▶ _(signature)_
(SIGNATURE OF PETITIONER OR ATTORNEY)

Attachment 1

## Attachment 1 to Petition to Confirm Arbitration Award

**Petitioners**

**David C. Soward** ("Soward"), an individual, resident of San Francisco, California

**& Management Company**, a corporation organized under the laws of California with its principal place of business in San Francisco, California

**Respondents**

**Leonard Bosack** ("Bosack"), an individual, resident of the State of Washington, in his individual capacity and as Trustee of The & Trust.

**Sandy Lerner** ("Lerner"), an individual, resident of the Commonwealth of Virginia, in her individual capacity and as Trustee of The & Trust

**Richard Troiano** ("Troiano"), an individual, resident of the State of Pennsylvania, as Trustee of The & Trust

**Cartesian Partners, LP**, a limited partnership comprised of **Soward** and **Bosack**. (Upon confirmation of the Final Award of the arbitrators, Soward will be deemed to have withdrawn from Cartesian Partners, LP)

**& Capital Partners, LP**, a limited partnership comprised of **Bosack** and **Lerner** with its principal place of business in Redmond, Washington

**The & Trust,** a charitable remained unitrust organized under the laws of Delaware

**Leonard X. Bosack and Bette M. Kruger Charitable Foundation, Inc.,** is a non-profit corporation organized under the laws of Massachusetts

86083\2001\559864.1

Attachment 4(b)

## MANAGEMENT AGREEMENT

This Management Agreement (the "Agreement") is entered into by and between The &
Trust, a charitable remainder trust organized under California law (the "Trust"), and
having Sandy Lerner, Len Bosack and Richard Troiano as its Trustees (the "Trustees")
and David Soward and & Management Company (collectively, "Manager"). The parties
hereto agree as follows:

1. <u>Management Services</u>. Manager shall render management services to the Trust of
an investment advisory and investment management nature. Manager shall make
recommendations to the Trustees regarding asset allocations and specific investments,
and shall seek Trustee approval before executing specific investments. The parties
agree that investments undertaken by Manager may be in equities, in private
companies, in venture funds, hedge funds, and a vanilla category of domestic and
foreign investments. The categories of investments are described in paragraph 4
hereof.

2. <u>Ministerial Acts</u>. Although Manager shall obtain authorization from the Trust for the
execution of investment decisions and Manager shall obtain signatures as needed from
one or more Trustees (for example, on partnership agreements), Manager shall have
the authority to execute documents for and on behalf of the Trust that are of a
ministerial nature following the Trust's effectuation of such investments. Examples of
such ministerial signature authority shall include the execution of amendments to
partnership agreements, proxy statements and other similar documents which do not
alter the fundamental nature or character of the Trust's investments. The Trustees may

DCS01840

EXHIBIT 3349

(a) <u>Hedge Fund</u>. The Hedge Fund category will include all investments made in hedge funds, whatever their strategy. Those investments, for 1999, would include Standard Pacific, Contrarian Capital, Chesapeake Partners, Quadra Appreciation Fund (renamed Quellos Appreciation Fund), and Quadra Strategic Fund (renamed Quellos Strategic Fund).

(b) <u>Private Equity</u>. The Private Equity category would include all investments made in private equity, venture capital, and special situation funds as well as individual company investments whether made as a coinvestment with another manager, solely by the trust, or held after distribution by a fund. Private Equity investments for 1999 would include DLJ Merchant Banking, Madison Dearborn, the TPG funds, Oppenheimer Argentina, the Active Value Funds, and Liberty.

(c) <u>Vanilla</u>. The Vanilla category will include everything not in the other two categories. For 1999 that would be Fountain Capital, Pictet, MAP, and cash.

(d) <u>Profit Determination</u>. Profit for each category will be calculated by taking the end-of-the-year value of that category's investments, less the beginning-of-year value and adding or subtracting to that amount net cash flows to and from other categories in order to isolate net profit, whether realized or unrealized. Amounts paid to beneficiaries and trustees will be considered cash flow to be added back to determine profit, but other expenses will not be so treated. For example, legal and accounting fees will reduce profit. Once profit is determined for each category the Incentive Allocation will be calculated as 10% of the profits of the Hedge Fund and Private Equity categories and 0% of the Vanilla category.

(e) <u>Examples</u>. Example calculations are attached (Attachments A and B), which are incorporated by reference and constitute a part of this Agreement. These

3

DCS01842

examples shall aid in interpreting this Agreement. Attachment A is a calculation

of returns and fees by using the three segments of the portfolio described above.

Attachment B is an Incentive Allocation matrix which shows the Incentive

Allocation based on various possibilities for the performance of the three

segments (Private Equity, Hedge Fund and Vanilla).

6. <u>High Water Mark</u>. If there is a year with a net loss, that loss must be recovered

before any Incentive Allocation could be earned for a subsequent year.

7. <u>Incentive Allocation Payment; Payment Dates</u>. The Incentive Allocation for each

year will be paid no later than April 30 of the year following the year for which the

Incentive Allocation is being paid.

8. <u>David Soward/& Management</u>. David Soward and & Management shall both

constitute the Manager hereunder, and David Soward shall direct the Trust how to

make payments called for hereunder.

9. <u>Arbitration</u>. In the event of any dispute between the parties concerning any

provision in this Agreement, it shall be resolved by arbitration under the rules of the

American Arbitration Association. The arbitration shall be conducted in San Francisco,

California, or in such other place as the parties may mutually agree. The arbitrator(s)

shall have the authority to make an award based on the equities of the dispute, and

such award may include attorneys' fees and costs to the party whom the arbitrator(s)

determines to be equitably entitled to such attorneys' fees as the party primarily

prevailing in such dispute.

10. <u>Entire Agreement; Modifications</u>. This Agreement represents the entire agreement

on the subject matter hereof among the parties. Any modification hereof must be made

in writing by an agreement signed by all of the parties.

4

DCS01843

11. <u>Notices</u>. Any notice required, permitted or desired to be given pursuant to any
provision of this Agreement shall be in writing and shall be deemed to have been
sufficiently given or served for all purposes if delivered in person or sent by registered
or certified mail, return receipt requested, postage and fees prepaid, sent by recognized
overnight delivery service or, to the extent receipt is confirmed, by facsimile, or other
electronic transmission service to the parties as follows:

If to the Manager:

> David C. Soward
> & Capital, Inc.
> 345 California Street #3300
> San Francisco, CA  94104
> Fax: 415/743-1509

If to the Trust, to all of the following Trustees:

> Sandy Lerner
> Ayrshire Farm
> 21846 Trappe Road
> P.O. Box 599
> Upperville, VA  20184
> Fax: 540/592-7093

> Leonard Bosack
> 8420 154th Avenue NE
> Redmond, WA  98052
> Fax: 206/556-9403

> Richard Troiano
> 205 Longfellow Street
> Vandergrift, PA  15690
> Fax: 724-568-2060

Any party may, at any time by giving five (5) days prior written notice to the other party,
designate any other address in substitution of the foregoing addresses to which future
notices will be given. Any notice given under this paragraph 11 shall be effective (i) if

5

DCS01844

delivered personally, when delivered; (ii) if delivered overnight by recognized overnight courier, the end of the next business day after deposit with such courier; (iii) if sent by facsimile or other electronic transmission, twelve (12) hours after sending and confirmation; and (iv) if mailed, the third (3rd) business day after mailing.  Any of the parties hereto may, at any time and from time to time, change the address to which notice shall be sent hereunder by notice to the other party given under this paragraph 11.

12.  Applicable Law; Successors.  This Agreement shall be governed by California law. This Agreement shall be binding on legal successors and assigns.

Dated: _1/30/01_          _____
                          DAVID C. SOWARD


                          & MANAGEMENT COMPANY
Dated: _1/30/01_          by: _____
                          DAVID C. SOWARD
                          its _____


                          THE & TRUST
Dated: _____    by: _____
                          RICHARD TROIANO, Independent
                          Trustee


Dated: _1/26/01_          by: _____
                          SANDY LERNER, Trustee


Dated: _26 Jan 01_        by: _____
                          LEN BOSACK, Trustee


C944

6

DCS01845

1  LEO P. CUNNINGHAM, State Bar No. 121605
   KYLE A. WOMBOLT, State Bar No. 224603
2  STEPHEN W. BUCHER, State Bar No. 202524
   WILSON SONSINI GOODRICH & ROSATI
3  Professional Corporation
   650 Page Mill Road
4  Palo Alto, CA 94304-1050
   Telephone:  (650) 493-9300
5  Facsimile:  (650) 565-5100

6  Attorneys for Respondents
   THE & TRUST, SANDY LERNER,
7  LEONARD BOSACK, RICHARD TROIANO,
   CAPITAL PARTNERS, L.P., CARTESIAN
8  PARTNERS, L.P., LEONARD BOSACK AND
   BETTE M. KRUGER FOUNDATION

9

10                              BEFORE THE

11              AMERICAN ARBITRATION ASSOCIATION

12
   DAVID C. SOWARD, an individual; &      )   CASE NO.:  74 Y 181 00129 04 LOPE
13 MANAGEMENT COMPANY                     )
                                          )   AMENDED ANSWERING
14           Claimants,                   )   STATEMENT AND
                                          )   COUNTERCLAIMS OF
15           v.                           )   RESPONDENTS
                                          )
16 THE & TRUST; SANDY LERNER,             )
   Individually and as Trustee on behalf of The &  )
17 Trust and the Sandy Lerner Trust; LEONARD  )
   BOSACK, individually and as Trustee on behalf  )
18 of The & Trust and the Leonard Bosack Trust;  )
   RICHARD TROIANO, as Trustee on behalf of  )
19 The & Trust; & CAPITAL PARTNERS, L.P.;  )
   CARTESIAN PARTNERS, L.P.; LEONARD  )
20 BOSACK AND BETTE M. KRUGER            )
   FOUNDATION, a California corporation; and &  )
21 CAPITAL, INC.                          )
                                          )
22           Respondents/Counterclaimants )
                                          )
23

