SUBJECT TO PROTECTIVE ORDER DATED  MARCH 21, 2006

## AMERICAN ARBITRATION ASSOCIATION

### Commercial Arbitration Tribunal

**DAVID C. SOWARD**, an individual;
**&MANAGEMENT COMPANY**

    Claimants and Counter Respondents

    and

**THE & TRUST; SANDY LERNER**, Individually
and as Trustee on behalf of the & Trust and the
Sandy Lerner Trust; **LEONARD BOSACK**,
individually and as Trustee on behalf of the &
Trust and The Leonard Bosack Trust; RICHARD
**TROIANO**, as Trustee on behalf of **THE &
TRUST; & CAPITAL PARTNERS, L.P.;
CARTESIAN PARTNERS, L.P.; LEONARD
BOSACK AND BETTE M. KRUGER
FOUNDATION**, a California corporation; and
**& CAPITAL, INC.**

    Respondents and Counterclaimants

**INTERIM  AWARD #1**
No. #74 181 Y 00129 04 DEAR

**David C. Soward et al and &Trust et al**
American Arbitration Association #74 181 Y 00129 04  DEAR

# TABLE OF CONTENTS

## PRELIMINARY STATEMENT

I.        BACKGROUND AND PROCEDURAL HISTORY                                    4

    (i)    Background                                                                 4

    (ii)   Procedural History                                                        7

II. THE CLAIMS                                                                  9

    #1.  Soward's Claim Against & Capital Partners For An
Accounting And Distribution Of His Partnership Interest                         9

    #2.   Soward's Claim For An Accounting And Distribution Of His
Partnership Interest In Cartesian Partners                                      13

        a.      The relevant agreement                                          15

        b.      The source of Soward's capital contribution to
Cartesian                                                                      17

        c.      The value of Soward's continuing interest in
Cartesian                                                                      19

        d.      Dissolution                                                     19

    #3.  Soward's Claim Against The &Trust For Unpaid 2003 Base
Management Fee                                                                  20

        a.      The agreement                                                   20

        b.      Expense Allocation                                              22

        c.      Trust Investment value                                          24

    # 4. Soward's Claim Against The &Trust For Unpaid 2001-2003
Incentive Allocation Fees                                                       25

    #5. Soward's Claim Against The Bette Kruger And Leonard X.
Bosack Foundation For His Unpaid 2003 Management Fee                            27

David C. Soward et al and &Trust et al
American Arbitration Association #74 181 Y 00129 04  DEAR

## III THE COUNTERCLAIMS

29

#E. Counterclaim To Limit Soward's Recovery Concerning The
Value Of His Purported Capital Account In Cartesian Partners
29

# F. Counterclaim Against Soward For Payment Of Deficit
Capital Account Balance Of & Capital Partners, L.P.
30

#G.  Counterclaim by & Capital Partners Against Soward For
Lost Investment Return Related To Passport
31

#H.  Counterclaim by & Capital , L.P. And Bosack And Lerner
Against Soward And & Capital Partners For Lost Investment
Value On Excess Distributions
34

#I.   Counterclaim by & Trust, Bosack, Lerner And Troiano
Against Soward For Overpayment Of Incentive Allocation Fee
For 1999 And 2000
35

#J.   Counterclaim by & Trust, Bosack, Lerner And Troiano
Against Soward For Overpayment Of Base Management Fee
For 2001 And 2002
35

#K.   Counterclaim by Bosack, Lerner & Capital Partners
Against Soward For $1 Million Loan To Soward
36

#L.   Counterclaim by & Capital Partners, Bosack And Lerner
Against Soward for $150,000 Loan To Kemp
39

#M.   Counterclaim Against Soward Relating To Institutional
Investor Advisory Firm Settlement
43

#N.   Counterclaim by Bosack, Lerner And & Capital Against
Soward Arising Out Of KPMG Tax Shelter
47

#O.   Counterclaim by & Capital Inc., Bosack And Lerner
Against Soward For Breach Of Oral Contract By Failing To
Reimburse & Capital, Inc. For The Salaries Of Soward's
Employees
51

#P.  Claim by Cartesian Partners And Bosack Against Soward
For $1,109,400 Loan To Myerson
52

IV.  AWARD
55

David C. Soward et al and &Trust et al
American Arbitration Association #74 181 Y 00129 04  DEAR

THE UNDERSIGNED ARBITRATORS, having been designated in accordance with the arbitration

agreement contained in the Management Agreement ("Management Agreement") entered into

between the parties on January 30, 2001, and effective as of January 1, 1999,

and having been duly sworn, and having duly heard the proofs and allegations of the Parties, do

hereby AWARD as follows:

**PRELIMINARY STATEMENT**

In making our findings and award, we have considered the documentary evidence, the

credibility of the witnesses, the expert testimony and reports, our views of the weight to be given to

the documentary evidence and the testimony of the numerous witnesses including the experts and

their reports, and the oral and written arguments of the parties.  We have also considered the

inferences that could, or could not, be drawn from the documents, the reports, and the testimony.

This is not a simple case.  The complexity of the dealings between and among the various

parties, and their failures at many levels and on many occasions to document transactions or

agreements, has rendered this proceeding time consuming and difficult, and led to the importance

of evaluating the credibility of the witnesses, which is reflected in these findings and award.

# I. BACKGROUND AND PROCEDURAL HISTORY

### a.   Background

This Matter involves a dispute between two persons (who are Husband and

Wife), Sandy Lerner ("Lerner") and Leonard Bosack ("Bosack"), and their Money

Manager, David Soward ("Soward"). The source of the Bosack/Lerner money was the

formation of Cisco Systems ("Cisco") by Bosack and Lerner in 1984. Bosack and

Lerner departed from Cisco in 1990, shortly after Cisco went public. Bosack and

Lerner then began selling their Cisco stock in 1991, ultimately netting an amount in

excess of $100,000,000. In the interim, Bosack and Lerner had formed the &Trust,

an irrevocable charitable remainder unitary trust (the "Trust"), and the Leonard X

Bosack and Bette M. Kruger Charitable Foundation, Inc. (the "Foundation"). Bosack

and Lerner transferred substantially all of their funds to the Trust, which was to hold

all of the funds for the life of Bosack and Lerner. On their death, the Trust would pay

the corpus of the Trust to designated charitable beneficiaries. During their life, the

Trust would pay an annual stipend to Lerner and Bosack. That amount was

actuarially computed at approximately 10% of the increase in the value of Trust

assets.

Bosack and Lerner immediately began to investigate the most prudent way

to manage both the Trust assets and their personal assets. They decided to retain a

full time Money Manager – a "Manager of Managers" - whose sole activity would be

to manage their personal funds and the Trust assets. They also decided that the

increase in value of Trust and Partnership assets ought to be the sole factor to be

considered in compensating the Money Manager, thus squarely aligning his interest

with theirs.[1]

Ultimately, Bosack and Lerner retained Soward for the job. Soward was an

accountant at KPMG, involved with international tax issues. Although Soward had not

had any experience as a money manager, he was young and bright, very willing to

learn, and a model of the kind of person they were looking for. As described in more

detail with respect to individual claims below, Soward was thereupon retained by

Bosack and Lerner for the job. Ultimately the Soward/Lerner/Bosack relationship

devolved into 4 entities: the Trust[2], whose assets Soward managed pursuant to a

management agreement (the "Management Agreement"); the Foundation, whose

assets Soward managed pursuant to a disputed agreement; the & Capital Partners

("& Capital"), a Limited partnership in which Soward was the General partner and

Bosack and Lerner the Limited partners, and which served as the vehicle for investing

the personal assets of Bosack and Lerner; and lastly, Cartesian Partners, L.P.

("Cartesian"),[3] a Limited partnership in which Soward was the General partner and

Bosack was the Limited partner, and which was to serve as the investment vehicle

for the personal funds of Bosack and Soward. Lerner was not a party to the Cartesian

agreement.

For a period of years all went fine. The personal fortunes of Bosack and Lerner, and

the value of the Trust assets, increased considerably. Then, during the latter part of

2003, Bosack and Lerner became disenchanted with Soward, and became convinced

---

[1] Soward was, however, also paid a salary of $120,000

[2] Both the Trust and the Foundation were formed prior to the hiring of Soward. The Trust, tax driven, held in excess of $100 million. The Foundation held in excess of $10 million.

[3] In addition to these 4 entities, both Lerner and Bosack had living trusts (the Sandy Lerner Trust and the Leonard Bosack Trust, respectively) apparently through which most of their transactions were directed, and Soward had the &Management Company though which most of his transactions were conducted.
In addition, & Capital, Inc. was a corporation owned by Bosack and Lerner through which payments were made to certain of the office staff for Bosack, Lerner, and Soward.

that he was manipulating trust and other assets for his own benefit and contrary to their best interests,[4] and, on November 24, 2003 fired Soward.

## b. Procedural History

In response to the belief of Bosack and Lerner that Soward was acting in a manner contrary to their interests, on 11/24/2003, Wilson, Sonsini, Goodrich and Rosati ("Wilson, Sonsini"), on behalf of Lerner and Bosack, wrote to the attorney for Soward and

1. enclosed a copy of a complaint against Soward that Wilson, Sonsini proposed to file in San Francisco Superior Court;

2. Purported to remove him as the General partner for the "Limited partnerships" (presumably, the & Capital partnership and Cartesian Partners, L.P.); and

3. terminated any further relationship between Soward and the Trust and the Foundation.

In response, Soward's counsel filed an action in Arbitration with the American Arbitration Association, alleging six claims for relief. The arbitration clause is contained in the Management Agreement, and reads as follows:

> "In the event of any dispute between the parties concerning any provision in this Agreement, it shall be resolved by arbitration under the rules of the American Arbitration Association. The arbitration shall be conducted in San Francisco, California, or in such other place as the parties may mutually agree. The arbitrator(s) shall have the authority to make an award based on the equities of the dispute, and such award may include attorneys' fees and costs to the party whom the arbitrator(s) determines to be equitably entitled to such attorneys' fees as the party primarily prevailing in such dispute."

---

[4] Bosack testified that Soward was a "...fallen man; [it] is tragic to see the opportunity squandered. He started as an energetic and honorable man; at some point he went bad."

In response, Wilson, Sonsini filed an action in Federal Court in Washington (where Bosack was living) raising essentially the same issues that would have been raised by filing the action in San Francisco. Soward countered by filing in the Washington action a Motion to Stay, or in the alternative to Dismiss. Wilson, Sonsini then filed a response raising a jurisdictional defense. The Federal Court then issued its order staying the action in that court, and directing that, in the manner provided in the Commercial Arbitration Rules of the American Arbitration Association, it was for the arbitration Panel and not the Court to rule on its own jurisdiction. Thereupon, Wilson, Sonsini, on behalf of Bosack and Lerner (and the related parties), filed a response in the AAA action, raising eight counterclaims against Soward. In that response, Wilson, Sonsini waived any further jurisdictional dispute, as follows:

> "On November 9, 2004, that (Federal) court entered an order staying the action pending this (arbitration) Panel's determination of whether the claims asserted by Bosack and Lerner in the Federal Case are properly arbitral or should be heard by the federal court. This Panel need not address issues of arbitrability, however, as Respondents have elected to assert their claims in the present arbitration by filing this Amended Answering Statement and Counterclaims." (Answering Statement, §30.)

