# TAB 2

**SUBJECT TO PROTECTIVE ORDER DATED MARCH 21, 2006**

# *AMERICAN ARBITRATION ASSOCIATION*

**Commercial Arbitration Tribunal**

**DAVID C. SOWARD**, an individual; & Management **COMPANY**

Claimants and Counter Respondents

and

**THE & TRUST; SANDY LERNER**, Individually and as Trustee on behalf of the & Trust and the Sandy Lerner Trust; **LEONARD BOSACK,** individually and as Trustee on behalf of the & Trust and The Leonard Bosack Trust; **RICHARD TROIANO,** as Trustee on behalf of **the & Trust; & CAPITAL PARTNERS, L.P.; CARTESIAN PARTNERS, L.P.; LEONARD BOSACK AND BETTE M. KRUGER FOUNDATION,** a California corporation; and **& CAPITAL, INC.**

Respondents and Counterclaimants

**INTERIM AWARD #2**
No. #74 181 Y 00129 04 DEAR

THE UNDERSIGNED ARBITRATORS, having been designated in accordance with the arbitration agreement contained in the Management Agreement ("Management Agreement") entered into between the parties on January 30, 2001, and effective as of January 1, 1999, and having been duly sworn, and having duly heard the proofs and allegations of the Parties, do hereby AWARD as follows:

**PRELIMINARY STATEMENT**

In making our findings and award, we have considered the documentary evidence, the credibility of the witnesses, the expert testimony and reports, our views of the weight to be given to the documentary evidence and the testimony of the various witnesses including the experts and their reports, and the oral and written arguments of the parties. We have also considered the inferences that could, or could not, be drawn, from the documents, the reports, and the testimony.

**I. BACKGROUND AND PROCEDURAL HISTORY**

This matter was the subject of Interim Award #1 ("the Interim Award"), dated September 7, 2006. The Interim Award disposed of 17 claims between the Parties and reserved jurisdiction for the purpose of permitting the Panel to hear certain additional claims which were added to this matter pursuant to the Panel's Hearing Order #24. Accordingly, in September 2006, the Panel heard testimony with respect to the "Westar claims." Briefs were then filed by the Parties, and the matter declared closed as to Westar as of October 5, 2006.

**II. THE WESTAR CLAIMS**

In 1995, Soward caused & Capital Partners ("& Capital" or the "Partnership") to make a major investment in Republic Leasing, Inc., which subsequently became Westar Financial Services Incorporated ("Westar"). The total Investment in Westar made by & Capital was $4,250,000: $3,000,000 of that was in loans and the balance in Preferred shares. Apparently, part of the & Capital deal made

by Soward with Westar was that Soward was to become a member of the Westar board. Soward did so, and remained a member until approximately October 2001. While on the Westar board, Soward received as compensation cash fees of $6,006, and 3,660 shares in lieu of cash fees. The shares were valued by Westar at $18,300, although, given the subsequent bankruptcy of Westar, of no probable value to Soward now.

Westar fell upon hard times and ultimately went into bankruptcy. During September 2001, while & Capital and Westar were involved in workout negotiations over the loans and dividends, Westar, without explanation, caused $400,288 (specifically $400,288.70) to be deposited by wire transfer into Soward's personal Schwab account. Those funds remained in his account for approximately 26 months. At the time that the funds were first deposited into his account, Soward consulted with Rummage and Kaufmann, two of & Capital's attorneys, about how the funds ought to be handled. Counsel advised Soward that, while the Westar negotiations continued, the funds ought to be left alone in the Schwab account.[1] Accordingly, the funds remained in Soward's account until November 21, 2003, when Soward transferred the funds to & Capital.

Soward testified that he consulted both Rummage and his bankruptcy partner Allred[2] as late as November 2003 about whether or not he ought to continue retaining the funds in his account. Rummage and Allred denied that testimony at the hearings. It is clear, however, that Soward notified Rummage and Kaufmann that the funds had been deposited into his account and that the lawyers had advised Soward to--in the vernacular of Kaufmann--"let sleeping dogs lie." It is fair to assume that, once the advice of counsel for both the partnership and for Soward had been sought with respect to Soward's retention of funds in a context that potentially triggered commingling by

---

1 Rummage apparently wanted to avoid characterizing the funds as either a loan payment or as a dividend payment, but rather to preserve the flexibility of being able to characterize the funds in whatever manner would be of maximum value in the Westar negotiations.

2 & Capital's bankruptcy attorney retained to deal with the Westar matter.

Soward, counsel would undertake the burden of advising Soward concerning when to transfer the funds to & Capital. Certainly, counsel should have done so once Soward's retention of the funds became potentially wrongful. However, there is no documentary evidence that counsel gave Soward any clear instruction on this point or that they ever explicitly told him not to leave the money in his account. Further, there is no evidence that Soward's retention of the funds was intended by him to be in derogation of & Capital's ownership of the funds. Moreover, Soward openly acknowledged that the deposit had been made, reminded counsel of that fact at intervals, and never denied that the money belonged to the partnership.

