# Exhibit B

1  LEO P. CUNNINGHAM, State Bar No. 121605
   KYLE A. WOMBOLT, State Bar No. 224603
2  STEPHEN W. BUCHER, State Bar No. 202524
   WILSON SONSINI GOODRICH & ROSATI
3  Professional Corporation
   650 Page Mill Road
4  Palo Alto, CA 94304-1050
   Telephone: (650) 493-9300
5  Facsimile:  (650) 565-5100

6  Attorneys for Respondents
   THE & TRUST, SANDY LERNER,
7  LEONARD BOSACK, RICHARD TROIANO,
   CAPITAL PARTNERS, L.P., CARTESIAN
8  PARTNERS, L.P., LEONARD BOSACK AND
   BETTE M. KRUGER FOUNDATION

9

10                           BEFORE THE

11              AMERICAN ARBITRATION ASSOCIATION

12

13  DAVID C. SOWARD, an individual; &      )   CASE NO.: 74 Y 181 00129 04 LOPE
    MANAGEMENT COMPANY                     )
14                                         )   AMENDED ANSWERING
              Claimants,                   )   STATEMENT AND
15                                         )   COUNTERCLAIMS OF
           v.                              )   RESPONDENTS
16                                         )
    THE & TRUST; SANDY LERNER,             )
17  Individually and as Trustee on behalf of The & )
    Trust and the Sandy Lerner Trust; LEONARD )
18  BOSACK, individually and as Trustee on behalf )
    of The & Trust and the Leonard Bosack Trust; )
19  RICHARD TROIANO, as Trustee on behalf of )
    The & Trust; & CAPITAL PARTNERS, L.P.; )
20  CARTESIAN PARTNERS, L.P.; LEONARD )
    BOSACK AND BETTE M. KRUGER             )
21  FOUNDATION, a California corporation; and & )
    CAPITAL, INC.                          )
22                                         )
           Respondents/Counterclaimants    )
23  _____ )

24        Respondents/Counterclaimants The & Trust, Sandy Lerner ("Lerner"), individually, as

25  Trustee on behalf of the & Trust and as Trustee on behalf of the Sandra K. Lerner Living Trust,

26  Leonard Bosack ("Bosack"), individually, as Trustee on behalf of the & Trust and as Trustee on

27  behalf of the Leonard Bosack Living Trust, Richard Troiano ("Troiano"), as Trustee on behalf of

28  the & Trust, & Capital Partners L.P. ("Capital Partners"), Cartesian Partners L.P. ("Cartesian"),

1   & Capital, Inc. and the Leonard X. Bosack and Bette M. Kruger Foundation (the "Foundation"

2   and, collectively with the other respondents, the "Respondents" or "Bosack and Lerner"), hereby

3   answer the Statement of Claim filed by David C. Soward and & Management Company

4   (collectively, the "Claimants" or "Soward") and assert counterclaims as follows:

### GENERAL DENIAL OF ALLEGATIONS

6       1.      Respondents generally deny all allegations set forth in or supporting Claimants'

7   Statement of Claim and deny that Claimants are entitled to any of the relief sought in their

8   Statement of Claim.

### RESPONDENTS' COUNTERCLAIMS

10  I.      **Nature of the Present Dispute**

11      2.      The dispute between the parties to this arbitration arises from Soward's betrayal of

12  the trust and confidence that Bosack and Lerner placed in him.  Claimants David C. Soward and &

13  Management Company, of which Soward is sole owner, were entrusted with the control and the

14  responsibility to manage hundreds of millions of dollars of Bosack and Lerner's assets.  In

15  accepting that control, responsibility, and generous compensation from Bosack and Lerner,

16  Soward entered into a fiduciary relationship with them.  Soward breached his fiduciary duties, as

17  well as other statutory and common law duties, and defrauded Bosack and Lerner through a

18  pattern of misconduct that included the following:

- Soward improperly withdrew assets from an investment partnership and concealed those withdrawals from Bosack and Lerner;

- Soward misrepresented the value of various investments held by an investment partnership and thereby fraudulently inflated amounts he was entitled to withdraw from that entity;

- Soward borrowed money from Bosack and Lerner on terms that were misrepresented, inadequately documented and which placed his financial interests in conflict with, and ahead of, their financial interests;

- Soward invested Bosack and Lerner's money based on his personal relationships and in a manner that placed the financial interests of his friends ahead of the financial interests of Bosack and Lerner;

- Soward loaned Bosack and Lerner's money to his friends on terms that were inadequately documented and which were detrimental to Bosack and Lerner;

-2-

...

1  • Soward deceived Bosack and Lerner in setting up investment vehicles, the terms of
   which allowed him to receive excessive compensation; and

2

3  • Soward placed assets belonging to Bosack and Lerner in investments that were
   unsuitable and failed to invest in a manner that would have been suitable.

4  As a result of Soward's misconduct, Respondents have suffered millions of dollars in injuries.

5  **II.     The Parties to this Proceeding**

6        3.     At the time of the events complained of herein, Bosack, an individual, was a

7  member of the Board of Directors of the Foundation, a trustee of The & Trust, a trustee of the

8  Leonard Bosack Living Trust ("Bosack Trust"), and a shareholder of & Capital, Inc. He works

9  and resides in Redmond, Washington.

10        4.     Lerner, an individual, is a member of the Board of Directors of the Foundation, a

11  trustee of The & Trust, a trustee of the Sandra K. Lerner Living Trust ("Lerner Trust"), and a

12  shareholder of & Capital, Inc. She works and resides in the Commonwealth of Virginia.

13        5.     Troiano, an individual, is a Trustee of the & Trust. He works and resides in New

14  Kensington, Pennsylvania.

15        6.     The & Trust is a Delaware charitable remainder trust. The trustees of the trust are

16  Bosack, Lerner and Troiano. The beneficiaries of the trust are the Bosack Trust and the Lerner

17  Trust.

18        7.     Capital Partners is a Delaware limited partnership. The limited partners are the

19  Bosack Trust and the Lerner Trust. During the time of the misconduct alleged herein, Soward was

20  the general partner.

21        8.     Cartesian is a limited partnership formed on or about January 1, 1999. The limited

22  partner is the Bosack Trust. During the time of the misconduct alleged herein, Soward and &

23  Management Company were the general partners.

24        9.     & Capital, Inc., is a Delaware corporation with its offices in Redmond,

25  Washington. Bosack and Lerner are the only shareholders and directors of the company. At the

26  time of the misconduct alleged herein, Soward was an officer of & Capital, Inc.

27        10.     The Foundation is a charitable foundation founded under the laws of Massachusetts

28  by Bosack and Lerner.