24         Respondents/Counterclaimants The & Trust, Sandy Lerner ("Lerner"), individually, as

25 Trustee on behalf of the & Trust and as Trustee on behalf of the Sandra K. Lerner Living Trust,

26 Leonard Bosack ("Bosack"), individually, as Trustee on behalf of the & Trust and as Trustee on

27 behalf of the Leonard Bosack Living Trust, Richard Troiano ("Troiano"), as Trustee on behalf of

28 the & Trust, & Capital Partners L.P. ("Capital Partners"), Cartesian Partners L.P. ("Cartesian"),

─────────────────────────────────────────────

1   & Capital, Inc. and the Leonard X. Bosack and Bette M. Kruger Foundation (the "Foundation"

2   and, collectively with the other respondents, the "Respondents" or "Bosack and Lerner"), hereby

3   answer the Statement of Claim filed by David C. Soward and & Management Company

4   (collectively, the "Claimants" or "Soward") and assert counterclaims as follows:

## GENERAL DENIAL OF ALLEGATIONS

6       1.      Respondents generally deny all allegations set forth in or supporting Claimants'

7   Statement of Claim and deny that Claimants are entitled to any of the relief sought in their

8   Statement of Claim.

## RESPONDENTS' COUNTERCLAIMS

10  I.      **Nature of the Present Dispute**

11      2.      The dispute between the parties to this arbitration arises from Soward's betrayal of

12  the trust and confidence that Bosack and Lerner placed in him.  Claimants David C. Soward and &

13  Management Company, of which Soward is sole owner, were entrusted with the control and the

14  responsibility to manage hundreds of millions of dollars of Bosack and Lerner's assets.  In

15  accepting that control, responsibility, and generous compensation from Bosack and Lerner,

16  Soward entered into a fiduciary relationship with them.  Soward breached his fiduciary duties, as

17  well as other statutory and common law duties, and defrauded Bosack and Lerner through a

18  pattern of misconduct that included the following:

19
        • Soward improperly withdrew assets from an investment partnership and concealed
20        those withdrawals from Bosack and Lerner;

21      • Soward misrepresented the value of various investments held by an investment
          partnership and thereby fraudulently inflated amounts he was entitled to withdraw
22        from that entity;

23      • Soward borrowed money from Bosack and Lerner on terms that were
          misrepresented, inadequately documented and which placed his financial interests
24        in conflict with, and ahead of, their financial interests;

25      • Soward invested Bosack and Lerner's money based on his personal relationships
          and in a manner that placed the financial interests of his friends ahead of the
26        financial interests of Bosack and Lerner;

27      • Soward loaned Bosack and Lerner's money to his friends on terms that were
          inadequately documented and which were detrimental to Bosack and Lerner;
28

-2-

- Soward deceived Bosack and Lerner in setting up investment vehicles, the terms of which allowed him to receive excessive compensation; and

- Soward placed assets belonging to Bosack and Lerner in investments that were unsuitable and failed to invest in a manner that would have been suitable.

As a result of Soward's misconduct, Respondents have suffered millions of dollars in injuries.

**II.     The Parties to this Proceeding**

3.     At the time of the events complained of herein, Bosack, an individual, was a member of the Board of Directors of the Foundation, a trustee of The & Trust, a trustee of the Leonard Bosack Living Trust ("Bosack Trust"), and a shareholder of & Capital, Inc. He works and resides in Redmond, Washington.

4.     Lerner, an individual, is a member of the Board of Directors of the Foundation, a trustee of The & Trust, a trustee of the Sandra K. Lerner Living Trust ("Lerner Trust"), and a shareholder of & Capital, Inc. She works and resides in the Commonwealth of Virginia.

5.     Troiano, an individual, is a Trustee of the & Trust. He works and resides in New Kensington, Pennsylvania.

6.     The & Trust is a Delaware charitable remainder trust. The trustees of the trust are Bosack, Lerner and Troiano. The beneficiaries of the trust are the Bosack Trust and the Lerner Trust.

7.     Capital Partners is a Delaware limited partnership. The limited partners are the Bosack Trust and the Lerner Trust. During the time of the misconduct alleged herein, Soward was the general partner.

8.     Cartesian is a limited partnership formed on or about January 1, 1999. The limited partner is the Bosack Trust. During the time of the misconduct alleged herein, Soward and & Management Company were the general partners.

9.     & Capital, Inc., is a Delaware corporation with its offices in Redmond, Washington. Bosack and Lerner are the only shareholders and directors of the company. At the time of the misconduct alleged herein, Soward was an officer of & Capital, Inc.

10.     The Foundation is a charitable foundation founded under the laws of Massachusetts by Bosack and Lerner.

Answering Statement and Counterclaims of Respondents

11.    Soward is an individual residing in San Francisco, California, and an investment adviser within the meaning of the Investment Advisors Act of 1940.  He was a general partner of Capital Partners and Cartesian, an officer of & Capital, Inc., and is the sole owner of & Management Company.

12.    & Management Company is a company that is owned and operated by Claimant Soward with its principal place of business in San Francisco, California.

13.    & Management Company is not only owned, influenced and governed by Soward, but there is such a unity of interest and ownership that the individuality, or separateness, of Soward and & Management Company has ceased.  Adherence to a fiction of separate existence for & Management Company would, under these particular circumstances, sanction a fraud or promote injustice.

14.    Soward and & Management Company are the agents, alter egos, accessories, accomplices, aiders, abettors, confederates, and co-conspirators of one another, and Soward is an employee of & Management Company.

III.    **Background of Respondents' Counterclaims**

    A.    **The Retention of Soward as Investment Advisor**

15.    Bosack and Lerner founded Cisco Systems, Inc., and thereby made a considerable fortune.  In or about October 1991, they sought a trustworthy individual, unaffiliated with any financial institution, who could provide financial advice and manage their assets and the assets of entities for which they were trustees or directors in a prudent manner unhampered by any conflicts of interest.  Soward, who was then employed as an international tax accountant at a prestigious accounting firm, represented that he was able and willing to provide such management, advice and consultation, and that he would do so exclusively for Bosack and Lerner and certain entities in which their assets were held and/or for which they served as trustees or directors.

16.    In 1992, Soward became Bosack and Lerner's investment adviser.  As such, Soward entered into a fiduciary relationship with Bosack and Lerner (and, eventually, with all other Respondents).  As fiduciaries, Soward owed Bosack and Lerner more than honesty and good faith alone.  Soward had an affirmative duty to act solely in the best interests of Bosack and Lerner

1    and to make full and fair disclosure of all material facts, particularly when Soward's interests

2    conflicted with those of Bosack and Lerner. Soward was obligated to exercise reasonable and

3    prudent supervision over the management, policies, practices, and control of four of Bosack and

4    Lerner's investment entities as would an ordinary prudent person in a like position. Because of

5    this fiduciary relationship, Soward was required at all times to be loyal to Bosack and Lerner and

6    act in their best interests. He did not do so.

7         17.     Instead, Soward oppressively, fraudulently, and with malice breached these duties

8    and defrauded Bosack and Lerner by engaging in transactions that were intended to, and did,

9    enrich himself and his friends at the expense of Bosack and Lerner.

10        **B.      The Investment Entities**

11        18.     Soward's fraudulent conduct arose from his purported advice and expertise in the

12   creation, management and operation of at least four different investment entities:

13                a.     Capital Partners – Based on Soward's advice, Capital Partners, was formed

14   as a Delaware limited partnership in December 1995. The capital for the partnership came

15   exclusively from the Bosack Trust and the Lerner Trust. Soward was entrusted with administering

16   the distributions from the partnership pursuant to a formula in the partnership agreement. Under

17   the Agreement of Limited Partnership of & Capital Partners, L.P. (the "Capital Partners

18   Agreement"), executed in 1995 between Soward and the Bosack and Lerner Trusts, Soward's

19   share of the distribution was 10% of the partnership's net income. Soward was also given

20   authority to manage the assets of the partnership, but was not allowed to acquire or dispose of an

21   investment without the consent of the limited partners. A copy of the Capital Partners Agreement

22   is attached as Exhibit 1.

23                b.     The & Trust – The & Trust is a charitable remainder trust formed under the

24   laws of the State of California. Bosack, Lerner and Troiano are its trustees. In January 2001,

25   based on the advice of Soward, the & Trust entered into a management agreement with Soward

26   which provided, *inter alia*, that in compensation for investment advice and management, Soward

27   would receive a base management fee of 0.30% per year of the net assets of the trust (less salary

28

1   paid to Soward by & Capital, Inc.) and an incentive allocation of 10% of the profits of the trust's

2   designated portfolio. A copy of the & Trust management agreement is attached as Exhibit 2.

3          c.      & Capital, Inc. –The offices of & Capital, Inc. currently house the books

4   and records of Capital Partners, Cartesian, The & Trust and the Foundation. In 2001 and 2002,

5   Soward was an officer of & Capital, Inc. As such, he received an annual salary of $120,000 from

6   the company, but Soward failed to deduct the salary and reimbursements in the calculation of his

7   fee from The & Trust. During 2003, & Capital, Inc. also paid the salaries of Soward's secretary

8   and of his assistant. Soward promised to reimburse & Capital, Inc. for payment of these amounts

9   and has failed to do so.