The matter was then set by the Panel for hearing during March, 2005. Then, during the last week of February, 2005, Wilson, Sonsini was discharged by Bosack and Lerner as their counsel, and was replaced by Messrs. Sellinger and Krum, who requested that the matter be taken off calendar to permit them to conduct further discovery and file additional counterclaims against Soward. The Panel took the matter off calendar, and set a new hearing date in August, 2005. There were new cross claims added to the Bosack and Lerner response, so that at the time of hearing there were a total of 17 claims and counterclaims heard by the Panel. The hearing

consumed in excess of 50 days. There were approximately 28 witnesses and 5 experts who testified, and in excess of 500 exhibits.

We have set forth below the nature of each claim, and the Panel's determination with respect to each such claim.  In the Panel's hearing order #21, we requested that, for our closing arguments, each claim and each cross claim be the subject of a separate brief. That was done by the parties, with the 5 claims of the Claimant numbered 1 through 5, and the 12 counter-claims of the Respondent numbered E through P.  To somewhat simplify our award and to be sure that we properly dispose of all of the claims of both parties, we have adopted the claim statements and the numbering system used by the parties. Accordingly, the 5 claims of the claimant are numbered 1 through 5, and the counterclaims are numbered E through P.

Pursuant to Hearing Order #24, the Panel permitted both sides to add certain additional claims which will be heard in September, and the Panel, pursuant to American Arbitration Association Commercial Arbitration Rule R34, has reserved jurisdiction for the purpose of hearing those claims.  And, because the aggregate liability of each of the parties to the other cannot be determined until we have decided those issues over which we have reserved jurisdiction, this interim award is not intended to be confirmable. It will become so when it is incorporated into and made a part of the final award.

## II. THE CLAIMS

### #1.  Soward's Claim Against & Capital Partners For An Accounting And Distribution Of His Partnership Interest.

& Capital Partners, a Limited partnership, was formed as of January 1995, and was the principal investment vehicle of Bosack and Lerner, the limited partners.

Soward was the general partner. As general partner, Soward was entitled to receive 10% of the profits of the partnership credited to his capital account. Pursuant to §5.6 of the Partnership Agreement, Soward (as set forth above) was terminated as general partner by Lerner and Bosack. Although unambiguously required by the Partnership Agreement, Soward, prior to the initiation of this action, was not provided with an accounting of the value of his Partnership interest, and, in this claim, seeks such an accounting together with an award giving him that amount (if any) determined by the Panel to be the value of his 10% interest.[5]

The assets of the partnership consist principally of investments that had been made for the Partnership by Soward, and which on the termination of the General partner must, under §8.1 of the Agreement, be valued at "fair value". 10% of the aggregate fair value is to then be credited to the capital account of Soward.

The fair value of the assets (and hence the value of the partners' capital accounts) was the subject of wildly disparate opinion. It was agreed that the relevant date as of which value ought to be determined is 12/31/2003. Bingham, the principal valuation expert of Bosack and Lerner, testified that the value of the assets on that date was such that Soward had a negative capital account balance of $1,874,365, and hence owed that amount to the Partnership. Regan, the valuation expert of Soward, testified that (i) the value at which the assets were carried on the balance sheet of the Partnership[6] as of 12/31/2003 was $70,803,677; (ii) that his "Base Case" aggregate value of the assets was $76,332,154; and that (iii) it would not be

---

[5] Bosack testified that "... we (Bosack and Lerner) should have provided it as soon as were able to provide an approximation of it, but certainly after he sued us, he wasn't going to get much. Somehow being sued disimproves one's mood with regard to these things ..."

[6] Listed variously as market value or fair market value, K-1 value, or cost, depending upon the circumstances of the investment.

improper to augment the Regan Base Case value by Soward's opinions with respect to value. Pursuant to §8.1 of the Partnership Agreement, "the fair market value will be determined on ...[the partner's termination date] by the General Partner in such manner as the General Partner may reasonably determine." Soward in that manner computed an aggregate asset value for the Partnership, consisting of the Regan base case as augmented by his opinion of value for an aggregate value of $113,038,819.

The sharp distinction between the two extremes of value is largely attributable to both the Bingham and the Soward valuation methods. Bingham first points to §2.1 of the Partnership Agreement, which requires that each "... asset owned by the Partnership [must be valued] by the Partnership as if, on the date as of which such computation is being made, such asset had been sold at its Value..." He then determines that, to compute market value, the bulk of the investments (starting with the Regan Base Case value) ought to be subject to 3 discounts: a "lack of marketability" discount of 35%; a "minority discount" of 5%; and lastly, a transaction cost discount of 5%, for an aggregate discount of 45%.

Soward, on the other hand, says that, starting with the Regan Base Case each of the investments ought to be marked up to reflect his personal estimates of increases in value.

After considerable reflection, the Panel has come to the determination that both approaches ought to be rejected. First, the Panel is mindful of the direction of the arbitration clause that "The arbitrator(s) shall have the authority to make an award based on the equities of the dispute..."  In that respect, §2.1 of the Partnership Agreement appears to have equitable roots; it is for the purpose of ensuring that a

distribution to a general partner on termination is not in such an amount as to erode the economic value of the interests of the remaining limited partners; in that sense it is a shield. To apply Bingham's suggested discounts here, however, would be to use the section as a sword. There is no perceivable intention to sell the assets of the partnership; the only effect of the application of the Bingham discounts would be to strip Soward of a significant percentage of the value of his interest in & Capital and transfer it to the two Limited partners. Certainly that cannot be an equitable result.

Further, Regan testified that in a real sense, the proposed discount by Bingham is a discount on a discount; that is, each of the investments was purchased at a price which reflects what a willing buyer would pay a willing seller, and would rationally take into account the marketability and liquidity issues raised by Bingham. And, of course, it does not seem right to apply a transaction fee when there has not been and does not appear to prospectively be any transactions.[7]

On the other hand, the Panel rejects the purely subjective estimates of value made by Soward. For that reason, the Panel has carefully reviewed all of Soward's testimony with respect to value, and, after having done so, believes that to increase values based on Soward's testimony of subjective values is improper.

Accordingly, the Panel starts with the Regan Base Case. Bingham, in his testimony testified that he agreed with the manner in which Regan had computed his Base Case, and that he was in agreement with its use as a starting point. Accordingly, we reach the following accounting of the amount due to Soward with respect to his capital account:

---

[7] In his assertions as to the discounts, Bingham did not quantify those discounts investment by investment, or by the nature of the investment, or by the type of analysis required for an equitable result. Instead, he just applied flat discount figures which in the circumstances the Panel did not find credible.

David C. Soward et al and &Trust et al
American Arbitration Association #74 181 Y 00129 04  DEAR

| | |
|---|---|
| **Regan Base Case** | **$76,332,154** |
| Less balance sheet value | 70,803,677 |
| Increase in value | 5,528,477 |
| Soward's 10% of increase in value | 552,847 |
| Less negative capital account balance for Soward[8] | 303,269 |
| **Value of Soward capital account.** | **$249,578** |

Pursuant to §5.8 of the Partnership Agreement, the General Partner, after his withdrawal or removal, is entitled to have the positive balance in his fair value capital account distributed to him no later than the later of (i) the end of the taxable year, or (ii) 90 days after removal. Soward was removed on November 24, 2003; 90 days from that date is February 23, 2004, and Soward is entitled to prejudgment interest from that date in the maximum amount provided under Delaware law.

As one of his original claims in this matter, Soward asked both for an accounting and dissolution of & Capital. Since Soward has been provided with an accounting and is no longer a partner in & Capital, however, there is no basis on which such a dissolution would be proper, and accordingly the Panel declines to do so.

**#2.  Soward's claim for an accounting and distribution of his partnership interest in Cartesian Partners.**

---

[8] As computed by Regan

Cartesian Partners is a limited partnership in which Soward was the General partner, and Bosack was the Limited partner. Unlike & Capital Partners, Lerner is not a partner. Cartesian had its genesis in Soward's proposal to Bosack that they jointly form a Partnership for the purpose of investing a portion of Bosack's distributions from the Trust in "high touch" investments. Soward proposed to Bosack that their agreement be modeled after the & Capital Partnership, with the exception that he, Soward, would make an initial capital contribution of $500,000. Soward was also to receive 10% of the profits of the Partnership, together with 100% of the return on his own investment. The economic consequence of that was to apportion profits of the Partnership 14.5% to Soward, and 85.5% to Bosack.[9]

Soward told Bosack that the Partnership Agreement would be modeled after the & Capital agreement. He then contacted Gibson, Dunn & Crutcher (who had prepared the & Capital Agreement) and asked that they prepare the Agreement for Cartesian. Gibson, Dunn did so. Soward was dissatisfied with the Gibson, Dunn draft; among other matters, it required that the general partner obtain the consent of the Limited partner with respect to investments, and gave the Limited partner the right to remove the General partner.  Thereupon Soward hired Robert Wood, a transactional attorney, to do a new draft of the Agreement. Wood did so. The Gibson, Dunn draft was done in December, 1998; the Wood agreement in January, 1999.

Soward, whose office was in San Francisco, sent the Wood agreement to Bosack's office in Washington State; Diane Norgaard, the bookkeeper in Bosack's office, testified that upon getting the agreement, she put it into a "folder" on

---

[9]  Bosack testified that he understood that the proposed financing of Cartesian was such that it would result in a 14.5% return on profits to Soward. (Bosack testimony, February 8, 2006, p. 212, lines 2-5)

Bosack's desk for his review. Bosack testified that the Agreement "could" have come to him and he didn't see it. The Wood version of the Cartesian agreement was never signed, although Soward and Bosack commenced to implement its terms. Bosack made his capital contribution of $9,500,000; Soward commenced making incremental contributions, and between the end of 1998 and the end of 2002, had made a total contribution to Cartesian of $525,636.

Cartesian, by the end of Soward's tenure, had relatively few investments, which are still the only investments of the Partnership. As set forth above, Bosack, on 11/24/2003, purported to remove Soward as general partner, but did not supply Soward with an accounting nor make a distribution to him of the fair value of his capital account. That ultimately resulted in the filing of this claim for an accounting and dissolution of Cartesian.

## a.  The relevant agreement

The Cartesian Partnership Agreement is an oral agreement. Its terms must be taken either from the Gibson, Dunn version, the Wood version, or some combination of the two. The significant issue is whether or not the purported removal of Soward by Bosack was effective, or whether Bosack remains to this day to be a partner of Cartesian.