Between September 25, 2001[3] and April 1, 2003, there was at all times not less than $400,288 in Soward's account. Soward testified that those funds were earning interest at the rate of 1.5%, and accordingly, Soward owes to & Capital an amount equal to that interest rate calculated for a period of 553 days, or $16.44 per day for 553 days, or an aggregate sum of $9,096.77. However, in April 2003, Soward began to withdraw funds from the account for personal uses, reducing the balance below $400,280 to $203,917.22 just prior to repayment of the full $400,280 to the Partnership account in November 2003, a few days before his termination. In making repayment, he did not repay the interest that accrued on the $400,280 in his account. Soward testified that all times during the period in which the balance in his Schwab account was below $400,288, the balance in his Copper Mountain bank account was in excess of that amount and that he had the ability to repay the money at all times.

Westar is still in bankruptcy. & Capital has been paid out of the bankrupt estate the sum of #1,269,367, $710,259 of which has been paid subsequent to Soward's termination. & Capital now contends that:

---

[3] The date the funds were deposited in Soward's account.

1. the retention of the funds in Soward's Schwab account was a breach of the fiduciary duties owed by him to the Limited Partners, and was a wrongful conversion of those funds;
2. Soward's becoming a member of the board of directors of Westar and retaining the director fees was a breach of the fiduciary duties owed by him to the Limited Partners; and
3. Not selling or otherwise attempting to recoup the Westar investment was a breach of the fiduciary duties of care, loyalty, and good faith owed by Soward to & Capital.

## III. Discussion

### 1. Retaining Westar funds in Soward's personal Schwab account.

There is no question that Soward notified Kaufmann and Rummage of the receipt of the $400,288 and sought their advice with respect to the handling of the money. Kaufman and Rummage advised that, until the completion of the negotiations with Westar, nothing ought to be done to the funds. Presumably, Rummage informed his partner Allred of this situation, although that was not made clear at the hearings. However, at the hearings, Allred testified that there appeared to be little reason for Soward to have retained the funds in his account. He added that the matter of who had custody of the funds made absolutely no difference in terms of how they were likely to be characterized by the Trustee in bankruptcy. Unfortunately, none of the lawyers followed through with additional advice to Soward on how to handle the money once they had given their initial advice about not disturbing the funds deposited with him.

Although the Panel believes that the initial deposit of the funds in the Soward account was innocent and that Soward was acting under a legitimate belief that & Capital's negotiating position with Westar would somehow be enhanced by leaving the funds in place, that belief erodes the longer the funds remain and the further down the road the Westar negotiations travel. It is clear to the panel that by April 2003, when

Soward's balance in the Schwab account had fallen to less than $400,288, what had started as an innocent matter had become not only an improper commingling of funds, but an improper *use* of commingled funds. The innocence of Soward's motivation cannot cure the fact that his use of the funds in the Schwab account-- once the balance dipped below $400,288-- was improper. The fact that Soward testified that he had the ability to repay the funds from some other account and make & Capital whole does not alter that fact.

Accordingly, the Panel determines that commencing in April 2003[4], Soward's use of the commingled funds was the product of an egregious lack of judgment on his part and hence violated his fiduciary duties of good faith, loyalty, and fair dealing owed to & Capital. Two members of the Panel believe that the withdrawal of funds for personal uses, once the commingled account fell below $400,280, and the failure to repay interest, does not rise to the level of conversion. One member of the Panel reaches a different conclusion.

Although & Capital ultimately suffered no loss of the principal sum of $400,280 on account of Soward's breaches, Soward owes the partnership the fair value of the lost interest on the partnership's money on account of Soward's retention of the & Capital funds. The amount which ought to be paid by Soward is the aggregate of (i) the 1.5% discussed above for the period from 9/25/2001 to 4/1/2003; and (ii) the maximum permitted rate under Delaware law for the period from April 1, 2003, when Soward began to use the funds, through November 21, 2003, when the funds were physically transferred to & Capital.