-3-

1   11.    Soward is an individual residing in San Francisco, California, and an investment

2   adviser within the meaning of the Investment Advisors Act of 1940.  He was a general partner of

3   Capital Partners and Cartesian, an officer of & Capital, Inc., and is the sole owner of &

4   Management Company.

5   12.    & Management Company is a company that is owned and operated by Claimant

6   Soward with its principal place of business in San Francisco, California.

7   13.    & Management Company is not only owned, influenced and governed by Soward,

8   but there is such a unity of interest and ownership that the individuality, or separateness, of

9   Soward and & Management Company has ceased.  Adherence to a fiction of separate existence for

10  & Management Company would, under these particular circumstances, sanction a fraud or

11  promote injustice.

12  14.    Soward and & Management Company are the agents, alter egos, accessories,

13  accomplices, aiders, abettors, confederates, and co-conspirators of one another, and Soward is an

14  employee of & Management Company.

15  **III.    Background of Respondents' Counterclaims**

16  **A.    The Retention of Soward as Investment Advisor**

17  15.    Bosack and Lerner founded Cisco Systems, Inc., and thereby made a considerable

18  fortune.  In or about October 1991, they sought a trustworthy individual, unaffiliated with any

19  financial institution, who could provide financial advice and manage their assets and the assets of

20  entities for which they were trustees or directors in a prudent manner unhampered by any conflicts

21  of interest.  Soward, who was then employed as an international tax accountant at a prestigious

22  accounting firm, represented that he was able and willing to provide such management, advice and

23  consultation, and that he would do so exclusively for Bosack and Lerner and certain entities in

24  which their assets were held and/or for which they served as trustees or directors.

25  16.    In 1992, Soward became Bosack and Lerner's investment adviser.  As such,

26  Soward entered into a fiduciary relationship with Bosack and Lerner (and, eventually, with all

27  other Respondents).  As fiduciaries, Soward owed Bosack and Lerner more than honesty and good

28  faith alone.  Soward had an affirmative duty to act solely in the best interests of Bosack and Lerner

1  and to make full and fair disclosure of all material facts, particularly when Soward's interests

2  conflicted with those of Bosack and Lerner. Soward was obligated to exercise reasonable and

3  prudent supervision over the management, policies, practices, and control of four of Bosack and

4  Lerner's investment entities as would an ordinary prudent person in a like position. Because of

5  this fiduciary relationship, Soward was required at all times to be loyal to Bosack and Lerner and

6  act in their best interests. He did not do so.

7      17.    Instead, Soward oppressively, fraudulently, and with malice breached these duties

8  and defrauded Bosack and Lerner by engaging in transactions that were intended to, and did,

9  enrich himself and his friends at the expense of Bosack and Lerner.

10    **B.    The Investment Entities**

11      18.    Soward's fraudulent conduct arose from his purported advice and expertise in the

12  creation, management and operation of at least four different investment entities:

13          a.    <u>Capital Partners</u> – Based on Soward's advice, Capital Partners, was formed

14  as a Delaware limited partnership in December 1995. The capital for the partnership came

15  exclusively from the Bosack Trust and the Lerner Trust. Soward was entrusted with administering

16  the distributions from the partnership pursuant to a formula in the partnership agreement. Under

17  the Agreement of Limited Partnership of & Capital Partners, L.P. (the "Capital Partners

18  Agreement"), executed in 1995 between Soward and the Bosack and Lerner Trusts, Soward's

19  share of the distribution was 10% of the partnership's net income. Soward was also given

20  authority to manage the assets of the partnership, but was not allowed to acquire or dispose of an

21  investment without the consent of the limited partners. A copy of the Capital Partners Agreement

22  is attached as Exhibit 1.

23          b.    <u>The & Trust</u> – The & Trust is a charitable remainder trust formed under the

24  laws of the State of California. Bosack, Lerner and Troiano are its trustees. In January 2001,

25  based on the advice of Soward, the & Trust entered into a management agreement with Soward

26  which provided, *inter alia*, that in compensation for investment advice and management, Soward

27  would receive a base management fee of 0.30% per year of the net assets of the trust (less salary

28

1   paid to Soward by & Capital, Inc.) and an incentive allocation of 10% of the profits of the trust's

2   designated portfolio.  A copy of the & Trust management agreement is attached as Exhibit 2.

3         c.      <u>& Capital, Inc.</u> –The offices of & Capital, Inc. currently house the books

4   and records of Capital Partners, Cartesian, The & Trust and the Foundation.  In 2001 and 2002,

5   Soward was an officer of & Capital, Inc.  As such, he received an annual salary of $120,000 from

6   the company, but Soward failed to deduct the salary and reimbursements in the calculation of his

7   fee from The & Trust.  During 2003, & Capital, Inc. also paid the salaries of Soward's secretary

8   and of his assistant.  Soward promised to reimburse & Capital, Inc. for payment of these amounts

9   and has failed to do so.

10         d.    <u>Cartesian</u> – Cartesian was formed when Soward fraudulently induced

11   Bosack to agree to the relationship.  Without adequately documenting the formation of the

12   partnership, Soward made himself and & Management Company the general partners and the

13   Bosack Trust the limited partner.  Under the draft partnership agreement, which was never signed

14   and never disclosed to Bosack, Soward was entitled to 14.5% of the profits of Cartesian and

15   Bosack, who contributed 95% of the capital, was entitled to 85.5%.  Soward also gave himself

16   unbridled authority to manage the assets of the partnership.

17   **C.**    **The Discovery of Soward's Misconduct**

18       19.    Prior to July 2003, Bosack and Lerner, who relied on Soward to faithfully and

19   loyally invest and manage their assets and accurately report on his performance, were never

20   provided with any information by which they could discover Soward's abuses.

21       20.    Soward's misconduct began to be uncovered in mid-2003 as a result of certain

22   agreed-upon audit procedures performed by Bosack and Lerner's accounting firm in connection

23   with a request by Soward for an increase in his compensation.  Specifically, in or around early

24   2003, Soward requested that Bosack and Lerner renew his contract as investment adviser to the &

25   Trust and increase his compensation.  As part of the process of determining whether they would

26   grant Soward's request, Bosack and Lerner engaged the Clark Nuber accounting firm to perform a

27   review under certain agreed-upon auditing procedures of, among other things, the investment

28   returns for the entities managed and advised by Soward.

1    21.    In approximately July 2003, Clark Nuber began to provide Bosack and Lerner with

2    preliminary reports showing possible abuses, breaches of duty, and outright fraud by Soward. By

3    the time the review was complete, it was clear that Soward had engaged in a pattern of fraudulent

4    and abusive acts that caused substantial injury to Bosack and Lerner.