10         d.      Cartesian – Cartesian was formed when Soward fraudulently induced

11  Bosack to agree to the relationship. Without adequately documenting the formation of the

12  partnership, Soward made himself and & Management Company the general partners and the

13  Bosack Trust the limited partner. Under the draft partnership agreement, which was never signed

14  and never disclosed to Bosack, Soward was entitled to 14.5% of the profits of Cartesian and

15  Bosack, who contributed 95% of the capital, was entitled to 85.5%. Soward also gave himself

16  unbridled authority to manage the assets of the partnership.

17         C.    **The Discovery of Soward's Misconduct**

18         19.     Prior to July 2003, Bosack and Lerner, who relied on Soward to faithfully and

19  loyally invest and manage their assets and accurately report on his performance, were never

20  provided with any information by which they could discover Soward's abuses.

21         20.     Soward's misconduct began to be uncovered in mid-2003 as a result of certain

22  agreed-upon audit procedures performed by Bosack and Lerner's accounting firm in connection

23  with a request by Soward for an increase in his compensation. Specifically, in or around early

24  2003, Soward requested that Bosack and Lerner renew his contract as investment adviser to the &

25  Trust and increase his compensation. As part of the process of determining whether they would

26  grant Soward's request, Bosack and Lerner engaged the Clark Nuber accounting firm to perform a

27  review under certain agreed-upon auditing procedures of, among other things, the investment

28  returns for the entities managed and advised by Soward.

1    21.    In approximately July 2003, Clark Nuber began to provide Bosack and Lerner with

2    preliminary reports showing possible abuses, breaches of duty, and outright fraud by Soward.  By

3    the time the review was complete, it was clear that Soward had engaged in a pattern of fraudulent

4    and abusive acts that caused substantial injury to Bosack and Lerner.

5    22.    For instance, in late July, the accountants at Clark Nuber informed Bosack that

6    there was no documentation for a $1 million loan from Capital Partners to Soward.

7    23.    Later in the fall of 2003, Bosack and Lerner received further preliminary reports

8    from Clark Nuber.  Bosack and Lerner were shocked to learn from the accountants at Clark Nuber

9    that Soward had improperly withdrawn more than $5 million from Capital Partners.  This

10   revelation frightened and concerned Bosack and Lerner.  As general partner, Soward had control

11   of a vast amount of assets and the ability to withdraw the remaining funds and abscond with them.

12   The news that Soward had improperly taken $5 million revealed that he could not be trusted.

13   24.    While awaiting final confirmation of the preliminary reports from Clark Nuber,

14   Bosack and Lerner purposely restricted their communications with Soward to avoid giving him

15   any indication of the results of the Clark Nuber reports because they were concerned that he may

16   loot the partnership of its remaining assets and disappear with the funds if he discovered that

17   Bosack and Lerner were aware of his misconduct.

18   **D.    The Procedural Background of the Dispute**

19   25.    As soon as the results of the Clark Nuber report had been confirmed, on

20   November 24, 2003, Bosack and Lerner, through their lawyers, sent a letter to counsel for Soward

21   discontinuing Soward's engagements with the & Trust and The Foundation, removing him as

22   general partner of Capital Partners and Cartesian, and concluding his employment with & Capital,

23   Inc. At the same time, in order to protect Bosack and Lerner's assets, their lawyers contacted each

24   of the banks in which the investment entities managed by Soward maintained accounts and

25   informed them that Soward no longer had authority to act on behalf of any of the investment

26   entities.

27

28

26.     In their November 24 letter, Bosack and Lerner demanded compensation for the harm Soward caused and included a draft complaint that would be filed in the event that a settlement could not be reached.

27.     In response to the settlement demand and draft complaint, Soward indicated that he would be amenable to settlement discussions and requested that Bosack and Lerner provide a copy of the audit report prepared by Clark Nuber, purportedly so Soward could formulate a response to the settlement demand. Bosack and Lerner complied with Soward's request and held off filing the judicial complaint in hopes of reaching a settlement.

28.     Soward, however, never responded to the settlement demand. Instead, he used the time Bosack and Lerner had given him to respond to the settlement demand to prepare his statement of claim in this arbitration and, on February 3, 2004, blindsided Bosack and Lerner by initiating the current proceeding.

29.     Following Soward's initiation of arbitration, both sides reached an agreement to stand down while Bosack and Lerner conducted a further investigation of Soward's conduct. The additional investigation revealed yet more misconduct by Soward in connection with his duties as general partner of Capital Partners and Cartesian.

30.     After Bosack and Lerner concluded their investigation, on July 1, 2004, they sent Soward a second complaint, along with another settlement demand and documentation supporting their damage claims. Soward did not respond. Because Soward did not respond to the settlement demand, Bosack and Lerner commenced an action in federal court in the Western District of Washington (the "Federal Case"). On November 9, 2004, that court entered an order staying the action pending this panel's determination of whether the claims asserted by Bosack and Lerner in the Federal Case are properly arbitrable or should be heard by the federal court. This panel need not address issues of arbitrability, however, as Respondents have elected to assert their claims in the present arbitration by filing this Amended Answering Statement and Counterclaims.

**IV.    Soward's Misconduct**

       **A.    The Misconduct at Capital Partners**

       31.    As the investment advisers to Capital Partners, Soward owed Bosack and Lerner the highest degree of care, candor, good faith and diligence.  Soward had an obligation to put Bosack and Lerner's interests above all others, including themselves, and to fully and fairly disclose to them all facts that were material to the management of their assets.  Soward failed to live up to these obligations by, among other things, improperly withdrawing funds from Capital Partners, misrepresenting the value of partnership assets, investing partnership funds based on Soward's personal relationships and contrary to specific instructions given by the limited partners, and using partnership assets as a source for loans to Soward and his friends.

       **(i)    The Improper Withdrawals**

       32.    The Capital Partners Agreement required that any distributions be made to all partners in proportion to the positive balances in their capital accounts and only from cash that was in excess of the reasonably foreseeable cash needs of the partnership.

       33.    Beginning no later than 1998, and continuing through the date that Soward was removed as the General Partner, Soward willfully and intentionally withdrew cash from Capital Partners in violation of the Capital Partners Agreement.  From 1998 through 2002, Soward knowingly caused himself to be paid excessive distributions to which he was not entitled in an amount exceeding $5,000,000.

       34.    From on or about September 16, 1998, through December 23, 1998, Soward distributed to himself $459,464, which was at least $413,518 more than allowed under the Capital Partners Agreement.

       35.    From on or about January 6, 1999, through November 23, 1999, Soward distributed to himself $707,386, which was at least $586,647 more than allowed under the Capital Partners Agreement.

       36.    From on or about January 5, 2000, through December 12, 2000, Soward distributed to himself $2,575,747, which was at least $1,768,172 more than allowed under the Capital Partners Agreement.

37.    From on or about January 18, 2001, through November 28, 2001, Soward distributed to himself $3,142,207, which was at least $2,437,986 more than allowed under the Capital Partners Agreement.

38.    On or about June 17, 2002, and July 1, 2002, Soward distributed to himself $26,617, which was at least $23,955 more than allowed under the Capital Partners Agreement.

**(ii)    The Improper Recording of Investment Values**

39.    In order to increase Soward's capital account balance and allow him to take larger withdrawals from Capital Partners (while concealing that the withdrawals violated the terms of the Capital Partners Agreement), Soward fraudulently inflated the value of certain partnership investments in 2001 and 2002.

40.    In 2001, Capital Partners' investment return spreadsheet falsely recorded Capital Partners' year-end market value at $82,788,846. Based on this valuation, the partnership made an annual return of 1.38%. Bosack and Lerner's accounting firm determined that the partnership's 2001 year-end market value was overstated by $2,142,356. The actual market value was $80,646,490 and the annual return was –2.92%.

41.    Part of the 2001 overstatement was based on the inflation of an investment in Madison Investment Partners. As recently as October 2001, Soward gave a presentation to Bosack and Lerner in which he represented that the value of this investment was $3,000,000 when, in fact, the investment was worth only $500,000.

42.    In 2002, Soward falsely recorded Capital Partners' year-end market value at $88,062,109. Based on this valuation, the partnership made an annual return of 2.13%. In reality, the 2002 year-end market value was overstated by $7,577,880. The actual market value was $80,484,229 and the annual return was –4.28%.

43.    Part of the 2002 overstatement resulted from Soward falsely recording the value of an investment in Madison Investment Partners II, L.P. Soward recorded the value of that investment at $3,984,756 when, in fact, its true value was $1,877,670.

44.    Also in 2002, Soward falsely recorded the value of an investment in Westar, a bankrupt private equity company. Soward recorded the value of that investment at $4,126,865

1   when, in fact, its true value was $0. Indeed, Soward caused the value of Westar to be reported to

2   the Internal Revenue Service as $0 during the same period.

3                  **(iii)**    **The Investment in Passport Cosmetics**

4          45.     In 1995, Capital Partners made a substantial investment in a cosmetics company

5   founded by Lerner called Urban Decay. In or about 1999, pursuant to a reference from one of his

6   close friends, Brian Myerson, Soward hired Malcolm Kemp to be the CEO of Urban Decay. In

7   2000, Urban Decay was sold to LVMH, a French company, and Capital Partners made a

8   substantial profit on its investment.

9          46.     After the sale of Urban Decay, Soward contacted Lerner and told her that he had a

10   new "cosmetics company" in which he wanted to invest Capital Partners' funds. Soward was

11   referring to Passport Cosmetics L.L.C. ("Passport"), although he did not tell Lerner the name of

12   the company. He did, however, inform her that Kemp, who acted as Passport's CEO, was going

13   to be involved in the operation of this new company. Lerner clearly and unequivocally told

14   Soward that he was not to invest Capital Partners' funds in any other cosmetics companies or in

15   any company in which Kemp was a CEO, consultant or otherwise had any interest.