The Gibson, Dunn version is different than the & Capital model. The latter gives the limited partners carte blanche to remove the general partner; the Gibson, Dunn version does not. Although it gives the limited partner the right to remove the general partner, the removed general partner then has the right to either become a "special" limited partner, or at his option to have his capital account interest distributed to him. The question of which agreement is applicable is of significance to the date on which Soward's capital account must be valued and distributed. If the Gibson, Dunn agreement is applicable, Soward – in the absence of any evidence that

he demanded to have his capital interest distributed to him – remains a "Special" limited partner. If the Wood agreement is applicable, Bosack had no right to remove him as a General Partner; and, pursuant to §8.4 of the Wood agreement, upon Bosack attempting to do so - and pursuant to §8.4 of the Agreement appointing a new general partner – see *Assignment of Partnership Interests In & Capital Partners, LP. And Cartesian Partners, LP, X*3730 – Soward's status would also revert to that of a "special" limited partner.

It is the belief of the Panel that the Wood agreement ought to provide the relevant terms. First, there was testimony that Soward told Bosack that the agreement was going to be modeled along the lines of the & Capital Partnership agreement. Soward sent a copy of that agreement to Gibson, Dunn who prepared a draft agreement based on it; that agreement was rejected by Soward, and he then asked Wood to draft an agreement which, according to Soward, became the operative agreement between him and Bosack. In fact, although the Gibson, Dunn version of the agreement permitted the limited partner to remove the general partner, the practical effect here is negligible, because under the agreement Soward would become a "special" Limited partner with all of the same continuing economic rights in Cartesian.

Second, there was nothing to suggest that Soward attempted to hide the terms of the Wood agreement, or to take advantage of Bosack. We believe the testimony of Diane Norgaard that she took the Wood agreement and placed it on Bosack's desk (in a "folder") for his review. The purpose for doing that was to bring the agreement to Bosack's attention; the fact that Bosack paid little, if any, attention to it ought not be laid at Soward's feet. Third, the fact that the agreement was never signed and that the parties operated without an executed agreement is consistent with their common history; during the formative years of their relationship,

David C. Soward et al and &Trust et al
American Arbitration Association #74 181 Y 00129 04  DEAR

Soward and Bosack and Lerner operated for a significant number of years without a written agreement.  Accordingly, we look to the Wood agreement to provide the basis of Soward's rights with respect to Cartesian.

### b.  The source of Soward's capital contribution to Cartesian

Soward's initial capital contribution to Cartesian had its source in Soward's capital account interest in & Capital. Bosack says that was improper for two reasons: first, under the & Capital Partnership Agreement distributions are to be from excess cash, as defined in §2.1 of the Partnership Agreement, and are to be made " to the Partners in proportion to the positive balances in their Capital Accounts", and second, Soward had no right to make *any* distribution to himself from & Capital for the purpose of providing a capital source with which to fund his capital account in Cartesian[10], because such distributions were not  proportional to the distributions taken by Bosack and Lerner.

We reject both arguments.

First, there are only two possible limitations in the & Capital Agreement on the right of Soward to withdraw funds from his capital account for the purpose of funding his Cartesian account. The first is §4.3, which requires that

"Excess cash shall be distributed no less frequently than annually to all of the Partners in proportion to the positive balances in their Capital Accounts."

The second limitation is the definition of "excess cash", which in §2.1 of the agreement is defined as

---

[10]  Soward's K1 for 2003 indicated that he had a balance of $1,001,101 as of December 31, 2003. Upon purportedly removing Soward as a general partner on November 24, 2004, Bosack instructed Cartesian's accountants to take part of that sum from Bosack's capital account and to transfer it to Bosack's capital account.

"cash and readily marketable securities held by the partnership that are in excess of the reasonably foreseeable cash needs of the Partnership ... as determined by the General Partner"

Not withstanding what appears to be a specific proportionability requirement in the agreement, the evidence was that throughout the history of the Partnership no attention was paid by anyone to the stricture of §4.2. For instance, if all distributions are to be proportional and they start with the same capital account, one would expect that at any given period of time the limited partners would have had the same amount distributed to them. Not so. Between the third quarter of 1995 and July, 2003, Bosack was distributed $11,300,000, and Lerner $14,238,391, respectively[11].

And at no time was a finding or determination made by Soward that a distribution was of excess cash. Lerner testified that when she needed cash her accountant would just ask Soward for money (Lerner, 10-11-2005). In like manner, Bosack testified that he would just ask Soward for money, and where it came from was up to Soward. (Bosack, 3-20-2006.) In none of those instances was there any concern as to whether the source of the distribution was excess cash or not. In view of the complete disregard of those provisions of the & Capital agreement, the Panel, mindful of the admonition in the arbitration clause that the Panel make "an award based on the equities of the dispute," believes that Bosack and Lerner and Soward, through conduct, modified the & Capital agreement in such a manner as to permit the making of distributions in the manner made. Accordingly, the Panel rejects the argument that the source of Soward's funding precludes him from asserting the right to an accounting and distribution of the value of his capital account in Cartesian.

---

[11] Soward over the same period was distributed $7,857,251 .

And, although Bosack argued that Soward had to get his consent and Lerner's consent to use his & Capital account to fund his Cartesian capital account, there is nothing in the & Capital Agreement that prohibits the General partner from making distributions to himself for any purpose. And, indeed, Soward in that manner made a total capital contribution to Cartesian of an amount slightly in excess of $500,000.

### c. The value of Soward's continuing interest in Cartesian

Although Regan, on the assumption that Soward was still a partner in Cartesian valued his interest as of 9/30/2004, that value does not reflect the current value of Soward's interest. We have accordingly in our award required that an accounting be made of the value of Soward's interest as of 9/30/2006, taking into account any enhancements or diminishments in the value of the Cartesian investments. In connection with that valuation, we accept Regan's valuation as of 9/30/2004, subject to the following:

1) the fair value of Liberty ought to be based on the last known price at which the Liberty shares were traded on the market, and not at 3 pounds; and

2) unless there is some subsequent event which would increase the value of Thomas Weisel Capital partners, Regan's write down ought to be maintained.

Regan, in his report, recognizes the necessity of updating his capital account analysis of Cartesian to reflect current value. Accordingly, in our award, we have provided a mechanism with which to do that.

### d. Dissolution

§17-802 of the Delaware limited partnership act provides that "on application by or for a partner the Court of Chancery may decree dissolution of a limited partnership whenever it is not reasonably practicable to carry on the business in conformity with the partnership agreement." We do not believe that it is

reasonably practicable to carry on the business of Cartesian with Soward as a partner. Accordingly, once Soward has had an accounting and the value of his interest has been determined, Cartesian shall have 60 days in which to pay that amount to Soward; upon payment to Soward, it is the decree of this Panel that Soward shall no longer be a partner of Cartesian and shall be considered for every purpose as having withdrawn as a partner. In the event that Soward is not paid the value of his capital account within 60 days it is the decree of this Panel that, pursuant to §17-802 of the Delaware law applicable to limited partnerships, Cartesian shall be dissolved and, in the manner set forth in §17-803, wound up.

### #3.  Soward's Claim against the &Trust for the payment of his base management fee for 2003

### a.  The agreement

The Trust and Soward were parties to a Management Agreement (the "Management Agreement"), dated 1/30/01, and effective for the period 1/1/1999 through 12/31/2003.  Under the Agreement Soward, as partial payment for managing the assets of the trust, was to receive a "Base Management Fee" of

> "30 Basis points (.30%) per year of the net assets of the Trust as of the beginning of each year. Any salary paid to David Soward by & Capital, which salary is properly allocable to the Trust (and agreed by he parties to be so allocable) will reduce this Base Management Fee. The Base Management Fee for each year will be paid after a valuation for the Trust can be determined, but no later than April 30 of that year." (§4 of the Agreement).

In July of 2003, Soward sent a request to Bosack and Lerner for the payment of his Base Management Fee, calculated on the value of the Trust assets as of 12/31/2002. He did not hear from either Bosack or Lerner; rather, he received a note from Brook Middleton, the accountant for the Trust, saying that the "audit" of the Trust had not yet been completed and hence payment was not authorized.  In fact, Clark Nuber, the Trust's accountants in the State of Washington, were doing agreed upon

**David C. Soward et al and &Trust et al**
American Arbitration Association #74 181 Y 00129 04  DEAR

procedures for the purpose of determining whether or not Soward's request was proper in amount. Clark Nuber determined that it was; the Clark Nuber report shows the net Assets of the Trust at the end of the 2002 to be $112,813,585; Soward's request for payment of his Base Management Fee shows the Trust assets as $112,918,719[12].

Soward heard nothing further from either Middleton or Clark Nuber, and nothing from Lerner and Bosack, until November 24, 2003, when he was summarily told by a letter from Wilson, Sonsini that he was fired. He has not been paid anything under the Agreement.

Notwithstanding the Clark Nuber report, Lerner and Bosack take the position that Soward has overstated the value of the Trust investments by not allocating to the Trust administrative costs incurred by it during the year for which the Base Management Fee is being calculated.[13] In that respect, they[14] say that Swap reset fees,[15] travel expenses, legal expenses, accounting expenses, Cambridge Associates[16] expenses, bank custody fees, Soward's Base Management Fee, and Soward's incentive allocation fee ought to be charged against the value of the trust investments in determining his Base Management Fee and incentive allocation fee.

---

[12]  At the hearing the Respondents attempted to impeach the Clark Nuber report by having Fleming, a Clark Nuber accountant, testify that the numbers in the Clark Nuber report could not be relied upon.

[13] Both the Foundation and & Capital Partners compete for expense allocation.

[14] See Ex. 3840, Galbally Report, exhibit 7

[15] Soward gave as an example the use of a swap to acquire Quellos (one of the Trust's investments) in such a manner as to provide significant tax benefits in connection with the transaction.

[16] Cambridge is an East Coast institutional investment advisor.

INTERIM AWARD #1                          - 21 -

They also claim that Soward improperly failed to deduct his salary of $120,000 per year from the Base Management Fee and, by inference, from the value of the trust investments.

### b.    Expense Allocation

After considering the testimony and the Galbally report, the Panel does not believe that, for the purpose of computing the Soward Base Management Fee or incentive allocation fee, it would be proper to charge any of the Galbally proposed expenses against the value of the investments.

The " swap reset" fees were paid for the purpose of making specific Trust investments, such as in Quellos, and are included in the value of the investment, They are not properly treated as an administrative expense.[17]

As to the claimed deduction against the value of the assets of the Trust for the amount of the current year's or prior year's Base Management Fee and incentive allocation fee as an administrative expense in calculating the amount of the Base Management Fee and incentive allocation fee payable to Soward for any given year, this deduction is denied.  In the Panel's view, the Agreement does not permit in effect a reduction in the base management and incentive fees for any year by charging the same fees against the calculation of the sums otherwise payable to Soward.  If there were to be such a reduction in value to account for these payments, then the reduction would need to be clearly spelled out in the Agreement. This was not done.  Indeed, if Bosack's and Lerner's position were to be accepted as part of the Agreement, then the better Soward did for the Trust in any given year the

less he would be paid in fees.  In effect, there would be an inevitable discount for his services.  Accordingly, as noted above, the claim for a deduction of such fees is denied.