Delaware law has application to the issue of the breach of his fiduciary duties by Soward. Hence, Delaware law will supply the maximum permitted interest rate which ought to be charged to Soward for the use of & Capital's funds. Based on Exhibit 1 of

[4] The date on which the balance in Soward's Schwab account dipped below $400,288.70

Respondents' *Memorandum Regarding Prejudgment Interest*, dated September 27, 2006, the Panel believes that the proper rate as of April 1, 2003, is 8.5%. April 1, 2003 to November 21, 2003, is 234 days. An 8.5% per annum interest rate on $400,288.70 is $93.22 per day; that times 234 is $21,812.99. Soward is liable to & Capital for that amount as of November 21, 2003, together with $9,096.77, for the period September 25, 2001 to April 1, 2003. The aggregate interest is $30,909.77. Since Soward at all times had a 10% interest in & Capital, he must be given a credit of $3,090.97, which results in an amount owed by Soward to & Capital as of November 21, 2003, of $27,818.77. Accordingly, we have below awarded that sum to & Capital, with prejudgment interest in the amount of 7%[5] per annum from November 21, 2003 until paid.

**2. Becoming a member of the board of directors of Westar and retaining the director's fees.**

The Panel believes that, without more, there is simply nothing wrong with an investor representative serving on the board of directors of a corporation in which an investment has been made. Without more, there is nothing shown to be inappropriate here. Although it is clear that a time might come when being both an investor and board member could present a conflict of interest, there was no suggestion that that point was reached here. Indeed, it appears that Soward believed he was, and in fact was, acting in the best interests of & Capital throughout his tenure on the Westar board. In like manner, the Panel does not believe it inappropriate for Soward to retain his board fees, which (in terms of real value) amounted to slightly less that $6,000.00.

---

[5] The maximum rate as of November, 2003 under Delaware law.

Accordingly, we have below found for Soward on this claim, both with respect to conversion and breach of fiduciary duty.

**3. Not selling or otherwise attempting to recoup the Westar investment.**

It appears to the panel that the nature of the issues implicated by the retention of the Westar investment on behalf of & Capital are different from those raised by the retention of the Westar funds by Soward. There was no testimony on this issue that, in the view of the Panel, implicated either loyalty or good faith. However, we believe that the relevant inquiry is whether the retention of the Westar investment for the account of & Capital was a breach of the fiduciary duty of due care pursuant to the Delaware Revised Uniform Partnership Act, 6 Del. Code, section 15-404 (c). After lengthy consideration, the Panel cannot find that it is. Although the Counterclaimants made much of the risk of the retention of the Westar investment, the panel does not find that retaining the investment amounts to gross negligence and recklessness. As to the claim by Soward for 10% of the recovery in the bankruptcy proceedings allocated to & Capital by the Bankruptcy Court, this claim relates to the issue of valuation of the investment in Westar which was decided in Interim Award No. 1. That Interim Award has now become final. It will not be reopened. In the proceeding leading to Interim Award No. 1, Soward's expert assigned no current or residual value in bankruptcy to the investment in Westar.

The argument of the Counterclaimants that the Westar investment ought to have been sold cuts two ways. Galbally, Counterclaimant's expert, testified that there were many banks and institutional investors that would have been willing to purchase the Westar investment. Of course, if it would be a rational business decision to purchase

Westar, is it not also rational to decide to continue to hold Westar once the purchase has been made? The Panel believes that the proper answer to that question is in the affirmative and that in doing so Soward was within the umbrella of the business judgment rule. We do not believe that Soward breached his fiduciary duties of good faith, loyalty and due care on this issue and so below have found for the Claimant.

**III. AWARD**

For the reasons discussed above, the Panel unanimously **AWARDS** as follows:

i. On & Capital's counterclaim with respect to the issues of Soward's alleged breach of his fiduciary duties owed to & Capital with respect to the retention of the Westar funds in his personal Schwab account, the Panel finds for & Capital. Soward shall pay to & Capital the sum of $27,818.77, together with prejudgment interest in the amount of 7% per annum from November 21, 2003, until paid;

ii. On Claimant Soward's claim for 10% of the proceeds received from the bankruptcy estate of Westar, the Panel finds for Respondent and Counterclaimant & Capital.

iii. On & Capital's counterclaims relating to Soward's sitting on the board of directors of Westar and for recovery of his compensation as a director, the Panel finds for Soward;

iv. On & Capital's counterclaim with respect to the issue of Soward's alleged breach of his fiduciary duties owed to & Capital with respect to not timely disposing of the Westar investment, the Panel finds for Soward;

v. This Interim Award No. 2 includes a full settlement and determination of all claims and counterclaims relating to Westar, to the extent no already decided in Interim Award No. 1, except for (1) claims set for hearing in November, (2) claims relating to the accuracy of the accounting for the value of the interest of Soward in Cartesian Partners, (3) claims for punitive damages, and (4) claims for attorney's fees and costs. All other claims and counterclaims relating to Westar not expressly granted in this Interim Award No. 2 are hereby denied.

vi. The Panel reserves jurisdiction over this arbitration proceeding for all purposes until the entry of the Final Award herein.

DATED: November 7, 2006

Professor JL Bader
Chairman of the Panel

Zela G. Claiborne
Arbitrator

Thomas J. Klitgaard
Arbitrator