5    22.    For instance, in late July, the accountants at Clark Nuber informed Bosack that

6    there was no documentation for a $1 million loan from Capital Partners to Soward.

7    23.    Later in the fall of 2003, Bosack and Lerner received further preliminary reports

8    from Clark Nuber. Bosack and Lerner were shocked to learn from the accountants at Clark Nuber

9    that Soward had improperly withdrawn more than $5 million from Capital Partners. This

10    revelation frightened and concerned Bosack and Lerner. As general partner, Soward had control

11    of a vast amount of assets and the ability to withdraw the remaining funds and abscond with them.

12    The news that Soward had improperly taken $5 million revealed that he could not be trusted.

13    24.    While awaiting final confirmation of the preliminary reports from Clark Nuber,

14    Bosack and Lerner purposely restricted their communications with Soward to avoid giving him

15    any indication of the results of the Clark Nuber reports because they were concerned that he may

16    loot the partnership of its remaining assets and disappear with the funds if he discovered that

17    Bosack and Lerner were aware of his misconduct.

18    **D.    The Procedural Background of the Dispute**

19    25.    As soon as the results of the Clark Nuber report had been confirmed, on

20    November 24, 2003, Bosack and Lerner, through their lawyers, sent a letter to counsel for Soward

21    discontinuing Soward's engagements with the & Trust and The Foundation, removing him as

22    general partner of Capital Partners and Cartesian, and concluding his employment with & Capital,

23    Inc. At the same time, in order to protect Bosack and Lerner's assets, their lawyers contacted each

24    of the banks in which the investment entities managed by Soward maintained accounts and

25    informed them that Soward no longer had authority to act on behalf of any of the investment

26    entities.

27

28

26.    In their November 24 letter, Bosack and Lerner demanded compensation for the harm Soward caused and included a draft complaint that would be filed in the event that a settlement could not be reached.

27.    In response to the settlement demand and draft complaint, Soward indicated that he would be amenable to settlement discussions and requested that Bosack and Lerner provide a copy of the audit report prepared by Clark Nuber, purportedly so Soward could formulate a response to the settlement demand. Bosack and Lerner complied with Soward's request and held off filing the judicial complaint in hopes of reaching a settlement.

28.    Soward, however, never responded to the settlement demand. Instead, he used the time Bosack and Lerner had given him to respond to the settlement demand to prepare his statement of claim in this arbitration and, on February 3, 2004, blindsided Bosack and Lerner by initiating the current proceeding.

29.    Following Soward's initiation of arbitration, both sides reached an agreement to stand down while Bosack and Lerner conducted a further investigation of Soward's conduct. The additional investigation revealed yet more misconduct by Soward in connection with his duties as general partner of Capital Partners and Cartesian.

30.    After Bosack and Lerner concluded their investigation, on July 1, 2004, they sent Soward a second complaint, along with another settlement demand and documentation supporting their damage claims. Soward did not respond. Because Soward did not respond to the settlement demand, Bosack and Lerner commenced an action in federal court in the Western District of Washington (the "Federal Case"). On November 9, 2004, that court entered an order staying the action pending this panel's determination of whether the claims asserted by Bosack and Lerner in the Federal Case are properly arbitrable or should be heard by the federal court. This panel need not address issues of arbitrability, however, as Respondents have elected to assert their claims in the present arbitration by filing this Amended Answering Statement and Counterclaims.

1    IV.    **Soward's Misconduct**

2        A.    **The Misconduct at Capital Partners**

3        31.    As the investment advisers to Capital Partners, Soward owed Bosack and Lerner

4    the highest degree of care, candor, good faith and diligence.  Soward had an obligation to put

5    Bosack and Lerner's interests above all others, including themselves, and to fully and fairly

6    disclose to them all facts that were material to the management of their assets.  Soward failed to

7    live up to these obligations by, among other things, improperly withdrawing funds from Capital

8    Partners, misrepresenting the value of partnership assets, investing partnership funds based on

9    Soward's personal relationships and contrary to specific instructions given by the limited partners,

10    and using partnership assets as a source for loans to Soward and his friends.

11        (i)    **The Improper Withdrawals**

12        32.    The Capital Partners Agreement required that any distributions be made to all

13    partners in proportion to the positive balances in their capital accounts and only from cash that was

14    in excess of the reasonably foreseeable cash needs of the partnership.

15        33.    Beginning no later than 1998, and continuing through the date that Soward was

16    removed as the General Partner, Soward willfully and intentionally withdrew cash from Capital

17    Partners in violation of the Capital Partners Agreement.  From 1998 through 2002, Soward

18    knowingly caused himself to be paid excessive distributions to which he was not entitled in an

19    amount exceeding $5,000,000.

20        34.    From on or about September 16, 1998, through December 23, 1998, Soward

21    distributed to himself $459,464, which was at least $413,518 more than allowed under the Capital

22    Partners Agreement.

23        35.    From on or about January 6, 1999, through November 23, 1999, Soward distributed

24    to himself $707,386, which was at least $586,647 more than allowed under the Capital Partners

25    Agreement.

26        36.    From on or about January 5, 2000, through December 12, 2000, Soward distributed

27    to himself $2,575,747, which was at least $1,768,172 more than allowed under the Capital

28    Partners Agreement.

37.    From on or about January 18, 2001, through November 28, 2001, Soward distributed to himself $3,142,207, which was at least $2,437,986 more than allowed under the Capital Partners Agreement.

38.    On or about June 17, 2002, and July 1, 2002, Soward distributed to himself $26,617, which was at least $23,955 more than allowed under the Capital Partners Agreement.

(ii)    **The Improper Recording of Investment Values**

39.    In order to increase Soward's capital account balance and allow him to take larger withdrawals from Capital Partners (while concealing that the withdrawals violated the terms of the Capital Partners Agreement), Soward fraudulently inflated the value of certain partnership investments in 2001 and 2002.

40.    In 2001, Capital Partners' investment return spreadsheet falsely recorded Capital Partners' year-end market value at $82,788,846. Based on this valuation, the partnership made an annual return of 1.38%. Bosack and Lerner's accounting firm determined that the partnership's 2001 year-end market value was overstated by $2,142,356. The actual market value was $80,646,490 and the annual return was –2.92%.

41.    Part of the 2001 overstatement was based on the inflation of an investment in Madison Investment Partners. As recently as October 2001, Soward gave a presentation to Bosack and Lerner in which he represented that the value of this investment was $3,000,000 when, in fact, the investment was worth only $500,000.