16          47.     Bosack and Lerner have recently discovered that, notwithstanding Lerner's clear

17   directive not to invest in Passport, and notwithstanding a provision in the Capital Partners

18   Agreement prohibiting the general partner from acquiring an investment without the approval of

19   the limited partners, Soward caused Capital Partners to invest more than $1,500,000 in Passport

20   from late 2001 to mid-2003. The investment is now worthless.

21          48.     Capital Partners' investment in, and eventual withdrawal from, Passport, typifies

22   Soward's fraudulent and deceitful conduct and willingness to put his own interests ahead of the

23   interests of Bosack and Lerner.

24          49.     Passport was organized on or about November 27, 2001, by two acquaintances of

25   Soward, Meredith McGann and Erin Kotter, neither of whom had any significant business

26   experience prior to organizing Passport. Indeed, because of the lack of experience of McGann and

27   Kotter, Soward arranged for Malcolm Kemp to become Passport's CEO.

28

50.     During 2001, Capital Partners contributed $185,000 to Passport.  Soward did not formally document this contribution.  Moreover, Capital Partners received nothing in return for the $185,000.  It did not receive a promissory note or any other documentation evidencing a creditor/borrower relationship.  Neither did it receive equity in Passport in return for its investment.

51.     On or about May 20, 2002, the parties purported to document their relationship by drafting a formal operating agreement.  Pursuant to the operating agreement, which was never signed by a representative of Capital Partners, Capital Partners agreed to and did contribute $715,000 to Passport in exchange for a 60% equity interest.  McGann and Kotter, neither of whom were capable of running the company, each contributed $1 in return for a combined 40% equity stake in the company.

52.     During the course of 2002, Capital Partners contributed an additional $360,000 to Passport, bringing its total capital contributions for 2002 to $1,075,000.  As with the other contributions, Soward failed to formally document this transaction and received no documented interest in Passport, either as a creditor or equity holder, in return for the contribution.

53.     During the time that Soward was throwing huge sums of Bosack's and Lerner's money at Passport, the company was going nowhere.  Indeed, as early as 2002, it was obvious to Soward that Passport was a failure.  Malcolm Kemp left the company in or about late 2002, and Soward's only hope to realize any value on its investment was by a sale of the company.  Nevertheless, in further violation of his fiduciary and other obligations to Bosack and Lerner, Soward caused Capital Partners to contribute an additional $296,510 to Passport in 2003.  As with the other transfers, the contribution was not formally documented and Soward received nothing in return.

54.     In July 2003, Soward caused Capital Partners to withdraw from Passport.  Upon its withdrawal, Capital Partners contributed an additional $100,000 to Passport and surrendered any and all equity interest it purported to have in the company.  In return, Capital Partners received from Passport a Nonrecourse Contingent Promissory Note for $700,000 (the "Note").

55.     Interest on the Note accrues at 5% annually, but no interest payments are due to Capital Partners unless (1) Kotter and McGann receive aggregate distributions from Passport in excess of $250,000 in one calendar year; (2) Kotter and McGann receive aggregate distributions from Passport in excess of $500,000 in any consecutive three calendar years; or (3) Passport is sold for more than $250,000, in which case the first $250,000 of the amount realized is allocated to Kotter and McGann.  In short, interest is due and payable to Capital Partners only after Kotter and McGann are allocated at least $250,000.

56.     The Note also subordinated Capital Partners' interests to those of Kotter and McGann in the event of a sale of Passport.  In that event, the first $250,000 of the amount realized is allocated to Kotter and McGann.  Capital Partners only gets paid on the Note if Passport is sold for more than $250,000, an event that Soward knew was unlikely at the time he negotiated the withdrawal because less than two months earlier a potential buyer walked away from a deal to pay $100,000 for the company.

57.     By withdrawing from Passport and accepting the Note, Soward caused Capital Partners to pay an additional $100,000 to subordinate its interest to the interests of Kotter and McGann and to reduce the amount to which Capital Partners would be entitled in the event Passport was thereafter sold.  In fact, Soward contributed $100,000 in additional funds at the time of withdrawal not because it was in the best interest of Capital Partners, but because, as Soward communicated to an acquaintance, it gave Kotter and McGann "a chance."

            (iv)     The Improper Loans

58.     Soward engaged in further fraud and self-dealing by causing Capital Partners to make substantial loans to Soward and his friends.  On or about April 12, 2001, Soward engaged in self-dealing by causing Capital Partners to extend him $1,000,000 of partnership assets purportedly as a loan.

59.     Soward represented that the loan was short-term, would be extended at a rate of interest consistent with the market rates for similar loans, and, during the short time it was outstanding, would be secured by the real property that Soward represented the loan would be used to purchase.  In reliance on these misrepresentations, Bosack orally approved the loan.

-13-

60.     In reality, Soward unreasonably constructed the repayment schedule on 30-year, interest-only terms at a below-market rate of interest.  Further, the loan was not secured by real property.  Instead, Soward purported to pledge his capital account in Capital Partners as security for the loan.  However, at the time the loan was extended, as Soward knew, his capital account had a negative balance because he had made substantial withdrawals from the account on April 12, 2001.  Since the date of the loan, Soward improperly withdrew additional funds from Capital Partners that reduced his capital account balance even further.

61.     Soward also failed to provide to Bosack and Lerner documentation of the terms of the loan and the security arrangement.  It was only during performance of the review under the agreed-upon procedures by Bosack and Lerner's accounting firm that Bosack and Lerner first discovered a draft note and pledge agreement setting forth the terms of the fraudulently induced loan.  Subsequently, Bosack and Lerner have located what appears to be a final note and pledge agreement, copies of which are attached as Exhibit 3.  Notably, these documents were not prepared and signed by Soward until August 2003 — the period during which Bosack and Lerner' accounting firm was performing its review.  At the time of his removal as general partner of Capital Partners on November 24, 2003, Soward's capital account in Capital Partners had a balance of approximately $-300,000.

62.     The only signatures on the note and pledge agreement belong to David Soward.  He signed the pledge agreement in his individual capacity (as the borrower) and in his capacity as the general partner of Capital Partners (as the lender).  Soward was also in default on the note and pledge agreement from inception — the note mandated that Soward make quarterly interest payments beginning in 2002, but he made only annual payments in 2002 and 2003.

63.     In July 2003, when Bosack and Lerner discovered that the loan was still outstanding and that the terms were other than as represented by Soward, they demanded payment from Soward.  That demand was initially refused.  However, after Bosack and Lerner initiated the Federal Case, on or about October 1, 2004, Soward repaid the loan.

64.     Soward caused Capital Partners to improperly loan money not only to himself, but also to his friends.  On or about February 26, 2002, in violation of the Capital Partners Agreement

1  and their fiduciary obligations to Bosack and Lerner, Claimants caused Capital Partners to make

2  an unauthorized $150,000 loan to Soward's friend Malcolm Kemp. The loan is unsecured and has

3  never been formally documented. Kemp has made no interest or principal payments on the loan

4  and no such payments were sought by Soward.

5  **B.    The Misconduct at Cartesian**

6         65.    As the investment advisers for Bosack, Soward owed him a duty to exercise the

7  highest degree of due care, good faith, candor, loyalty and diligence. Soward breached that duty

8  by willfully and intentionally deceiving Bosack in connection with the creation, management and

9  administration of Cartesian.

10               **(i)    The Fraud in the Creation of Cartesian**

11        66.    In late 1998, Soward became aware that Bosack had additional funds he wanted to

12  invest. Soward contacted Bosack and proposed that the two of them create an investment limited

13  partnership — Cartesian — whereby Claimants Soward and & Management Company would be

14  the general partners and Bosack would be the limited partner. Soward represented to Bosack that

15  the terms of the Cartesian Limited Partnership Agreement (the "Cartesian Agreement") would be

16  the same as those in the Capital Partners Agreement. Soward represented that Cartesian and

17  Capital Partners would be the same, "except that Sandy will not be a limited partner" of Cartesian.

18  Soward knew, however, that this was not true. In fact, he caused Capital Partners' lawyer to draft

19  a limited partnership agreement for Cartesian that was very different from the Capital Partners

20  Agreement.

21        67.    Pursuant to the unsigned, draft Cartesian Agreement, the general partners, who are

22  the Claimants, are allocated the first 10% of profits. The remaining 90% of profits are allocated

23  5% to the general partners and 95% to the limited partner. This provision allocates 14.5% of the

24  total profits to the general partners and 85.5% to the limited partner. Under the Capital Partners

25  Agreement, however, 10% of the profits are allocated to the general partners and 90% to the

26  limited partners.

27        68.    The unsigned, draft Cartesian Agreement, in contrast to the Capital Partners

28  Agreement, (a) gave the general partners exclusive control over the partnership's business,

1    including the power to make investments and execute agreements without the limited partner's

2    consent; and (b) allowed the general partners to engage in business for their own profit or

3    advantage, even if in direct competition with Cartesian, without the consent of the limited partner.

4            69.      In order to conceal from Bosack the actual terms of the Cartesian Agreement,

5    Soward never disclosed it to him and Bosack never saw, received or signed a copy of the

6    agreement.

7            70.      In reliance on Soward's representations, Bosack contributed more than $9,500,000

8    to Cartesian. Soward purported to contribute $525,636 to Cartesian, but all of the contributions

9    were made with funds that he improperly withdrew from Capital Partners. Thus, the only capital

10    ever contributed to Cartesian belonged to Bosack and Lerner and Soward and & Management

11    Company have no lawful interest in that entity.

12                  **(ii)      The Improper Investments in Myerson Controlled Entities**

13            71.      After Soward had deceived Bosack in setting up Cartesian, he used the

14    partnership's assets as a source of funds for his friends and in disregard of the best interests of

15    Bosack and Cartesian and prudent investing practices.

16            72.      Soward caused Cartesian to invest in Liberty of London ("Liberty"), a clothing

17    retailer in Great Britain that was also an investment of Brian Myerson, a personal friend to Soward

18    and the Best Man in Soward's 2001 wedding.