As to the remainder of the expenses for travel, legal, accounting, Cambridge Associates, and bank custody fees, they were general administrative expenses of the Trust and are not deductible from the assets of either the Private Equity category or the Hedge Fund for purposes of determining Soward's Base Management Fee or Incentive Allocation Fee.  Indeed, in one instance they included the personal travel expenses of Troiano.  In another instance, they included the cost or rewriting the trust documents.  In any event, there was a failure to provide sufficiently credible evidence to permit a specific deduction of these expenses against either the Private Equity category or the Hedge Fund.  The claim for an offset of these fees is denied.

At first blush it would appear that the Management Agreement would also require that Soward's annual salary of $120,000 be charged against the value of trust investments. §4 of the Management Agreement provides that

> "The Base Management Fee hereunder shall be 30 basis points per year of the net assets of the Trust as of the beginning of each year. Any salary paid to David Soward by & Capital, Inc. which salary is properly allocable to the Trust (and agreed by the parties as so allocable) will reduce this Base Management Fee)."

The fact, however, is that Soward's salary has already been charged against investment values. In the first two years of Soward's entitlement to a Base Management Fee, Soward charged 0% of his salary against the Trust; in the latter two years he (after sending a note to Lerner and Bosack) – because no allocation

---

[17] As with much of the Galbally testimony, there was no effort to specify the amount of any particular swap

had been made – charged 100% of his salary against the Trust, for a net effective average over the first four year period of the Management Agreement of 50%. There was no claim made in the arbitration by Soward for his $120,000 salary, allocated or otherwise, for 2003.  Thus, there was no need to reduce the value of the Trust assets for any amount of that salary in 2003.  Accordingly, we believe that an appropriate amount of Soward's salary has been allocated to the Trust and that there ought not be any further reduction in value on that account.  The claim for an offset, or reduction, on account of these fees is denied.

c.    **Trust Investment value.**

There are two relevant reports with respect to Trust values. The first is the Clark Nuber report, which was prepared at the request of Bosack and Lerner, and which was intended to be a comprehensive report detailing the value of and return afforded by each of the Trust investments.  The principle reason for the creation of the Clark Nuber report was to determine whether or not Soward's Base Management Fee request was proper in amount. The second relevant report was that which Soward furnished in connection with his fee request.  The Clark Nuber report is remarkably congruent with the Soward statement of values.  For the year ended 12/31/2002, Clark Nuber valued trust investment assets at $112,113,585; the comparable Soward statement of value is $112,918,719, a .007% difference.

Accordingly, for those reasons set forth above, we determine that Soward is owed a Base Management Fee of $338,400, which is 30 basis points of the value of

---

reset fee, the date of the fee, or the particulars of the transaction in which it was incurred.

the assets of the trust as of 1/1/2003, together with pre-judgment interest on that

amount under Delaware law from May 1, 2003.

#### #4.     Soward's Claim against the &Trust for unpaid 2001-2003 Incentive Allocation fees.

In addition to the 30 basis points (.30%) comprising the Base

Management Fee (Ex. 3349, paragraph 4), paragraph 5(d) of the Management

Agreement ("Agreement") specifies that Soward is to be paid an Incentive Allocation

of "10% of the profits of the Hedge Fund and Private Equity categories and 0% of

the Vanilla category." Soward claims his incentive allocation for 2001, 2002, and

2003.

The parties disagree about whether the Agreement requires that profits

on the Hedge Fund and Private Equity categories are to be calculated separately or

whether profits and losses on the two categories should be netted.  Specifically,

Respondents claim that Soward is owed no incentive allocation for 2001 and 2002

because losses in Private Equity in 2001 exceeded gains in the Hedge Fund for that

year and those losses were not fully recovered in 2002.  We find that the language of

the Agreement allows profits to be calculated separately.

The Agreement was preceded by a letter agreement dated October 26,

2000 (Ex. 3298).  Two provisions of that letter agreement and final Agreement are

particularly relevant here.  First, paragraph 4 of the letter agreement entitled "High

Water Mark" states: "If there is a year with a net loss in a category, that loss must

be recovered before any Incentive Allocation could be earned from that category for

a subsequent year." Respondents argue that the language was changed in the final Agreement (Ex. 3349) to omit the words "in a category" and that the change requires that the profits and losses from the two categories must be netted. We do not believe that the change in the language requires netting, especially when read in conjunction with the second significant provision.

That provision in the letter agreement refers to Attachments A and B (Ex. 3298, paragraphs 3 and 6). In those Attachments, Soward sets forth the manner in which his incentive allocation is to be calculated. The Panel has reviewed those calculations in detail and has concluded that netting is not required.

Respondents point to a file memo prepared by attorney Wood and dated October 14, 2002, which refers to an inquiry from Soward regarding the issue of whether netting is required (Ex. 3543). In response, Soward testified that he did raise the issue with Wood but, before hearing a response, he found and reviewed Attachments A and B. The Panel believes that Soward's review of A and B provided clear guidance on the netting issue.

Respondents further argue that they found no copy of the Agreement that included Attachments A and B. However, Ex. 4012 from Wood's file is a letter to Troiano dated October 30, 2000, forwarding the letter agreement and Attachments A and B, asking Troiano to review the terms, discuss them with Bosack and Lerner, and return an executed copy. Subsequently, Bosack and Lerner signed the letter agreement and, on November 11, 2000, Troiano signed a Consent of Independent Trustee stating that he approved the terms (Ex. 3298). There is no evidence that he contested the language regarding the Attachments.

In addition, when the final Agreement was drafted by Wood, that language also refers to Attachments A and B (Ex. 3349).  Paragraph 5 (e) states that the Attachments provide "Example calculations . . . which are incorporated by reference and constitute part of this Agreement."  That this provision was included purposely and not due to oversight is shown by the fact that the language is revised, not identical to that in the letter agreement.  Troiano, Bosack, and Lerner signed both documents and did not object to the language referring to Attachments A and B.

For these reasons, we award Soward the incentive allocation fees claimed and calculated by Regan in his base case to be $1,296,755 plus pre-judgment interest on that amount in the maximum amount permitted under Delaware law on each segment from May 1, 2001, 2002, and 2003, respectively.

### #5.   Soward's claim for his unpaid 2003 management fee from the Bette Kruger and Leonard X. Bosack Foundation.

This claim of Soward's again demonstrates the penchant of the parties for operating in the shadow of an unsigned agreement.  One of Soward's jobs was providing investment advisory services to the Bette Kruger and Leonard X. Bosack Foundation.  In 1999, Soward – concerned that there was no operative agreement in place with respect to his fee from the Foundation – prepared a simple fee Agreement with a two year term, operative from January 1, 1999 through December 31, 2000. Soward's fee was 30 basis points of the investable assets of the Foundation, with certain exclusions (for instance, cash).  Each year's management fee was paid based on investable assets as of the end of the preceding year. In this manner Soward was paid for 4 years, 1999 through 2002.

Although Soward's agreement had been sent by him to both Bosack and Lerner, it was never signed by either, nor by Soward. The pattern of Soward's billing and the Foundation's payment, however, was consistent with the terms of the unsigned agreement. Until 2003, Soward was paid each year upon submitting a statement for his fee based on investable assets as of the prior year end, in the manner provided in the Agreement.

Further, it does not appear that the parties ever disagreed with respect to Soward's right to be paid as of year end. Although Kathleen Saveski, the Executive Director of the Foundation, in 2003 expressed disapproval of the amount of cash that the Trust had accumulated, and the slowness of Soward in providing her with a proposed statement of the Foundation's investment policy, that did not appear to rise to the level of an accusation of Soward that he had breached any duty that he owed to the Foundation under the agreement. Indeed, the Minutes of a Board meeting of the Foundation, held in February, 2003, contained some criticism of Soward for not providing the board with a draft investment policy. Notwithstanding, Saveski, in August, 2003, emailed Soward and, among other matters said

> "Also, I haven't received your billing for 2002 [sic, 2003] fees. As soon as you have a figure, just send me an invoice and we will authorize the payment ..."

In fact Soward did send the figures, but was never paid. Rather, he was fired in November. From 1999 through Soward's termination in November 2003, both he and the Foundation acted in a manner consistent with the unsigned agreement that had been prepared in 2000. At the end of each year, Soward, in the manner provided in the Agreement would provide the Foundation with a list of its investable assets,

David C. Soward et al and &Trust et al
American Arbitration Association #74 181 Y 00129 04  DEAR

and request his payment of 30 basis points for the following year. In the manner provided in the agreement, the Foundation would make payment to Soward.

It is accordingly clear that, whether one considers that they were acting pursuant to a written agreement which was just never signed, or whether they were operating under an oral agreement, the Agreement provided the terms to be followed with respect to Soward's payment, and that the refusal to pay Soward is a breach of that agreement.[18]

Regan, in his report, adopted the statement of investable assets[19] of the Foundation that had been reported in the Clark Nuber report that had been commissioned by the Foundation. In that manner Regan came up with an amount owed for providing services for 2003 of $62,287. Soward, though, was terminated as of November 24, 2003, (the 327th day of 2003) less than a full year. Accordingly, the proper amount owed to Soward is a fee for 327 days, or $55,802, together with prejudgment interest at 10% from November 24, 2003.

## III The Counterclaims

### #E. Counterclaim to limit the amount of Soward's recovery based on the value of his capital account in Cartesian Partners.

This claim is in all respects the virtual reciprocal of Claim #2, discussed above, and the discussion of the Panel with respect to that claim has equal application to this claim. As explained there, it is the determination of the Panel that

---

[18] Clark Nuber, among other assignments, was asked to verify the accuracy of the Soward number on the basis of which he was entitled to payment. Clark Nuber came up with essentially the same numbers. See Ex. 3807, appendix A.

[19] Excluding Cash, Chawton House, and Chawton House Library, all of which, under the terms of the Management Agreement, were required to be excluded from investable assets.

David C. Soward et al and &Trust et al
American Arbitration Association #74 181 Y 00129 04  DEAR

Soward continues to be a partner in Cartesian, and is entitled to an accounting and distribution of that amount determined to be the value of his capital account.

We do not believe that Soward violated any fiduciary duties owed to Bosack in connection with the creation of Cartesian, nor did he commit fraud or constructive fraud in its creation, and accordingly do not believe that Soward's recovery of the value of his capital interest in Cartesian ought to be limited in any manner. As set forth in Claim # 2, the subject of the value of Soward's capital account in Cartesian will be the subject of an accounting and limited hearing.  Accordingly, this claim is denied.

## #F. Counterclaim against Soward for payment of the Deficit Capital Account Balance in his & Capital Partners Capital Account

In this Counterclaim, & Capital Partners contends that Soward's capital account had a negative balance of $1,874,365, as computed by Bingham, one of the Respondents' valuation experts. If in fact that is the case, then under §7.2(c) of the Partnership Agreement & Capital Soward must reimburse the Partnership in that amount.