42.    In 2002, Soward falsely recorded Capital Partners' year-end market value at $88,062,109. Based on this valuation, the partnership made an annual return of 2.13%. In reality, the 2002 year-end market value was overstated by $7,577,880. The actual market value was $80,484,229 and the annual return was –4.28%.

43.    Part of the 2002 overstatement resulted from Soward falsely recording the value of an investment in Madison Investment Partners II, L.P. Soward recorded the value of that investment at $3,984,756 when, in fact, its true value was $1,877,670.

44.    Also in 2002, Soward falsely recorded the value of an investment in Westar, a bankrupt private equity company. Soward recorded the value of that investment at $4,126,865

-10-

1  when, in fact, its true value was $0.  Indeed, Soward caused the value of Westar to be reported to

2  the Internal Revenue Service as $0 during the same period.

3           (iii)    The Investment in Passport Cosmetics

4      45.    In 1995, Capital Partners made a substantial investment in a cosmetics company

5  founded by Lerner called Urban Decay.  In or about 1999, pursuant to a reference from one of his

6  close friends, Brian Myerson, Soward hired Malcolm Kemp to be the CEO of Urban Decay.  In

7  2000, Urban Decay was sold to LVMH, a French company, and Capital Partners made a

8  substantial profit on its investment.

9      46.    After the sale of Urban Decay, Soward contacted Lerner and told her that he had a

10  new "cosmetics company" in which he wanted to invest Capital Partners' funds.  Soward was

11  referring to Passport Cosmetics L.L.C. ("Passport"), although he did not tell Lerner the name of

12  the company.  He did, however, inform her that Kemp, who acted as Passport's CEO, was going

13  to be involved in the operation of this new company.  Lerner clearly and unequivocally told

14  Soward that he was not to invest Capital Partners' funds in any other cosmetics companies or in

15  any company in which Kemp was a CEO, consultant or otherwise had any interest.

16      47.    Bosack and Lerner have recently discovered that, notwithstanding Lerner's clear

17  directive not to invest in Passport, and notwithstanding a provision in the Capital Partners

18  Agreement prohibiting the general partner from acquiring an investment without the approval of

19  the limited partners, Soward caused Capital Partners to invest more than $1,500,000 in Passport

20  from late 2001 to mid-2003.  The investment is now worthless.

21      48.    Capital Partners' investment in, and eventual withdrawal from, Passport, typifies

22  Soward's fraudulent and deceitful conduct and willingness to put his own interests ahead of the

23  interests of Bosack and Lerner.

24      49.    Passport was organized on or about November 27, 2001, by two acquaintances of

25  Soward, Meredith McGann and Erin Kotter, neither of whom had any significant business

26  experience prior to organizing Passport.  Indeed, because of the lack of experience of McGann and

27  Kotter, Soward arranged for Malcolm Kemp to become Passport's CEO.

28

-11-

50.   During 2001, Capital Partners contributed $185,000 to Passport. Soward did not formally document this contribution. Moreover, Capital Partners received nothing in return for the $185,000. It did not receive a promissory note or any other documentation evidencing a creditor/borrower relationship. Neither did it receive equity in Passport in return for its investment.

51.   On or about May 20, 2002, the parties purported to document their relationship by drafting a formal operating agreement. Pursuant to the operating agreement, which was never signed by a representative of Capital Partners, Capital Partners agreed to and did contribute $715,000 to Passport in exchange for a 60% equity interest. McGann and Kotter, neither of whom were capable of running the company, each contributed $1 in return for a combined 40% equity stake in the company.

52.   During the course of 2002, Capital Partners contributed an additional $360,000 to Passport, bringing its total capital contributions for 2002 to $1,075,000. As with the other contributions, Soward failed to formally document this transaction and received no documented interest in Passport, either as a creditor or equity holder, in return for the contribution.

53.   During the time that Soward was throwing huge sums of Bosack's and Lerner's money at Passport, the company was going nowhere. Indeed, as early as 2002, it was obvious to Soward that Passport was a failure. Malcolm Kemp left the company in or about late 2002, and Soward's only hope to realize any value on its investment was by a sale of the company. Nevertheless, in further violation of his fiduciary and other obligations to Bosack and Lerner, Soward caused Capital Partners to contribute an additional $296,510 to Passport in 2003. As with the other transfers, the contribution was not formally documented and Soward received nothing in return.

54.   In July 2003, Soward caused Capital Partners to withdraw from Passport. Upon its withdrawal, Capital Partners contributed an additional $100,000 to Passport and surrendered any and all equity interest it purported to have in the company. In return, Capital Partners received from Passport a Nonrecourse Contingent Promissory Note for $700,000 (the "Note").

-12-

1  55.  Interest on the Note accrues at 5% annually, but no interest payments are due to

2  Capital Partners unless (1) Kotter and McGann receive aggregate distributions from Passport in

3  excess of $250,000 in one calendar year; (2) Kotter and McGann receive aggregate distributions

4  from Passport in excess of $500,000 in any consecutive three calendar years; or (3) Passport is

5  sold for more than $250,000, in which case the first $250,000 of the amount realized is allocated

6  to Kotter and McGann.  In short, interest is due and payable to Capital Partners only after Kotter

7  and McGann are allocated at least $250,000.

8  56.  The Note also subordinated Capital Partners' interests to those of Kotter and

9  McGann in the event of a sale of Passport.  In that event, the first $250,000 of the amount realized

10  is allocated to Kotter and McGann.  Capital Partners only gets paid on the Note if Passport is sold

11  for more than $250,000, an event that Soward knew was unlikely at the time he negotiated the

12  withdrawal because less than two months earlier a potential buyer walked away from a deal to pay

13  $100,000 for the company.

14  57.  By withdrawing from Passport and accepting the Note, Soward caused Capital

15  Partners to pay an additional $100,000 to subordinate its interest to the interests of Kotter and

16  McGann and to reduce the amount to which Capital Partners would be entitled in the event

17  Passport was thereafter sold.  In fact, Soward contributed $100,000 in additional funds at the time

18  of withdrawal not because it was in the best interest of Capital Partners, but because, as Soward

19  communicated to an acquaintance, it gave Kotter and McGann "a chance."

20  **(iv)  The Improper Loans**

21  58.  Soward engaged in further fraud and self-dealing by causing Capital Partners to

22  make substantial loans to Soward and his friends.  On or about April 12, 2001, Soward engaged in

23  self-dealing by causing Capital Partners to extend him $1,000,000 of partnership assets

24  purportedly as a loan.