19            73.      Myerson was the principal of a family of funds operating under the name U.K.

20    Active Value. Through U.K. Active Value and various other companies he controlled, Myerson

21    held approximately 17% of Liberty's outstanding shares throughout the 1990s. Myerson had been

22    attempting to gain control of Liberty, and Soward caused Cartesian to help him do so. Soward

23    aided Myerson in three ways. First, Soward caused Cartesian to purchase shares in Liberty. As

24    Liberty shareholders, Soward could then act in concert with Myerson in pursuit of his quest for

25    control of the company. Second, Soward caused Cartesian to invest directly in U.K. Active Value.

26    This provided Myerson with additional cash to pursue his objective. Third, Soward caused

27    Cartesian to loan funds directly to Myerson.

28

Answering Statement and Counterclaims of Respondents

1   74. On or about October 7, 1998, Myerson wrote to Soward and suggested that it was a

2 good time to purchase stock in Liberty. Almost immediately — even before Soward had induced

3 Bosack to agree to the creation of Cartesian — Soward began to purchase Liberty shares for

4 Cartesian's account, eventually acquiring more than 10% of the company's outstanding stock.

5   75. Once Soward had purchased the large block of stock, he pursued Myerson's

6 interests and acted in disregard of the best interest of Bosack and Cartesian. For instance, to assist

7 Myerson in his quest for control of Liberty, Soward agreed to exchange Cartesian's shares in

8 Liberty for shares in Retail Stores Plc ("Retail"), the Myerson-controlled entity that was used as

9 an acquisition vehicle for, and was eventual successor to, Liberty. At the time Soward agreed to

10 the share exchange, it would have been much better for Bosack and Cartesian to sell the shares for

11 the significant cash premium that was also available to Liberty shareholders.

12   76. Soward also caused Cartesian to invest in Myerson's U.K. Active Value, which

13 itself owned a substantial interest in Retail (and prior to that, in Liberty). On or about December

14 9, 2002, Soward invested approximately $759,203 of Cartesian funds in U.K. Active Value and,

15 on or about April 17, 2003, Soward invested approximately $158,670 of Cartesian funds in U.K.

16 Active Value.

17   77. Bosack has recently learned that, as of year-end 2003, Cartesian owned in excess of

18 2 million shares, or more than 11%, of Retail, and that 76% of Cartesian's assets were invested

19 directly in Retail. In addition, more than 10% of Cartesian's assets were invested in U.K. Active

20 Value. Thus, no less than 86% of Cartesian's assets were made available to Myerson by investing

21 directly in Liberty/Retail and U.K. Active Value.

22   **(iii) The Loan from Cartesian to Myerson**

23   78. Soward also used Cartesian funds to loan Myerson over $1 million at a below-

24 market interest rate. Soward failed to properly document the loan or set forth terms upon which

25 the loan would be repaid. In fact, Soward initially attempted to conceal the loan by recording the

26 payment to Myerson as a "Liberty Share Purchase."

27   79. Specifically, on or about January 18, 2001, Soward authorized the transfer of

28 $1,109,400 (750,000 British Pounds) from Cartesian to a Myerson controlled company called

1  Second Concerto Corporation ("Second Concerto").  In connection with the transfer, Cartesian

2  received 250,000 shares in Retail with an option to put the shares back to Second Concerto at the

3  price paid for shares any time up to April 1, 2001.

4        80.    On March 23, 2001, Soward wrote Myerson and informed him that he intended to

5  exercise the put right.  Retail's share price had dropped significantly and the Retail shares he

6  caused Cartesian to "purchase" from Second Concerto were worth less than Cartesian paid.  By

7  exercising the put right, Cartesian could recover the full amount paid to Second Concerto.

8        81.    But, the put right was never exercised.  Instead, about one week later, Soward met

9  with Myerson in Europe.  Shortly after returning from his trip, Soward had changed his mind.  He

10  instructed Cartesian's bookkeeper to change the description of the transaction on Cartesian's

11  books from an investment in shares of Retail to a loan to Second Concerto.

12        82.    It was not until late-July 2002 that Soward sought any repayment of interest and

13  principal from Second Concerto and Myerson, and it was not until November 2002 that the loan

14  was finally repaid.  At all times, Soward placed the financial interest of Myerson above that of

15  Cartesian and Bosack.  On July 29, 2002, Soward telecopied a note to Myerson showing a

16  calculation of the total amount due on the loan using a below-market rate of interest.  Soward

17  noted that Myerson should be happy that, on a British Pound basis, the note was practically

18  interest-free for Myerson.  The note also goes on to thank Myerson for "all the hospitality you

19  showed us at Shawford and in Venice."

20        83.    The hospitality on the trip to Shawford and Venice was not the only benefit Soward

21  received as a result of putting Myerson's interest ahead of the interests of Bosack and Cartesian.

22  Soward was appointed to Retail's Board of Directors and sat on an advisory board for U.K. Active

23  Value.  Myerson and his companies also made sure that Soward traveled in style, arranging for

24  Soward to take expensive, first-class vacations in Europe with his family.  On one occasion

25  Myerson secured for Soward a chalet for a skiing trip in Courcheval because Soward offered to

26  make certain funding available to Myerson in connection with a business deal.

27

28

Answering Statement and Counterclaims of Respondents

1    C.    The Misconduct at the & Trust and & Capital, Inc.

2    84.    Soward was investment adviser to The & Trust and an officer of & Capital, Inc.  As

3    a result, he owed Bosack and Lerner the duties of loyalty, good faith, due care and diligence in

4    connection with the management and administration of those entities.  Soward breached those

5    duties by, among other things, improperly calculating his compensation from the & Trust and by

6    failing to make required reimbursements to & Capital, Inc.

7    85.    Under the Trust Management agreement between Soward and the & Trust, Soward

8    was required to deduct his $120,000 salary from & Capital, Inc. in the calculation of his base

9    management fee.  However, in 2001 and 2002, Soward purposely calculated the management fee

10    without making the deduction.  Soward thereby improperly misappropriated fees of approximately

11    $240,000.

12    86.    In or about January 1999, Soward calculated his bonus payment from the & Trust

13    at an excessive level by improperly including a hedge fund dispute settlement as profit.  The

14    settlement, which totaled $18,762,000, comprised both compensatory and punitive damages.

15    Although Bosack and Lerner only approved of using the compensatory award as profit for

16    purposes of determining the bonus payment, Soward willfully and intentionally violated his

17    fiduciary duties by basing the bonus on the entire settlement.

18    87.    Each year & Capital, Inc. paid the salaries of Soward's secretary and of his

19    assistant.  Soward agreed to reimburse the company for making the payments and, in fact, did so

20    every year through 2002.  However, in 2003, Soward failed to make the promised reimbursement

21    to & Capital, Inc. for the $70,512.739 it paid to his secretary and the $79,626.34 it paid to his

22    assistant.  & Capital, Inc. is entitled to be reimbursed for these amounts.

23    **FIRST COUNTERCLAIM**

24    **(Fraud)**

25    88.    Bosack and Lerner incorporate by reference each of the allegations contained in

26    paragraphs 1 through 87.

27    89.    Soward, while acting with scienter, made false or misleading material statements

28    and omissions to Bosack and Lerner about Capital Partners.  Soward made misstatements or

-19-

1  omissions about the excessive income distributions from Capital Partners from 1998 through 2002

2  that violated the terms of the Capital Partners Agreement; the year-end market value of Capital

3  Partners' assets; the receipt of $1,000,000 of partnership assets in 2001 purportedly as a loan on

4  terms that were disadvantageous to the partnership and the limited partners and the failure of

5  Soward to provide Bosack and Lerner with documentation of the terms; the authorization of a

6  $150,000 loan to a personal friend in February 2002 from partnership assets on terms that were

7  disadvantageous to the partnership and the limited partners and the failure of Soward to document

8  the terms; and the undocumented investments in Passport, an entity partly owned by acquaintances

9  of Soward, for which he failed to secure sufficient financial interest for Capital Partners.

10      90.    Soward, while acting with scienter, made false or misleading material statements

11  and omissions to Bosack about Cartesian. Soward made misstatements or omissions about the

12  material terms of the Cartesian Partnership Agreement, stating that its terms were the same as the

13  terms of the Capital Partners Agreement when, in fact, those terms were not the same and served

14  only to unjustly enrich Soward at Bosack's expense. Soward also misrepresented and omitted to

15  disclose that the funds he contributed to Cartesian to set up his capital account were directly and

16  improperly withdrawn from Capital Partners.

17      91.    Bosack and Lerner reasonably and justifiably relied on Soward's intentionally false

18  or misleading statements and omissions.

19      92.    As a result of Soward's conduct, Bosack and Lerner have been harmed and suffered

20  damages in an amount to be determined at hearing. Soward oppressively, fraudulently, and with

21  malice breached his duties and defrauded Bosack and Lerner by engaging in transactions that were

22  intended to, and did, enrich himself and his friends at the expense of Bosack and Lerner.

23                          **SECOND COUNTERCLAIM**

24                            **(Constructive Fraud)**

25      93.    Bosack and Lerner incorporate by reference each of the allegations contained in

26  paragraphs 1 through 92.

27      94.    Soward assumed a fiduciary position in relation to Bosack and Lerner as

28  investment adviser, limited partner, general partner and officer. By reason of the fiduciary

1    relationship, Soward owed Bosack and Lerner the highest duties of good faith, fair dealing, loyalty
2    and due care.