This counterclaim is in a real sense the reciprocal of Soward's claim #1, above, in which Soward seeks recovery of the fair value of his capital account as of the date of his termination by Lerner and Bosack.  And here, as there, the Panel believes that to value the Soward account in the manner proposed by Bingham would be to permit Lerner and Bosack to use what was designed to be a shield as a sword.[20]  That is, the essence of the Bingham valuation method was to apply

---

[20] Bingham was ostensibly acting under the language of §2.1 of the Agreement

substantial marketability discounts against the carried value of most of the

Partnership investments, notwithstanding that there was no perceivable intention to

sell the assets of the partnership. As a result, the only effect of the application of the

Bingham discounts would be to strip Soward of a significant percentage of the value

of his interest in & Capital and transfer it to the two Limited partners. Certainly that

cannot be an equitable result.  For all of these reasons we have adopted the Regan

base case as the appropriate standard with which to measure the value of the

investments of the partnership.[21]

Further, Regan testified that in a real sense, a discount here is a discount on a

discount; that is, each of the investments were purchased at a price which reflects

what a willing buyer would pay a willing seller, and would rationally take into account

the marketability and liquidity  issues raised by Bingham. And, of course, it does not

seem right to apply a transaction fee when there has not been and does not appear

to prospectively be any transactions. For all of these reasons, as in Claim #1 above,

the Panel has determined that in fact it is not Soward who owes to the Partnership,

but the partnership that owes Soward. Accordingly, the Panel herewith denies this

claim.

## #G. Counterclaim by & Capital Partners against Soward for loss in Passport

Respondents & Capital Partners, Bosack, and Lerner claim losses of

$1,556,510 plus prejudgment interest arising from the investment of & Capital

Partners in the Passport cosmetics venture.  We find that Soward, acting as general

partner, is liable for that loss on the ground of breach of fiduciary duty.  In making

---

[21]  Bingham agreed that the Regan Base case was an appropriate beginning of the valuation process; see the

this investment, Soward's actions, tinged with personal interest, were grossly negligent and reckless.  Therefore, the business judgment rule is not a defense that is applicable to this claim and paragraphs 5.3 and 5.4 of the Limited partnership Agreement (Ex. 3017) do not shield Soward from liability.

Between June 2001 and July 2003, Soward invested over $1.5 million in a cosmetics company, known as Taxi L.L.P. and later as Passport L.L.C.  The company was founded by Meredith McGann and Erin Cotter, two young women with no business experience and no start-up capital.  Although McGann testified that there had been some business plans, the only one in evidence relates to plans for a retail store.  Nothing was submitted that related to the actual business plan to sell the Passport line through Sephora, Boots, and similar stores[22], nor was there anything which showed a schedule for the investment of funds, the basis for further disbursements, or any benchmarks for measuring performance.

After meeting the young women at Aqua, a San Francisco restaurant, in January 2001, Soward began to invest money in the company even before entering into any written agreement.  By the time the agreement of May 20, 2002, was executed, he already had invested approximately $185,000 without obtaining any formal documentation (Ex. 8000).  When attorney Wood did prepare the documentation, it stated that & Capital Partners was to invest $715,000 and receive a 60% equity share, while the young women were to invest $1 each and receive a 40% share.  Further, cosmetics industry veteran Malcolm Kemp agreed to assist in

---

discussion under claim #1 above .

[22] Later materials submitted to the Panel in January 2006 were essentially promotional materials, not a business plan.

building the company and, according to instructions from Soward, was given a 15%

share "off the books" instead of a salary.

Soward defends his actions by explaining that he was simply investing in

another cosmetics company in order to replicate the success of Urban Decay, Lerner's

company which finally was sold to LVMH for approximately $16 million.[23] He claims

that he reconnected with the Urban Decay team, including Wendy Zomnir and

Malcolm Kemp, and believed that the new company could succeed with their help.

However, Respondents claim that Lerner specifically ordered Soward not

to invest in another cosmetics company and also that Soward invested in Passport at

least in part to further his romantic interest in Ms. McGann.  Soward denies both

claims.  We reach our determination regardless of whether those claims are true or

not.  Further, Bosack and Lerner argue that Soward breached section 5.1 of the

Partnership Agreement (Ex. 3017) which states the "the General Partner shall not

acquire or dispose of an investment without the prior oral or written consent of the

Limited partners."  We reach our determination also without finding breach of that

provision because the parties never followed that requirement and therefore, over

time, modified that portion of the partnership Agreement by their conduct.  Rather

than adhering to the requirements of section 5.1, Bosack and Lerner approved a

general asset allocation and Soward, working within that framework, selected specific

investments without obtaining specific approval of each one.

Instead, we find a breach of the fiduciary duty of due care pursuant to the

Delaware Revised Uniform Partnership Act, 6 Del. Code, section 15-404 (c).  After

lengthy consideration, the Panel cannot find any rational business purpose for the

Passport investment.  We believe it was not only risky, but reckless misconduct to

invest such a substantial amount of the partnership's money in the Passport venture.

Our views are further supported by the withdrawal document drafted by

Wood and dated July 17, 2003 (Ex. 3676).  The terms of the withdrawal were not

favorable to the partnership.  For some unfathomable reason, Soward agreed to pay

McGann and Cotter another $100,000, to give them 100% of the equity in the

company, and to accept a non-recourse note for only $700,000, less than half of the

amount invested.  By late 2002, Passport was a failure and even Kemp, who testified

that he had believed in the concept when he joined the team in November of 2001,

had departed.  When Soward paid out another $100,000 of the partnership's money

in July 2003, he was throwing good money after bad .  The total  amount of the lost

investment was $1,556,510, and the Panel awards to & Capital that sum, together

with the maximum Delaware prejudgment interest on such sum from July 17, 2003,

the date on which & Capital terminated its interest in Passport.

## #H. Counterclaim by Bosack and Lerner and & Capital Partners for Lost investment value on excess distributions in & Capital Partners

Respondents counterclaim for (i) the deficit balance in Soward's & Capital Partners

Capital Account and  (ii) for lost investment value on excess distributions in & Capital

Partners would only have meaning if we determined that in fact Soward was owed

nothing by & Capital Partners, and that he instead had liability to it on account of his

capital account transactions. We have found to the contrary, and above have

---

[23]    After suffering defeat in the Holmes lawsuit, it would seem that neither Soward nor Lerner would want to replicate the Urban Decay experience.

determined that Soward's actions with respect to his capital account in & Capital Partners did not in any manner breach any duty owed by him to the Limited partners or to the Partnership.[24]  Accordingly, we deny this counterclaim and do not believe that either claim requires any further discussion.

### #I.  Counterclaim by & Trust and Bosack, Lerner And Troiano Against Soward for overpayment of Incentive Allocation Fee For 1999 and 2000.

The core issue  of this counterclaim is the same as that of Soward's Claim #4: does the &Trust Management Agreement mandate the netting of the Hedge Fund and Private Equity categories of Trust investment in the computation of Soward's Incentive Allocation Fee?  Here, as there, our answer is no, for those same reasons discussed at length above in connection with Soward's claim 4[25]. Accordingly, we reject the assertion that Soward committed fraud, or that he breached his fiduciary duty or breached the Management Agreement in connection with the computation of his incentive allocation fee for 1999 and for 2000, and find for Soward on this claim.

### #J.  Counterclaim by &Trust and Bosack, Lerner and Troiano Against Soward for overpayment of Base Management Fee for 2001 and 2002.

In this counterclaim the Respondent has raised the precise issue that is raised and which has been dealt with by the Panel in Claim #3. The only difference is the alignment of the parties and the claims. Here, the Respondents are seeking the return from Soward of the Base Management Fee paid to him for 2001 and 2002; in Claim #3 Soward seeks payment of his Base Management Fee for 2003, payment of which is resisted for the same reasons that return of what he has been paid is

_____

[24] We have below, though, determined that certain other actions of Soward did breach his duty of care.

sought.  Accordingly the Panel has determined that Soward has not committed fraud or violated his fiduciary duties to the Counterclaimants in respect to the payment of his Base Management Fee and the Panel denies this claim.

### #K. Counterclaim by Bosack, Lerner And & Capital Against Soward for $1 Million Loan to Soward

Counterclaimants Bosack, Lerner, and & Capital seek damages of $249,777 from Soward for additional interest, plus interest on the interest, on a loan of $1,000,000 made by & Capital Partners to Soward in 2001.  The purpose of the loan was to assist Soward to purchase a home on Green Street in San Francisco.  The purchase price was $3,550,297.69.  Soward paid $1,000,000 from his personal funds and withdrew $1,559,297.69 from his capital account at & Capital Partners to put toward the purchase price.  He needed the additional $1,000,000 to complete the payment of the purchase price.

In April 2001, Bosack approved the loan of $1,000,000 to Soward from the general funds of & Capital Partners.  He believed the loan was for a short period and was to be secured by a mortgage on the real property at Green Street.  Instead, Soward caused papers to be drafted by the lawyer for & Capital Partners for an interest only loan for thirty years at six and one-eighth percent (6.125%), with a balloon payment of the principal at the end of thirty years.  Bosack thought that the interest was to be six and eight tenths percent (6.8%).

Further, instead of securing the loan by a mortgage on the real property, Soward also had the attorney for & Capital Partners draft a pledge agreement of Soward's 10% interest in & Capital Partners as collateral.  This was Soward's capital account.  At the time of the loan in April 2001 and again when the pledge agreement

---

[25] In view of the extensive discussion in Claim #4 above of this same issue, we do not repeat it here.

was prepared in late 2001, it appears that Soward had a negative balance in his capital account at & Capital Partners because of various withdrawals by him from that account.

In January 2002, approximately nine months after receiving the $1,000,000 from & Capital Partners, Soward sent the documents for the loan (the note and the pledge agreement for his interest in the partnership) to Bosack in Seattle.  Bosack's assistant, Ms. Norgaard, received the documents.  She put them on Bosack's desk.  It is not clear that Bosack ever saw them.  In any event, there was nothing for Bosack to do with regard to the note and pledge.  There was nothing for him to sign.  The pledge agreement was signed by Soward in both his individual capacity as the borrower and in his capacity as General Partner of & Capital Partners as lender.

In December 2001, 2002, and 2003 Soward made payments of interest at the rate set forth in the note at 6.125%.  His payments under the terms of the note were in default, being paid annually rather than quarterly.

In April 2003, Soward requested that Bosack reduce the interest rate on the note.  Bosack did not respond.  In the summer 2003, Clark Nuber, a third party retained by Bosack and Lerner to review the activities of Soward, informed Bosack that no documentation had been found for the $1,000,000 loan, which was still outstanding, or for another loan to Soward which had been paid off earlier.

In August 2003, Bosack denied the request by Soward for a reduction in the interest on the $1,000,000 loan.  He asked Soward to retire the loan as soon as possible.  There is no evidence that Bosack demanded a higher rate of interest as an alternative to his demand for payment.  It is a reasonable inference, made by the Panel, that Bosack knew, or could have found out, that the interest was 6.125% and that a pledge, rather than a mortgage, had been given.