25  59.  Soward represented that the loan was short-term, would be extended at a rate of

26  interest consistent with the market rates for similar loans, and, during the short time it was

27  outstanding, would be secured by the real property that Soward represented the loan would be

28  used to purchase.  In reliance on these misrepresentations, Bosack orally approved the loan.

-13-

1    60.    In reality, Soward unreasonably constructed the repayment schedule on 30-year,

2    interest-only terms at a below-market rate of interest.  Further, the loan was not secured by real

3    property.  Instead, Soward purported to pledge his capital account in Capital Partners as security

4    for the loan.  However, at the time the loan was extended, as Soward knew, his capital account had

5    a negative balance because he had made substantial withdrawals from the account on April 12,

6    2001.  Since the date of the loan, Soward improperly withdrew additional funds from Capital

7    Partners that reduced his capital account balance even further.

8    61.    Soward also failed to provide to Bosack and Lerner documentation of the terms of

9    the loan and the security arrangement.  It was only during performance of the review under the

10   agreed-upon procedures by Bosack and Lerner's accounting firm that Bosack and Lerner first

11   discovered a draft note and pledge agreement setting forth the terms of the fraudulently induced

12   loan.  Subsequently, Bosack and Lerner have located what appears to be a final note and pledge

13   agreement, copies of which are attached as Exhibit 3.  Notably, these documents were not

14   prepared and signed by Soward until August 2003 — the period during which Bosack and Lerner'

15   accounting firm was performing its review.  At the time of his removal as general partner of

16   Capital Partners on November 24, 2003, Soward's capital account in Capital Partners had a

17   balance of approximately $-300,000.

18   62.    The only signatures on the note and pledge agreement belong to David Soward.  He

19   signed the pledge agreement in his individual capacity (as the borrower) and in his capacity as the

20   general partner of Capital Partners (as the lender).  Soward was also in default on the note and

21   pledge agreement from inception — the note mandated that Soward make quarterly interest

22   payments beginning in 2002, but he made only annual payments in 2002 and 2003.

23   63.    In July 2003, when Bosack and Lerner discovered that the loan was still

24   outstanding and that the terms were other than as represented by Soward, they demanded payment

25   from Soward.  That demand was initially refused.  However, after Bosack and Lerner initiated the

26   Federal Case, on or about October 1, 2004, Soward repaid the loan.

27   64.    Soward caused Capital Partners to improperly loan money not only to himself, but

28   also to his friends.  On or about February 26, 2002, in violation of the Capital Partners Agreement

-14-

1   and their fiduciary obligations to Bosack and Lerner, Claimants caused Capital Partners to make

2   an unauthorized $150,000 loan to Soward's friend Malcolm Kemp.  The loan is unsecured and has

3   never been formally documented.  Kemp has made no interest or principal payments on the loan

4   and no such payments were sought by Soward.

5       **B.    The Misconduct at Cartesian**

6       65.    As the investment advisers for Bosack, Soward owed him a duty to exercise the

7   highest degree of due care, good faith, candor, loyalty and diligence.  Soward breached that duty

8   by willfully and intentionally deceiving Bosack in connection with the creation, management and

9   administration of Cartesian.

10          **(i)    The Fraud in the Creation of Cartesian**

11      66.    In late 1998, Soward became aware that Bosack had additional funds he wanted to

12  invest.  Soward contacted Bosack and proposed that the two of them create an investment limited

13  partnership — Cartesian — whereby Claimants Soward and & Management Company would be

14  the general partners and Bosack would be the limited partner.  Soward represented to Bosack that

15  the terms of the Cartesian Limited Partnership Agreement (the "Cartesian Agreement") would be

16  the same as those in the Capital Partners Agreement.  Soward represented that Cartesian and

17  Capital Partners would be the same, "except that Sandy will not be a limited partner" of Cartesian.

18  Soward knew, however, that this was not true.  In fact, he caused Capital Partners' lawyer to draft

19  a limited partnership agreement for Cartesian that was very different from the Capital Partners

20  Agreement.

21      67.    Pursuant to the unsigned, draft Cartesian Agreement, the general partners, who are

22  the Claimants, are allocated the first 10% of profits.  The remaining 90% of profits are allocated

23  5% to the general partners and 95% to the limited partner.  This provision allocates 14.5% of the

24  total profits to the general partners and 85.5% to the limited partner.  Under the Capital Partners

25  Agreement, however, 10% of the profits are allocated to the general partners and 90% to the

26  limited partners.

27      68.    The unsigned, draft Cartesian Agreement, in contrast to the Capital Partners

28  Agreement, (a) gave the general partners exclusive control over the partnership's business,

-15-

1  including the power to make investments and execute agreements without the limited partner's

2  consent; and (b) allowed the general partners to engage in business for their own profit or

3  advantage, even if in direct competition with Cartesian, without the consent of the limited partner.

4      69.     In order to conceal from Bosack the actual terms of the Cartesian Agreement,

5  Soward never disclosed it to him and Bosack never saw, received or signed a copy of the

6  agreement.

7      70.     In reliance on Soward's representations, Bosack contributed more than $9,500,000

8  to Cartesian. Soward purported to contribute $525,636 to Cartesian, but all of the contributions

9  were made with funds that he improperly withdrew from Capital Partners. Thus, the only capital

10  ever contributed to Cartesian belonged to Bosack and Lerner and Soward and & Management

11  Company have no lawful interest in that entity.

12          **(ii)    The Improper Investments in Myerson Controlled Entities**

13      71.     After Soward had deceived Bosack in setting up Cartesian, he used the

14  partnership's assets as a source of funds for his friends and in disregard of the best interests of

15  Bosack and Cartesian and prudent investing practices.

16      72.     Soward caused Cartesian to invest in Liberty of London ("Liberty"), a clothing

17  retailer in Great Britain that was also an investment of Brian Myerson, a personal friend to Soward

18  and the Best Man in Soward's 2001 wedding.

19      73.     Myerson was the principal of a family of funds operating under the name U.K.

20  Active Value. Through U.K. Active Value and various other companies he controlled, Myerson

21  held approximately 17% of Liberty's outstanding shares throughout the 1990s. Myerson had been

22  attempting to gain control of Liberty, and Soward caused Cartesian to help him do so. Soward

23  aided Myerson in three ways. First, Soward caused Cartesian to purchase shares in Liberty. As

24  Liberty shareholders, Soward could then act in concert with Myerson in pursuit of his quest for

25  control of the company. Second, Soward caused Cartesian to invest directly in U.K. Active Value.