3          95.     Soward, while acting with intent to deceive, made false or misleading material
4    statements and omissions to Bosack and Lerner about Capital Partners. Soward made
5    misstatements or omissions about the excessive income distributions from Capital Partners from
6    1998 through 2002 that violated the terms of the Capital Partners Agreement; the year-end market
7    value of Capital Partners' assets; the receipt of $1,000,000 of partnership assets in 2001
8    purportedly as a loan on terms that were disadvantageous to the partnership and the limited
9    partners and the failure of Soward to provide Bosack and Lerner with documentation of the terms;
10    the authorization of a $150,000 loan to a personal friend in February 2002 from partnership assets
11    on terms that were disadvantageous to the partnership and the limited partners and the failure of
12    Soward to document the terms; and the undocumented investments in Passport, an entity partly
13    owned by acquaintances of Soward, for which he failed to secure sufficient financial interest for
14    Capital Partners.

15          96.     Soward, while acting with scienter, made false or misleading material statements
16    and omissions to Bosack about Cartesian. Soward made misstatements or omissions about the
17    material terms of the Cartesian Partnership Agreement, stating that its terms were the same as the
18    terms of the Capital Partners Agreement when, in fact, those terms were not the same and served
19    only to unjustly enrich Soward at Bosack's expense. Soward also misrepresented and omitted to
20    disclose that the funds he contributed to Cartesian to set up his capital account were directly and
21    improperly withdrawn from Capital Partners.

22          97.     Bosack and Lerner reasonably and justifiably relied on Soward's intentionally false
23    or misleading statements and omissions.

24          98.     As a result of Soward's conduct, Bosack and Lerner have been harmed and suffered
25    damages in an amount to be determined at hearing. Soward oppressively, fraudulently, and with
26    malice breached his duties and defrauded Bosack and Lerner by engaging in transactions that were
27    intended to, and did, enrich himself and his friends at the expense of Bosack and Lerner.

28

## THIRD COUNTERCLAIM

### (Breach of Fiduciary Duty)

99.    Bosack and Lerner incorporate by reference each of the allegations contained in paragraphs 1 through 98.

100.    Soward assumed a fiduciary position in relation to Bosack and Lerner as investment adviser, limited partner, general partner and officer.  By reason of the fiduciary relationship, Soward owed Bosack and Lerner the highest duties of good faith, fair dealing, loyalty and due care.

101.    Soward breached his fiduciary duties.

102.    As a result of Soward's conduct, Bosack and Lerner have been harmed and suffered damages in an amount to be determined at hearing.  Soward oppressively, fraudulently, and with malice breached his duties and defrauded Bosack and Lerner by engaging in transactions that were intended to, and did, enrich himself and his friends at the expense of Bosack and Lerner.

## FOURTH COUNTERCLAIM

### (Negligent Misrepresentation)

103.    Bosack and Lerner incorporate by reference each of the allegations contained in paragraphs 1 through 102.

104.    Soward, without reasonable grounds for believing their truth and while acting with the intent to induce Bosack and Lerner's reliance, made false or misleading material statements and omissions to Bosack and Lerner about Capital Partners.  Soward made misstatements or omissions about the excessive income distributions from 1998 through 2002 that violated the terms of the Capital Partners Agreement; the year-end market value of the partnership's assets; the receipt of $1,000,000 of partnership assets in 2001 purportedly as a loan on terms that were disadvantageous to the partnership and the limited partners and the failure of Soward to provide to Bosack and Lerner documentation of the terms of the loan; the authorization of a $150,000 loan to a personal friend in February 2002 from partnership assets on terms that were disadvantageous to the partnership and the limited partners and the failure of Soward to document the terms; and the

1   undocumented investments in Passport, an entity partly owned by acquaintances of Soward, for

2   which he failed to secure sufficient financial interest for Capital Partners.

3       105.    Soward, without reasonable grounds for believing their truth and while acting with

4   intent to induce Bosack's reliance, made false or misleading material statements and omissions to

5   Bosack about Cartesian.  Soward made misstatements or omissions about the material terms of the

6   Cartesian Partnership Agreement, stating that its terms were the same as the terms of the Capital

7   Partners Agreement when, in fact, those terms were not the same and served only to unjustly

8   enrich Soward at Bosack's expense.  Soward also misrepresented and omitted to disclose that the

9   funds they contributed to Cartesian to set up their capital accounts were directly and improperly

10  withdrawn from Capital Partners.

11      106.    Bosack and Lerner, ignorant of the truth, reasonably and justifiably relied on

12  Claimants' false or misleading material statements or omissions.

13      107.    As a result of Soward's conduct, Bosack and Lerner have been harmed and suffered

14  damages in an amount to be determined at hearing.  Soward oppressively, fraudulently, and with

15  malice breached his duties and defrauded Bosack and Lerner by engaging in transactions that were

16  intended to, and did, enrich himself and his friends at the expense of Bosack and Lerner.

17

18                          **FIFTH COUNTERCLAIM**

19                           **(Breach of Contract)**

20      108.    Bosack and Lerner incorporate by reference each of the allegations contained in

21  paragraphs 1 through 107.

22      109.    A valid management agreement for The & Trust, executed in or about January

23  2001, existed between Claimants Soward and & Management Company and the & Trust.

24      110.    Bosack and Lerner performed their obligations under the management agreement.

25      111.    Claimants materially breached the management agreement by, among other actions,

26  failing to deduct Soward's salary from & Capital, Inc. from his base management fee in 2001 and

27  2002.  In addition, Claimants engaged in conduct separate and apart from the performance of the

28

1  obligations under the agreement without good faith and fair dealing and for the purpose of
2  depriving Bosack and Lerner of rights and benefits under the management agreement.

3      112.    As a result of Claimants' conduct, Bosack and Lerner have been harmed and
4  suffered damages in an amount to be determined at trial.

5                        **SIXTH COUNTERCLAIM**

6                          **(Breach of Contract)**

7      113.    Bosack and Lerner incorporate by reference each of the allegations contained in
8  paragraphs 1 through 112.

9      114.    A valid contract exists whereby Soward promised to reimburse & Capital, Inc. for
10 paying the salaries of Soward's secretary and of his assistant.

11     115.    Bosack and Lerner and & Capital, Inc. performed their obligations under the
12 contract.

13     116.    Soward materially breached the contract by refusing to reimburse & Capital, Inc.
14 for its payment of approximately $150,000 in salary to Soward's secretary and to his assistant.  In
15 addition, Soward engaged in conduct separate and apart from the performance of the obligations
16 under the agreement without good faith and fair dealing and for the purpose of depriving Bosack
17 and Lerner of rights and benefits under the agreement.

18     117.    As a result of Soward's conduct, Bosack and Lerner have been harmed and suffered
19 damages in an amount to be determined at hearing.

20                      **SEVENTH COUNTERCLAIM**

21                          **(Breach of Contract)**

22     118.    Bosack and Lerner incorporate by reference each of the allegations contained in
23 paragraphs 1 through 117.

24     119.    The Capital Partners Agreement, which was executed on or about January 1, 1995
25 and existed between Soward and the Bosack and Lerner Trusts, is a valid limited partnership
26 agreement.

27     120.    Bosack and Lerner performed their obligations under the Capital Partners
28 Agreement.

-24-

1    121.   Soward materially breached the Capital Partners Agreement by taking income

2  distributions from 1998 through 2002 in excess of the amount allowed under the agreement; by

3  causing Capital Partners to extend him a $1,000,000 loan in 2001 and to make an unauthorized

4  $150,000 loan to a friend in February 2002; and by making an investment in Passport that was

5  contrary to the specific directions of a limited partner not to make such an investment. Soward

6  also engaged in conduct separate and apart from the performance of the obligations under the

7  agreement without good faith and fair dealing for the purpose of depriving Bosack and Lerner of

8  rights and benefits under the agreement.

9    122.   As a result of Soward's conduct, Bosack and Lerner have been harmed and suffered

10  damages in an amount to be determined at hearing.

11                                   **EIGHTH COUNTERCLAIM**

12                                        **(Conversion)**

13    123.   Bosack and Lerner incorporate by reference each of the allegations contained in

14  paragraphs 1 through 122.

15    124.   Bosack and Lerner were the owners of personal property, namely assets in five

16  investment entities.

17    125.   Soward interfered with Bosack and Lerner's ownership of this property by taking

18  the property from Bosack and Lerner's possession.

19    126.   Soward's interference was knowing, intentional and malicious.

20    127.   Bosack and Lerner demanded return of the property.

21    128.   As a result of Soward's conduct, Bosack and Lerner have been harmed and suffered

22  damages in an amount to be determined at hearing. Soward oppressively, fraudulently, and with

23  malice breached his duties and defrauded Bosack and Lerner by engaging in transactions that were

24  intended to, and did, enrich himself and his friends at the expense of Bosack and Lerner.

25                                   **AFFIRMATIVE DEFENSES**

26    129.   Bosack and Lerner, without assuming the burden of proof where the burden is not

27  by law upon them, assert the following separate affirmative defenses to Claimants' Statement of

28  Claim:

### FIRST AFFIRMATIVE DEFENSE

#### (Failure to State a Claim)

130.     The Statement of Claim, and each purported cause of action alleged therein, fails to state a claim or cause of action against any Respondents.

### SECOND AFFIRMATIVE DEFENSE

#### (Unclean Hands)

131.     By virtue of their conduct, Claimants Soward and & Management Company come to this action with unclean hands.

### THIRD AFFIRMATIVE DEFENSE

#### (Claimants' Negligence or Fault)

132.     The Statement of Claim, and each purported cause of action contained therein, is barred in whole or in part by Soward's own negligent conduct or because Soward is at fault in bringing about any alleged loss or harm they may have suffered, which harm Respondents deny.

### FOURTH AFFIRMATIVE DEFENSE

#### (Set-Off)

133.     The claims asserted by Claimants Soward and & Management Company are barred in whole or in part by the doctrine of set-off.