In November 2003, Bosack and Lerner discharged Soward as general partner of & Capital Partners.  At the same time, in November 2003, counsel for Bosack, Lerner, and & Capital Partners sent to counsel for Soward a draft complaint alleging, among other things, that the loan transaction was on terms disadvantageous to & Capital Partners and the partners and was not properly documented.  The draft sought compensatory damages in an amount to be determined at trial and punitive damages according to proof.

In February 2004, Soward filed an arbitration demanding an accounting for his interest in the & Capital Partnership.  He did not offer to pay off the loan as part of his accounting.

In July 2004, Bosack, Lerner, and & Capital Partners filed suit against Soward in the Federal District Court in Seattle for various claims growing out of their relationship in the partnership. The complaint sought damages in an unspecified amount relating to the loan of $1,000,000.

In October 2004, Soward repaid the loan in full with interest at the rate of 6.125%.  Bosack, Lerner, and & Capital Partners accepted payment of the principal and interest on the loan.  There is no evidence that they reserved any rights against Soward for any additional interest.

In this proceeding, Bosack, Lerner, and the &.Capital Partners contend that they would have charged a higher rate of interest for the loan had they known that it was for 30 years and was not secured by a mortgage on real property, but only by a pledge of in their view a valueless interest in the capital account of Soward in & Capital Partners.  They seek the difference between the interest rate paid by Soward and a higher rate of interest.

Bosack and Lerner, by accepting payment in 2004 without complaint, waived any rights against Soward relating to the loan.  When they accepted payment, they

had before them the facts of the undocumented loan. They knew, or could have known, that payments had been made at the lower rate of interest at the end of 2001, 2002, and 2003. They also knew that they did not have the security that Bosack had wished for the loan. However, by that time the issue of a lack of security was moot, the loan having been repaid by Soward.

While Soward was remiss in not documenting the loan promptly and used debatable judgment in signing the pledge agreement as both borrower and lender, he did in fact pay off the loan. If the amount of the interest was insufficient, it would have been a simple matter for Bosack, Lerner, or their counsel to have so informed Soward at the time of payment. But they did not do so. Instead, they took the money without reservation.

For the above reasons, the claim for additional interest on the loan, and interest on that interest, is denied.

## #L.  Counterclaim by & Capital Partners, Bosack and Lerner for $150,000 Loan to Kemp

Counterclaimants & Capital Partners, Bosack, and Lerner seek damages of $150,000 plus interest from Soward for a loan made in February, 2002, by Soward to Mr. Malcolm Kemp from the funds of & Capital Partners.

There was a prior relationship between the parties and Kemp. In 1998, & Capital Partners had retained Kemp in an executive capacity for a company called Urban Decay. Lerner had founded Urban Decay to develop a new kind of cosmetics. In 2000, Kemp was instrumental in the sale of Urban Decay to LVMH Moet Hennessy Louis Vuitton ("LVMH"). He was paid a bonus of $1,000,000 for his work on the sale. He then went to work with LVMH.

Sometime in 2001, Soward told Kemp that & Capital Partners had invested in, and would be making further investments in, a start up company in the cosmetics

business called Taxi (later renamed Passport).  He asked Kemp to serve as chief executive officer of the new company and to supervise the activities of the founders, two young women.

Soward told Kemp that & Capital Partners would provide the financing for the new company.  He said that it would own 60% of the stock.  He said that the two young women would each contribute $1 to the capital and would own 40% of the stock.  Soward told Kemp that he would not have to contribute any capital, but that Kemp would receive 15% of the stock owned by & Capital Partners.[26]  He did not document these arrangements with Kemp.  He likewise did not disclose them to Bosack or Lerner.

In February 2002, Kemp asked Soward for a loan of $150,000 to tide him over for living expenses during an arbitration of a dispute between him and LVMH. Apparently Kemp had spent, or no longer had, the bonus of $1,000,000 paid to him in 2000.

In requesting the loan, Kemp offered a choice to Soward of terms of repayment.  One, repayment of the full amount of the debt.  The other, receiving back $100,000 in cash, together with a 25% ownership interest in Kemp's share of two distributor companies he was intending to set up.  Soward apparently did not accept either alternative.

The day after receiving the terms proposed by Kemp, Soward transferred $150,000 from & Capital Partners to the private account of Kemp at a bank in the Isle of Man.  Soward did not prepare any documents which showed the due date of the loan, the rate of interest, the events of default, or other terms of payment.  He obtained no security.

_____

[26] The transfer of 15% of the stock was apparently in lieu of a salary for Kemp.

Soward did not report the loan to Bosack or Lerner.  Instead, he listed the loan on the accounts of & Capital Partners under the category "other."

In the Summer 2003, a year and half later, Kemp had not repaid the loan.[27] An accounting firm retained by Bosack and Lerner to determine the investment performance by Soward in & Capital Partners and other Bosack and Lerner investment entities learned about the loan.  It informed Soward that the loan needed to be documented.

In September 2003, Soward requested Kemp to repay the loan or to sign a note.  Kemp, then living in England, did not do either.  Instead, his lawyer in California sent to Soward and & Capital Partners a document entitled "Settlement Agreement and Mutual Release."  This document purported to be a general release by Soward, personally, and & Capital Partners of all claims against Kemp and Tikkit Group Ltd (apparently a company in which Kemp held an interest) of "whatever kind or nature," in addition to the claim for $150,000.

The document did not provide for a due date for repayment of the $150,000.  Instead, it provided that the loan would be repaid from the "first" income earned by Tikkit Group, Ltd., after payment of all the company's reasonable expenses, including but not limited to salaries, rent, office expenses, and taxes.  The document provided for payment of 5% simple interest on the $150,000.  However, it provided that the

---

[27] In early 2003, Kemp had terminated his relationship with Passport.  Soward later transferred the total share interest of & Capital Partners in Passport--including the undocumented 15% interest of Kemp in the & Capital Partners shares--to the two young women.  He did not tell the transferees about the undocumented interest of Kemp.  He also apparently did not tell Kemp about the transfer or obtain his approval.

interest would not begin to run until September 2002, six months after the loan was made.

Soward was unwilling to sign the settlement agreement and mutual release. Soward was discussing with & Capital Partners' lawyer the terms of repayment by Kemp at the time Soward was terminated as General partner in November 2003.

The debt still has not been paid. Kemp testified at the arbitration that he is willing to do so. However, he did not say when, or at what interest rate, or that he was abandoning his demand for a general release a condition to payment.

It was reckless conduct by Soward to loan $150,000 of the funds of & Capital Partners to Kemp without any documentation as to repayment of the loan, the due date, the rate of interest, the events of default, or any other terms of the loan. It was also reckless conduct not to obtain security of the loan in view of Kemp's residence in England, which would require legal action overseas in a foreign jurisdiction if Kemp failed to repay the loan.

In this arbitration proceeding, Soward now blames Bosack and Lerner and their counsel for not making a better effort to collect the debt. However, he did not provide them with the documentation to support the terms of the loan or time of repayment.

The Panel finds that Soward breached his duty of due care to & Capital Partners under Delaware law with respect to the $150,000 loan. The Panel finds that & Capital Partners is entitled to recover $150,000 from Soward, plus prejudgment interest under Delaware law on that amount from February 27, 2002, to the date of this interim award, plus interest on the $150,000 including prejudgment interest until the award is paid.

In view of Soward's contention that the loan is still somehow collectible, even though there is no documentation as to its terms, the Panel hereby assigns to

David C. Soward et al and &Trust et al
American Arbitration Association #74 181 Y 00129 04  DEAR

Soward the entire interest of & Capital Partners in the loan to Kemp.  Soward is free

to pursue his remedies, if any, against Kemp.

## #M.  Counterclaim against Soward relating to Institutional Investor Advisory Firm settlement and Soward's Pre-1999 Compensation from The & Trust

This issue arises out of Soward's claim for compensation from The & Trust

in January 1999.  Respondents assert that, in calculating the amount of his

compensation, Soward improperly included as part of Trust assets the total amount

paid to the Trust from a settlement with a large brokerage house ("the brokerage

firm"), or approximately $30,000,000.[28]    Respondents argue that the settlement

included both compensatory and punitive damages and that only the compensatory

portion should have been included in calculating the total Trust assets as the basis

for the fee calculation, not the approximately $18,000,000 paid as punitive damages.

In the early 1990s, The & Trust invested a sizeable amount of money with

the brokerage firm.  Substantial losses were incurred and, upon investigation, were

believed to be due to churning.  The claim against the brokerage firm was taken to

AAA arbitration and, after the arbitration Panel issued an award of approximately

$12,000,000, the parties negotiated a settlement.  On February 5, 1998, the parties

entered into a written settlement agreement pursuant to which the brokerage firm

paid the Trust over $30 million.

At the end of 1998, Soward raised the issue of his compensation.  He had

been hired in October 1992 and, for approximately six years after that, was paid a

---

[28] Because the terms of this settlement are confidential and because of the extreme consequences to the parties if the settlement terms are disclosed to outsiders, the brokerage house is not named here.

salary of $120,000 per year for all of his work as money manager for the & entities

as well as for Bosack's and Lerner's personal accounts.  Also, he received $100,000

to cover his travel and business expenses, including the salary of an assistant, but

nothing additional.  At a meeting in December 1998 in Lerner's cabin in Virginia,

Soward talked with Bosack and Lerner and negotiated an agreement on his

compensation.  The agreed upon fees were to be paid in lieu of any amounts due

under earlier agreements, including the 1993 Fee Agreement with the Trust (Ex.

3018).  Soward testified that, out of a desire to avoid "sticker shock," he told Bosack

and Lerner that his total compensation for the six year period would be

approximately $5,000,000 (Soward testimony, August 12, 2005, pp. 55-56).  He

added that Bosack and Lerner did not object.

The rationale for paying Soward any amount based on Trust assets that

included a portion of the settlement proceeds was that the churning had deprived

him of fees he otherwise would have made.  The formula in his Fee Agreement with

the Trust (Ex. 3018) required that he beat the performance of the S & P 500 in order

to claim his share of the profits.  Because of the churning, there were losses and the

investments did not perform as they would have otherwise.  The idea was to

compensate Soward as if the settlement money had been pre-1999 investment

returns.  Trustees Troiano and Kaufmann objected to any payment based on

settlement proceeds, but Lerner disagreed and persuaded Bosack to join her in

approving this approach to compensation.

There was conflicting testimony about communications related to the

settlement money.  Respondents assert that the arbitration was bifurcated into a

compensatory damages phase and a punitive damages phase and that, therefore,

any settlement money paid in excess of the $12,000,000 awarded by the Panel  after

the first phase, should be considered punitive damages.  They claim that they

discussed the issue among themselves and that the two trustees, Troiano and

Kaufman, were told to direct Soward not to include the  punitive portion of the

settlement funds in the Trust assets as a basis for calculating his fees (Lerner,

October 10, 2005, pp. 180-181).  By contrast, Soward testified that no one told him

not to include the entire $30,000,000 in the Trust assets and argued that, in fact,

these funds were Trust assets.