26  This provided Myerson with additional cash to pursue his objective. Third, Soward caused

27  Cartesian to loan funds directly to Myerson.

28

74.    On or about October 7, 1998, Myerson wrote to Soward and suggested that it was a good time to purchase stock in Liberty. Almost immediately — even before Soward had induced Bosack to agree to the creation of Cartesian — Soward began to purchase Liberty shares for Cartesian's account, eventually acquiring more than 10% of the company's outstanding stock.

75.    Once Soward had purchased the large block of stock, he pursued Myerson's interests and acted in disregard of the best interest of Bosack and Cartesian. For instance, to assist Myerson in his quest for control of Liberty, Soward agreed to exchange Cartesian's shares in Liberty for shares in Retail Stores Plc ("Retail"), the Myerson-controlled entity that was used as an acquisition vehicle for, and was eventual successor to, Liberty. At the time Soward agreed to the share exchange, it would have been much better for Bosack and Cartesian to sell the shares for the significant cash premium that was also available to Liberty shareholders.

76.    Soward also caused Cartesian to invest in Myerson's U.K. Active Value, which itself owned a substantial interest in Retail (and prior to that, in Liberty). On or about December 9, 2002, Soward invested approximately $759,203 of Cartesian funds in U.K. Active Value and, on or about April 17, 2003, Soward invested approximately $158,670 of Cartesian funds in U.K. Active Value.

77.    Bosack has recently learned that, as of year-end 2003, Cartesian owned in excess of 2 million shares, or more than 11%, of Retail, and that 76% of Cartesian's assets were invested directly in Retail. In addition, more than 10% of Cartesian's assets were invested in U.K. Active Value. Thus, no less than 86% of Cartesian's assets were made available to Myerson by investing directly in Liberty/Retail and U.K. Active Value.

(iii)    The Loan from Cartesian to Myerson

78.    Soward also used Cartesian funds to loan Myerson over $1 million at a below-market interest rate. Soward failed to properly document the loan or set forth terms upon which the loan would be repaid. In fact, Soward initially attempted to conceal the loan by recording the payment to Myerson as a "Liberty Share Purchase."

79.    Specifically, on or about January 18, 2001, Soward authorized the transfer of $1,109,400 (750,000 British Pounds) from Cartesian to a Myerson controlled company called

1   Second Concerto Corporation ("Second Concerto"). In connection with the transfer, Cartesian

2   received 250,000 shares in Retail with an option to put the shares back to Second Concerto at the

3   price paid for shares any time up to April 1, 2001.

4        80.    On March 23, 2001, Soward wrote Myerson and informed him that he intended to

5   exercise the put right. Retail's share price had dropped significantly and the Retail shares he

6   caused Cartesian to "purchase" from Second Concerto were worth less than Cartesian paid. By

7   exercising the put right, Cartesian could recover the full amount paid to Second Concerto.

8        81.    But, the put right was never exercised. Instead, about one week later, Soward met

9   with Myerson in Europe. Shortly after returning from his trip, Soward had changed his mind. He

10  instructed Cartesian's bookkeeper to change the description of the transaction on Cartesian's

11  books from an investment in shares of Retail to a loan to Second Concerto.

12       82.    It was not until late-July 2002 that Soward sought any repayment of interest and

13  principal from Second Concerto and Myerson, and it was not until November 2002 that the loan

14  was finally repaid. At all times, Soward placed the financial interest of Myerson above that of

15  Cartesian and Bosack. On July 29, 2002, Soward telecopied a note to Myerson showing a

16  calculation of the total amount due on the loan using a below-market rate of interest. Soward

17  noted that Myerson should be happy that, on a British Pound basis, the note was practically

18  interest-free for Myerson. The note also goes on to thank Myerson for "all the hospitality you

19  showed us at Shawford and in Venice."

20       83.    The hospitality on the trip to Shawford and Venice was not the only benefit Soward

21  received as a result of putting Myerson's interest ahead of the interests of Bosack and Cartesian.

22  Soward was appointed to Retail's Board of Directors and sat on an advisory board for U.K. Active

23  Value. Myerson and his companies also made sure that Soward traveled in style, arranging for

24  Soward to take expensive, first-class vacations in Europe with his family. On one occasion

25  Myerson secured for Soward a chalet for a skiing trip in Courcheval because Soward offered to

26  make certain funding available to Myerson in connection with a business deal.

27

28

C.    The Misconduct at the & Trust and & Capital, Inc.

84.    Soward was investment adviser to The & Trust and an officer of & Capital, Inc.  As a result, he owed Bosack and Lerner the duties of loyalty, good faith, due care and diligence in connection with the management and administration of those entities.  Soward breached those duties by, among other things, improperly calculating his compensation from the & Trust and by failing to make required reimbursements to & Capital, Inc.

85.    Under the Trust Management agreement between Soward and the & Trust, Soward was required to deduct his $120,000 salary from & Capital, Inc. in the calculation of his base management fee.  However, in 2001 and 2002, Soward purposely calculated the management fee without making the deduction.  Soward thereby improperly misappropriated fees of approximately $240,000.

86.    In or about January 1999, Soward calculated his bonus payment from the & Trust at an excessive level by improperly including a hedge fund dispute settlement as profit.  The settlement, which totaled $18,762,000, comprised both compensatory and punitive damages.  Although Bosack and Lerner only approved of using the compensatory award as profit for purposes of determining the bonus payment, Soward willfully and intentionally violated his fiduciary duties by basing the bonus on the entire settlement.

87.    Each year & Capital, Inc. paid the salaries of Soward's secretary and of his assistant.  Soward agreed to reimburse the company for making the payments and, in fact, did so every year through 2002.  However, in 2003, Soward failed to make the promised reimbursement to & Capital, Inc. for the $70,512.739 it paid to his secretary and the $79,626.34 it paid to his assistant.  & Capital, Inc. is entitled to be reimbursed for these amounts.

## FIRST COUNTERCLAIM

### (Fraud)

88.    Bosack and Lerner incorporate by reference each of the allegations contained in paragraphs 1 through 87.

89.    Soward, while acting with scienter, made false or misleading material statements and omissions to Bosack and Lerner about Capital Partners.  Soward made misstatements or

-19-

1  omissions about the excessive income distributions from Capital Partners from 1998 through 2002

2  that violated the terms of the Capital Partners Agreement; the year-end market value of Capital

3  Partners' assets; the receipt of $1,000,000 of partnership assets in 2001 purportedly as a loan on

4  terms that were disadvantageous to the partnership and the limited partners and the failure of

5  Soward to provide Bosack and Lerner with documentation of the terms; the authorization of a

6  $150,000 loan to a personal friend in February 2002 from partnership assets on terms that were

7  disadvantageous to the partnership and the limited partners and the failure of Soward to document

8  the terms; and the undocumented investments in Passport, an entity partly owned by acquaintances

9  of Soward, for which he failed to secure sufficient financial interest for Capital Partners.