### FIFTH AFFIRMATIVE DEFENSE

#### (Claimants' Fraud)

134.     The Statement of Claim, and each purported claim asserted therein, is barred, in whole or in part, by Soward's fraud, concealment, or fraudulent or negligent misrepresentations.

### PRAYER FOR RELIEF

WHEREFORE, Respondents request entry of judgment on their counterclaims against Claimants as follows:

1.     For judgment to be entered in favor of Respondents and against Claimants, and that Claimants take nothing by way of their Statement of Claim;

2.     For compensatory damages to Respondents in an amount to be determined at hearing;

3.  For the establishment of a constructive trust;

4.  For the forfeiture of all salary and management fees to which Claimants claim to be entitled;

5.  For the forfeiture of all partnership capital account balances in which Claimants claim to have an interest;

6.  For restitution according to proof;

7.  For costs of suit, including reasonable attorneys' fees to the extent permitted by law;

8.  For exemplary and punitive damages according to proof;

9.  For interest on all damage amounts; and

10. For such other and further relief as the panel deems just and proper.

Dated:  November 30, 2004

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

By: _____
    Leo P. Cunningham
    Kyle A. Wombolt
    Stephen W. Bucher

Attorneys for Respondents/Counterclaimants

Attachment 8(c)

## *AMERICAN ARBITRATION ASSOCIATION*

### **Commercial Arbitration Tribunal**

**DAVID C. SOWARD**, an individual; )
**&MANAGEMENT COMPANY** )
)
)
    Claimants and Counter Respondents )
)
)
  and )
)    **FINAL  AWARD**
**THE & TRUST; SANDY LERNER**, Individually )    No. #74 181 Y 00129 04 DEAR
and as Trustee on behalf of the & Trust and the )
Sandy Lerner Trust; **LEONARD BOSACK**, )
individually and as Trustee on behalf of the & )
Trust and The Leonard Bosack Trust; RICHARD )
**TROIANO**, as Trustee on behalf of **THE &** )
**TRUST; & CAPITAL PARTNERS, L.P.;** )
**CARTESIAN PARTNERS, L.P.; LEONARD** )
**BOSACK AND BETTE M. KRUGER** )
**FOUNDATION**, a California corporation; and )
**& CAPITAL, INC.** )
)
)
    Respondents and Counterclaimants )
─────────────────────────────── )

David C. Soward et al and &Trust et al
American Arbitration Association #74 181 Y 00129 04  DEAR

THE UNDERSIGNED ARBITRATORS, having been designated in accordance with the arbitration
agreement contained in the Management Agreement ("Management Agreement") entered into
between the parties on January 30, 2001, and effective as of January 1, 1999,
and having been duly sworn, and having duly heard the proofs and allegations of the Parties, do
hereby make their **FINAL AWARD** as follows:

**PRELIMINARY STATEMENT**

In making our findings and award, we have considered the documentary evidence, the
credibility of the witnesses, the expert testimony and reports, our views of the weight to be given to
the documentary evidence and the testimony of the numerous witnesses including the experts and
their reports, and the oral and written arguments of the parties.  We have also considered the
inferences that could, or could not, be drawn from the documents, the reports, and the testimony.

This is not a simple case.  The complexity of the dealings between and among the various
parties, and their failures at many levels and on many occasions to document transactions or
agreements, has rendered this proceeding time consuming and difficult, and led to the importance
of evaluating the credibility of the witnesses, which is reflected in these findings and award.

## 1. Background

This is a complicated matter that has been the subject of five (5) Interim
Awards. It has consumed in excess of sixty (60) hearing days over a period of more
than two years.  Four experts and approximately twenty six witnesses  have testified.

Three serial teams of lawyers have represented the Respondents and Counterclaimants.  At the outset of the hearings, there were three Arbitrators on the Panel.  However, when Respondents' third set of attorneys came into the case, one Arbitrator was disqualified due to various connections to the new firm.   Thousands of pages of briefs and memoranda have been filed with the Panel,   over five hundred exhibits were introduced into evidence, and countless hours have been consumed in argument.

The purpose of this Final Award is to bring this matter to an end. The Panel has decided all of the issues that have been raised by both parties, and which have been the subject of the Panel's five Interim Awards.  All five are attached to this Final Award, and all of those awards in their totality are incorporated herein by reference.

The AWARD section of this Final Award sets forth in full the liability determinations made by the Panel in all five Awards.  This award does not change or modify in any manner any of the Panel's earlier determinations, but simply incorporates their substance.  Having said that, there are two specific issues that Interim Award #1 specifically requires be dealt with in this Final Award: (i) "the proper interest under Delaware law and the manner of its calculation;" (see INTERIM AWARD #1, p. 56), and (ii) the amount of Soward's capital account in Cartesian (see INTERIM AWARD #1, p. 56).

The Panel made a determination that the amount of Soward's interest in the Cartesian partnership was $1,464,391 plus interest.  Because that amount was then paid promptly by the Claimant Respondents to Soward, we have shown the amount as satisfied in the list of individual items in the AWARD section of this Final Award.

David C. Soward et al and &Trust et al
American Arbitration Association #74 181 Y 00129 04  DEAR

There is nothing further to be done with respect to our determination of the value of the Cartesian interest.

## 2. Attorneys' Fees and Costs

The Panel has decided that Soward is the prevailing party in this arbitration. Therefore, the one remaining issue to be determined is the amount of attorneys' fees and costs awardable to him. Both parties have filed extensive briefs with respect to the issue of attorneys' fees and costs and, on June 29, there was a hearing on the issue. The Respondents' position is that Soward is entitled only to attorneys' fees in connection with issues involving the & Trust Management Agreement. That Agreement contains the core underlying attorneys' fees and costs clause:

> "In the event of any dispute between the parties concerning any provision in this Agreement, it shall be resolved by arbitration under the rules of the American Arbitration Association. The arbitration shall be conducted in San Francisco, California, or in such other place as the parties may mutually agree. The arbitrator(s) shall have the authority to make an award based on the equities of the dispute, and such award may include attorneys' fees and costs to the party whom the arbitrator(s) determines to be equitably entitled to such attorneys' fees as the party primarily prevailing in such dispute."

Respondents take the position that, since the attorneys' fees and costs clause is found only in the & Trust Management Agreement, fees and costs may be awardable only in connection with issues that involve the Trust. That argument is without merit. At the inception of this matter the Respondents agreed to waive their argument that nothing other than claims under the Management Agreement were arbitrable, and consented to the

FINAL AWARD                                   - 4 -

inclusion in this arbitration of all their claims against Soward. It is hard to describe their

decision as anything other than general consent to be bound by the provisions of the

arbitration clause in the Management Agreement.  That clause provides for an award of

attorneys' fees and costs to the "party primarily prevailing in such dispute."

  Further, both Soward in his demand and the Respondents in their answer asked for

attorneys' fees and costs. Pursuant to R-43 of the Commercial Arbitration Rules of the

American Arbitration Association, the Panel may properly award both attorneys' fees and

costs "if all parties have requested such an award. . . ."  All parties have done so.

Accordingly, it is clear to the Panel that it has the power to award attorneys' fees and costs

to that party it determines to be the prevailing party, Claimant Soward.

  Soward's attorneys have filed an extensive account of attorneys' fees and costs  to

Soward  during the conduct of this case. Those fees and costs, in the aggregate, total

$3,360,576.80, (not including AAA costs and fees) all incurred from the inception of this

matter through May 31, 2007. Although the aggregate claimed by Soward is a large amount,

it appears to be reasonable under the circumstances.  This was an extremely contentious

matter and unquestionably consumed enormous resources, both with respect to attorney

time and properly chargeable costs. Accordingly, after a thorough review of the billings of

counsel for Claimant, it is clear to the Panel that the requested amount is reasonable.

Respondents have not contended otherwise.

  The Respondents either want the amount of the fee reduced to reflect the fact that

they won on four claims or, in the alternative,  they want an award of attorneys' fees and

costs that reflects their prevailing on some issues. The panel rejects both those approaches.

We have determined that Soward is the prevailing party and entitled to reasonable fees and

costs. The Panel, mindful of the equitable nature of arbitration, believes that the only

David C. Soward et al and &Trust et al
American Arbitration Association #74 181 Y 00129 04  DEAR

question is whether the amount requested by Soward is reasonable, given the loss of the Passport issue. The panel believes that it is and, therefore, we have awarded to Soward the full amount claimed by his attorneys.

Soward has requested that we allocate the amount of the attorneys' fees and costs claimed to those incurred, first, through INTERIM AWARD #3 and then from INTERIM AWARD #3 to the end of the case.  The Panel has done so, and has awarded $3,004,741.37 for attorneys' fees and costs incurred through Interim Award #3 and $355,835.43 incurred thereafter.

## 3.  Award

As set forth above, the purpose of this Award is to bring all of the individual determinations made by the Panel within a single Final Award. In accordance with the directions contained in INTERIM AWARD #1, the Panel has below set forth the proper interest rate under Delaware law that is to be used for the purpose of calculating interest with respect to each of the award items to which Delaware interest has application. The rate of Delaware interest is taken from Exhibit #1 of the memorandum entitled "Analysis of Prejudgment Interest Factors, September 27, 2006." That memorandum was filed by Messrs. Krum and Sellinger, counsel for Respondents, pursuant to the directions contained in §IV ii. of the AWARD section of INTERIM AWARD #1.

Accordingly, based on the discussions both above and in INTERIM AWARDS numbers 1 through 5, the Panel unanimously AWARDS as follows:

i.    This is a Final Award and is intended to be fully confirmable;

ii.   Soward is herewith AWARDED and shall take from the Respondents, in the aggregate, exclusive of interest, but including an award of punitive damages

and attorneys' fees and costs, the net sum of  $24,435,895.90.