Respondents claim that Soward fraudulently hid the fact that he included

the punitives in his fee calculation.  Regardless of who said what to whom, we find

that Soward did nothing of the sort.  We note that Soward spelled out his fee

calculation in writing several times and that the basis for the calculation should have

been clear to respondents.   For example, on December 8, 1998, Soward confirmed

the fee agreement in an email to Lerner, stating the Trust assets as $130,000,000

(Ex. 3151).  That email was sent to Bosack and, later, to Troiano (Ex. 3173).

Although Lerner suggested that Soward could just pay himself, Soward insisted that

Troiano, as trustee, would have to authorize the payment (Ex. 3153).  Troiano

confirmed with Bosack and Lerner that he was authorized to pay Soward $3,325,000

from the Trust (Ex. 3174).  Then, Soward sent him a letter dated January 8, 1999,

confirming the authorization and stating that he was withdrawing that amount from

the Trust's Copper Mountain account (Ex. 3177).  On that same date, Soward sent a

letter to Bosack and Lerner confirming the amount of the payment from the Trust as

well as those from the accounts of the Foundation, Bosack, and Lerner (Ex. 3178).

Because of these written confirmations of Soward's calculation of the fee, the Panel does not believe that Soward attempted to deceive Respondents about the basis for his fee calculation, including the amount of Trust assets on which it was based.  When trustee and fiduciary Troiano authorized the payment, he was responsible for reviewing the calculation.  It was his responsibility to confirm that the stated amount of Trust assets was correct.  Surely, if Soward overstated the Trust assets by $18,000,000, Troiano was obligated to alert Bosack and Lerner at that time.

Significantly, we also note that Respondents' claim concerning punitive damages is inconsistent with the position they took with the IRS.  They obtained an opinion from attorney Wood regarding the tax treatment of the settlement amount.  On November 30, 1998, Wood sent them an opinion letter concluding that all of the amounts paid in settlement reasonably could be characterized as a return of capital and, therefore, would be taxed as long term capital gain rather than as ordinary income (Ex. 3149).  Respondents subsequently took that position with the IRS in order to avoid paying the much higher tax rate for punitive damages.  The Panel believes that Respondents are bound by the position they took with the government and, therefore, we need not reach the other defenses offered by Claimant, including the statutes of limitations.

For these reasons, we deny Respondents' claim that the Trust overpaid Soward's pre-1999 compensation and award nothing on this claim.

### #N.   Counterclaim by Bosack, Lerner And & Capital Against Soward Arising out of KPMG Tax Shelter

Counterclaimants Bosack, Lerner, and & Capital seek damages from Soward for placing them in a "tax shelter" which is now being challenged by the Internal Revenue Service.  Counterclaimants seek damages of $3,024,147.  The claim is denied.

In 1996, Soward informed Bosack of an opportunity to hedge against currency fluctuations overseas and to reduce United States Federal income taxes for Bosack and Lerner through an investment by & Capital Partners in a complicated offshore exchange of stock involving the Union Bank of Switzerland and other offshore companies ("the "UBS" transaction).  In essence, the investment as structured by KPMG, and as intended to be executed by the parties offshore, would almost certainly result in a Federal tax deduction of approximately $15 for Bosack, Lerner, and Soward for every $1 invested.

There was to be one investment transaction, but the losses, if and when they occurred, were to be taken in roughly equal proportions in two separate years, 1996 and 1997.  The investment transaction in fact resulted in losses in both years.  The & Partnership, and Bosack, Lerner, and Soward took the losses on their individual tax returns, reducing the income tax ultimately payable by Bosack, Lerner, and Soward in each year.

In 2001, the Internal Revenue Service (IRS) challenged the deductions by Bosack, and Lerner for the second year.  It had allowed the statute of limitations run on the deduction taken by Soward for the second year.  It had not challenged the deductions by Bosack, Lerner, or Soward for the first year.  As to the second year, the Internal Revenue service contended that the investment program was an illegal "tax shelter," in essence, a transaction solely for tax purposes without economic substance.

In 2001, Bosack and Lerner paid the additional tax and penalties claimed by the IRS to be due for the second year.  They then retained an experienced tax lawyer and sued for a refund of the tax paid.  After consulting with their lawyer, they alleged among other things that the investment as structured had economic substance.  In making this allegation, they were subject to the strictures of Rule 11, Federal Rules of Civil Procedure.  The tax refund lawsuit is still pending.  It appears from the evidence that the IRS may be willing to enter a settlement.

In their present claim against Soward, Bosack and Lerner contend that he committed actual fraud, constructive fraud, made negligent misrepresentations, and breached his fiduciary duties to them in connection with the UBS transaction.  Reduced to its essentials, the claim is that Soward did not adequately inform them of the risks of the transaction from a tax standpoint and that had he so informed them of the risks of a possible disallowance of the deduction, they would not have authorized him to make the investment.  They claim that they thus would have saved the costs of battling the IRS as to the deduction for the second year, interest, and penalties.

Bosack and Lerner support their claim as to the extreme risk of the investment  with evidence, inter alia, that KPMG, the sponsor of the type of investment, has recently entered into a consent judgment in the Federal District Court in New York acknowledging wrongdoing in connection with the UBS type of transaction, characterizing it as a "tax shelter."

However, this claim is inconsistent with the claim by Bosack and Lerner in the Federal District Court in their tax refund case that the investment had economic substance, was genuine, and was commercially reasonable—i.e., that it was not unlawful and that they should not be penalized.

It will never be known for sure what Soward told Bosack about the nature of the investment in UBS or its risks.  The evidence is conflicting as to what was said or not said.

It is known that from the beginning of their relationship with Soward, Bosack and Lerner were interested in ways of reducing or avoiding Federal and State tax.

It is further known that no reported case has yet to hold, after a contested trial and appeal, that the UBS transaction was indeed solely a tax shelter which would not justify a deduction for losses sustained.

It was within the judgment of Soward to make investments that would reduce taxes, if possible, for Bosack and Lerner.  It was also within his sound judgment to take risks, where, appropriate, to achieve that end.  It is difficult to say, on the merits, that the risks of a tax challenge to the UBS transaction in the case of Bosack and Lerner were inappropriate, where the IRS elected not to challenge the deductions of losses for the first year, but in effect allowed them.

In taking the risk, to the extent such risk existed, Soward in the end produced a tax benefit for Bosack and Lerner.  They have not offered to offset that tax benefit for the first year against the damages claimed by them for the second part of the transaction.

We do not find that Soward committed actual fraud, constructive fraud, made a negligent representation, or breached any fiduciary duty in making the investment of $1,000,000 in the UBS transaction, but was acting within his parameters to make investments in transactions would produce a benefit for one year, or for several years.

The fact that the IRS ultimately tried to set aside the deduction for one year does not convert the alleged failure to disclose the risks, even if they all could have

been perfectly known, into a claim for damages for the costs of defending against the IRS claims or other costs of the transaction.

The risks were not just taken on behalf of Bosack and Lerner. They were taken also on behalf of Soward. It cannot be assumed that he was acting against his own interest, in an irrational manner, in making the investment for Bosack and Lerner in the UBS transaction.

In view of the above disposition of this claim, we do not reach the argument by Soward that the claim relating to UBS is barred by the statute of limitations. Were we to need to reach that argument to adjudicate this claim, we would find that the claim was barred by the statute of limitations.

The IRS sent a notice of deficiency to Bosack and Lerner in the summer 2001. This put them on notice of a possible tax assessment. It also put them on notice of a possible claim, now asserted, against Soward, who had put them into the UBS transaction.

Later, in the Fall 2001, Bosack and Lerner discussed the IRS notice with their specially retained tax counsel. Again, they had the opportunity to understand the tax risks, as then known to tax counsel, and to assert their present claim against Soward. But they did not do so. Instead, they let the statute of limitations run on any claim against Soward. They did not first assert the UBS claim until 2006, well outside the period of the statute of limitations in Delaware (3 years).

Bosack and Lerner now claim, as an alternative theory, that even if their present claim based on tax risks against Soward is barred by the statute of limitations, they are entitled to offset the full amount of that claim against the amounts presently claimed by Soward against them, to the extent that both claims existed at the same time when neither of them was barred by the statute of limitations.

This claim is without merit.  It depends on whether the amount of the claims can be determined.  Here, the respective amounts of the claims were not in a liquidated amount at any given point in time.  Instead, they were fluid, to be determined at a later date after a hearing.  Bosack and Lerner are still litigating their claim against the IRS.  The amount of that claim will not be determined, by adjudication or settlement, until sometime in the future.  It is conceivable that the IRS could abandon its claim against Bosack and Lerner altogether.

Bosack and Lerner did not present evidence of any specific amount to be offset by them at any point in time before the claim against Soward relating to entry into the UBS transaction was barred.  Even if their present contention had merit, it fails for lack of proof.

#O.  **Counterclaim by & Capital Inc. against Soward for the salaries of Soward's employees.**

This is a simple contract claim. & Capital Inc. ("Inc."), was a corporation in which Soward was the Executive Vice President, and which had been formed by Bosack and Lerner for the purpose of paying the salaries of Soward's office staff, consisting principally of Lisa Snyder and Bachelle Simms. Although there was no written agreement in effect dealing with who ultimately would bear the cost of Sims and Snyder, Norgaard (the bookkeeper for & Capital) testified that Soward, for the years prior to 2003, at year end, would reimburse Inc. for the salaries of his office staff.[29] Accordingly, the undisputed testimony appears to be that the custom and practice was for Soward to make Inc. whole for office salaries paid by it. Although

---

[29] Soward received an annual stipend of $120,000, later raised to $135,000, with which to pay travel and like expenses.

payment was usually made by Soward at year end, it is not unreasonable to require Soward to reimburse Inc. for the 11 months that he was functioning in 2003.[30]

Invoices were placed into evidence detailing the salaries paid to Simms and Snyder: $70,512 and $79,265, respectively, or an aggregate amount of $149,777. Soward was terminated on the 327th day of the year, however, and only ought to be liable in an amount which reflects that, or $134,184, and the Panel accordingly grants Inc.'s claim for reimbursement in the amount of $134,184, together with prejudgment interest from 1/1/2004 at the rate of 10% per annum.

### #P.  Counterclaim by Cartesian Partners and Bosack Against Soward For $1,109,400 Loan to Myerson

Counterclaimants Cartesian Partners and Bosack seek damages of $90,204 for additional interest on a loan by Cartesian Partners to Brian Myerson.

The facts are straightforward.  In 2001, Soward had known Mr. Myerson for seven or eight years.  Cambridge Associates, which was advising Bosack and Lerner on investment allocations at the time Soward entered into his relationship with them in 1992, had introduced Soward to Mr. Myerson in 1992 or 1993.  Bosack and Lerner had money invested with Mr. Myerson, who operated investment funds in England.