10      90.    Soward, while acting with scienter, made false or misleading material statements

11  and omissions to Bosack about Cartesian.  Soward made misstatements or omissions about the

12  material terms of the Cartesian Partnership Agreement, stating that its terms were the same as the

13  terms of the Capital Partners Agreement when, in fact, those terms were not the same and served

14  only to unjustly enrich Soward at Bosack's expense.  Soward also misrepresented and omitted to

15  disclose that the funds he contributed to Cartesian to set up his capital account were directly and

16  improperly withdrawn from Capital Partners.

17      91.    Bosack and Lerner reasonably and justifiably relied on Soward's intentionally false

18  or misleading statements and omissions.

19      92.    As a result of Soward's conduct, Bosack and Lerner have been harmed and suffered

20  damages in an amount to be determined at hearing.  Soward oppressively, fraudulently, and with

21  malice breached his duties and defrauded Bosack and Lerner by engaging in transactions that were

22  intended to, and did, enrich himself and his friends at the expense of Bosack and Lerner.

23              **SECOND COUNTERCLAIM**

24              **(Constructive Fraud)**

25      93.    Bosack and Lerner incorporate by reference each of the allegations contained in

26  paragraphs 1 through 92.

27      94.    Soward assumed a fiduciary position in relation to Bosack and Lerner as

28  investment adviser, limited partner, general partner and officer.  By reason of the fiduciary

-20-

1 relationship, Soward owed Bosack and Lerner the highest duties of good faith, fair dealing, loyalty

2 and due care.

3    95.    Soward, while acting with intent to deceive, made false or misleading material

4 statements and omissions to Bosack and Lerner about Capital Partners. Soward made

5 misstatements or omissions about the excessive income distributions from Capital Partners from

6 1998 through 2002 that violated the terms of the Capital Partners Agreement; the year-end market

7 value of Capital Partners' assets; the receipt of $1,000,000 of partnership assets in 2001

8 purportedly as a loan on terms that were disadvantageous to the partnership and the limited

9 partners and the failure of Soward to provide Bosack and Lerner with documentation of the terms;

10 the authorization of a $150,000 loan to a personal friend in February 2002 from partnership assets

11 on terms that were disadvantageous to the partnership and the limited partners and the failure of

12 Soward to document the terms; and the undocumented investments in Passport, an entity partly

13 owned by acquaintances of Soward, for which he failed to secure sufficient financial interest for

14 Capital Partners.

15    96.    Soward, while acting with scienter, made false or misleading material statements

16 and omissions to Bosack about Cartesian. Soward made misstatements or omissions about the

17 material terms of the Cartesian Partnership Agreement, stating that its terms were the same as the

18 terms of the Capital Partners Agreement when, in fact, those terms were not the same and served

19 only to unjustly enrich Soward at Bosack's expense. Soward also misrepresented and omitted to

20 disclose that the funds he contributed to Cartesian to set up his capital account were directly and

21 improperly withdrawn from Capital Partners.

22    97.    Bosack and Lerner reasonably and justifiably relied on Soward's intentionally false

23 or misleading statements and omissions.

24    98.    As a result of Soward's conduct, Bosack and Lerner have been harmed and suffered

25 damages in an amount to be determined at hearing. Soward oppressively, fraudulently, and with

26 malice breached his duties and defrauded Bosack and Lerner by engaging in transactions that were

27 intended to, and did, enrich himself and his friends at the expense of Bosack and Lerner.

28

1

## THIRD COUNTERCLAIM

2

### (Breach of Fiduciary Duty)

3      99.    Bosack and Lerner incorporate by reference each of the allegations contained in

4 paragraphs 1 through 98.

5      100.    Soward assumed a fiduciary position in relation to Bosack and Lerner as

6 investment adviser, limited partner, general partner and officer. By reason of the fiduciary

7 relationship, Soward owed Bosack and Lerner the highest duties of good faith, fair dealing, loyalty

8 and due care.

9      101.    Soward breached his fiduciary duties.

10      102.    As a result of Soward's conduct, Bosack and Lerner have been harmed and suffered

11 damages in an amount to be determined at hearing. Soward oppressively, fraudulently, and with

12 malice breached his duties and defrauded Bosack and Lerner by engaging in transactions that were

13 intended to, and did, enrich himself and his friends at the expense of Bosack and Lerner.

14

### FOURTH COUNTERCLAIM

15

### (Negligent Misrepresentation)

16      103.    Bosack and Lerner incorporate by reference each of the allegations contained in

17 paragraphs 1 through 102.

18      104.    Soward, without reasonable grounds for believing their truth and while acting with

19 the intent to induce Bosack and Lerner's reliance, made false or misleading material statements

20 and omissions to Bosack and Lerner about Capital Partners. Soward made misstatements or

21 omissions about the excessive income distributions from 1998 through 2002 that violated the

22 terms of the Capital Partners Agreement; the year-end market value of the partnership's assets; the

23 receipt of $1,000,000 of partnership assets in 2001 purportedly as a loan on terms that were

24 disadvantageous to the partnership and the limited partners and the failure of Soward to provide to

25 Bosack and Lerner documentation of the terms of the loan; the authorization of a $150,000 loan to

26 a personal friend in February 2002 from partnership assets on terms that were disadvantageous to

27 the partnership and the limited partners and the failure of Soward to document the terms; and the

28

1  undocumented investments in Passport, an entity partly owned by acquaintances of Soward, for

2  which he failed to secure sufficient financial interest for Capital Partners.

3      105.    Soward, without reasonable grounds for believing their truth and while acting with

4  intent to induce Bosack's reliance, made false or misleading material statements and omissions to

5  Bosack about Cartesian.  Soward made misstatements or omissions about the material terms of the

6  Cartesian Partnership Agreement, stating that its terms were the same as the terms of the Capital

7  Partners Agreement when, in fact, those terms were not the same and served only to unjustly

8  enrich Soward at Bosack's expense.  Soward also misrepresented and omitted to disclose that the

9  funds they contributed to Cartesian to set up their capital accounts were directly and improperly

10  withdrawn from Capital Partners.

11      106.    Bosack and Lerner, ignorant of the truth, reasonably and justifiably relied on

12  Claimants' false or misleading material statements or omissions.

13      107.    As a result of Soward's conduct, Bosack and Lerner have been harmed and suffered

14  damages in an amount to be determined at hearing.  Soward oppressively, fraudulently, and with

15  malice breached his duties and defrauded Bosack and Lerner by engaging in transactions that were

16  intended to, and did, enrich himself and his friends at the expense of Bosack and Lerner.