This amount has been calculated by netting the individual amounts awarded both to Soward and to Respondents in the individual claims set forth below. It also includes the amount of $1,464,391, owed to Soward as his share of Cartesian, which has been paid to Soward and hence has been satisfied. In addition to such amount, Soward (and the Respondents with respect to those claims on which they prevailed) is also entitled to prejudgment interest. The panel has set forth with respect to each claim the manner in which prejudgment interest ought to be computed, both with respect to the rate and the date from which interest ought to be  calculated.

iii.    On his claim #1, Soward is herewith awarded against & Capital Partners the sum of $249,578, together with prejudgment interest commencing as of 90 days after the date of his termination, or 2/23/2004. Interest shall accrue from that date at the maximum Delaware rate of 7%.

iv.    Soward's claim #2 regarding his share in the Cartesian partnership is dealt with herein under item xxiv.

v.    On his claim #3, Soward is herewith awarded against & Trust the sum of $338,400. Both parties have agreed that California law has application to this claim; accordingly, that sum shall bear prejudgment interest from May 1, 2003, at the rate of 10% per annum.

vi.    On his claim #4, Soward's Claim Against & Trust For Unpaid 2001, 2002, and 2003 Incentive Allocation Fees,  Soward is hereby awarded against the & Trust the following sums:

      (a) $532,263, together with prejudgment interest under California law commencing as of May 1, 2002, at the rate of 10%, for unpaid incentive allocation fees for 2001.  The aggregate amount of interest

at that daily rate shall be incorporated into the Final Award on Claim #4;

(b) $190,004, together with prejudgment interest under California law commencing as of May 1, 2003, at the rate of 10%, for unpaid incentive allocation fees for 2002. The aggregate amount of interest at that daily rate shall be incorporated into the Final Award on Claim #4;

(c) $574,488, together with prejudgment interest under California law commencing as of May 1, 2004, at the rate of 10%, for unpaid incentive allocation fees for 2003. The aggregate amount of interest at that daily rate shall be incorporated into the Final Award on Claim #4.

vii.    On his claim #5, Soward is herewith awarded against the Bette Kruger and Leonard Bosack  Foundation the sum of $55,802, together with prejudgment interest thereon from November 24, 2003, at the rate of 10% per annum.

viii.    Counterclaim E is DENIED.

ix.    Counterclaim F is DENIED.

x.    Counterclaim G is GRANTED against Soward, and Soward shall pay to the Respondents on such claim the sum of  $1,556,510, together with prejudgment interest at the rate of 7%, which is the maximum rate permitted under Delaware Law from July 17, 2003, the date on which & Capital terminated its interest in  Passport.

xi.    Counterclaim H is DENIED.

xii.    Counterclaim I is DENIED.

xiii.    Counterclaim J is DENIED.

xiv.    Counterclaim K is DENIED.

xv.    Counterclaim L is GRANTED and Soward shall pay to the Respondents with respect to such claim the sum of $150,000, plus prejudgment interest at the

David C. Soward et al and &Trust et al
American Arbitration Association #74 181 Y 00129 04  DEAR

rate of 6.25% per annum, the maximum permitted rate of prejudgment
interest under Delaware law, from February 27, 2002. The Panel herewith
assigns to Soward the entire interest of & Capital Partners in the loan to
Kemp and Soward is free to pursue his remedy against Kemp.

xvi.    Counterclaim M is DENIED.

xvii.    Counterclaim N is DENIED.

xviii.    Counterclaim O is granted, and Soward shall pay to & Capital Inc. the sum of
$134,184, together with prejudgment interest thereon from November 24,
2003,  at the rate of 10% per annum.

xix.    Counterclaim P is GRANTED against Soward, and Soward shall pay Cartesian
Partners the sum of $15,750.09 plus prejudgment interest at the rate of
6.25%, the maximum permitted rate under Delaware law from August 1,
2002.

xx.    On  & Capital's counterclaim with respect to the issues of Soward's alleged
breach of his fiduciary duties owed to & Capital with respect to the retention
of the Westar funds in his personal Schwab account, the Panel finds for &
Capital. Soward shall pay to & Capital the sum of $27,818.77, together with
prejudgment interest in the amount of 7% per annum from November 21,
2003, until paid.

xxi.    On Claimant Soward's claim for 10% of the proceeds received from the
bankruptcy estate of Westar, the Panel finds for Respondent and
Counterclaimant & Capital.

xxii.    On & Capital's counterclaims relating to Soward's sitting on the board of
directors of Westar and for recovery of his compensation as a director, the
Panel finds for Soward.

FINAL AWARD                    - 9 -

David C. Soward et al and &Trust et al
American Arbitration Association #74 181 Y 00129 04 DEAR

xxiii.    On & Capital's counterclaim with respect to the issue of Soward's alleged

breach of his fiduciary duties owed to & Capital with respect to not timely

disposing of the Westar investment, the panel finds for Soward.

xxiv.    Soward is entitled to payment of $1,464,391 as his share of the assets of

Cartesian as of September 30, 2006, with interest on the $1,464,391 at 10%

from October 1, 2006, until paid.   This amount has been paid to Soward, and

Cartesian's obligation with respect to the payment to Soward of his capital

account has been satisfied.  Soward for every purpose is deemed to  have

withdrawn as a partner of Cartesian.

xxv.    On Soward's Seventh Claim, part one, breach of fiduciary duty (failure to

account), Claimants David Soward and & Management Company are hereby

awarded against Leonard Bosack individually and as Trustee of the Leonard

Bosack Trust, separately and collectively, the sum of $1,001,101, together

with prejudgment interest at the maximum Delaware rate permitted by law

from September 29, 2004, through December 14, 2006 or until paid,

whichever is later.  However, since such sum, plus interest, through

December 14, 2006, is less than the sum of $1,464,391, plus interest, paid to

Soward on December 14, 2006 pursuant to INTERIM AWARD #4 ("the

accounting amount'), this award shall be deemed satisfied.

xxvi.    On Soward's Seventh Claim, part two, breach of fiduciary duty (conversion),

Claimants David Soward and & Management Company are hereby awarded

against Leonard Bosack individually and as Trustee of the Leonard Bosack

Trust, separately and collectively, the sum of $1,001,101, together with

prejudgment interest at the maximum Delaware rate permitted by law from September 29, 2004, through December 14, 2006 or until paid, whichever is later.  However, to  the extent that such sum, plus interest, through December 14, 2006, is less than the sum of $1,464,391, plus interest, paid to Soward on December 14, 2006 paid to Soward pursuant to INTERIM AWARD #4 ("the accounting amount"), this award shall be deemed satisfied.  If such amount of $1,001,101, plus interest through December 14, 2006, is greater than the accounting amount, Bosack individually and as Trustee, separately and collectively, shall pay the difference to Soward and & Management Company, with interest at the maximum rate permitted by Delaware law, until paid.  As above, this amount has been paid to Soward and & Management Company and deemed satisfied.

xxvii.  On Soward's Eighth Claim, conversion, Claimants David Soward and & Management Company are hereby awarded against Leonard Bosack individually and as Trustee of the Leonard Bosack Trust, and Sandy Lerner, individually and as Trustee on behalf of the Sandy Lerner Trust, separately and collectively, the sum of $1,001,101, together with prejudgment interest at the maximum rate permitted by California law from September 29, 2004, through December 14, 2006 or until paid, whichever is later.  However, to the extent that such sum, plus interest, through December 14, 2006, is less than the sum of $1,464,391, plus interest, paid to Soward on December 14, 2006 pursuant to INTERIM AWARD #3 ("the accounting amount'), this award shall be deemed satisfied.  If such amount of $1,001,101, plus interest through December 14, 2006, is greater than the accounting amount, Bosack

individually and as Trustee, and Lerner individually and as Trustee, separately and collectively, shall pay the difference to Soward and & Management Company, with interest at the maximum rate permitted by Delaware law, until paid. As above, this amount has been paid to Soward and & Management Company and deemed satisfied.

xxviii.    The Respondent Leonard Bosack shall pay to Soward as and for Punitive Damages the sum of $10,999,494.00.

xxix.    The Respondent Sandy Lerner shall pay to Soward as and for Punitive Damages the sum of $8,555,162.00.

xxx.    The Respondents shall pay to Soward for attorneys' fees and costs for that period commencing with the inception of this dispute through INTERIM AWARD #3 the amount of $3,004,741.37.

xxxi.    The Respondents shall pay to Soward for attorneys' fees and costs for the period commencing with the issuance of INTERIM AWARD #3 to the end of the case the amount of $355,835.43.

xxxii.    The administrative fees and expenses of the American Arbitration Association totaling $66,844.50, and the compensation and expenses of the Arbitrators totaling $1,472,183.17 shall be borne by Respondents.  Therefore, Respondents, shall reimburse Soward the sum of $745,327.59, representing that portion of said fees and expenses in excess of the apportioned costs previously incurred by Soward.

**David C. Soward et al and &Trust et al**
American Arbitration Association #74 181 Y 00129 04  DEAR

xxxiii.    This Final Award includes a full settlement and determination of all claims and

counterclaims submitted to the Panel in this arbitration. All claims not

expressly granted are hereby deemed denied.

DATED: July 26, 2007

Professor J. Lani Bader
Arbitrator

Zela G. Claiborne
Arbitrator

David C. Soward et al and &Trust et al
American Arbitration Association #74 181 Y 00129 04  DEAR

xxxiii.    This Final Award includes a full settlement and determination of all claims and

counterclaims submitted to the Panel in this arbitration. All claims not

expressly granted are hereby deemed denied.

DATED: July 26, 2007

Professor J. Lani Bader
Arbitrator

Zela G. Claiborne
Arbitrator