In January 2001, Soward, on behalf of Cartesian, offered to acquire 250,000 shares of ordinary stock of a British company, Retail Stores, for 3 pounds per share from a company owned by Mr. Myerson and his family (Second Concerto Corporation).  Mr. Myerson offered to take the shares off Soward's hands ("place" them) within approximately 45 days for the same 3 pounds per share.  If Mr. Myerson could not place some or all of the shares with a third party within the 45 days, Mr. Myerson gave Cartesian the right to "put" the remaining shares back to

---

[30] Soward was terminated on November 24, 2003

Second Concerto at 3 pounds per share--the same price that Cartesian had paid for them.

In March 2001, the 250,000 shares had not been placed. Soward then "put" the shares back to Second Concerto. However, Second Concerto did not have the money to pay for them. In March, Soward, on behalf of Cartesian, then converted the debt of Second Concerto for the 250,000 shares at 3 pounds per share to a loan. It was not clear if the loan was to Second Concerto, Mr. Myerson, or Mr. Myerson and his family. The terms of the loan had not been set out in Soward's offer to purchase the shares. Soward did not document the loan, the interest rate, or the repayment terms. Nor did he document the currency of repayment or how and when the loan was to be repaid. It was in essence an "off books" transaction.

In October 2001, Soward invited Mr. Myerson to be the best man at his wedding in the United States. Even though he and Mr. Myerson were together at the events surrounding the wedding, it does not appear that they did anything to document the loan at the time or thereafter. A few days later, Soward met with Bosack and Lerner for a review of the overall status of the "&Empire"—the name given to the collective assets of & Capital Trust, & Capital Partners, The Foundation, and Cartesian Partners. He did not disclose the loan.

In July 2002, about 16 months after the debt owed by Second Concerto was converted to a loan, Soward obtained repayment of the loan. It is not clear from the evidence as to who made the payment—Mr. Myerson personally, Second Concerto, or some other payor. As interest, Soward charged the then current Libor rate of 1.83% plus 1%. In the period since the loan was made in 2001, the Libor rate had declined from 5.57% to 1.83%. Thus, instead of charging the Libor rate at the time the loan was made for the period until the loan was paid, Soward charged the lower Libor rate in effect at time of payment.

Soward also allowed the loan to be paid off in dollars, which, in the meantime, had declined in value against the British pound.  At the time of the pay off, Soward told Mr. Myerson that on a British pound basis the loan was "practically interest free."

Bosack, on his own behalf and on behalf of Cartesian, contends that the loan was a "sweetheart" deal between Soward and his friend, Mr. Myerson.  He seeks an additional $90,244 in interest for the loan.  Soward contends that the initial purchase transaction for the stock, and the later conversion of the purchase to a loan, was always in dollars, and that it would be improper to base repayment of the loan on the then current value of the pound.  He points particularly to a handwritten notation on the instruction to the American bank holding Cartesian funds to transfer 750,000 pounds for the purchase of the stock.  He argues that the notation shows that the transaction was intended to be in dollars, not in pounds.  This notation shows that at an exchange rate of 1.4792 dollars for a British pound, the loan was for $1,109,400.  Based upon the evidence and testimony which we find credible, the Panel finds that the loan was to be in dollars, repayable in dollars not in pounds.  Thus, it was not improper to accept repayment in dollars, even though the dollar had weakened against the British pound.

Nonetheless, we find that Soward breached his duty of care as general partner to Bosack, as limited partner, and to Cartesian, by failing to document the loan as to interest.  Having failed to do so, he cannot now complain if any ambiguities are resolved against him as to the amount of interest payable on the loan.  Soward placed Bosack and Cartesian at risk of a lesser return on the loan if the Libor interest rate declined.

Further, it was reckless to place the determination of interest at the time of repayment, rather than at the time of the loan.  Soward did nothing to protect

Bosack and Cartesian against the downside risk that interest rates would fall.  In fact, the Libor interest rates fell a significant amount between the time of the loan and the time of repayment.  As of March 31, 2001, the time of the loan, the Libor rate was 5.5700%.  As of July 30, 2002, the date of payment, the rate was 1.8300%.  This was a difference of 3.7400%.  Soward applied an average Libor rate of 3.02105% to the loan for the 557 days that the loan was outstanding.  This average rate was a difference of 2.54895% from the Libor rate as of the date of the loan, i.e., 5.5700%.  At simple interest, the result of the difference in interest rates came to $15,750.09 (2.54895% times $1,109,400 times 557 days)

Having acted in a reckless manner as to the setting of the interest rate, and also in a reckless manner as to failing to document the interest rate at the time the loan was made, Soward is liable for this difference in interest rates.  For the foregoing reasons, Cartesian Partners is entitled to recover $15,750.09 from Soward, plus prejudgment interest at the maximum rate permitted by Delaware law, from August 1, 2002, until entry of the final award herein.

Because the loan of $1,109,400 was ultimately repaid, albeit at a lower interest rate than appropriate, we do not reach the contention by Bosack and Cartesian that the loan was based on a personal relationship between Mr. Soward and Mr. Myerson who, among other things, appointed Soward to advisory boards for some of Myerson's investment funds.

## IV. AWARD

Based on all of the Foregoing, the Panel herewith unanimously AWARDS as follows:

    i.    This is an interim award, and for those reasons set forth above, is not intended to be confirmable until it is incorporated into a final award.

David C. Soward et al and &Trust et al
American Arbitration Association #74 181 Y 00129 04  DEAR

    ii.    On his claim #1, Soward is herewith awarded against & Capital Partners the sum of $249,578, together with prejudgment interest commencing as of 90 days after the date of his termination, or 2/23/2004. Interest shall accrue at the maximum Delaware rate; both parties shall, within 20 days after the date of this award, provide the Panel with a memorandum of the proper interest under Delaware law and the manner of its calculation; that amount shall be incorporated into the final award as part of the amount of recovery on this claim;

    iii.    On his claim #2, for those reasons set forth above, it is the determination of the Panel that Soward is and continues to be a partner in Cartesian and is entitled to be paid the value of his capital account as of his withdrawal as partner. Accordingly, within 60 days after the date of this interim award, the claimant and respondents shall file with the Panel an accounting, prepared by their experts, calculating the value of Soward's capital account as of 9/30/2006. That amount, together with interest accruing as of 10/1/2006, shall be incorporated into the final award as the amount awarded to Soward on this claim. Interest shall be calculated in the manner established in the memoranda to be furnished to the Panel pursuant to the immediately preceding claim. Cartesian is directed to cooperate with Soward with respect to access to Cartesian's books and records for the purpose of making such accounting;

§17-802 of the Delaware Limited Partnership act provides that "on application by or for a partner the Court of Chancery may decree dissolution of a limited partnership whenever it is not reasonably practicable to carry on the business in conformity with the partnership agreement". We do not believe that it is reasonably practicable to carry on the business of Cartesian

with Soward as a partner. Accordingly, once Soward has had an accounting and the value of his interest has been determined, Cartesian shall have 60 days in which to pay that amount to Soward; upon payment to Soward, it is the decree of this Panel that Soward shall no longer be a partner of Cartesian and shall be considered for every purpose as having withdrawn as a partner. In the event that Soward is not paid the value of his capital account within 60 days it is the decree of this Panel that, pursuant to §17-802 of the Delaware law applicable to Limited partnerships, Cartesian shall be dissolved, and in the manner set forth in §17-803, wound up.

iv.   On his claim #3, Soward is herewith awarded against & Trust the sum of $338,400. Both parties have agreed that California law has application to this claim; accordingly, that sum shall bear prejudgment interest from May 1, 2003, at the rate of 10% per annum;

v.   On his claim #4, Soward's Claim Against & Trust For Unpaid 2001, 2002, and 2003 Incentive Allocation Fees,  Soward is hereby awarded against the & Trust the following sums:

(a) $532,263, together with prejudgment interest under California law commencing as of May 1, 2002, at the rate of 10%, for unpaid incentive allocation fees for 2001.  The aggregate amount of interest at that daily rate shall be incorporated into the Final Award on Claim #4;

(b) $190,004, together with prejudgment interest under California law commencing as of May 1, 2003, at the rate of 10%, for unpaid incentive allocation fees for 2002. The aggregate amount of interest at that daily rate shall be incorporated into the Final Award on Claim #4;

(c) $574,488, together with prejudgment interest under California law commencing as of May 1, 2004, at the rate of 10%, for unpaid incentive allocation fees for 2003. The aggregate amount of interest at that daily rate shall be incorporated into the Final Award on Claim #4;

vi.    On his claim #5, Soward is herewith awarded against the Bette Kruger and Leonard Bosack  Foundation the sum of $55,802, together with prejudgment interest thereon from November 24, 2003, at the rate of 10% per annum;

vii.    Counterclaim E is DENIED;

viii.    Counterclaim F is DENIED;

ix.    Counterclaim G is GRANTED against Soward, and Soward shall pay to the Respondents on such claim the sum of  $1,556,510, together with prejudgment interest at the maximum rate permitted under Delaware Law from July 17, 2003, the date on which & Capital terminated its interest in Passport;

x.    Counterclaim H is DENIED;

xi.    Counterclaim I is DENIED;

xii.    Counterclaim J is DENIED;

xiii.    Counterclaim K is DENIED;

xiv.    Counterclaim L is GRANTED and Soward shall pay to the Respondents with respect to such claim the sum of $150,000, plus the maximum permitted rate of prejudgment interest under Delaware law from February 27, 2002. The Panel herewith assigns to Soward the entire interest of & Capital Partners in the loan to Kemp and Soward is free to pursue his remedy against Kemp;

xv.    Counterclaim M is DENIED;

xvi.    Counterclaim N is DENIED;

David C. Soward et al and &Trust et al
American Arbitration Association #74 181 Y 00129 04  DEAR

xvii.   Counterclaim O is granted, and Soward shall pay to & Capital Inc. the sum of
$134,184, together with prejudgment interest thereon from November 24,
2003,  at the rate of 10% per annum; and

xviii.   Counterclaim P is GRANTED against Soward, and Soward shall pay Cartesian
Partners the sum of $15,750.09 plus the maximum permitted rate of
prejudgment interest under Delaware law from August 1, 2002.

xix.   This interim Award includes a full settlement and determination of all claims
and counterclaims submitted to the Panel in this arbitration, except for the
(1) claims set for hearing in September, (2) claims relating to the accuracy of
the accounting for the value of the interest of Soward in Cartesian Partners,
(3) claims for punitive damages, and (4) claims for attorney's fees and costs.
All other claims and counterclaims not expressly granted in the Interim
Award are hereby denied.

xx.   The Panel reserves jurisdiction over this arbitration proceeding for all
purposes until entry of the Final Award herein.

**DATED:** September 7, 2006

Professor J. Lani Bader
Arbitrator

Zela G. Claiborne
Arbitrator

Thomas J. Klitgaard
Arbitrator