17

18                              **FIFTH COUNTERCLAIM**

19                              **(Breach of Contract)**

20      108.    Bosack and Lerner incorporate by reference each of the allegations contained in

21  paragraphs 1 through 107.

22      109.    A valid management agreement for The & Trust, executed in or about January

23  2001, existed between Claimants Soward and & Management Company and the & Trust.

24      110.    Bosack and Lerner performed their obligations under the management agreement.

25      111.    Claimants materially breached the management agreement by, among other actions,

26  failing to deduct Soward's salary from & Capital, Inc. from his base management fee in 2001 and

27  2002.  In addition, Claimants engaged in conduct separate and apart from the performance of the

28

1  obligations under the agreement without good faith and fair dealing and for the purpose of

2  depriving Bosack and Lerner of rights and benefits under the management agreement.

3      112.    As a result of Claimants' conduct, Bosack and Lerner have been harmed and

4  suffered damages in an amount to be determined at trial.

5                        **SIXTH COUNTERCLAIM**

6                          **(Breach of Contract)**

7      113.    Bosack and Lerner incorporate by reference each of the allegations contained in

8  paragraphs 1 through 112.

9      114.    A valid contract exists whereby Soward promised to reimburse & Capital, Inc. for

10  paying the salaries of Soward's secretary and of his assistant.

11     115.    Bosack and Lerner and & Capital, Inc. performed their obligations under the

12  contract.

13     116.    Soward materially breached the contract by refusing to reimburse & Capital, Inc.

14  for its payment of approximately $150,000 in salary to Soward's secretary and to his assistant.  In

15  addition, Soward engaged in conduct separate and apart from the performance of the obligations

16  under the agreement without good faith and fair dealing and for the purpose of depriving Bosack

17  and Lerner of rights and benefits under the agreement.

18     117.    As a result of Soward's conduct, Bosack and Lerner have been harmed and suffered

19  damages in an amount to be determined at hearing.

20                       **SEVENTH COUNTERCLAIM**

21                          **(Breach of Contract)**

22
        118.    Bosack and Lerner incorporate by reference each of the allegations contained in
23
    paragraphs 1 through 117.
24
        119.    The Capital Partners Agreement, which was executed on or about January 1, 1995
25
    and existed between Soward and the Bosack and Lerner Trusts, is a valid limited partnership
26
    agreement.
27
        120.    Bosack and Lerner performed their obligations under the Capital Partners
28
    Agreement.

-24-

1    121.    Soward materially breached the Capital Partners Agreement by taking income

2    distributions from 1998 through 2002 in excess of the amount allowed under the agreement; by

3    causing Capital Partners to extend him a $1,000,000 loan in 2001 and to make an unauthorized

4    $150,000 loan to a friend in February 2002; and by making an investment in Passport that was

5    contrary to the specific directions of a limited partner not to make such an investment. Soward

6    also engaged in conduct separate and apart from the performance of the obligations under the

7    agreement without good faith and fair dealing for the purpose of depriving Bosack and Lerner of

8    rights and benefits under the agreement.

9    122.    As a result of Soward's conduct, Bosack and Lerner have been harmed and suffered

10    damages in an amount to be determined at hearing.

11                              **EIGHTH COUNTERCLAIM**

12                                    **(Conversion)**

13    123.    Bosack and Lerner incorporate by reference each of the allegations contained in

14    paragraphs 1 through 122.

15    124.    Bosack and Lerner were the owners of personal property, namely assets in five

16    investment entities.

17    125.    Soward interfered with Bosack and Lerner's ownership of this property by taking

18    the property from Bosack and Lerner's possession.

19    126.    Soward's interference was knowing, intentional and malicious.

20    127.    Bosack and Lerner demanded return of the property.

21    128.    As a result of Soward's conduct, Bosack and Lerner have been harmed and suffered

22    damages in an amount to be determined at hearing. Soward oppressively, fraudulently, and with

23    malice breached his duties and defrauded Bosack and Lerner by engaging in transactions that were

24    intended to, and did, enrich himself and his friends at the expense of Bosack and Lerner.

25                              **AFFIRMATIVE DEFENSES**

26    129.    Bosack and Lerner, without assuming the burden of proof where the burden is not

27    by law upon them, assert the following separate affirmative defenses to Claimants' Statement of

28    Claim:

### FIRST AFFIRMATIVE DEFENSE

#### (Failure to State a Claim)

130.   The Statement of Claim, and each purported cause of action alleged therein, fails to state a claim or cause of action against any Respondents.

### SECOND AFFIRMATIVE DEFENSE

#### (Unclean Hands)

131.   By virtue of their conduct, Claimants Soward and & Management Company come to this action with unclean hands.

### THIRD AFFIRMATIVE DEFENSE

#### (Claimants' Negligence or Fault)

132.   The Statement of Claim, and each purported cause of action contained therein, is barred in whole or in part by Soward's own negligent conduct or because Soward is at fault in bringing about any alleged loss or harm they may have suffered, which harm Respondents deny.

### FOURTH AFFIRMATIVE DEFENSE

#### (Set-Off)

133.   The claims asserted by Claimants Soward and & Management Company are barred in whole or in part by the doctrine of set-off.

### FIFTH AFFIRMATIVE DEFENSE

#### (Claimants' Fraud)

134.   The Statement of Claim, and each purported claim asserted therein, is barred, in whole or in part, by Soward's fraud, concealment, or fraudulent or negligent misrepresentations.

### PRAYER FOR RELIEF

WHEREFORE, Respondents request entry of judgment on their counterclaims against Claimants as follows:

1.   For judgment to be entered in favor of Respondents and against Claimants, and that Claimants take nothing by way of their Statement of Claim;

2.   For compensatory damages to Respondents in an amount to be determined at hearing;

-26-

3.  For the establishment of a constructive trust;

4.  For the forfeiture of all salary and management fees to which Claimants claim to be entitled;

5.  For the forfeiture of all partnership capital account balances in which Claimants claim to have an interest;

6.  For restitution according to proof;

7.  For costs of suit, including reasonable attorneys' fees to the extent permitted by law;

8.  For exemplary and punitive damages according to proof;

9.  For interest on all damage amounts; and

10. For such other and further relief as the panel deems just and proper.

Dated:  November 30, 2004

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

By: _____
    Leo P. Cunningham
    Kyle A. Wombolt
    Stephen W. Bucher

Attorneys for Respondents/Counterclaimants