# Exhibit F

1

```
 1     AMERICAN ARBITRATION ASSOCIATION
 2              —oOo—
 3   DAVID C. SOWARD & MANAGEMENT
     COMPANY,
 4
        Claimants,
 5                         Case No.
     vs.            74-Y-181-001-2904
 6            LOPE
     THE & TRUST; SANDY LERNER,
 7   individually and as Trustee
     on behalf of The & Trust and
 8   The Sandy Lerner Trust;
     LEONARD BOSACK, individually
 9   and as Trustee on behalf of
     The & Trust and the Leonard
10   Bosack Trust; RICHARD
     TROIANO, as Trustee and on
11   behalf of The & Trust; &
     CAPITAL PARTNERS, L.F.;
12   CARTESIAN PARTNERS, L.P.;
     LEONARD BOSACK AND BETTE M.
13   KRUGER FOUNDATION, a
     California corporation,
14
     _____Respondents._____//
15   Pages 1 through 220, inclusive.
16
17      REPORTER'S TRANSCRIPT OF PROCEEDINGS
18        Friday, March 23, 2007
19
20
21   REPORTED BY:
22   MARYANN H. VALENOTI, RPR, CSR #11266
23
24
25
```

2

```
 1        A P P E A R A N C E S
 2
         B E F O R E
 3    J. LANI BADER, CHAIRMAN
      ZELA G. CLAIBORNE, ARBITRATOR
 4
     FOR THE CLAIMANT:
 5    FOLGER, LEVIN & KAHN, LLP
      BY:  MICHAEL KAHN, ATTORNEY AT LAW
 6    J. DANIEL SHARP, ATTORNEY AT LAW
      275 BATTERY STREET, 23RD FLOOR
 7    SAN FRANCISCO, CALIFORNIA  94111
      (415) 986-2800
 8
     FOR RESPONDENTS:
 9    O'MELVENY & MYERS, LLP
      BY:  STEVEN SMITH, ATTORNEY AT LAW
10    275 BATTERY STREET
      SAN FRANCISCO, CALIFORNIA  94111
11    (415) 984-8700
12
     REPORTED AT:
13    AMERICAN ARBITRATION ASSOCIATION
      ONE SANSOME STREET, 16TH FLOOR
14    SAN FRANCISCO, CALIFORNIA
15   ALSO PRESENT:
      CASEY MC NAMARA, ESQ.
16    DAVID C. SOWARD
      ROXANNE SOWARD
17    SCOTT NONAKA
      BENJAMIN SMIETANA
18    IVANA CINGEL
      LEONARD BOSACK
19    JERRY MUNN
20
21
22
23
24
25
```

3

```
 1              —oOo—
 2       BE IT REMEMBERED that on Friday,
 3   March 23, 2007, commencing at 9:30 a.m. thereof,
 4   before me, MARYANN H. VALENOTI, RPR, CSR, a
 5   Registered Professional Reporter and Certified
 6   Shorthand Reporter, the arbitration proceedings
 7   commenced as follows:
 8              —OOO—
 9       CHAIRMAN BADER:  It's March 23, 2007, and
10   we are assembled for a hearing in the matter of
11   David C. Soward, et al., and The & Trust, et al.,
12   American Arbitration Association Case Number
13   74-Y-181-001-2904.
14       Now, before we get to housekeeping, there
15   are a couple of things that ought to be put on the
16   record.  First, we have new counsel.  Messrs. Krum
17   and Sellinger have withdrawn as attorneys for
18   Respondents and Counter-Claimants and have been
19   replaced by O'Melveny & Myers, Mr. Steve Smith,
20   Scott Nonaka.
21       MR. SMITH:  Ben Smietana and Ivana Cingel.
22       CHAIRMAN BADER:  What was your last name?
23       MS. CINGEL:  Cingel, C-I-N-G-E-L.
24       CHAIRMAN BADER:  Thank you.  And as a
25   result, henceforth, O'Melveny & Myers will be here
```

4

```
 1   on behalf of Mr. Bosack and Ms. Lerner.
 2       Secondly, on account of conflicts that
 3   became apparent upon the substitution of O'Melveny
 4   & Myers in the disclosures made by Arbitrator
 5   Klitgaard in connection with his contacts with
 6   Steve Smith, Arbitrator Klitgaard's continued
 7   service was challenged and the challenge was
 8   granted by the American Arbitration Association,
 9   and accordingly, pursuant to American Arbitration
10   Association Commercial Rule (R) (19) (b),
11   Arbitrators Claiborne and Bader are continuing as
12   panel of two.
13       Okay, now, that's all I have for the
14   record.  Mr. Kahn.
15       MR. KAHN:  Other than welcoming Mr. Smith
16   and Mr. Nonaka and the other lawyers from
17   O'Melveny, we're ready to proceed.
18       CHAIRMAN BADER:  Any housekeeping?
19       MR. SMITH:  Not on this side, no.  Thank
20   you for the welcome.
21       CHAIRMAN BADER:  Mr. Kahn, before you
22   proceed, let me just tell you about one issue that
23   I really would appreciate your spending some time
24   on because it is of concern to me.  That is the
25   interest analysis choice-of-law question and the
```

5

1  comparative impairment test.
2    MR. KAHN: Okay.
3    CHAIRMAN BADER: Fine.
4    MR. KAHN: Mr. Bader, Ms. Claiborne, we're
5  going to proceed as follows: I'm going to make
6  some preliminary remarks. Mr. Sharp is going to
7  walk through a presentation. Then I'm going to
8  make a couple of concluding remarks, and we will
9  then turn it over to Mr. Bosack and Ms. Lerner's
10  lawyers and then we will respond as the moving
11  parties conclude.
12    What strikes me now where we are is this
13  is a little bit like an episode of the television
14  show Survivor. The television show Survivor, if
15  you happen to watch it, is the one where they
16  famously vote people off the island.
17    First Wilson, Sonsini was voted off the
18  island, then Mr. Sellinger and Mr. Krum were voted
19  off the island, and then Ms. Lerner, after she saw
20  your opinion, she has absented herself from the
21  island having with great protestations insisted on
22  this proceeding only when she's there, she's
23  completely vanished after your first set of
24  rulings. Then Mr. Klitgaard was voted off the
25  island. Now, O'Melveny & Myers wants to vanish

6

1  Order Number 4 off the island. That's the purpose
2  of their 120 pages. They ask you to throw Order
3  Number 4 off the island, and also with it,
4  California law and Delaware law.
5    I must confess, as an advocate, I think
6  it's a very clever strategy because the last time
7  we met — and by the way, I'm going to completely
8  resist the temptation, which I suspect the two of
9  you had also when reading their papers, of saying
10  that's not how it happened.
11    A little bit of reading their production,
12  it reminded me of Kramer Versus Kramer where
13  Dustin Hoffman, in that movie about separation,
14  Dustin Hoffman desperately tried to take care of
15  his child, and he was in the park and he tried so
16  hard to take care of his child and he watched it,
17  and you saw, you were there, and you saw what a
18  good fellow he was, then in court it was presented
19  as if he were this ogre who didn't care.
20    That's a little bit how I felt reading
21  O'Melveny & Myers' papers. What I've been through
22  for many days, I won't repeat the number, it was a
23  clinical recitation of something that they hadn't
24  been through, but I am not going to do anything but
25  comment on the fact that I'm sure you will not take

7

1  my failure to go sentence by sentence in their
2  brief and say, "Well, that's not how it happened,"
3  or, "That's not what happened," or, "This was
4  rejected," as acquiescence in any way. It serves
5  no purpose for us to do that. It is, I think, a
6  little bit showing the wisdom of continuity of
7  counsel and the problem of new counsel, because
8  what we have here is a dramatic revisionist history
9  and we have a regurgitation of arguments that were
10  rejected.
11    But, be all that as it may, the strategy
12  of asking you to throw Order 4 off the island is
13  quite a clever one, but it misses the last
14  interchange between Mr. Bader and myself. If you
15  recall, we said we didn't need this phase of the
16  proceeding. We could go directly from Order 4 to
17  punitive damages, and I argued quite strenuously
18  that would be the case, and as is frequently the
19  case, I lost and we came back in here and Mr. Bader
20  said to me, "Mr. Kahn," I believe the words were,
21  "Welcome to the world of bifurcation."
22    The purpose of the trifurcation, the only
23  purpose of the trifurcation was to take Order
24  Number 4 and see whether it required or permitted
25  punitive damages. That's the only thing we were

8

1  supposed to be doing in this phase. That's the
2  only purpose of this trifurcation, is to take Order
3  4 and to see whether it requires as we think or
4  permits at the minimum punitive damages.
5    Now, that is precisely what we did in our
6  briefs. Ms. Lerner and Mr. Bosack have precisely
7  totally and completely ignored that protocol,
8  totally. There is not one single word in their
9  120-page massive filing which says under Order
10  Number 4, no punitive damages. They don't talk
11  about a sentence, they don't talk about a finding,
12  they don't talk about anything. They totally
13  ignore Order 4. It's as if the protocol that you
14  ordered us to enter into on their motion, their
15  motion didn't exist.
16    Now, you will remember in closing that I
17  said that Len and Sandy created their own world,
18  and I have to say with some degree of satisfaction
19  that though Len and Sandy's world that I painted as
20  not an accurate one was rejected by you in almost
21  its entirety. But I said that in Len and Sandy's
22  world certain things happened. This is another
23  example. In Len and Sandy's world, your 28-page
24  opinion is vaporized. In Len and Sandy's world,
25  the 28 pages of findings of law and fact are

9

1 totally eliminated.
2     Now, in lawyer's talk, what that means is
3 they want to relitigate this.  They were not here.
4 I don't blame them for not having read every word
5 of the record or missed it, but there were a number
6 of occasions where you, Mr. Bader, and our dearly
7 departed Mr. Klitgaard, pointed a finger at us and
8 said, "We will not be relitigating.  Things that
9 are decided are decided.  What's over is over."
10     So we didn't.  We didn't relitigate.  In
11 fact, you asked for our brief on punitive damages
12 in Passport, and if you note in that brief, which
13 you got which we prepared, we never relitigated the
14 Passport thing, but I want to make something clear.
15 I wish I could.  I wish I had the license that
16 Mr. Smith gave himself because we truly believe
17 that our failures as lawyers on this side, we did a
18 lousy job on Passport.  We did not communicate to
19 you properly.  We had a decision that we believe is
20 completely wrong.  To use every adjective they have
21 invoked, we think it's inconsistent, incompatible,
22 and in-whatever.
23     We also think that's irrelevant, but I
24 want to make clear, there is a real cake and eat it
25 too aspect of their papers.  They want to

10

1 relitigate everything they don't like and they want
2 to stand on the platform as if it were from the 10
3 Commandments engraved in stone everything that they
4 like.  We have new bottles, but old wine.  That's
5 not fair.
6     How could they possibly come to you and
7 say Passport and all those terrible things you
8 found against David are absolutely immutable in
9 stone, but everything you found against Len and
10 Sandy, that we want to relitigate the whole thing
11 and throw out all your findings?  In our
12 presentation, we're going to try to do what we've
13 always done, try to be lawyer-like and explain the
14 legal principles involved and why that what to
15 do is impermissible to do and it's wrong.
16     I don't want us to fail to understand the
17 moment here of what's going on.  You ordered us to
18 do something, on their motion over my objection,
19 and they precisely not done it in any way, shape,
20 or form, in any way at all, and I'd like to pause
21 just for a second before turning it over to
22 Mr. Sharp and contemplate the reason for that.
23     Why would such brilliant lawyers, and I
24 have from the day I began practicing law to this
25 day, I have nothing but admiration for this law

11

1 firm.  They're above us in many ways including the
2 same building, three floors above us.  Why would
3 such brilliant lawyers spend so much time and
4 effort filing 120 pages, spending can you imagine
5 what this thing cost, we'll find out.  Could you
6 imagine, this must have cost a quarter million
7 dollars.  It's just an incredible amount of money
8 they spent.  Why would they spend all this money
9 and never ever address the only issue at hand?
10 Well, I think the answer to that is obvious, as
11 Mr. Sharp will demonstrate in his presentation.
12     CHAIRMAN BADER:  Thank you, Mr. Kahn.
13 Mr. Sharp.
14     MR. SHARP:  As you know, we received the
15 brief from O'Melveny & Myers last Friday.  We
16 didn't have the opportunity to file a written
17 response.  What I'd like to do is address the legal
18 arguments that were made as obstacles to an award
19 of punitive damages and sort of clear out the
20 underbrush of these legal arguments and then turn
21 to the legal reasons why Mr. Soward is entitled to
22 punitive damages.
23     First you asked us to address the
24 choice-of-law issue, Mr. Bader.  This issue is
25 Respondents attempt at the 11th hour to avoid

12

1 either California and Delaware law, which up until
2 getting their brief last Friday were the only state
3 laws that either side had ever contended were
4 applicable to the claims here.
5     In Interim Award Number 4, which is what
6 we're dealing with here, the claim for breach of
7 fiduciary duty is subject to Delaware law, and the
8 parties had stipulated that the claim for
9 conversion was subject to California law because
10 the conversion was committed with respect to
11 Mr. Soward who was in California and it was the
12 property was taken from him in California.
13     The governmental interest analysis in a
14 choice of law, when a choice of law question is
15 raised, the presumption is that the forum will
16 apply its own rule of decision unless a party
17 litigant timely invokes the law of a foreign state.
18 We have copies of these slides that we will give to
19 the Panel, the other side as well.
20     CHAIRMAN BADER:  Good.
21     MR. SHARP:  Timely invokes the law of a
22 foreign state, and the reason for that is because
23 there are sometimes factual issues that go into
24 what law should apply.  For example, with a
25 contract, one of the questions is, well, where was

13

1  it negotiated?  If they had timely raised that the
2  Washington law applied, we would have had the
3  opportunity to put on evidence where the Cartesian
4  partnership was actually negotiated and entered
5  into, but the record you have in front of you
6  doesn't address that question because they never
7  raised it.
8      The basic principle in choice of law is
9  that the forum state, California, is going to apply
10  its own law unless there's a compelling reason to
11  displace forum law, a compelling reason.  What is
12  the compelling reason for not applying California
13  law here?  Well, it's what Respondents say is that
14  Washington has a near blanket prohibition on the
15  award of punitive damages and the compelling reason
16  is that Washington law is favorable to them.
17  Nothing more substantial really than they think if
18  you apply Washington law, they could apply punitive
19  damages entirely.
20      Well, their characterization of Washington
21  law is really a bit of a stretch.  What does the
22  Washington Supreme Court say about punitive
23  damages, Winchester v. Stein, relatively recent
24  case in 1998, Mr. Stein argues that punitive
25  damages are not allowed under Washington law;

14

1  that's inaccurate.  Punitive damages are allowed
2  when expressly authorized by the Legislature.
3      There are some statutes in Washington that
4  allow for punitive damages.  We agreed that there
5  is not a Washington statute that allows punitive
6  damages for conversion, but the notion that there
7  is some public policy in Washington that they never
8  allow punitive damages is not the way the
9  Washington Supreme Court sees it.  They see it the
10  Legislature could do it when they see fit and the
11  courts will enforce it, and there are several cases
12  cited there.
13      Now, what are the interests that are
14  involved in the decision of whether to allow
15  punitive damages or not, because as you pointed
16  out, the test, it's called a governmental interest
17  analysis, and in deciding whether there is a true
18  conflict between the laws of two jurisdictions, you
19  look at what the governmental interests are between
20  the laws of the two states.
21      In the bar, Interbay Citizens Bank case,
22  which is one of the cases that Respondents cited,
23  and it's included in the big binder of cases that
24  they gave to you, the Washington Supreme Court
25  articulated the reason for not allowing punitive

15

1  damages, and the reason is that in Washington, they
2  believe that their system of compensatory damages
3  is exceedingly liberal towards the injured party.
4      The compensatory damages award everything
5  a Plaintiff could possibly be entitled to.  It
6  enters the domain of feelings, tenderly inquires
7  into his mental suffering and pays him for any
8  anguish of mind he may have experienced,
9  indignities received, insults borne, sense of shame
10  or humiliation.  Every actual case are paid under
11  the rule of compensatory damages.  That's the
12  Washington rationale; they think their compensatory
13  scheme is pretty liberal.  It's not a we never
14  grant punitive damages, we think they're evil and
15  wrong.
16      Well, what's California's interest?
17  California's paramount interest is in protecting
18  its residents by deterring tortfeasors.  California
19  had a governmental interest in punishing
20  tortfeasors who act with oppression, fraud and
21  malice.  California's interest is reflected in a
22  statute adopted by the Legislature.  There is no
23  statute in Washington that says, "We will never
24  grant punitive damages."  But if you were to apply
25  Washington law, you would be impairing California's

16

1  interest because you would be ignoring the statute.
2  You would completely impair this statute that has
3  been on the books for decades and decades.  But if
4  you apply California law, you're not impairing any
5  interest of Washington because their interest is
6  only that their compensatory scheme is adequate.
7      Now, what would happen if this case, this
8  very case were litigated in a Washington court?  If
9  we were in Washington where the forum state is
10  Washington, what would happen there?  Well, there
11  is a case that's very closely analogous to this one
12  which O'Melveny didn't cite in their 120 pages that
13  they filed and all the cases that they cited to
14  you.  I guess they didn't have room to cite to you
15  the Kammerer case decided by the Supreme Court of
16  Washington in 1981.  That was a case where a
17  Washington corporation, a Washington defendant had
18  entered into a contract with a California citizen
19  over patents for oil-drilling equipment.
20      The Court found that the Washington
21  defendant had committed fraud on the California
22  plaintiff in the enforcement of this contract, and
23  the Washington Supreme Court said, "Well, here both
24  states, California and Washington, have significant
25  contacts.  California has an interest in deterring

17

1   fraudulent activities by corporations having a
2   substantial business presence within its borders.
3   Washington has no interest in protecting persons
4   who commit fraud."
5       If you go back to California's interest,
6   where the defendant has been guilty of oppression,
7   fraud, or malice, what the Washington Supreme Court
8   is saying, "We have no interest in protecting
9   defendants who act in a way that would entitle the
10  plaintiff to punitive damages under California law.
11  Under these circumstances, a Washington court can
12  award punitive damages under the law of
13  California."
14      So the notion that O'Melveny put in their
15  brief that Washington courts will never award
16  punitive damages is -- that's the Kammerer case, I
17  have a copy for Mr. Smith as well -- that
18  Washington courts will never award punitive damages
19  is just flat out wrong, and Washington courts will
20  award punitive damages under California law when
21  there's a reason to do so.
22      And in this case, what are the reasons in
23  this case?  What are the underlying facts here?
24  Well, Mr. Soward is a California resident.  We're
25  in a California forum and that's not just because

18

1   Mr. Soward chose it.  Mr. Bosack and Ms. Lerner
2   voluntarily chose to arbitrate their claims here.
3       Remember how we got here.  Mr. Soward
4   asked for arbitration.  Mr. Bosack and Ms. Lerner
5   filed an action in the Western District of
6   Washington and tried to force Mr. Soward to
7   litigate in Washington.  We obtained a stay of that
8   case, not a dismissal, just a stay, and the Court
9   said, "You go arbitrate what the Arbitrators deem
10  to be arbitrable and come back here and we'll
11  litigate what the Arbitrators deem to be not
12  arbitrable."  And Mr. Wombolt from Wilson, Sonsini
13  said, "Hey, we'll bring all our claims here and
14  litigate everything here in California."
15      So it's a California forum voluntarily
16  chosen by Bosack and Lerner.  We're dealing with
17  Cartesian, the partnership agreement was drafted by
18  Rob Wood, a California attorney.  It has a Delaware
19  choice-of-law clause, not a Washington
20  choice-of-law clause.  Delaware allows punitive
21  damages.  In the Kammerer case, you will see that
22  one of the factors the Court looked at was did the
23  contract have a choice-of-law clause.  It did, it
24  had a California choice-of-law clause.
25      Here, the contract partnership agreement

19

1   points to either California or Delaware.  The
2   activities of Cartesian occurred in California.
3   Mr. Soward was the general partner.  Mr. Bosack was
4   a limited partner.  Soward managed the assets here
5   in California.  The assets were invested in
6   California in Thomas Weisel Partners and also in
7   the United Kingdom in Active Value Advisors and SG
8   Securities Liberty.
9       Soward was terminated in California when
10  Bosack and Lerner had their California attorneys at
11  Wilson, Sonsini send him a draft complaint which
12  was to be filed in San Francisco Superior Court.
13  So really, the only reason for the other side to
14  ask for Washington law here is they want to argue
15  that you can't award punitive damages.  So we
16  believe that California law should apply.
17      Unless there are any questions on that,
18  I'll turn to the next legal issue that's raised on
19  the other side.
20      CHAIRMAN BADER:  Okay, Mr. Sharp.
21      MR. SHARP:  The next legal obstacle that
22  the other side has raised is this notion of functus
23  officio, which is their argument that the Panel
24  made legal or factual errors in Interim Award
25  Number 4 that somehow preclude the award of

20

1   punitive damages, and what they say is the Panel
2   made findings in Interim Award Number 4 that
3   directly contradict the central findings of Awards
4   Number 1 and 3, and because the Panel was without
5   jurisdiction to reach these contrary findings, its
6   breach of fiduciary duty and conversion in Interim
7   Award Number 4 are erroneous and cannot provide a
8   basis for the imposition of punitive damages.
9       Under AAA rules, if a party believes a
10  award to be erroneous or a mistake, there is
11  procedure for modification, but it is not a
12  procedure that allows the arbitrator to redetermine
13  the merits of the claim.  So under their own
14  principle, the theme of this module is that under
15  their own principle of functus officio, you have to
16  follow Interim Award Number 4, even if it was, as
17  they say, erroneous, which it wasn't, as I'll show
18  you.
19      Functus officio is a Latin term.  It means
20  a task performed.  It applies to the officer, or
21  to the Arbitrators, to the two of you.  It means
22  having fulfilled the function or discharged the
23  office, accomplished the purpose.  You have no
24  further authority, apply to an officer whose term
25  has expired, and consequently, no further official

21

```
1    authority.
2         So their argument is, in this case that
3    they cited, when an arbitration award is rendered
4    as a final award, the Arbitrators become functus
5    officio as to the issue upon which the award was
6    made and they can't go back and change it.
7         Now, in the very same case, the Second
8    Circuit points out an arbitrable determination is
9    not final unless it conclusively decides every
10   point required by and included in the submission of
11   the parties.  In their brief, in their brief on
12   this very point they quote from Interim Award
13   Number 1, which says, it said, "On the face award,
14   includes a full settlement and determination of all
15   claims and counterclaims, except for claims set for
16   hearing in September."  That was conversion and
17   breach of fiduciary duty.
18        So on the face of the award, you reserved
19   your jurisdiction to decide the things that were
20   decided in Interim Award Number 4, you clearly were
21   not functus officio, and you also reserved punitive
22   damages.  In making Interim Award Number 4, you
23   made it very clear to the parties that although you
24   made a ruling on Claim Number 1 for the failure to
25   make an accounting on Cartesian, the claims made
```

22

```
1    for conversion, breach of fiduciary duty were
2    separate and grounds for relief and you were
3    starting afresh.
4         Now, you made Interim Award Number 4
5    starting afresh and under the very principles that
6    they cite, this is a case cited in their brief, an
7    arbitrator may not correct an award that he or she
8    intended on the ground that he or she later
9    determined a factual or legal error had been made
10   in the award.  So even if they were right that
11   there was some inconsistency between the two awards
12   and you made a mistake or legal or factual error,
13   the principles they're relying on say you can't go
14   back and relitigate it.
15        So the interim award is final and binding
16   as to the claims for breach of fiduciary duty and
17   the claims for conversion, and under their
18   authorities, Interim Award Number 4 governs the
19   entitlement to punitive damages based on those two
20   claims.  Well, so regardless of whether there are
21   any inconsistencies or not, this argument fails as
22   a matter of law, but let's just talk for a minute,
23   since they raised it, of whether there is any
24   inconsistency about the awards the Panel has made.
25        There are two inconsistencies that they
```

23

```
1    claim, this is the first one.  They say, "Well, in
2    Interim Award Number 1, you rule that Soward is and
3    continues to be a partner in Cartesian and is
4    entitled to be paid the value of his capital
5    account as of September 2006."
6         They say, "But wait a minute, in Interim
7    Award Number 4, you say Bosack made a nonjudicial
8    determination of the partnership with Soward and he
9    took over his assets and held the assets in the
10   partnership in trust as a fiduciary when he threw
11   Soward out in 2003.  Well, aren't those things
12   irreconcilable?"  Obviously, they're not.
13        In Interim Award Number 1, you were
14   determining Soward's rights as a partner.  You were
15   determining what should have happened under the
16   Partnership Agreement.  What should have happened
17   is Soward should have continued to be a partner
18   until there was an accounting, and he's entitled to
19   enforce that right as to what should have happened.
20        In Interim Award Number 4, you looked at
21   what did happen.  What actually happened was
22   Mr. Bosack threw him out and he committed a tort of
23   breach of fiduciary duty and he committed a tort of
24   conversion and Mr. Soward is entitled to relief for
25   that tort as well.  So there's no inconsistency
```

24

```
1    between these two awards.  One determines what
2    should have happened and Interim Award Number 4
3    looks at what did happen and awards relief
4    accordingly.
5         What's the other inconsistency that they
6    argue?  This is from Page 42, they say that your
7    finding that Bosack breached his fiduciary duty to
8    Soward by failing to provide an accounting and
9    distribute Soward's capital account is inconsistent
10   with the earlier finding that the Wood agreement
11   supplied the terms of the oral partnership.  Why is
12   that inconsistent?  They say it's inconsistent
13   because the terms of the Wood agreement, Soward had
14   no right to an accounting or distribution upon his
15   removal as general partner for cause.
16        Well, we read the Wood agreement, it
17   provided for a distribution after the withdrawal of
18   the general partner.  How is it they could say
19   Soward had no right to an accounting under the Wood
20   agreement?  Even if the Wood agreement were
21   silent -- well, what the Wood agreement said is
22   that Bosack had no right to remove Soward as a
23   general partner.  So it's not that Soward was
24   removed for cause, it's that your finding was that
25   Bosack had no right to remove him.
```

Arbitration Proceeding  3/23/2007  4:00:00 PM

25

1  So already they're starting to rewrite
2  Interim Award Number 1.  But even if the Wood
3  agreement was silent on the right to an accounting
4  and distribution as the Panel pointed out in its
5  award, Delaware law provides if not otherwise
6  provided in a Partnership Agreement, such partner,
7  that's a withdrawing partner, is entitled to
8  receive within a reasonable time after withdrawal
9  the fair value of such partnership's interest.
10  So their claim of inconsistency is that
11  Soward had no right to an accounting as a partner
12  after Bosack threw him out; that's just wrong under
13  Delaware law.  How do they deal with that point?
14  Well, Page 41 of their brief, they say the Panel's
15  reliance on Section 17604 is misplaced.  They say
16  you made a mistake.  That code provision concerns
17  the rights of a general partner upon withdrawal.
18  This dispute, however, concerns the rights
19  of a general partner upon removal for cause on the
20  basis of a gross abuse of trust.  Well, excuse me,
21  there was no finding by the Panel in Interim Award
22  Number 1, Number 2, Number 3, or Number 4 that
23  Mr. Bosack had the right to remove Mr. Soward for
24  cause on the basis of a gross abuse of trust,
25  they're just trying to relitigate and rewrite the

26

1  award.  The finding was if the Wood agreement is
2  applicable, Bosack had no right to remove Soward as
3  a general partner.
4  So not only there are no legal or factual
5  errors in either of the awards, this doctrine of
6  functus officio precludes the Arbitrators from
7  reconsidering those awards, it precludes the other
8  side from relitigating the issues.
9  Unless there are any questions on that
10  topic, I'll move to the next one.
11  ARBITRATOR CLAIBORNE:  I don't think so.
12  CHAIRMAN BADER:  March ahead, Mr. Sharp.
13  MR. SHARP:  The next major argument that
14  is made in the O'Melveny brief is that Mr. Soward
15  is seeking punitive damages based on things that
16  happened in the litigation and the litigation
17  conduct of the other side of Mr. Bosack,
18  Ms. Lerner, and their attorneys, and that you can't
19  use litigation conduct as a basis for awarding
20  punitive damages.  Litigation conduct is privileged
21  under Code of Civil Procedure Section 47.
22  Well, this is a straw man argument in many
23  respects, and it's also legally erroneous, but it's
24  a straw man argument.  Much of the conduct on which
25  Soward seeks to base his request for punitive

27

1  damages relates to Respondent's litigation conduct,
2  that's their argument.  Soward's claim for punitive
3  damages is based on Mr. Bosack and Ms. Lerner's
4  conduct in failing to give him an accounting and
5  converting his interest without justification.
6  It's based on them taking his money and denying him
7  rights in the partnership.  That's not litigation
8  conduct.
9  We're seeking punitive damages for the
10  conversion of his partnership interest, taking it
11  and refusing to give it back until the Panel make
12  them do it.  We argue that those acts, the acts of
13  conversion and breach of fiduciary duty were made
14  with oppression, fraud, or malice.  Same thing on
15  conversion.  We allege that the conversion was done
16  with oppression, fraud, or malice.  That's the
17  basis of our claim.
18  It's a straw man to say we're seeking
19  punitive damages based on their litigation conduct.
20  In fact, in Interim Award Number 4, the Panel found
21  in favor of us on those claims and found that
22  Bosack and Lerner, Bosack here committed breach of
23  fiduciary duty, taking over the assets of Cartesian
24  and treating them as belonging to Bosack and to
25  SLLB then exercising dominion and control over

28

1  them and they did it intentionally.  That's the
2  basis of our claim for punitive damages.
3  Interim Award Number 4, you found that
4  Bosack didn't provide an accounting; that's the
5  basis of our claim.  What they argue is that there
6  is a litigation privilege that immunizes
7  litigations of all forms of tort liability based on
8  their litigation conduct.  As we've seen, that
9  argument is completely misplaced because our claim
10  for punitive damages is based on the conversion and
11  breach of fiduciary duty.
12  Well, what relevance does litigation
13  activity have, then, to your decision about whether
14  to award punitive damages?  Well, let's address the
15  litigation privilege and take a look at the context
16  of it.  It occurs in the section of the civil code
17  dealing with libel and slander.  Libel is defined
18  as a false and unprivileged publication.  Slander
19  is defined as a false and unprivileged publication.
20  The Section 47 is defining what a privileged
21  publication is in the context of libel and slander,
22  and it says that a privileged publication is one
23  that's made in a legislative proceeding or judicial
24  proceeding or any other official proceeding
25  authorized by law.

29

1    So what the statute by its terms is saying
2  is that if we sued Mr. Bosack for slander, or if we
3  sued Mr. Krum for saying Mr. Soward was
4  engaged in criminal activity in this hearing room,
5  Section 47 would have afforded a privilege to
6  Mr. Krum for his statements here in this hearing
7  room in an independent tort action for slander or
8  libel.
9    Now, the statute has been applied beyond
10  slander and libel to other tort claims such as
11  emotional distress or interference with contract,
12  and the law is basically saying you cannot sue
13  someone for -- you cannot create tort liability out
14  of statements made in a judicial proceeding.
15  Again, that's not what we're doing here.  We sued
16  for the conversion of Mr. Soward's partnership
17  interest, and we are proving the conversion and
18  proving the malice, oppression, and fraud with
19  evidence that's put on in this hearing room.
20    This distinction between how you prove a
21  tort and the privilege for tort liability was
22  addressed by the California Supreme Court in this
23  Oren Royal Oaks Venture case where the California
24  Supreme Court said on brief reflection, it's quite
25  clear that Section 47 (2) has never been thought of

30

1  to bar the evidentiary use of every statement or
2  publication made in the course of a judicial
3  proceeding.  Answers to interrogatories or to
4  questions at deposition are, for example, routinely
5  admitted into evidence and relied on in determining
6  liability, even though they're clearly statements
7  made in the course of a judicial proceeding.
8    So of course you can consider their
9  conduct in the litigation, their testimony here,
10  their demeanor, their attitudes, because what you
11  are doing at this phase is you are examining the
12  mental state, the intentions, the motives of
13  Mr. Bosack and Ms. Lerner.  Did they act with
14  malice, did they act with the intent to defraud,
15  and how do you answer that question other than by
16  listening to what they say and observing their
17  demeanor and judging their actions and using your
18  common sense, and that's the way it's always done
19  in the -- litigation privilege has never been
20  asserted to bar a court from judging malice,
21  oppression, and fraud by a party's words and
22  conduct during the course of a litigation.
23    ARBITRATOR CLAIBORNE:  Mr. Sharp, I just
24  want to interrupt you and ask a pretty basic
25  question, and that is, is the claim for punitive

31

1  damages on your side based entirely on breach of
2  fiduciary duty and conversion with regard to
3  Cartesian?  And I ask that question because your
4  brief covered a lot more than that, and so I just
5  want clarity on that point.
6    MR. SHARP:  Well, we asked to amend our
7  claim as to both a Capital Partners and Cartesian.
8  The Panel ruled that we would be limited only to
9  Cartesian.  So the state of the record is that our
10  claim is because of your ruling limited to
11  Cartesian.  Now, so it's based on the conversion of
12  his partnership in Cartesian, failure to give an
13  accounting and keeping his money for the past three
14  years and denying his status as a partner for the
15  past three years.
16    On the issue of punitive damages, the
17  determination is did they do those things with
18  malice, oppression, and fraud, and to judge whether
19  they were vindictive towards Mr. Soward or whether
20  they were motivated by ill will towards Mr. Soward,
21  and all of their conduct is relevant to showing
22  their state of mind toward Mr. Soward, and as the
23  California Supreme Court said in this, Oren Royal
24  Oaks case when allegations of misconduct properly
25  put an individual's intent at issue in a civil

32

1  action, statements made during the course of a
2  judicial proceeding may be used for evidentiary
3  purposes in determining whether the individual
4  acted with the requisite intent.
5    CHAIRMAN BADER:  Let's make sure I
6  understand you, Mr. Sharp.  What you are saying,
7  then, is that in terms of what happened, the
8  Complaint is about, we're limited to Cartesian, but
9  in terms of why it happened, the sky's the limit as
10  far as the record is concerned; is that correct?
11    MR. SHARP:  Sure.  You could judge
12  Mr. Bosack's intent and Ms. Lerner's intent by all
13  of their conduct, all of their words and conduct.
14  Does any of that indicate to you that they had a
15  vindictive purpose towards Mr. Soward, that they
16  had ill will towards Mr. Soward?
17    In fact, in your interim award here,
18  Mr. Bosack did not provide a prompt accounting of
19  Soward's share of the assets in Cartesian.  He
20  testified here in court, judicial statement, "We
21  should have provided it as soon as we were able to
22  provide an approximation of it, but certainly after
23  he sued us, he wasn't going to get much.  Somehow
24  being sued disimproves one's mood with regard to
25  these things."  You could rely on a statement like

33

1 that to judge Mr. Bosack's intent.
2      Was this just a business dispute where he
3 was going to provide an accounting in the normal
4 course of business as soon as the accountants got
5 around to it, or was he vindictive, or was he out
6 to punish Mr. Soward for having the temerity to
7 challenge Mr. Bosack's authority?  That's the way
8 the law works on this point.
9      Unless the Court has any questions, I
10 will —
11      ARBITRATOR CLAIBORNE:  No, thank you.
12      MR. SHARP:  I will give you these slides,
13 and in the slides I cite you cases where courts, in
14 assessing punitive damages, have ruled that malice
15 can be proved by indirect evidence from which the
16 jury draws inferences.
17      In the Shade Foods Case, which is cited by
18 Respondents, it's in their pleading, the Court
19 ruled in the context of punitive damages in bad
20 faith against an insurer, that the Court could rely
21 on the statements made and the litigation conduct
22 of the insurer judging whether they had bad faith.
23      In the White v. Western Title case, the
24 California Supreme Court said you could even look
25 at settlement offers made in the context of

34

1 litigation to determine if the insurer was acting
2 in bad faith; was the settlement offer so cheap, so
3 chintzy, that it showed bad faith by the insurer?
4      The two cases that Respondents rely on in
5 their brief, they really make this argument based
6 on two cases.  One is that the De Anza Mobile
7 Homeowners case which they quote the phrase, "The
8 Defendants' trial tactics and litigation conduct
9 may not be used to impose punitive damages in a
10 tort action."  It was a very unusual case because
11 it was based on a violation of a statute the way
12 you could charge for utilities in a mobile home
13 park.
14      In that case, the Plaintiff alleged tort
15 causes of action, but did not pursue them at trial.
16 He only pursued the statutory cause of action in
17 trial, but was nevertheless awarded punitive
18 damages, and the Court-awarded punitive damages are
19 not available for a statutory violation where there
20 was a specific penalty provided in the statute.
21 Then later in the case the Court said, "Well, on
22 remand, if they do pursue the tort case, you can't
23 say that they were malicious because they were
24 litigating the statutory issue."  You can't look —
25 you cannot have a lay jury imply malice, but

35

1 they're litigating over this statutory issue, so
2 it's a very unusual case.
3      The other case they rely on is Palmer
4 versus Ted Stevens Honda, and they say that case
5 reversed an award of punitive damages that had been
6 based substantially on evidence of the Defendant's
7 litigation tactics and the attorney's fees incurred
8 by the Plaintiff.
9      Again, this was a very unusual case.  It
10 was based on the tort that no longer exists in
11 California of a Defendant in bad faith and without
12 probable cause denying the existence of a contract
13 under Seaman's Direct Buying Service.  There used
14 to be this tort where if a party completely denied
15 the existence of a contract, that could be
16 considered a tort.  The Supreme Court later
17 eradicated that because it was too — it conflated
18 toward in-contract liability.
19      This Ted Stevens case, the Plaintiff had
20 sought to prove punitive damages by introducing the
21 pleading saying, "Look, here's his answer, he's
22 denying the existence of the contract, he's denying
23 his liability under the contract.  Look how much
24 attorneys' fees I had to incur to establish my
25 rights under the contract," and the Court in Ted

36

1 Stevens said there was no continuing contractual
2 relationship.  No implied covenant to treat the
3 Plaintiff fairly.  You cannot allow a jury to base
4 punitive damages on the mere fact that the lawyers
5 in their answer defended the Defendant's legal
6 position.
7      Well, you could see from the highlighted
8 phrases that this doesn't apply at all here.  You
9 found that there was a continuing partnership
10 relationship between Mr. Bosack and Mr. Soward,
11 that Mr. Bosack was under a continuing fiduciary
12 duty with respect to the assets, and it's just not
13 the case that as soon as Mr. Soward filed his
14 arbitration, Bosack could treat him at arm's length
15 and engage in litigation and you can't consider
16 that in assessing Mr. Bosack's malice, oppression,
17 or fraud.  So that's that issue.
18      MR. KAHN:  Mr. — Ms. Claiborne.
19      ARBITRATOR CLAIBORNE:  Yes.
20      MR. KAHN:  In answer to your question,
21 maybe I could shed just a little more light.  It's
22 a recognized jurisprudence in this state that when
23 you have to decide what to do about a person who
24 you found liable, you could take into account their
25 behavior in trying defend themselves.  The best

37

1  example I could give you is the one I'm most
2  familiar with, and that is the Supreme Court's
3  teachings in the Commission of Judicial
4  Performance.
5      We routinely get judges who are accused of
6  doing things.  Then they come before the Panel, the
7  Commission, and they say things to us, and the
8  Supreme Court has held that if they're dishonest in
9  trying to talk their way out of the problem, we
10  could hold that against them and act accordingly,
11  and that is based on the whole history of
12  California jurisprudence that when someone comes to
13  you themselves, we're not talking about the
14  lawyers, their conduct in testifying to you, if
15  they lie to you, for example, in an effort to get
16  out of their liability, you can hold that against
17  them and say, and indeed they came here and lied,
18  so that we didn't sue them for lying to you, so
19  that's not part of the element of the tort, but we
20  can say to you please, we think you should take
21  that into account where you found, for example, on
22  occasion, as Dan will show, that they weren't
23  straightforward with you.  You can take that into
24  account.
25      And the flip side of it is true, too.  If

38

1  you found them to be otherwise completely honest
2  and moral and wonderful, all their dealings,
3  obviously, I'm sure Mr. Smith will, if we get to
4  the next phase, will tell you that you must take
5  that into account, the course of their conducts,
6  and we certainly won't deny that he could invoke
7  all the wonderful deeds that they think they've
8  engaged in.
9      So I hope that answers your question.
10      ARBITRATOR CLAIBORNE:  Yes, thank you.
11      Lani, did you have anything?
12      CHAIRMAN BADER:  No, thank you.
13      MR. SHARP:  The next defense, legal issue
14  that is raised in the brief is the argument that
15  Mr. Bosack's actions were taken and Ms. Lerner's
16  actions were taken in good-faith reliance on advice
17  of counsel.
18      This defense, Page 56 of their brief, much
19  of the conduct in which Soward seeks to base his
20  claim for punitive damages was carried out by
21  Bosack in good-faith reliance on the advice of
22  counsel.  Again, the conduct is the breach of
23  fiduciary duty and excluding Soward from the
24  partnership, taking dominion over his partnership
25  interest, his management of the assets, taking his

39

1  money and refusing to account for him for his money
2  for three years until the Panel forced him to do
3  so.
4      The defense of advice of counsel was first
5  recognized in actions for malicious prosecution
6  where the Defendant accused of malicious
7  prosecution would say, "Well, my lawyers said it
8  was okay to file this suit," and the law that
9  developed said you have the burden of proof as the
10  Defendant that you sought advice in good faith and
11  not as a mere cloak to protect against the suit for
12  malicious prosecution or to refute the theory of
13  malice.  That's what they're trying to do here is
14  say, "Well, we relied on advice of counsel and,
15  therefore, you shouldn't find that we acted with
16  malice."
17      Well, as this defense was developed, good
18  faith has a specific meaning, and it doesn't just
19  mean clean heart, empty head.  It means, this is
20  from a 1947 case, before a person accuses another
21  in a judicial proceeding of having committed an
22  unlawful, a base or immoral act, that's kind of
23  quaint language, but it applies fully as to what
24  happened here, because they came in here and
25  accused Mr. Soward of fraud, criminal conduct.  You

40

1  remember the first hearing we had with Krum and
2  Sellinger, they said, "You can't tell us we can't
3  use the word 'criminal' when we interview people,"
4      It is his duty not only to make a full and
5  fair disclosure of all the facts within his
6  knowledge, tending to prove or disprove the
7  criminal charge, meaning the disclosure from the
8  client to the attorney, but it is also incumbent
9  upon him to find out all of the pertinent facts
10  known to his own agents and such facts as are
11  readily ascertainable and to acquaint his attorney
12  with them.
13      So if they really wanted to make this
14  good-faith-advice-of-counsel defense, they had to
15  come in here and say, "This is everything we told
16  our attorneys.  These are all the steps we took to
17  investigate.  These are all the people we talked
18  to, and this is the information we provided to our
19  attorney, and this is the advice the attorney gave
20  us," and they didn't do any of that.  They didn't
21  do anything close to that in this proceeding.
22      Another principle of this defense is that
23  if you assert advice of counsel, you waive the
24  attorney-client privilege, and the reason for that
25  is to prevent a party from using the advice he

Arbitration Proceeding  3/23/2007  4:00:00 PM

41

1   received as both a sword by waiving to privilege to
2   favorable advice, and a shield by asserting the
3   privilege to unfavorable advice, and as you will
4   recall, that's exactly what happened here.
5       In this arbitration on the 59th day, after
6   asserting privilege for three years, on the 59th
7   day they brought in Mr. Klein, and they sought to
8   have him say that everything was fine, everything
9   was in good faith, and it was all done on advice of
10  counsel, but they were using it as both a shield
11  and a sword.
12      And this is from November 21, Mr. Klein
13  under questioning by Mr. Krum, Mr. Krum was asking
14  Mr. Bosack -- excuse me, Mr. Krum was asking Mr.
15  Klein, "Did Bosack ever disagree with any of your
16  recommendations," and Mr. Klein said, "Well, you're
17  asking for some advice that I had given to my
18  client and which would normally be a matter of
19  privilege, so if you'd like me to go into that,
20  because we did make some recommendations about the
21  case in general, Cartesian was a part of that."
22      And, Mr. Chairman, you allowed Mr. Krum to
23  decide whether he's going to waive the privilege or
24  not and he didn't.  We know that when Mr. Soward
25  was terminated, he was terminated as to everything.

42

1   There was a unitary course of conduct in dealing
2   with him.  They fired him from everything.  They
3   sent letters to all the banks.  Cartesian was only
4   part of their overall treatment of Mr. Soward and
5   we never learned about that.
6       We never learned what they told Wilson,
7   Sonsini.  We never learned the true story of how
8   that came about.  We asked -- we know that Wilson,
9   Sonsini was fired right when we were going to start
10  the arbitration and Mr. Klitgaard tried to get an
11  answer to a simple question:  "To your knowledge,
12  was your termination as counsel for Mr. Bosack and
13  Ms. Lerner related in any way to your advice
14  concerning an accounting for Cartesian?"
15      And Mr. Sellinger objected on the grounds
16  of attorney-client privilege.  He tried to recast
17  the question in an artful way, but the Chair
18  overruled the objection, and Mr. Klein, sitting
19  here in this room, refused to answer on the grounds
20  of attorney-client privilege over the Chairman's
21  order.
22      Now, when we had attorney-client
23  privileged disputes over documents, like over the
24  e-mails that went back and forth with Clark-Nuber
25  over changing the tax return, the Panel made

43

1   rulings on privilege, and we got privileged
2   documents produced to us, but here when they
3   brought in the attorney in the courtroom about the
4   very subject of this proceeding, they asserted
5   attorney-client privilege.  So they're not entitled
6   to rely on the advice-of-counsel defense.  Even
7   though they're not entitled to rely on it, let's
8   take a look at what Mr. Klein said about the advice
9   that he gave.
10      This is the same day, November 24, "You
11  are aware that there was no final distribution to
12  Mr. Soward tendered to him on the day he was
13  fired?"  Mr. Klein was aware of that.  "Did you
14  tell Mr. Bosack he didn't have to make a final
15  distribution to Mr. Soward?"  No, he didn't tell
16  him that.  "As a matter of fact, at the time we
17  removed him, I think we actually discussed the
18  consequence of removal that a distribution would
19  have to be made," and he said Len's response was,
20  "Well, if we need to make a distribution, we'll
21  make a distribution."
22      So that's what he said the advice was,
23  okay, you could throw him out, but you have to do
24  an accounting.  What do Respondents say in their
25  brief?  How do they characterize?  They're trying

44

1   to recast this testimony.  Bosack was advised by
2   his counsel at Wilson, Sonsini not to distribute to
3   Soward his punitive interest in Cartesian, they
4   cite November 21 transcript at Page 109 to 110, as
5   well as Mr. Bosack's testimony.  The November 21
6   testimony is Mr. Klein's and here it is.
7       Mr. Krum asked what about Mr. Soward's
8   right to his money in Cartesian if he had money in
9   Cartesian?  And they know that he did.  Mr. Klein
10  answered, "Right, well, you know, we figured that
11  that would naturally be put into some process,
12  either settlement negotiations or dispute
13  resolution process with Mr. Soward."  So that's Mr.
14  Klein's testimony.  Either settlement negotiations
15  or a dispute resolution process with Mr. Soward.
16      Well, we know what happened when
17  Mr. Soward was terminated on November 24, 2003.
18  Wilson, Sonsini sent a letter, this is Hearing
19  Exhibit 3728.  In this letter, they terminated
20  Mr. Soward effective immediately and they attached
21  a draft complaint that accused Mr. Soward of fraud,
22  looting.  They claimed in their complaint damages
23  in excess of $12 million.
24      In this same letter, they made a
25  settlement proposal to Mr. Soward, and their

45

1  settlement proposal was that they wouldn't file the
2  Complaint if Mr. Soward agreed to reimburse our
3  clients for the damages suffered as outlined in the
4  Complaint, the $12 million.  They knew Mr. Soward
5  didn't have it, and they wanted a substantial
6  payment immediately.  And then they wanted, for the
7  remaining payments, security, including his house
8  and all his other assets, and then they said,
9  "Well, if you do that, we'll agree that you can
10 resign," even though they had fired him immediately
11 and sent out letters to every bank and investment
12 relationship that he had, terminating him and
13 publicly humiliating him with respect to all his
14 business contacts.
15       So the notion that Mr. Klein gave good —
16 that Mr. Bosack was relying in good faith on advice
17 from counsel in the way he treated Mr. Soward is
18 disproved by the scant amount of evidence that we
19 do have about the attorney-client communications,
20 and certainly there was no establishment of a
21 defense of good-faith reliance on advice of
22 counsel.
23       Unless there are any questions on that,
24 I'll turn to my next topic or maybe we could take a
25 break.

46

1       CHAIRMAN BADER:  Let's take a 15-minute
2  break.
3       (Whereupon, a recess is taken.)
4       CHAIRMAN BADER:  Mr. Sharp, continue.
5       MR. SHARP:  The last issue that I'm going
6  to address is Mr. Soward's entitlement to punitive
7  damages.  Under California law, which is the law
8  that we contend applies, and as you saw from the
9  Kammerer case when we were discussing choice of
10 law, even a court sitting in Washington would apply
11 California law under facts similar to those that we
12 have here, and Delaware law and punitive damages is
13 really very similar to California law, but somewhat
14 differently phrased.  But our briefing has been
15 under California law and that's what I'll address
16 here.
17       What I have up on the screen is from the
18 Judicial Counsel jury instructions on punitive
19 damages, the jury instructions that would be used
20 to bifurcate a trial where the jury first decides
21 liability, and in deciding liability, they decide
22 whether or not the Plaintiff is entitled to
23 punitive damages.  Then in the second phase, the
24 jury would determine the amount.
25       The jury instruction is if you decide that

47

1  the Defendant's conduct caused Plaintiff harm, you
2  must decide whether that conduct justifies an award
3  of punitive damages.  At this time, you must decide
4  whether Plaintiff that's proved by clear and
5  convincing evidence that the Defendant engaged in
6  that conduct with oppression, fraud or malice,
7  malice, oppression or fraud.
8       So again, the conduct is the conversion of
9  Mr. Soward's partnership interest, excluding him
10 from the partnership, taking his money, stripping
11 him of his rights to manage his own money in the
12 partnership, and refusing for three years to
13 provide an accounting until compelled to do so by
14 process of law.  That's the conduct that is at
15 issue here.
16       Now, in a bifurcated trial, the jury would
17 decide liability and entitlement to punitive
18 damages at the same time, and here the Panel has
19 decided liability in Interim Award Number 4, and
20 we'll look at each element of punitive damages
21 through the lens of Interim Award Number 4,
22 starting with malice.
23       Malice, as it's defined in the jury
24 instruction, means that the Defendant acted with
25 intent to cause injury or the Defendant's conduct

48

1  was despicable and was done with a willful and
2  knowing disregard of rights for safety or disregard
3  for another.
4       What the Panel found in Interim Award
5  Number 21 was the failure by Bosack to provide an
6  accounting to Soward was done for the purpose of
7  making it as difficult as possible for Soward to
8  receive his funds in Cartesian and to hurt him.  If
9  this finding — if we were in court and a jury had
10 made this finding, the judge would say that's a
11 finding of malice, we've now go to the next phase.
12      In Interim Award Number 4 on Page 16, the
13 Panel, in fact, found malice by Bosack and SLLB
14 towards Soward as an inference drawn from the way
15 they handled the tax return in 2004, so the trier
16 of facts findings on liability include findings of
17 malice that entitle Mr. Soward to punitive damages.
18      Oppression, as defined in the jury
19 instruction, means despicable conduct that subjects
20 a person to cruel and unjust hardship, in conscious
21 disregard of that person's rights.  In Interim
22 Award Number 4, Page 24, the Panel found that
23 Bosack and Lerner's conduct showed a knowing and
24 callus indifference to Soward's rights in his
25 property that he had in Cartesian.

49

1    In the Dang versus Cross case, this is a
2    judicial gloss on oppression.  It means an act or
3    omission done in a manner which injures or damages
4    or otherwise violates the rights of another person
5    with unnecessary harshness or severity as by misuse
6    or abuse of authority or power, or by taking
7    advantage of some weakness or disability or the
8    misfortunes of another person.
9        Here the Panel found that Bosack, who took
10   control of the partnership and its books and cooked
11   the books to reduce Mr. Soward's capital account to
12   a mere $135,000, which was infinitesimal compared
13   to Bosack's wealth, refused to pay him even that
14   amount of money, making Soward spend time, effort,
15   and resources for another year.  It's been three
16   years to prove his right to the money.  The interim
17   award contains a finding of oppression that
18   entitles Mr. Soward's punitive damages.
19       Another instance of oppression was the
20   handling of the tax return which they refused to
21   provide to Mr. Soward, refused to tell him about,
22   even though Mr. Bosack was right here in this room
23   sitting across from the table of Mr. Soward looking
24   him in the face; that was an abuse of power that
25   meets the definition of oppression.

50

1    Fraud means that the Defendant
2    intentionally misrepresented or concealed a
3    material fact and did so intending to harm.  Now,
4    you will note that this definition is somewhat
5    different from the traditional definition of fraud,
6    which is a misrepresentation intended to induce
7    reliance.  This is a misrepresentation intended to
8    harm Mr. Soward.  Bosack contends that he --
9    contends that he could not know how much to pay, if
10   anything.  This is in the accounting to Mr. Soward
11   to Cartesian until the Panel made its ruling as to
12   whether Soward ever had a legitimate interest in
13   Cartesian.
14       The Panel finds that this assertion was
15   both false and made in bad faith.  That's a finding
16   of fraud.  Mr. Bosack's statement, gee, he can't
17   possibly do the accounting because Mr. Soward might
18   disagree with it, and the Panel has -- I can't
19   possibly do that.  That was false, made in bad
20   faith for the purpose of keeping Mr. Soward from
21   getting his money.  Page 19 of the interim award,
22   Bosack's position did not even pass the smell test
23   of his lawyers.  If anything, he was being
24   duplicitous with funds held by a fiduciary.
25   Duplicitous is fraudulent.

51

1    Another instance of fraud found in Interim
2    Award Number 4 was on the tax return, which in
3    addition to transferring Soward's interests to
4    Bosack, SLLB reduced the value of SG Securities
5    Liberty, one of the three investments of Cartesian
6    on the tax return by $3,429,713.  They did that in
7    order to argue that the value of the assets were
8    less so that Soward would get less out of the
9    accounting for the purpose of harming Mr. Soward.
10       The findings in Interim Award Number 4 on
11   the face of the award contain findings of malice,
12   fraud, and oppression.  Any one would be
13   sufficient.  The Panel has found all three.  There
14   would not be a case in Superior Court where a jury
15   made those findings and the Plaintiff was denied
16   punitive damages.  The only question should be the
17   amount.
18       Now, the last thing that Respondents have
19   argued in their brief is that somehow Ms. Lerner
20   should be absolved from responsibility for all of
21   this conduct.  They don't say what law should apply
22   to Ms. Lerner, I guess they couldn't find a state
23   where she had been that doesn't allow punitive
24   damages, but we will address it under California
25   law.

52

1    SLLB was the general partner that Bosack
2    and Lerner inserted in place of Mr. Soward.  When
3    they kicked him out, they put in SLLB, and what
4    does the evidence show; what does the evidence show
5    about that entity?  Let's go to the Elmo.  This is
6    from September 16, Page --
7        MR. MC NAMARA:  We are at Page 25.
8        CHAIRMAN BADER:  Whose testimony is this?
9        MR. SHARP:  This is the testimony of
10   Mr. Brook Middleton, Respondent's witness:
11       "After Mr. Bosack fired Mr. Soward, who
12   became the general partner?
13       "SLLB, LLC.
14       "What is SLLB, LLC?
15       "It's a limited liability company owned by
16   Mr. Bosack and Ms. Lerner.
17       "And who makes the decisions for SLLB,
18   LLC?
19       "They do.
20       "Bosack and Lerner?
21       "Yes, sir.
22       "Okay, now after Mr. Soward was fired,
23   Mr. Bosack and Ms. Lerner became responsible for
24   managing Cartesian Partners?
25       "Yes, sir.  Yes.

53

1    "And if there was a decision to be made
2    about whether Mr. Soward should be paid and cashed
3    out for his interest in Cartesian Partners, that
4    was a decision for Mr. Bosack and Ms. Lerner;
5    correct?
6    "Answer: Yes."
7    So the evidence is that Ms. Lerner —
8    CHAIRMAN BADER: I'm sorry, what page was
9    that?
10   MR. SHARP: It's pages --
11   MR. MC NAMARA: Pages 25 through 26.
12   MR. SHARP: September 16.
13   MR. MC NAMARA: September 15.
14   MR. SHARP: I'm sorry, September 15.
15   CHAIRMAN BADER: Thank you.
16   MR. SHARP: Now, that was evidence
17   specifically directed to SLLB, LLC, and
18   Cartesian Partners, which is the particular claim
19   here. So the evidence shows without contradiction
20   that Ms. Lerner was — had inserted herself as a
21   party responsible for the decision-making with
22   respect to Cartesian from the time that Mr. Soward
23   was fired and thrown out of the partnership.
24   So what does the evidence show about
25   Ms. Lerner's state of mind and her malice,

54

1    oppression, and fraud? The evidence is that the
2    attack on Mr. Soward was carried out by Mr. Bosack
3    and Ms. Lerner together. They had the same lawyers
4    in this proceeding. They engaged in the same
5    actions towards Mr. Soward.
6    If anything, Ms. Lerner was more of a
7    driving force in the attack against Mr. Soward.
8    She was the one who testified first in this
9    proceeding. She testified that she was the one who
10   became physically ill, she claimed, as a result of
11   the actions that Mr. Middleton and Clark-Nuber
12   supposedly found. She was the driving force behind
13   the decision to fire Mr. Soward and treat him the
14   way that they did. You remember that Mr. Bosack
15   claimed, "I was Mr. Soward's last defender."
16   Defender from whom? From Ms. Lerner. She was the
17   only other one whose assets were involved.
18   The evidence here, I think, for those of
19   us who participated in these proceedings, is very
20   clear that Ms. Lerner was intimately involved with
21   every aspect of the treatment of Mr. Soward, at
22   least through the time that the Panel reached
23   Interim Award Number 1 and decided against
24   Ms. Lerner on virtually all of the claims she had
25   brought, at which point she decided this wasn't fun

55

1    anymore and decided to stop coming. But clearly
2    she was involved in the way that Mr. Soward treated
3    and should be subjected to punitive damages as
4    well.
5    Unless there are any questions on that,
6    I'll turn it back over to Mr. Kahn.
7    CHAIRMAN BADER: Thank you, I have no
8    questions.
9    ARBITRATOR CLAIBORNE: No.
10   CHAIRMAN BADER: Thank you, Mr. Sharp.
11   MR. KAHN: I'll defer at this point to the
12   other side.
13   CHAIRMAN BADER: Okay.
14   MR. SMITH: Just give us a minute to get
15   set up.
16   CHAIRMAN BADER: Mr. Smith, at the end of
17   the day, are you going to give us copies of your
18   slides?
19   MR. SMITH: Yes, absolutely.
20   ARBITRATOR CLAIBORNE: Tradition in this
21   hearing has been to use a cardboard box as a
22   lectum, but I see we've been upgraded today.
23   MR. KAHN: I think they've added class to
24   the whole proceeding.
25   MR. SMITH: Well, there's one thing we

56

1    could agree on, then.
2    Actually, there is a second thing that we
3    could agree on; that is that we have not been
4    involved in this matter from the very beginning.
5    We came in after the issuance of Interim Award
6    Number 4, and it became very apparent to us that;
7    one, this is a case badly in need of deescalation,
8    and as a result of that observation, and also the
9    observation that this is a isolated business
10   dispute, that was hardly fought between two
11   sophisticated parties, that it is not an
12   inappropriate action for the imposition of punitive
13   damages on either side, and in the interest of
14   deescalation and bringing a little reasoned sanity
15   to this, we withdrew our claim for punitive damages
16   against Mr. Soward, and the point of our brief,
17   which was 68 pages, was that punitive damages, to
18   impose punitive damages on Mr. Bosack and
19   Ms. Lerner is also completely inappropriate in this
20   case, and what I'd like to do is go through a
21   presentation that explains why this is exactly the
22   case.
23   The presentation is organized roughly
24   along the main points that we make in our brief,
25   and the first is that the Panel exceeded its

57

1  authority in finding breach of fiduciary duty and
2  conversion.  And in the first section of the
3  presentation, I'm going to go through that, rather
4  methodically, because I think the Claimant has
5  misapprehended our basic point.
6      The second point is that Washington does
7  apply, Washington law does apply to this issue,
8  issue of punitive damages, and it bars it as to
9  Mr. Bosack.  Third issue is that even if California
10  law applies, California has very stringent
11  standards for the imposition of punitive damages,
12  it's disfavored under California law.  It's
13  discretionary even if the requirements for punitive
14  damages have been made -- have been met.
15      We'll also explain why Bosack and Lerner's
16  conduct was reasonable, not malicious, oppressive,
17  or fraudulent under the standard applicable under
18  California law.  We're also getting a copy of the
19  tribunal's order that Mr. Kahn referred to in his
20  opening remarks because I think it's pretty
21  apparent that the prior phase of the arbitration
22  was to establish the issues of liability on breach
23  of fiduciary duty and conversion claims.  They were
24  not to prejudge whether Mr. Bosack and Ms. Lerner
25  acted with malice, oppression, and fraud such as to

58

1  entitle the Claimant to punitive damages.
2      This is the purpose of this proceeding and
3  they, in fact, have recognized it, all you have to
4  do is look at their brief.  In their brief they go
5  through the evidence and the facts and categorize
6  them into three categories, malice, fraud, and
7  oppression, and try to show you that the facts that
8  they cite are supportive of those findings.
9      We disagree with them, but that is the
10  purpose of this phase of the arbitration, to
11  determine whether under clear and convincing
12  evidence, they have established their entitlement
13  to punitive damages under California law or under
14  Washington law, if it applies, and I think that we
15  both agree that if Washington law applies, this
16  isn't a punitive damages case, because Washington
17  law does not permit punitive damages on a breach of
18  fiduciary duty and conversion claim.
19      Related to the fact that conduct was
20  reasonable, it was done in good faith on the advice
21  of counsel.  Even if the technical requirements for
22  this defense have not been met, it can't be denied
23  that every step Mr. Bosack and Ms. Lerner took was
24  done with counsel.  It was done through counsel.
25      Wilson, Sonsini's fingerprints are all

59

1  over this, as are Krum and Sellinger's, in
2  connection with the conduct of the arbitration.
3  Despite their very cramped reading of the
4  litigation privilege, it's been expansively
5  applied, and if you look at the facts that they're
6  relying on in their brief to support fraud,
7  oppression, and malice, almost all of them are
8  privileged litigation conduct and cannot be the
9  basis for an award of punitive damages.
10      There's a reason why Sandy Lerner is here
11  and that's because she doesn't belong here.  The
12  allegations of fraud, malice, and oppression as to
13  her are not based on any conduct in which she was
14  directly involved, and the finding that SLLB is not
15  a party to this proceeding.  It's a Delaware
16  limited liability corporation and there's been --
17  she is not responsible for the liability of SLLB,
18  and there's been no allegation that SLLB should be
19  pierced.  There's been no evidence to that, that it
20  should be pierced, and there's been no finding that
21  it has been pierced.
22      So she doesn't belong here as a matter of
23  law, and there's no evidence of her conduct that
24  meets the standards of clear and convincing
25  evidence of fraud, malice, and oppression.  So she

60

1  is literally and figuratively detached from this
2  proceeding.
3      So let's talk about the first issue is
4  that the Panel exceeded its authority in finding
5  breach of fiduciary duty and conversion in Award
6  Number 4.  The basic argument is pretty
7  straightforward.  It's that in Interim Award Number
8  4, the Panel made findings regarding the Cartesian
9  partnership that are inconsistent with its prior
10  findings in Interim Award Numbers 1 and 3 with
11  respect to the Cartesian partnership.  Mr. Sharp
12  said that the awards are reconcilable.  They're
13  absolutely irreconcilable on fundamental points.
14      The Panel's prior findings in Awards
15  Number 1 and 3 establish that there was no breach
16  of fiduciary duty or conversion and thus, no basis
17  for the imposition of punitive damages.  I'll be
18  going through these in more detail.  And that the
19  Panel is functus officio with respect to those
20  prior findings in one and three with respect to
21  Cartesian and had no authority in Interim Award
22  Number 4 to redetermine that to find liability for
23  breach of fiduciary duty and conversion.  The
24  Panel's findings in four, a breach of fiduciary
25  duty and conversion hinge on the redetermined

inconsistent findings of issues that were determined the other way in Awards 1 and 3.

These are the findings in Interim Award Number 1. The Wood agreement provides the relevant terms of the oral Cartesian Partnership Agreement and thus provides the basis of Soward's rights with respect to Cartesian. Soward is and continues to be a partner in Cartesian. In fact, he was a partner in Cartesian in correspondence with one and three until he was paid in, I believe, December, I believe, 16, 2006. Shall no longer be a partner of Cartesian upon payment of the amount of his capital account as determined by the Panel, and to make that determination, the Panel ordered that Claimant and Respondents shall file with the Panel an accounting prepared by their experts as of 9/30/2006.

So the partnership's in existence, it's governed by the Wood agreement, he remains a partner in the partnership, and you ordered an accounting to determine his interest and then a distribution. These are the findings of Award Number 3. You incorporate by reference the prior findings by the Panel as to Cartesian in Interim Award Number 1. You reiterate that Soward is and

continues to be a partner in Cartesian. You rely on the terms of the Wood agreement to determine Soward's net interest in Cartesian through September 30, 2006, and you determine that that interest was $1,464,391.

Here's four, the Panel held that as of late November 2003, Bosack made a nonjudicial termination of the partnership with Soward, and a nonjudicial termination effects a dissolution of the partnership. So in four you are finding the partnership does not continue to exist, it's been dissolved.

The Panel thus found that Soward was no longer a partner of Cartesian, and Bosack held the assets of the former partnership in trust. And ignoring the Wood agreement, the Panel instead looked to Delaware law and The & Capital Partner's agreement to determine that Soward had a right to an accounting and a distribution of his net interest in Cartesian within a reasonable time after his withdrawal as a partner, and again, his withdrawal as a partner was as of November 2003.

These awards only coexist in two parallel universes. They're completely irreconcilable with one another. In Awards 1 and 3, it's the Wood

agreement that controls, and four, it's Delaware, and in the alternative, The & Capital Partners' agreement. In one and three, Soward is and continues to be a partner of Cartesian, and in four, there's been a dissolution of the partnership and he is no longer a partner of the partnership. In one and three, the Wood agreement does not entitle the partners to an accounting and distribution, and the only way that you ordered that was by virtue of your broad remedial powers.

You were not looking to the Wood agreement, you simply found that these two people cannot coexist in the same partnership. What is a sensible outcome here, a sensible outcome is let's give him an accounting, we'll deny his dissolution claim, and we'll require payment of his interest within 60 days, and if Mr. Bosack does not do that, then the partnership, the Cartesian partnership will be dissolved sometime in late 2006, early 2007.

In Interim Award Number 4, Soward had a right to an accounting of his interest in Cartesian within a reasonable time after his withdrawal as a partner which you deemed November 2003. In one and three, the Panel relies on the terms of the Wood

agreement to determine Soward's net interest in Cartesian as of September 30, 2006. In four, you relied on the 2003 Cartesian tax return as to the amount due and payable to Soward as of September 29, 2004.

Then you will see that the amounts are -- the methodology and the amounts are different. It's these inconsistent findings that form the basis of the Panel's determination that Bosack breached his fiduciary duty to Soward to provide an accounting and distribution of Soward's net interest in Cartesian within a reasonable time after his removal from the partnership in November of 2003. Bosack, individually, and Bosack and Lerner through SLLB likewise converted Soward's interest in Cartesian.

Let's take a look at the Panel's findings on breach of fiduciary duty in Award Number 4. We have the citations at the bottom of the slide, so I'm not going to give you the page cites. But the Panel relies on Mr. Bosack's testimony with respect to & Capital. He says, in explaining why he and Lerner had not done so, i.e. given a distribution to Mr. Soward in connection with his interest of & Capital, he testified that, "We, Bosack and Lerner,

65

1  should have provided it as soon as we were able to
2  provide an approximation of it, but certainly after
3  he sued us, he wasn't going to get much. Somehow
4  being sued disimproves one's mood with regard to
5  these things."
6        Then the Panel found -- the Panel finds
7  individually and through the Bosack trust, took the
8  same approach in failing to provide a accounting
9  and distribution to Soward for his interest in
10  Cartesian within a reasonable time. So the Panel
11  drew this analogy to The & Capital agreement and
12  situation when it had previously found that it was
13  the Wood agreement that controlled the party's
14  rights and obligations with respect to Cartesian.
15        The Panel went on to say, "The failure to
16  pay Soward within a reasonable time the value of
17  his capital interest in Cartesian was likely an
18  egregious, willful breach of fiduciary duty." So
19  the question is, where is that duty? To be a
20  breach of fiduciary duty, there has to be a duty.
21        Then let's look at the Panel's findings of
22  conversion. They rest on the same purported
23  obligation to provide a distribution within a
24  reasonable time. The Panel said, "When Soward
25  requested an accounting for his interest in the

66

1  specific assets, Bosack and Lerner refused to
2  provide one. They also refused to turn over any
3  part of the assets to Soward claiming them as their
4  own. The Panel finds that Bosack breached his
5  fiduciary duty as sole limited partner and as an
6  owner of SLLB, the new general partner, in
7  exercising dominion and control over the assets of
8  Cartesian in derogation of Soward's rights."
9        So the question is: Is there a duty and
10  what are Soward's rights as determined already by
11  the Tribunal? It goes on, "We find that their
12  actions, separately for Bosack and through SLLB for
13  Bosack and Lerner, in failing to turn over to
14  Soward his interest in the assets of Cartesian
15  within a reasonable time was willful conversion."
16        Let's take a look again at one and three
17  because in light of the Panel's findings in one and
18  three, which the Tribunal does not have the power
19  to revisit, there could have been no breach of
20  fiduciary duty and no conversion. The Panel was
21  obligated to apply the terms of the Wood agreement.
22        Pursuant to the Panel's final
23  determinations in Awards Number 1 and 3, the Wood
24  agreement applies and governs the party's
25  respective rights and obligations in Cartesian.

67

1  Under Delaware limited partnership law, a claim of
2  breach of fiduciary duty must first be analyzed in
3  terms of the -- it's actually the operative
4  governing instrument. So to determine whether
5  there's a duty, you look to the agreement and
6  that's the Wood agreement.
7        The Wood agreement provides no right to an
8  accounting or distribution of the capital account
9  of a limited or general partner. Under Section
10  8.4, Soward's interest as a general partner was
11  converted into a limited partner interest upon his
12  removal as general partner and that's what you all
13  found in Interim Award Number 1. Under Section
14  2.3, no partner shall have the right to demand or
15  receive the return of his capital distribution or
16  cause the termination or dissolution of the
17  partnership.
18        So he remained -- when he was removed as
19  general partner, his interest was converted into a
20  limited partnership interest and he had no right to
21  a distribution of that interest under the governing
22  agreement. And this is the Wood agreement,
23  Section 8.4, conversion of general partner's
24  interest. Upon cessation of any general partner's
25  status as a general partner, for any reason other

68

1  than as a result of a transfer of such general
2  partner's interest pursuant to Section 8.2, which
3  doesn't apply, such general partner's interest will
4  be converted into a limited partner interest.
5        So he's a limited partner in Cartesian
6  just as you had ruled in one and three. There's no
7  termination of the partnership. There's no
8  dissolution of the partnership. It continues to
9  exist and he is a partner in it, a limited partner.
10        This is Section 2.3, Return of Capital.
11  Except as otherwise provided in this agreement, and
12  there is no applicable term there, no general
13  partner or limited partner shall have the right to
14  demand or receive the return of his or her capital
15  distribution or cause the termination or
16  dissolution of the partnership. So he has no right
17  to a distribution of his partnership interest.
18  There is no duty to give him an accounting and
19  distribution of that interest. He has no right to
20  it under the governing agreement.
21        So given the fact that Soward remained a
22  partner in Cartesian and was not entitled to an
23  accounting or a distribution pursuant to the Wood
24  agreement or Delaware law, which tells you to look
25  to the Wood agreement, the Panel found because it

69

1 was impracticable for Soward and Bosack to continue
2 in the same partnership, that Soward would be
3 deemed to have been -- to have withdrawn from the
4 partnership upon the payment of his net interest
5 therein.  You were relying on your broad remedial
6 powers to create that solution with respect to an
7 existing partnership in which he had a limited
8 partnership interest.  Then an accounting was
9 necessary to determine the amount of Soward's net
10 interest.
11        Now, Interim Award Number 1 is final.  It
12 states, "This interim award includes a full
13 settlement and determination of all claims and
14 counterclaims submitted to the Panel in this
15 arbitration," and then it lists exceptions, which
16 aren't applicable here.
17        Then in Interim Award Number 3 you have
18 similar language.  Interim Award Number 3 includes
19 a full settlement and determination of all claims
20 and counterclaim submitted to the Panel in this
21 arbitration in connection with the valuation of
22 Soward's interest in Cartesian and incorporates by
23 reference the prior determination of all claims and
24 counterclaims relating to Cartesian covered by
25 Interim Award Number 1.

70

1        So three incorporates the findings of one
2 and then three is confirmable.  It's not only
3 final, but it's confirmable, and it's confirmable
4 not only with respect to the determinations in
5 three, but also the incorporated determinations
6 from one with respect to Cartesian.  Not only are
7 Awards 1 and 3 final and confirmable, but they were
8 also performed with respect to Cartesian because
9 Mr. Bosack paid Mr. Soward the amount determined in
10 the accounting as his net interest in Cartesian two
11 days after the Panel issued Interim Award Number 3.
12        Now, the law with respect to functus
13 officio is very basic.  It's a fundamental common
14 law principle that once an arbitrator has made and
15 published a final award, his authority is exhausted
16 and he is functus officio and can do nothing more
17 in regard to the subject matter of the arbitration.
18 And the rules of the American Arbitration
19 Association in California law are in accord, the
20 arbitrator is not empowered to redetermine the
21 merits of any claim already decided.
22        The Arbitrators in one and three determine
23 all of the claims and counterclaims with respect to
24 Cartesian, with the exception of the breach of
25 fiduciary duty and conversion claims that were set

71

1 for determination in the last phase, but the
2 findings that the Tribunal made in one and three
3 with respect to the parties' rights and obligations
4 in Cartesian could not be revisited and
5 redetermined by the Tribunal once they had already
6 been conclusively established.
7        CHAIRMAN BADER:  May I ask you a question
8 about this ultimate award, if I take it that this ultimate award, if
9 contested, would be taken back to the Federal Court
10 in Washington that reserve jurisdiction in
11 connection with the original litigation that
12 spawned the arbitration.  If that's the case --
13        MR. KAHN:  No.
14        CHAIRMAN BADER:  No?
15        MR. SHARP:  No.
16        MR. SMITH:  That's one option.
17        MR. KAHN:  That's in connection to being
18 dismissed.
19        MR. SHARP:  No, this was initiated first
20 before the Washington action, and it would be taken
21 to San Francisco Superior Court.
22        CHAIRMAN BADER:  I withdraw that question.
23 Go ahead.
24        MR. SMITH:  I don't necessarily agree with
25 that.

72

1        ARBITRATOR CLAIBORNE:  Did you want to say
2 something?
3        MR. SMITH:  Well, the Washington forum
4 remains an option for any challenge to the
5 enforceability of the award; that's just an
6 observation.  I haven't given any thought as to
7 whether that would be an enforcement jurisdiction
8 or whether there would even be a need to challenge
9 an award of the Tribunal.
10        So far, Interim Award Number 4, there's no
11 harm because you awarded compensatory damages that
12 were actually below the amount that Mr. Bosack was
13 required to pay on the accounting.  Interim Award
14 Number 4 only becomes important if you impose
15 punitive damages on the basis of your findings that
16 there's been a breach of fiduciary duty when there
17 was no duty in accordance with your earlier awards,
18 and conversion, which he had no right to the
19 distribution in accordance with your earlier
20 awards.  That is the only situation in which
21 Interim Award Number 4 will have significance.
22        Now, in the rules of the American
23 Arbitration Association, which control, the
24 arbitrator is not empowered to redetermine the
25 merits of any claim already decided.  California

73

1  law is in accord outside of limited statutory
2  exceptions that aren't applicable, an arbitrator
3  may not correct an award that he or she intended on
4  the ground that he or she later determined a
5  factual or legal error has been made in the award.
6      So in other words, your finding as to one
7  and three are binding and you did not have
8  jurisdiction to redetermine them. So the Panel's
9  determination of breach of fiduciary duty and
10  conversion was premised on findings that had no
11  power to make. Claimant seeks punitive damages
12  based solely on those claims, the breach of
13  fiduciary duty and conversion. Absent liability on
14  those claims, there's no basis for punitive
15  damages. That should be the end of this. This
16  functus officio point is absolutely dispositive of
17  their claim.
18      Now, Washington law is applicable and also
19  is absolutely dispositive of their claim.
20  Claimant's counsel argued that we didn't raise
21  Washington law at the appropriate time, but both
22  briefs essentially acknowledge that you do a
23  separate choice of law analysis for punitive
24  damages. So you could have one law applicable to
25  the claim and whether there's liability, and then

74

1  you do a separate choice of law analysis as to
2  whether punitive damages are appropriate with
3  respect to that claim. There's nothing odd about
4  California law or Delaware law governing the
5  underlying claim and punitive damages being
6  governed by a completely different law such as
7  Washington.
8      Now, the reason Washington and California
9  are the two most directly involved states is
10  because Mr. Soward, who is the party seeking
11  punitive damages, resides in California. The
12  reason why Washington's interest is directly
13  implicated here is because Bosack, the party
14  against whom punitive damages could be imposed,
15  resides in Washington. So those are the two
16  potentially most concerned states.
17      Because this is a California forum, we
18  look to California choice-of-law principles and
19  California employs a three-step analysis. First,
20  California requires the courts or the Tribunal to
21  determine whether a conflict exists between the
22  laws of the two potentially concerned states, in
23  this case Washington and California. Then,
24  California choice-of-law analysis requires an
25  examination of each state's interest in the

75

1  application of its own laws under the circumstances
2  of the particular case. Then finally, you must
3  determine which state's interest would be more
4  impaired if its policy were subordinated. In other
5  words, which state's interest would be the more
6  impaired if the other state's law were applied.
7      So what is Washington's law on this
8  particular issue? Washington has historically
9  rejected punitive damages as contrary to public
10  policy. Mr. Sharp is right, there is legislation
11  in Washington in which where a statute specifically
12  authorizes punitive damages, but there is a blanket
13  prohibition against punitive damages unless the
14  Legislature has specifically authorized them, and
15  we both agree that the Legislature has not
16  authorized them for claims of breach of fiduciary
17  duty and conversion.
18      The reason why Washington has this
19  historical prohibition was explained in the daily
20  case. Since it's earliest decisions, this court
21  has consistently disapproved punitive damages as
22  contrary to public policy. Punitive damages not
23  only imposed on the Defendant a penalty generally
24  reserved for criminal sanctions, but also award the
25  Plaintiff with a windfall beyond full compensation.

76

1      The reference to the Washington's earliest
2  decisions may be to the Spokane case which is from
3  1891, and in it the theory that Plaintiff should be
4  entitled to additional damages once he has been
5  fully compensated for his loss is determined to be
6  repugnant to every sense of justice. That's the
7  position of the Washington courts that reflects the
8  Washington's policy with respect to punitive
9  damages. It's a very strongly-held interest.
10      Now, unlike Washington, California permits
11  punitive damages on claims of breach of fiduciary
12  duty and conversion. So there is clearly a
13  conflict. But even in California, punitive damages
14  are available only where it is proven by clear and
15  convincing evidence that the Defendant has been
16  guilty of oppression, fraud, or malice for the sake
17  of example and by way of punishing the Defendant.
18  So the purpose of punitive damages in California is
19  not to reward Mr. Soward, it is to punish
20  Mr. Bosack who is a Washington resident. That's
21  the underlying purpose of allowing punitive damages
22  in California.
23      Now, they added to the facts that they
24  claim support a relationship between the State of
25  California and this dispute in their presentation

77

1   this morning, but what they said in their brief was
2   Soward was a California resident; that's true, many
3   of the underlying events took place in California.
4        Well, some of the underlying events did
5   take place in California, we'll concede that, and
6   the arbitration is being conducted in California,
7   that's legally irrelevant.  It's only relevance is
8   the fact that this is the forum state and,
9   therefore, you look to California's comparative
10  impairment test as the conflict analysis.
11       Now, here are the contacts with
12  Washington.  They establish that Washington has a
13  much more significant relationship to the dispute
14  for purposes of punitive damages particularly.
15  Bosack is a Washington resident.  His offices are
16  maintained in Washington.  Cartesians' business was
17  operated from his office in Washington at the time
18  of the alleged wrongdoing.  Cartesian's stock
19  records, banks statements, books and records and
20  tax returns are kept in Washington.  Its
21  bookkeeper, Diane Norgaard, was employed in
22  Washington.  Any harm alleged, allegedly caused to
23  Soward was directed from Washington when this
24  dispute arose.
25       Mr. Bosack initially sought relief from a

78

1   Washington court and that action remains pending in
2   Washington.  Of course Clark-Nuber is in Washington
3   and its investigation took place there.  Now,
4   normally I wouldn't point out the fact that
5   Mr. Bosack initially sought relief from a
6   Washington court or that that action remains
7   pending in Washington.  I pointed out because
8   Claimants have used those facts to support their
9   claim for punitive damages.  They contend that
10  those facts support findings of malice, oppression,
11  and fraud.
12       Now, Washington has a stronger interest in
13  the application of its law than does California and
14  as a result, its interest would be the more
15  impaired if California law were to apply to this
16  dispute.  It has a near blanket policy against
17  punitive damages and a strong interest in
18  protecting its citizens from the financial burdens
19  they impose.
20       When I say it has a near blanket policy
21  against punitive damages, they've taken the
22  position that punitive damages are repugnant to
23  every sense of justice.  That is a very
24  strongly-held view.  Because punitive damages would
25  be awarded here to punish a Washington resident,

79

1   Washington's policy against punitive damages would
2   be directly impaired by the imposition or
3   application of California law.  So there's a direct
4   impairment of a strongly-held and expressed policy
5   in the event that California law applies.
6        On the other hand, California's interest
7   would be the less impaired if Washington law were
8   to apply to this dispute.  California law — we're
9   going to be getting into this in a minute —
10  disfavors punitive damages and permits them only
11  under very limited circumstances.  This is
12  important, even when the requirements of punitive
13  damages have been met under California law, it's
14  still discretionary.
15       The Claimant has no right to punitive
16  damages even if fraud, malice, and oppression are
17  found by clear and convincing evidence.  It's still
18  discretionary and that shows that California's
19  interest in the imposition of punitive damages is
20  not particularly strong, particularly in this case.
21       Because this isn't a case in which
22  punitive damages are warranted to punish for,
23  quote, "the maintenance of evil policies which
24  damage the public in general."  Instead, this is an
25  isolated business dispute between sophisticated

80

1   parties involving solely economic harm.  This is
2   not a case where an insurance carrier has a policy
3   to deny meritorious claims brought by California
4   residence.  This is not a claim that involves the
5   health and safety of the statement, for instance,
6   where you have a car manufacturer that has a policy
7   against recalling automobiles that are dangerous
8   because of defects.  This is not a case where
9   California would have a direct interest in applying
10  its punitive damage law.
11       This is a business dispute.  Punitive
12  damages are discretionary.  So Washington law
13  applies and only permits punitive damages in the
14  limited circumstances where those damages are
15  expressly authorized by statute.  No Washington
16  statute even arguably authorizes punitive damages
17  in this case.  So for this second reason, as a
18  matter of law, Mr. Soward's claim for punitive
19  damages has to be rejected.
20       Now, even if California law applies, he
21  still hasn't met the requirement for punitive
22  damages.  The reason, in part, is because the law
23  imposes very stringent standards.  In light of the
24  fact that punitive damages, even under California
25  law, are disfavored.  This is California law.

Arbitration Proceeding  3/23/2007  4:00:00 PM

81

1  Punitive damages constitute a windfall create the
2  anomaly of excessive compensation and are,
3  therefore, not favored in the law.
4      Section 3294, which is the punitive damage
5  statute, codifies the universally-recognized
6  principle that the law does not favor punitive
7  damages and they should be granted with the
8  greatest caution.  This is the statute:  In an
9  action for the breach of an obligation not arising
10  from contract where it is proven by clear and
11  convincing evidence that the Defendant has been
12  guilty of oppression, fraud, or malice, the
13  Plaintiff, in addition to the actual damages may,
14  may, even if they prove entitlement to punitive
15  damages, meet the standards of the statute, it's
16  still discretionary, may recover punitive damages
17  for the sake of example and by way of punishing the
18  Defendant.
19      This is the California Supreme Court,
20  "Agreeing with the Courts the punitive damages are
21  disfavored, the California Legislature in recent
22  years also 'has made it more difficult for
23  Plaintiffs to plead and prove such claims.'  To
24  restrict punitive damages, the Legislature
25  increased Plaintiff's burden of proof to clear and

82

1  convincing evidence and refined the definition of
2  malice to impose additional requirements of
3  despicable and willful conduct."  This was in 1987.
4      In Tomaselli, 1994, repeal decision, the
5  Court stated punitive damages should not be
6  allowable upon evidence that is merely consistent
7  with the hypothesis of malice, fraud, or
8  oppressiveness; rather, some evidence should be
9  required that is inconsistent with the hypothesis
10  that the tortious conduct was the result of mistake
11  of law, of fact, honest error of judgment,
12  overzealousness, mere negligence, or other such
13  iniquitous human failing.  Clear and convincing
14  evidence requires a finding of high probability.
15  It requires that the evidence be so clear as to
16  leave no substantial doubt sufficiently strong to
17  command the unhesitating assent of every reasonable
18  mind.
19      Punitive damages are not simply
20  recoverable in the abstract.  They must be tied to
21  oppression, fraud, or malice in the conduct which
22  gave rise to liability in the case.  That's a very,
23  very important legal principle.  We will come back
24  to this with respect to the tax returns, which had
25  no connection with the findings that gave rise to

83

1  liability for breach of fiduciary duty and
2  conversion.
3      A Defendant's acts, independent from the
4  acts upon which liability was premised, may not
5  serve as the basis for punitive damages.  Again,
6  think of the tax returns.  A Defendant should be
7  punished for the conduct that harmed the Plaintiff,
8  not for being an unsavory individual or business.
9      These are the statutory definitions of
10  malice and oppression.  Malice means conduct which
11  is intended by the Defendant to cause injury to the
12  Plaintiff or despicable conduct which is carried on
13  by the Defendant with the willful and conscious
14  disregard of the rights or safety of others.  In
15  considering this, you also have to go back and
16  consider the functus officio argument that there
17  was no right or duty to the accounting or
18  distribution under the Wood agreement.
19      Oppression means despicable conduct that
20  subjects a person to cruel and unjust hardship and
21  conscious disregard of that person's rights.
22  Despicable conduct has been defined as conduct
23  which is so vile, base, contemptible, miserable,
24  wretched, or loathsome that it would be looked down
25  upon and despised by ordinary decent people.  Is

84

1  that really what we're talking about here, as a
2  business dispute that was hotly litigated?
3      Despicable conduct has also been described
4  as having the character of outrage frequently
5  associated with crime.  Again, is that what we're
6  talking about here?
7      This is important with respect to fraud.
8  Fraud means an intentional misrepresentation,
9  deceit, or concealment of a material fact known to
10  the Defendant with the intention on the part of the
11  Defendant of thereby depriving a person of property
12  or legal rights or otherwise causing injury.  This
13  definition has been construed as incorporating the
14  common law definition of fraud.
15      The rationale for that is set forth in
16  this case, the Court says, as we have already
17  concluded, the Plaintiffs were not entitled to
18  recover on a fraud theory, so there was no
19  liability for fraud.  Therefore, the fraud theory
20  cannot be used to support the award of punitive
21  damages.  It would be anomalous to prevent the
22  Plaintiffs from recovering compensatory damages
23  under a fraud theory and yet allow them to recover
24  punitive damages using a theory that would not
25  support the award of compensatory damages.

85

1  So what does this mean?  It means that in
2  order to establish a fraud base for the award of
3  punitive damages, you have to meet the common law
4  elements of fraud, which they don't even attempt to
5  do.  They just use the label.
6      So you have to have a misrepresentation,
7  knowledge of falsity, its falsity, intent to
8  defraud, i.e. to induce reliance, justifiable
9  reliance on the representation, and resulting
10  damage.  They've made no showing of fraud and that
11  prong of punitive damages analysis should just
12  completely be disregarded.
13      Now, California courts, in light of this
14  very, very high standard, have consistently denied
15  punitive damages where a defendant's conduct is
16  merely unreasonable or misguided.  Thus, punitive
17  damages awards have been reversed where the
18  Defendant's conduct was merely in bad faith and
19  overzealous.
20      In Shade Foods, for example, an insured
21  sought punitive damages against an insurer for
22  unreasonably denying coverage and failing to take
23  any action to reassess its ill-advised position.
24  The Court denied punitive damages, and this is its
25  reasoning, but we still must take into account the

86

1  extreme complexity of the coverage issues and the
2  purely economic character of the losses in
3  assessing the level of a program that it merits.
4      In our opinion, the record shows well
5  short of establishing by clear and convincing
6  evidence the sort of contemptible conduct that
7  could be described by the term "despicable."
8  Unreasonable and negligent as it may have been,
9  insurer's conduct falls within the common
10  experience of human affairs, both with respect to
11  its careless initial evaluation and its stubborn
12  persistence in error.
13      Similarly, in Tomaselli, in summation, the
14  actions of appellant may be found to be negligent,
15  failing to follow up information provided by the
16  insurer, overzealous, taking unnecessary deposition
17  under oath of the insured, legally erroneous,
18  relying on an endorsement which was not shown to
19  have been delivered and callus, failing to
20  communicate.  There was nothing done, however,
21  which could be described as evil, criminal,
22  recklessly indifferent to the rights of the
23  insured, but with a vexatious intention to injure.
24  There is simply no evidence supporting a punitive
25  damage claim in this case.

87

1  Another one, nor does the record support a
2  finding that the insurance company acted
3  fraudulently.  American had a different
4  interpretation of the contract than the bank and
5  was perfectly upfront about it.  Nor was there a
6  showing that American acted with malice.  This was
7  a contract dispute where each side advanced its
8  position aggressively, nothing more.  Here American
9  won on some of its claims and lost on others.  All
10  its argument were plausible, none was laughable.
11  Under these circumstances, the award of punitive
12  damages cannot be sustained.
13      So let's take a look at Mr. Bosack and
14  Ms. Lerner's conduct which is the purpose of this
15  proceeding, is to determine whether that conduct
16  meets the standard of malice, oppression, or fraud
17  under the clear and convincing evidence standard of
18  California law and the legal framework that which
19  we just reviewed.  I think when you do that, you
20  will conclude that it was not malicious, it was not
21  oppressive, and it was not fraudulent.  Now, this
22  may be revisiting some of the factual history of
23  this dispute, but this is relying on basic facts
24  and the testimony of record.  It's not reinventing
25  anything.

88

1  The parties' dispute arose out of
2  Mr. Soward's misconduct.  We can't forget that.  It
3  was his serial, serious malfeasance that resulted
4  in the dispute.  Bosack and Lerner were justified
5  in acting to protect their interest.  Mr. Bosack
6  responded reasonably in light of the uncertainty
7  surrounding Cartesian.  And the 2004 tax return was
8  prepared in good faith and in consultation with
9  counsel and accountants every step of the way.
10  We're going to go through each one of these.
11      Let's talk about the party's dispute and
12  how it arose.  Bosack and Lerner hired Mr. Soward
13  despite his lack of experience because they
14  believed him to be loyal and trustworthy.  The
15  parties agreed on an investment model under which
16  Mr. Soward's interest would be aligned with those
17  of Mr. Bosack and Ms. Lerner.
18      Mr. Soward became very wealthy through
19  this relationship, earning over $20 million over
20  the course of about 10 years.  Bosack and Lerner
21  trusted Mr. Soward and gave him signatory authority
22  over virtually all of their assets.  He operated
23  with minimal supervision consistent with the trust
24  that was placed in him.
25      Mr. Soward requested increased

89

1  compensation, and in response to that request,
2  Brook Middleton, the accountant, reviewed Soward's
3  asserted investment returns. He suspected that
4  Mr. Soward had overstated the returns and notified
5  Bosack and Lerner that some of Soward's
6  calculations were not correct. Middleton
7  recommended that Bosack and Lerner verify the
8  accuracy of the numbers and that an independent
9  auditor verify the investment returns.
10  Here's Mr. Middleton's letter of April 28,
11  2003. "The attached letter from David Soward which
12  indicates that the Foundation's assets would only
13  be $12,227,206, if invested in the S&P 500 Index,
14  is not correct. He inflated the investment returns
15  he had achieved in order to support a claim for
16  increased compensation. I believe it is important
17  that we verify the accuracy of the numbers, of
18  course. I suggest that the Foundation's
19  independent auditor verify the investment returns."
20  Of course Bosack and Lerner followed
21  Middleton's advice and engaged Clark-Nuber to
22  perform a review of the Trust and the Foundation.
23  After Clark-Nuber began providing preliminary
24  reports flagging Soward's apparent misconduct,
25  Bosack and Lerner asked Clark-Nuber to review &

90

1  Capital Partners.
2  In Clark-Nuber's report for & Capital
3  Partners, it identified at least four instances of
4  Soward's potential misconduct. They overstated the
5  values of certain investments by millions of
6  dollars, that he overdrew his capital account by
7  5.6 million and made excess distributions. That he
8  made undocumented loans to himself and to Malcolm
9  Kemp, and he made a substantial unauthorized
10  investment in a cosmetics company which resulted in
11  squandering about $1.5 million of the partnership's
12  assets.
13  This is Mr. Bosack's testimony. He had
14  the Clark-Nuber report, he was getting advice on
15  what it meant. He testified Soward called sometime
16  in late November and asked what was going on, "And
17  I said, 'No decision had been made,' and the reason
18  I know no new decision was being made was I was
19  preventing the decision being made. I was still
20  hoping beyond at this point rational hope that
21  there would be a reasonable explanation for all the
22  things that were found. In a complex operation,
23  errors could occur, that there would be many
24  reasons why some of the things that now appeared
25  sinister, then appeared sinister, could have been

91

1  possibly errors."
2  So that's the discovery of the wrongdoing,
3  and what they did not to protect the financial's
4  interest was entirely justified. Mr. Soward had
5  discretionary authority over virtually all of
6  Bosack and Lerner's assets. Bosack and Lerner were
7  concerned, in light of Clark-Nuber's findings, that
8  he might further impair the assets or even abscond
9  with them. This is the testimony on this issue
10  from Sandy Lerner.
11  "What were you concerned about?"
12  "Answer: David had access to -- to a
13  first order of approximation, my entire net wealth.
14  Len's entire wealth. He had signatory on
15  everything. And all of a sudden, everything I
16  believed about this person for 10 years, more than
17  10 years, just on the basis of undocumented loans
18  was -- just seemed in question. So the trust was
19  in question." She continued.
20  "And what's the reason, ma'am, that you
21  notified the banks?"
22  "Answer: We wanted to remove David's
23  signatory authority.
24  "Question: Why, what were you concerned
25  about?

92

1  "Answer: David had access to
2  approximately our entire net wealth and we didn't
3  feel comfortable with that business relationship
4  any longer.
5  "Question: Why didn't one of you call
6  David Soward and say, 'What's your story?'
7  "Answer: Well, I think the simple reason
8  that if your concern is that somebody is going to
9  run off to some other part of the world with your
10  entire net fortune, you don't put them on notice
11  that you are expecting them to do that."
12  Mr. Klein was the Wilson, Sonsini lawyer
13  who they retained to deal with this issue. He
14  believed that the concerns were reasonable and
15  legitimate. The clients were concerned about
16  Mr. Soward having some kind of continual control
17  over their assets.
18  "Question: Did you feel that concern was
19  reasonable?
20  "Answer: Yes.
21  "Question: Legitimate?
22  "Answer: Based on, yes, based on the
23  facts we had been presented with, we did.
24  "Question: So that was the primary
25  concern, how do we effectively remove Mr. Soward

93

1  and terminate his authority to any of our client's
2  money?
3     "Answer: Right."
4     And Mr. Klein had exactly the information
5  that Mr. Bosack did. All of the information was in
6  the possession of Mr. Soward. So what did — what
7  information was on this side of the table? Well,
8  it was the Clark-Nuber report and the analysis that
9  had been done of it which showed significant
10  malfeasance.
11     Now, Mr. Soward places very heavy emphasis
12  on the ambiguities of testimony. We think it's a
13  complete misreading when you take this testimony in
14  the context of what Mr. Bosack was saying before
15  and afterward. So this is it:
16     "Question: And three days earlier, he
17  offered you to resign?
18     "Answer: He did.
19     "Question: He said, 'I will assist you in
20  any way in the transition of my responsibilities to
21  someone new?
22     "Answer: I'm not sure that he used
23  exactly those words, but I believe he would have.
24     Claimant has interpreted that to mean, I
25  believe he would have assisted us in the transition

94

1  to someone else; that's completely inconsistent
2  with Bosack's testimony, both directly before and
3  after this quote, and the most natural reading of
4  that testimony is that he wasn't sure whether
5  Soward used exactly those words, but that he
6  believed that he would have used those words or
7  something similar to those words in the
8  conversation. But obviously they didn't believe
9  that.
10     Let's take a look at the testimony before
11  that statement. This is Mr. Bosack's testimony.
12     "Answer: Soward had the entirety of our
13  fortune under his control. He had step by step
14  earned our trust and now the concern was raised
15  that perhaps he was not worthy of that trust. When
16  those concerns are raised, do you warn Robert Vesco
17  that you are about to impound investors' overseas
18  services accounts so he could not flee to the
19  Carribean with the 300 million? No, sir. You must
20  act.
21     "Question: You treat your partners like
22  someone who's going to flee to the Carribean,
23  that's what you do?"
24     He had the potential, the risk was there.
25  Once trust was broken, and trust was broken, and

95

1  once trust was broken, you must act prudently.
2  This was a prudent defense for our position, and
3  the lawyer who he had hired thought it was
4  completely understandable and legitimate. Then
5  directly after — I'm sorry, this is still
6  proceeding.
7     "If the concern is that this man has
8  broken trust and might abscond all of your money,
9  all of your hard-earned money because he had
10  complete discretionary control over it, do you warn
11  that man that you're thinking of acting against
12  him? Don't be absurd."
13     And this is the testimony following
14  Bosack's statement:
15     "Question: And you never asked Wilson,
16  Sonsini or Clark-Nuber or anyone to prepare an
17  accounting of Cartesian Partners to determine
18  Mr. Soward's interest before you just threw him
19  out; right?
20     "Answer: When trust is broken, Mr. Sharp,
21  prudence dictates that one acts to protect one's
22  interest. Trust was broken."
23     So they acted, justifiably and
24  legitimately to protect their very, very
25  substantial financial interest over which he had

96

1  complete discretionary control. So given their
2  concerns that Mr. Soward had breached their trust
3  for all the reasons that were itemized in the
4  Clark-Nuber report, independent accountant that did
5  a study, and that he continued to control their
6  assets, Bosack and Lerner in consultation with
7  Wilson, Sonsini, they didn't do this alone, they
8  decided to replace Soward as the investment manager
9  at the Trust, in the Foundation, to replace him as
10  general partner of & Capital Partners, to issue
11  letters alerting custodians of & entities'
12  accounts, that Soward no longer had signatory
13  authority, and then in consultation with Wilson,
14  Sonsini, Bosack also decided to remove Soward as
15  the general partner of Cartesian Partners.
16     Wilson, Sonsini provided Soward with a
17  copy of the draft complaint detailing the reasons
18  for their decision to terminate him, but they chose
19  not to serve it or to file it. In the letter
20  notifying Soward of his termination, Bosack and
21  Lerner invited settlement discussions and informed
22  Soward that they thought to — that they sought to
23  resolve their dispute without resorting to
24  litigation.
25     Now, mind you, their settlement position

97

1   may not have been something that Claimants
2   appreciated, but it was based on the information
3   that they had at the time as a result of the
4   Clark-Nuber report, and they were willing to
5   attempt to resolve the dispute without resorting to
6   litigation or to arbitration.
7       This is the Wilson, Sonsini letter
8   notifying Soward of his termination. It actually
9   goes to Michael Kahn. So at the time that Wilson,
10  Sonsini reached out to Soward to tell him that his
11  services would no longer be needed, he actually
12  referred him to his litigation counsel. So
13  Mr. Soward already had litigation counsel at that
14  point.
15      It states that, "We have enclosed the
16  draft complaint. We have not filed or served the
17  Complaint if a mutually-agreeable settlement can be
18  reached without litigation. Our clients would
19  consider such a settlement provided that it would
20  be effected expeditiously." This is a letter in
21  which Wilson, Sonsini notified custodians of &
22  entities' accounts of Mr. Soward's terminations.
23  Although the notification is -- I'm sorry,
24  notification letters are marked urgent, they were
25  pro forma and they didn't include any of the

98

1   allegations of wrongdoing. They just said that he
2   no longer had authority.
3       Now, let's just take a look at Passport as
4   an example, and what the Panel's findings with
5   respect to the Passport do is it vindicates their
6   concerns about Mr. Soward and it vindicates their
7   conclusion that there had been a very, very
8   substantial breach of trust.
9       The Panel found that Soward's investment
10  in Passport was tinged with personal interest and
11  was grossly negligent and reckless. The Panel
12  further found that the investment lacked any
13  rational business purpose and that it was not only
14  risky, but reckless misconduct to invest such a
15  substantial amount of the partnership's money in
16  the venture.
17      The Panel concluded that Claimant had
18  thrown good money after bad and wasted in total
19  around $1.5 million of the partnership's assets and
20  Soward had been expressly instructed not to invest
21  in a cosmetics company.
22      Question, this is Sandy Lerner, "You spoke
23  in your testimony about Passport and the investment
24  in Passport. In your mind, what distinguished
25  Passport?"

99

1   "Answer: It was something I had just
2   simply told David not to do. I didn't have any
3   expectation whatsoever that David would do
4   something with my money, Len's money, my money that
5   I had told him not to do." That testimony is
6   corroborated by Mr. Troiano's testimony.
7       "Question: Was there a subsequent
8   occasion where you had another conversation
9   concerning a cosmetics investment with Ms. Lerner?
10      "Answer: There was. There were only
11  three people at the table, Sandy, David and I, and
12  David brought up this cosmetics company. David
13  said, 'How about an investment in a cosmetics
14  company?'"
15      And Sandy said, "I already told you no,
16  that I didn't want to be involved in a cosmetics
17  company."
18      So he was instructed twice not to make an
19  investment in a cosmetics company and yet he did,
20  for no rational business purpose, resulting in
21  squandering of the $1.5 million. Now, given this
22  factual framework, Bosack responded reasonably in
23  light of the uncertainty surrounding Cartesian.
24  That's what we're going to discuss next.
25      As you recognized in your first award,

100

1   there was no signed Partnership Agreement for
2   Cartesian. Bosack believed that there was an oral
3   agreement modeled on the terms of the & Capital
4   agreement, which permitted him to remove
5   Mr. Soward. So he acted on the belief that that
6   was the agreement and those were the parties'
7   respective rights or those were his rights.
8       Mr. Soward initiated arbitration before an
9   accounting was required under the agreements
10  potentially governing Cartesian. This is
11  important, he sought an accounting only as part of
12  his claim to dissolve the partnership. It wasn't,
13  "I want an accounting. Give me a distribution
14  based on my interest." It was, "Panel, you must
15  dissolve this partnership, liquidate its assets, do
16  an accounting of my interest, and then there should
17  be a distribution of my interest." That was his
18  position.
19      Given the multitude of disputed legal and
20  factual issues surrounding the Cartesian claim,
21  Mr. Bosack agreed that the claim should be
22  submitted to the Panel for determination. His
23  position regarding Soward's interest in Cartesian
24  was grounded in the language of the relevant
25  agreements, as well as his belief that there would

101

1    be numerous offsets.
2         So this wasn't a situation where he simply
3    owed Mr. Soward money and refused to pay it.  This
4    was a situation where he might owe Mr. Soward some
5    money, but Mr. Soward, in Mr. Bosack's mind, owed
6    him a substantial amount of money as well as a
7    result of the misconduct that had already been
8    uncovered in the Clark-Nuber report.
9         Now we're going to go through each of
10   those briefly, go through the evidence.  The
11   first is Mr. Bosack believed in good faith that
12   Cartesian was governed by an oral agreement modeled
13   on the terms of The & Capital agreement and he
14   conveyed that understanding to his counsel.  Mr.
15   Klein testified in the arbitration, he's a
16   third-party, there is no reason not to credit his
17   testimony.  He testified, question, "In fact,
18   Bosack told you there was an agreement?"
19        "Answer:  Yes.
20        "Question:  But he told you it was, in his
21   understanding, it was not in writing and it was an
22   oral agreement?
23        "Answer:  That is correct, and I would
24   characterize it as Len saying, you know, 'We have
25   an agreement, I believe the terms are the same as

102

1    the agreement with & Capital Partners, LP.'"
2         So that was Mr. Bosack's belief at the
3    time.  It turned out to be wrong, but that was his
4    belief.  Under that agreement, which Mr. Bosack
5    reasonably governed, Soward could be removed as the
6    general partner from Cartesian, but was due an
7    accounting and distribution of his interest within
8    90 days.  This is the relevant provision, 5.6.
9         The limited partners may at any time, for
10   any reason or no reason, for any reason or no
11   reason remove the general partner as general
12   partner of the partnership by giving the general
13   partner written notice of removal.  Following the
14   removal of the general partner, the limited
15   partners may appoint one or more general partners
16   to join the partnership.
17        So that's what they did.  They removed him
18   and then they installed SLLB, the Delaware LLC as
19   the new general partner.  In Section 5.8 at The &
20   Capital agreement says, "All such distributions
21   shall be made no later than the later to occur end
22   of the taxable year or 90 days."
23        So 90 days was actually -- 90 days from
24   withdrawal is the applicable period.  Mr. Soward
25   initiated arbitration before the time to prepare an

103

1    accounting elapsed under The & Capital agreement,
2    which Mr. Bosack thought was applicable to
3    Cartesian.  Mr. Soward never made a direct demand
4    for his capital interest in Cartesian.  He never
5    made a direct demand for it.  Instead, he only
6    asked for an accounting as part of his claim that
7    the partnership be dissolved.
8         Of course, there was complete disagreement
9    on that.  Mr. Bosack's position was there's no
10   basis whatsoever for this partnership being
11   dissolved, its assets liquidated followed by an
12   accounting and a distribution here.  Mr. Bosack was
13   advised by his counsel that any legal issues
14   concerning Soward's ownership rights in Cartesian
15   would be addressed in either settlement
16   negotiations or a dispute resolution process.  That
17   dispute resolution process was initiated by
18   Mr. Soward in early February of 2004 and Mr. Bosack
19   submitted to it.
20        Now, once the Panel determined on the
21   accounting that it ordered pursuant to its broad
22   remedial powers, the final amount that was owed to
23   Mr. Soward, Mr. Bosack paid it within two days, and
24   that was consistent with his position throughout
25   this arbitration.

104

1    This is Mr. Klein's testimony.  After he
2    advised Bosack that Soward's removal did not
3    deprive him of his rights to a distribution, Mr.
4    Klein testified that Bosack responded by saying
5    something along the lines, "Of course," or, "If he
6    has a contractual right, we'll make a
7    right, and, well, if we need to make a
8    distribution, we'll make a distribution."
9         So again, there's no reason not to credit
10   Mr. Klein's testimony.  Why would he be lying about
11   that?  He's a third party, the lawyer, member of
12   the state board, member of the prestigious firm.
13   He's not going to come in here and not tell the
14   truth.  That was the position from the very
15   beginning from when Wilson, Sonsini was still
16   involved.  That was the position throughout,
17   because we know once the Tribunal ordered the --
18   I'm sorry, established that the amount of
19   Mr. Soward's net interest in Cartesian was
20   1.4 million or so, that amount was paid within two
21   days.
22        Of course Mr. Bosack testified that he
23   always said to Mr. Klein that we will pay David
24   what he's due under the contracts.  He submitted to
25   the arbitrable process and he was willing to let

105

1    the chips fall where they may, and once the
2    Tribunal made a determination, it would be carried
3    out and it was.
4         Now, we know that the Panel ultimately
5    found that it wasn't The & Capital agreement that
6    controlled the party's rights and obligations with
7    respect to Cartesian.  It was the Wood agreement.
8    But despite the Panel's ultimate findings to that
9    effect in Awards Numbers 1 and 3, Bosack's position
10   regarding Soward's interest in Cartesian was based
11   on the express language of The & Capital agreement,
12   which he thought controlled.  It wasn't as if he
13   didn't have a legally tenable basis for the
14   positions he took in the arbitration.
15        So let's look at The & Capital agreement.
16   Mr. Bosack's position in the arbitration that
17   Soward's contributions to Cartesian were improper,
18   was made in good faith, and was supported by the
19   terms of The & Capital agreement.  This is the
20   agreement.  Section 4.3 states after December 31,
21   1997, excess cash defined term shall be distributed
22   no less frequently than annually to all of the
23   partners in proportion to the positive balance in
24   their capital accounts.  This agreement contains an
25   express provision prohibiting amendment, except

106

1    through a written agreement.  This is it, Section
2    11.1, amendments, this agreement may be amended
3    only by the written agreement of the general
4    partner and the limited partners.
5         So he was relying on this and he was
6    relying on that prior provision, and the Panel
7    recognized in Interim Award Number 1 the
8    agreement's specific proportionality requirement.
9    The term "specific proportionality requirements" in
10   your award that the Tribunal found that the parties
11   had amended the agreement through their conduct,
12   rather than through a written agreement, even
13   though a written agreement is required by the
14   agreement.
15        So Bosack's position that the distribution
16   from & Capital partners was unlawful, was based on
17   the terms of the agreement, and was entirely
18   reasonable.  The only reason he turned out to be
19   wrong is because the Tribunal found that that
20   agreement with respect to & Capital had been
21   amended through conduct.  So his position was in
22   good faith, and he surely couldn't have anticipated
23   that that would have been the result in the
24   arbitration.
25        The Tribunal in Interim Award Number 1

107

1    recognized the complexity and uncertainty of this
2    case.  Quote, "This is not a simple case.  The
3    complexity among the dealings between and among the
4    various parties and their failures at many levels
5    and on many occasions to document transactions or
6    agreements has rendered this proceeding
7    time-consuming and difficult.  In light of this
8    uncertainty and this complexity which the Tribunal
9    recognized, it's not appropriate to equate any
10   mistaken positions by Mr. Bosack and his lawyers to
11   malice, oppression, or fraud."
12        I'm about to get into the tax return, is
13   this a good time to break?
14        MR. KAHN:  Could I inquire as to how much
15   we have here?
16        CHAIRMAN BADER:  Yes, how much longer do
17   you think you are going to have?
18        MR. SMITH:  I have about an hour.
19        CHAIRMAN BADER:  About an hour, Mr. Kahn.
20        MR. KAHN:  Thank you.
21        CHAIRMAN BADER:  Let's take an hour and a
22   half.
23        (Whereupon, the lunch recess is taken.)
24        CHAIRMAN BADER:  Mr. Smith, proceed.
25        MR. SMITH:  At the break, I was just about

108

1    to get into the circumstances surrounding the
2    preparation and filing of the 2004 tax return and
3    how that is not evidence of malice, oppression, or
4    fraud in this punitive damage proceeding.
5         Now, the Cartesian 2004 tax return came
6    due in the midst of the arbitration proceeding the
7    late fall of 2005.  It was at that point that
8    Bosack's advisors raised the issue of how the
9    return should report the value of Soward's capital
10   account in light of the professional advice that
11   Mr. Bosack had been receiving in the arbitration.
12   They're the ones — nobody else had paid any
13   attention to that issue prior to that.
14        Bosack and his representatives determined
15   to have the return reflect their position in the
16   arbitration with a note indicating that the amount
17   was subject to an ongoing arbitration.  This is
18   important, Bosack and his advisors all understood
19   that under this approach, the Cartesian returns,
20   not only the 2004 return, but going back, might
21   need to be amended to reflect what the Panel
22   ultimately decided Mr. Soward was owed in
23   connection with Cartesian.  The position taken on
24   the 2004 return had absolutely no impact on the
25   amount of Mr. Soward's capital account to Cartesian

109

1    and did not harm him in any way.
2        Now, this is the footnote and it was
3    inserted on the advice of counsel.  This is an
4    e-mail from Mr. Sellinger dated Friday, October 14,
5    2005.  In it, essentially, Mr. Bosack gave two
6    alternatives.  One, that the amount of the capital
7    account is zero, in which case the footnote would
8    indicate that.  In the alternative, Mr. Bosack has
9    a capital account and David Soward has a capital
10   account of no more than $135,889.
11       It goes on to say, "The issue whether
12   David Soward is entitled to a partnership interest
13   in the partnership, and if so, the amount of his
14   capital account, if any, is the subject of a
15   pending arbitration proceeding, and then
16   alternatively, if the decision was made to have the
17   return reflect the capital account was the 135,889,
18   then the footnote would be the same, but it would
19   say alternatively, his capital account could be
20   zero, but it's being determined by the Tribunal."
21       CHAIRMAN BADER:  What exhibit number is
22   this, Mr. Smith?
23       MR. SMITH:  4387.
24       CHAIRMAN BADER:  Thank you.
25       MR. SMITH:  Yes, 4387, it's at the bottom.

110

1    So this is the e-mail from his lawyer
2    telling him what to put on the return and giving
3    him that choice.  Although counsel advised
4    Mr. Bosack that the value of Soward's capital
5    account could be zero based on the theories that
6    they were presenting to the Tribunal in the
7    arbitration, Mr. Bosack opted to take a more
8    conservative approach and report Mr. Soward's
9    capital account at $135,889.  And his testimony is,
10   I believe it to be the most conservative position,
11   because it was clear and verifiable that the money
12   came from Soward's account and everything else
13   pretty much was in dispute.
14       Now, we realized that the Tribunal has
15   taken exception to the footnote and has concluded
16   that, well, it doesn't tell the complete truth, and
17   we agree, the footnote could have been better
18   expressed.  But as we explain, this has absolutely
19   no impact on Mr. Soward, and he is legally
20   irrelevant to the current issue, which is whether
21   punitive damages could be sustained under the clear
22   and convincing standard of California law.
23       Now, the amount was based on Mr. Bosack's
24   reasonable belief that the calculation of his
25   expert witness Galbally was correct.  This

111

1    testimony from Mr. Bosack is in essence -- the
2    question is, "Is it just coincident that that's the
3    same amount that Mr. Galbally came up with?"  And
4    Mr. Bosack explained, "I think that amount is the
5    correct calculation."
6        If you follow 25,000 through the various
7    partnership mechanisms, Mr. Galbally was an expert
8    and an expert accountant and he did that; in other
9    words, he assumed the investment of $25,000 by
10   Mr. Soward in Cartesian and then he did the
11   calculations that came up with the 135,000.  So not
12   only was the footnote on the advice of counsel, but
13   the number was as a result of the expert
14   determination by Mr. Galbally in the arbitration.
15       Nobody has maintained that the statement
16   of the capital share on the tax return has actually
17   affected any transfer of Mr. Soward's capital
18   account.  The statement of capital share had no
19   effect on the taxable income of the partners, much
20   less on the value of Mr. Soward's partnership
21   interest.
22       And this is Mr. Salak, he's an accountant
23   and lawyer at Clark-Nuber, was responsible for
24   preparing the return, and he testified:
25       "Question:  What you write down on a tax

112

1    return has absolutely no impact on ownership
2    interest in the partnership, it's just a
3    tax-reporting position?
4        "Answer:  That's what we understood.
5    Mr. Middleton had a similar understanding with
6    respect to including Mr. Soward's position in the
7    footnote.  He said, 'Including Mr. Soward's
8    arbitration position on the 2004 tax return, would
9    have no impact on his interest in Cartesian.'"
10       "Question:  Now, if you had included the
11   million dollars that Mr. Soward claimed was his
12   capital account balance on the footnote to the tax
13   return that was filed with the IRS, would that have
14   changed the amount that was in Mr. Soward's capital
15   account on the books and records of Cartesian in
16   any way?"
17       "Answer:  No.
18       "Question:  And can you think of any way
19   that would have changed Mr. Soward's ownership
20   interest in the Cartesian partnership?"
21       "No."
22       So the tax return could have reflected
23   zero, 135, 1 million, the possibility that it was
24   2 million, it absolutely had no impact on what the
25   amount actually was, and the amount had to be

113

1 determined by the Tribunal pursuant to the
2 accounting claim. That's what the footnote was all
3 about. He was advising the IRS that this was in
4 dispute in arbitration and would be determined by
5 the Panel.
6     Now, at the hearing, Mr. Soward was given
7 an extensive opportunity to try and articulate how
8 the tax return resulted in distinct harm to him,
9 and he couldn't identify any way that the tax
10 return resulted in distinct harm to him. The Panel
11 found that the tax return did not constitute a
12 conversion of Soward's interest in Cartesian. The
13 Panel, in Interim Award Number 4, found that that
14 conversion took place as of the end of September
15 2004. So the conversion was more than a year
16 earlier.
17     Now, Mr. Bosack and his representatives
18 never instructed anyone to alter Cartesian's books
19 and records to reflect a change in Mr. Soward's net
20 interest in the partnership; it's never done,
21 there's no evidence to that effect. As the Panel
22 found, and it repeatedly states this in Interim
23 Award Number 4, the books and records of Cartesian
24 show that the capital account of Soward remained at
25 $1,001,101. The records were never changed.

114

1     This was the testimony with respect to the
2 intention to amend. Mr. Bosack and his
3 representatives always intended to amend the
4 returns if necessary to conform to the Panel's
5 ruling. "Question "And just like in your
6 October 13 memo" -- I'm sorry, Mr. Salak, the
7 lawyer and accountant at Clark-Nuber:
8     "Question:  And just like in your
9 October 13 memo, if you look at Item Number 3, that
10 says," this is a quote from Mr. Salak's memo,
11 "depending on the results of the ongoing
12 arbitration litigation, those prior year tax
13 returns may need to be amended to agree with the
14 filing position of '04; right?
15     "Answer:  Yes."
16     He continues.
17     "Question:  Nonetheless, you understood on
18 October 14, 2005, that it was Mr. Middleton's
19 instruction to you that the Panel may decide
20 differently than what that tax reporting was for
21 '04 and then you would have to amend the 2004
22 return?
23     "Answer:  The context was that once
24 there's closure, all the returns need to be
25 synchronized as to what actually happened."

115

1     In other words, once the Tribunal makes a
2 decision with respect to the amount of Mr. Soward's
3 capital account in Cartesian, the tax returns would
4 have to be amended to conform to that decision.
5 That was the program going into this. They were
6 preparing the 2004 tax return in October 2005 on
7 that basis. It was a placeholder, in effect,
8 subject to change, depending on what the Tribunal
9 found.
10     Now, as a matter of law, the filing of the
11 2004 tax return is legally irrelevant because it's
12 completely divorced from the conduct which gave
13 rise to Mr. Bosack's liability for breach of
14 fiduciary duty and conversion. It is legally
15 irrelevant. Under California law, punitive damages
16 must be tied to oppression, fraud, or malice in the
17 conduct which gave rise to liability in the case.
18     So even if we accept the findings of
19 Interim Award Number 4 with respect to breach of
20 fiduciary duty and conversion, the filing of the
21 tax return in October 2005 had nothing to do with
22 those events. A conversion had already occurred,
23 the breach of fiduciary had already occurred as of
24 September 30, 2004. That's the point, it was
25 temporally divorced from the alleged failure to

116

1 provide an accounting and conversion of Soward's
2 assets in Cartesian more than a year earlier.
3     At most, Mr. Bosack's conduct under
4 consultation with his lawyers and his accountants
5 and his experts, with respect to the 2004 tax
6 return was the result of, quote, "Of a mistake of
7 law or fact, honest error of judgment,
8 overzealousness, mere negligence or other such
9 noniniquitous human failing and, therefore, not a
10 proper basis for an award of punitive damages."
11     Now, to the extent that the Panel's
12 Interim Award Number 4 has determined that Bosack
13 acted with malice regarding the 2004 tax return,
14 such a determination was not necessary to the
15 findings of liability. The findings of liability
16 were breach of fiduciary duty and conversion, i.e.
17 was there a duty, was it breached, was there harm,
18 conversion, did he have an interest in property,
19 was there dominion over that property inconsistent
20 with his rights?
21     There's no need on those findings of
22 liability to go further and find malice in
23 connection with the filing of a tax return a year
24 later. It prejudices Mr. Soward's entitlement to
25 punitive damages, which is the subject of this

117

1    subsequent phase of the arbitration, and Mr. Kahn
2    opened with this argument, and it's very clear from
3    the record and what the tribunal's order, that the
4    prior phase of the arbitration was to deal with
5    whether there was liability on the new claims for
6    breach of fiduciary duty and conversion.
7        There was never any intention in the prior
8    phase for the Tribunal to establish a basis for
9    Mr. Soward's entitlement to punitive damages, and
10   what it says in its footnote is, "It is
11   contemplated that the parties will adduce all their
12   evidence to support or defend against claims for
13   punitive damages as to Cartesian under the test for
14   liability for exemplary punitive damages as
15   established by the California Supreme Court and by
16   the United States Supreme Court.  However, there
17   will be no argument on the punitive damages claims
18   or the defenses thereto until after the Panel
19   enters its award as to whether or not there is
20   liability on the underlying claims for conversion,
21   breach of fiduciary duty, or other pleaded wrong
22   doing as to Cartesian, apart from claims for
23   punitive damages.
24       So the Tribunal, in this footnote, made it
25   very clear that the prior phase of the arbitration

118

1    was to deal with issues of liability and that this
2    phase is to deal with whether Mr. Soward is
3    entitled to punitive damages under applicable law.
4    That's what we're dealing with here.
5        Is he entitled?  Mr. Sharp made my
6    understanding of this consistent with his, and his,
7    in the transcript on 11/20, he says, "Also for
8    purposes of clarification, our understanding is
9    that the Panel has trifurcated the issue of
10   punitive damages such that the evidence we're
11   putting on now goes to the issue of entitlement to
12   punitive damages, and although we are putting
13   evidence at this point, the Panel will not hear any
14   argument on that, our claim of entitlement to
15   punitive damages, until after January, I believe
16   it's January 5, 2007, at which point we will have
17   argument on entitlement to punitive damages, and
18   then if there is a finding of entitlement to
19   punitive damages, we will thereafter have a
20   subsequent proceeding to determine the amount of
21   punitive damages.  I just want to make sure that my
22   understanding of that is correct procedurally.
23   Arbitrator Klitgaard said that's what Footnote 3
24   says in the order."
25       So we are not impermissibly revisiting the

119

1    evidence or the facts, what we're doing is looking
2    at the evidence and facts and explain to you why
3    the evidence and the facts does not give rise to an
4    entitlement on Mr. Soward's part to punitive
5    damages in this case and that was the issue that
6    was reserved to this part of the arbitration.
7        To the extent that those determinations
8    were made in the prior phase of the arbitration,
9    it's inconsistent with the Panel's order, and it
10   was made before Respondents had an opportunity to
11   present its case on the issue.  So it would be
12   procedurally improper if the proceeding is
13   structured the way that Mr. Kahn explained it in
14   the beginning of the hearing.  I don't think that
15   it is.
16       In any event, the findings in Interim
17   Award Number 4 that Mr. Sharp was relying on in his
18   presentation of malice, intent to harm, and the
19   like, are irrelevant because they were not made
20   under the clear and convincing standard of
21   California law, and again, the examination of the
22   evidence under that standard is the purpose of this
23   phase of the arbitration.
24       Well, when you step back and look at the
25   various awards, including Interim Award Number 4,

120

1    it appears that the Panel is faulting Mr. Bosack
2    for not acting in a manner consistent with its
3    findings.  He may have been mistaken in certain
4    respects and his attorney is overzealous at times,
5    but his conduct fell within the common experience
6    of human affairs.  It was noniniquitous human
7    failure at most and we would ask the Panel not to
8    use hindsight to find that Mr. Bosack acted
9    maliciously in not anticipating and acting in a
10   manner consistent with its findings and its awards.
11       Now, this also goes to whether there is a
12   basis for punitive damages under California law,
13   and it's pretty clear from the evidence that
14   Mr. Bosack relied on the advice of counsel.
15   Counsel was with him every step of the way.
16   Mr. Bosack's counsel was intimately involved in
17   each of the following decisions.
18       ARBITRATOR CLAIBORNE:  Excuse me,
19   Mr. Smith, don't we have a problem here since
20   counsel, Mr. Bosack's counsel guarded the
21   attorney-client privilege so carefully during the
22   hearing?  I mean, we were not allowed to explore
23   any of this, so I don't know what is going to be on
24   your list, I'm certainly looking at it with an open
25   mind, but that is of concern to me because there

121

1    were many times where we were asked factual questions
2    and we were told that because of the
3    attorney-client privilege, we couldn't have that
4    information.  So we don't really have any of that
5    in our record.
6        MR. SMITH:  Well, I'll show you some
7    evidence regarding reliance on counsel, and you may
8    find that for whatever reason, the sword and the
9    shield problem, that there wasn't sufficient
10   evidence of what the lawyers had in hand when they
11   were making decisions and various other arguments
12   that Claimant has made, that the
13   good-faith-reliance-on-advice-of-counsel defense to
14   punitive damages have not been made out, and you
15   are free to do that, but it's undeniable that
16   counsel was with them every single step of the way.
17   That is completely inconsistent with the
18   fact-finding, that Mr. Bosack was intending to act
19   maliciously with oppression or fraudulently.
20       He had, through the course of conduct
21   which gives rise to the claims, very good counsel,
22   intimately involved in all of this.  From those
23   facts, you could draw an inference inconsistent
24   with malice, oppression, and fraud, even if you
25   don't find the advice-of-counsel defense has been

122

1    made out.
2        CHAIRMAN BADER:  But we have no way of
3    knowing what it is that they advised Mr. Bosack to
4    do in connection with these matters, we just don't
5    know.  You're right, they were intimately involved,
6    obviously, because they were all together all the
7    time, but in terms of the substantive content of
8    discussions they had with Mr. Bosack, Ms. Lerner,
9    we know nothing.
10       MR. SMITH:  But let's look at the
11   evidence, and keep in mind that much of the conduct
12   was actually implemented through Wilson, Sonsini,
13   the communications with Soward where he was told he
14   would be terminated and they were immediately
15   diverted to Mr. Kahn, his litigation counsel in
16   late November, that was Wilson, Sonsini.  The
17   letter advising him of their position, that was
18   Wilson, Sonsini.  The draft complaint, that was
19   Wilson, Sonsini.  The letter to the banks and other
20   account holders, that was on Wilson, Sonsini
21   letterhead, they drafted it.
22       So it would be a little difficult for me
23   to understand how that doesn't show that Wilson,
24   Sonsini was intimately involved in each step of
25   this process when everything was being carried out

123

1    by them, but let me go through this.
2        CHAIRMAN BADER:  I understand.
3        ARBITRATOR CLAIBORNE:  I think it just
4    comes back to our basic problem, we don't know what
5    Ms. Lerner and Mr. Bosack may have told Wilson,
6    Sonsini or the basis for that, we have no evidence
7    on that.
8        MR. SMITH:  Although we know that Wilson,
9    Sonsini had the Clark-Nuber report.
10       ARBITRATOR CLAIBORNE:  There was more than
11   one Clark-Nuber report, not that we admitted into
12   evidence, but that was discussed here.  So there's
13   kind of a question in my mind about what the
14   Clark-Nuber report said, too.  I mean, we saw a
15   Clark-Nuber report that said Mr. Soward was owed
16   money.
17       MR. SMITH:  Wilson, Sonsini had the
18   Clark-Nuber report that supported the assertions
19   that it made in its letter that went to Mr. Kahn,
20   that his client owed quite a bit of money as a
21   result of the malfeasance that had been uncovered
22   by Clark-Nuber.  To think otherwise would be that
23   Wilson, Sonsini sent out that letter having
24   absolutely no support for the allegations that it
25   was making there.

124

1        ARBITRATOR CLAIBORNE:  Again, we don't
2    know what the client said to the lawyers.  I don't
3    want to argue with you, I'm just telling you what
4    our problem is here.
5        MR. SMITH:  We know from the earlier
6    testimony that Mr. Bosack also told Mr. Klein that
7    the Cartesian partnership agreement was modeled
8    after The & Capital agreement, that was in the
9    testimony, so we had that information, and then
10   what information did Mr. Bosack have, because the
11   general partner of the partnership was Mr. Soward
12   and he had all the books and records.  All the
13   information regarding Mr. Soward's wrongdoing was
14   in Mr. Soward's hands, with the exception of the
15   information that Clark-Nuber had reviewed for
16   purposes of preparing its report.
17       CHAIRMAN BADER:  It would be helpful, I
18   think, Mr. Smith, if you can, before the day is
19   over, give us the exhibit number of the Clark-Nuber
20   report that you're referring to.
21       ARBITRATOR CLAIBORNE:  Or a copy of the
22   one you're referring to because, as I say, there
23   was discussion about, in our hearing, of more than
24   one Clark-Nuber report.  One of which I believe was
25   amended after the arbitration began or sometime

125

1  shortly before the arbitration began.  So there was
2  a big dispute about that.  I don't remember all the
3  details now because it's been a long time ago.
4      MR. SMITH:  Right, okay.  That they were
5  involved in the termination of Mr. Soward as
6  investment manager, the removal of Mr. Soward as
7  general partner of Cartesian, the issuance of
8  letters removing Soward's signatory authority,
9  restriction of communications with Mr. Soward, and
10 decision not to distribute Mr. Soward's putative
11 interest in Cartesian.  The first three items were
12 the subject of testimony of Mr. Klein that we've
13 already gone over.  Of course Mr. Sellinger and
14 Mr. Krum, as we know, were also intimately involved
15 in the filing of the 2004 Cartesian tax return.
16     This is Mr. Klein's testimony:
17     "Question:  Was there an accounting
18 performed to determine what Mr. Soward's legal
19 interest would be in Cartesian as of the date of
20 his termination?
21     "Answer:  On the date of his removal, no
22 accounting was done at that time.  That was in
23 connection with trying to terminate Mr. Soward's
24 authority over -- terminate his management
25 authority over the partnership, and that was Step 1

126

1  because we were -- the clients were concerned about
2  Mr. Soward having some kind of continual control
3  over the assets."
4      So Wilson, Sonsini is clearly involved in
5  these steps on the basis of the client's concern
6  over Mr. Soward's continual control over the
7  assets.
8      "Did you feel that concern was reasonable?
9      "Answer:  Yes.
10     "Legitimate?
11     "Answer:  Yes.  Based on -- yes, based on
12 the facts we had been presented with, yes, we did.
13     "But what about Mr. Soward's right to his
14 money in Cartesian if he had money in Cartesian?
15     "Answer:  Right.  Well, you know, we
16 figured that that would naturally be put into some
17 process, either settlement negotiation or a dispute
18 resolution process with Mr. Soward.
19     "Question:  Did Mr. Soward leave that to
20 his lawyers for them to make a decision on what to
21 advise them what would be the best course of action
22 in that regard, or did he tell you what he wanted
23 to do with Mr. Soward's money if any money existed?
24     "Answer:  Well, the lawyer/client
25 relationship is one of consultation and so we made

127

1  recommendations and we talked with Len and Sandra
2  Lerner about it, but with Cartesian, just Len, not
3  Sandy, just Len, and he adopted, you know, one or
4  more of our recommendations.
5      "Did Mr. Bosack ever refuse to take up one
6  of your recommendations?
7      "Answer:  Well, you know, I'm sure we had
8  some, there were times -- I mean, you know, just in
9  the normal course of human discussions, we have
10 some give and take, so I'm sure there was some back
11 and forth on some of the recommendations.  I
12 couldn't identify all of them.
13     "Question:  Well, I'm talking specifically
14 with Cartesian.  Could you identify any of them?
15     "Answer:  Where Len disagreed with our
16 recommendations about how to proceed?
17     "Question:  Yes.
18     "Answer:  In particular, no."
19     So here's the Wilson, Sonsini lawyer
20 saying that Len followed their recommendations with
21 respect to how to proceed with the Cartesian
22 controversy.
23     Question, this is Klein again, "Now, when
24 did -- when did this communication occur where you
25 were told, 'We are terminating Mr. Soward, now what

128

1  do we do?'
2      "Answer:  Well, in the context of
3  terminating Mr. Soward's authority over the
4  accounts of the various entities and making sure
5  that Mr. Soward didn't have any continuing
6  management authority as the general partner of the
7  two partnerships, we had discussed the mechanism
8  for doing that with regards to the accounts, and it
9  was to notify the custodians of the accounts that
10 Mr. Soward would no longer have the authority as an
11 agent for the respective entities, and with respect
12 to the partnerships, the mechanism was to act to
13 remove him under the partnership agreements as we
14 understood them to exist at the time."
15     So this is Mr. Klein testifying as to the
16 communications with the client as to what they were
17 going to do.  They were going to terminate his
18 authority over the accounts and they were going to
19 remove him as a general partner of the
20 partnerships.
21     As I said, advice of counsel is a complete
22 defense of charges of malice, but even if Soward is
23 correct, the advice-of-counsel defense has not been
24 met for whatever reason.  The participation of
25 lawyers in the decisions that I've outlined earlier

129

1 shows that Mr. Bosack was acting reasonably under
2 the circumstances to defend his financial
3 interests, not to harm Mr. Soward.
4     Now, this next section goes into the issue
5 that punitive damages cannot be based on litigation
6 conduct. The law on this is quite clear. A
7 defendant's trial tactics and litigation conduct
8 may not be used to impose punitive damages in a
9 tort action.
10     There's a very fundamental reason for that
11 rule and it's annunciated in De Anza, a person's
12 right of access to judicial and quasi-judicial
13 bodies to decide controversies is a fundamental
14 component of our society that cannot be impaired by
15 the threat of punishment or retaliation. This is
16 Palmer, there is no legal precedent for the
17 position that the very manner in which the
18 defendant conducts its defense in the litigation
19 can be further evidence of bad faith. More
20 importantly, once litigation has commenced, the
21 actions taken in its defense are not, in our view,
22 probative of whether Defendant acted in bad faith
23 prior to the lawsuit.
24     De Anza explains the reason for the rule
25 further, to allow punitive damages to be based on

130

1 litigation conduct, fails to consider or accord any
2 weight to the right of the Defendant to defend
3 itself. Also allowing — this is De Anza again at
4 the same page, allowing such evidence
5 impermissibly, quote, "Holds the client responsible
6 for the attorney's litigation strategy. While much
7 of what an attorney does in litigation is
8 contractually binding on the client, where it is
9 tortious, the client is not vicariously liable
10 merely for retaining the attorney."
11     This is the California Supreme Court,
12 Section 47(b) provides an absolute privilege for
13 all communications or communicative acts made in
14 connection, in connection with judicial proceedings
15 both inside and outside the courtroom. And it
16 immunizes litigants from all tort liability, all
17 tort liability based on their litigation conduct,
18 except for malicious prosecution. There's been no
19 allegation of that here.
20     The privilege extends to all prelitigation
21 communications made in reasonable contemplation of
22 litigation. So it extends back from the date of
23 the filing of the Complaint. It applies equally to
24 arbitration proceedings. That's recognized in the
25 California Supreme Court decision Moore v. Conlef

131

1 relying on an earlier California Supreme Court
2 decision, but there is a very extensive analysis of
3 the privilege and how it's applied to arbitration
4 as a quasi-judicial proceeding and why the purposes
5 of the privilege are as applicable in arbitration,
6 even possibly more so than in litigation.
7     So defensive pleading, including the
8 assertion of affirmative defenses, is communication
9 protected by the absolute litigation privilege.
10 Such pleading, even though allegedly false,
11 interposed in bad faith or even asserted for
12 inappropriate purposes, cannot be used as the basis
13 for allegations of ongoing bad faith. The
14 privilege also extends to communications which have
15 some relation to an anticipated lawsuit.
16     So you could see the privilege is very
17 expansively interpreted and applied. In other
18 words, if the statement is made with the good-faith
19 belief in a legally viable claim and in serious
20 contemplation of litigation, then the statement is
21 sufficiently connected to the litigation and will
22 be protected by the litigation privilege. The
23 privilege then applied is absolute.
24     Now, Mr. Soward relies substantially on
25 core protected litigation conduct as support for

132

1 his punitive damage claim. Communications made in
2 contemplation of litigation, actions by
3 Respondents' attorneys in preparing for litigation,
4 filing of the suit in District Court in Washington,
5 claims, defenses, and allegations made by
6 Respondents in the arbitration and in Federal
7 court, forcing Mr. Soward to litigate his rights,
8 and alleged false or inconsistent testimony and
9 evidence given to the Panel, and engaging in
10 discovery misconduct in the context of this
11 proceeding.
12     In their brief, Mr. Soward alleges
13 approximately 53 distinct actions as a basis for
14 punitive damages. So if you go through, you will
15 see they have the evidence in the back, categorized
16 in the three categories: Malice, oppression, and
17 fraud.
18     Of these, approximately 38 relate to core
19 litigation activity. Communications and
20 preparation in advance of litigation, 12 acts of
21 misconduct. Claims, defenses, and positions
22 asserted, nine acts. False or inconsistent
23 testimony and evidence presented to the Panel, nine
24 acts. Forcing Soward to litigate, three acts.
25 Alleged discovery misconduct, three acts. Filing

133

1 and maintaining the distract court action, two
2 acts. All this is core protective litigation
3 activity. So in total, almost three-quarters of
4 the alleged misconduct relates to core litigation
5 activity.
6      The remaining conduct at issue falls into
7 the following categories:  Conforming the 2004
8 Cartesian tax return to Bosack's arbitration
9 position and its use in these proceedings; that's
10 litigation activity.  Termination of Soward as
11 investment manager in contemplation of litigation;
12 that's potentially core litigation activity.
13 Removal of Soward as general partner of Cartesian;
14 same thing.  Failure to account for and distribute
15 Soward's interest in Cartesian before the Panel
16 ordered this relief.  A decision to submit to the
17 arbitration process and have the claim determined
18 there; litigation activity.  All of this is also
19 under the -- within the scope of the litigation
20 privilege of Section 47(b).
21      Now, what I'm going to do now is just go
22 through very quickly their brief and highlight the
23 key phrases that show that what they're complaining
24 of is really litigation conduct.
25      So here they're complaining that

134

1 Respondents claimed -- here Respondents refused to
2 communicate with Mr. Soward.  Respondents stated
3 these issues will be settled in the litigation we
4 recently commenced.  That's litigation activity,
5 and the fact that the communications were
6 channeled between the two lawyers is also a
7 decision that is privileged.
8      Again, Respondents claimed, Respondents
9 claimed here and in Federal Court, Respondents
10 filed suit in the United States District Court for
11 the Western District of Washington, the federal
12 complaint must have been maliciously filed to harm
13 Mr. Soward's reputation.  They've not dismissed
14 their federal complaint.
15      Forced Mr. Soward to litigate his right to
16 an accounting.  Forced Mr. Soward to arbitrate his
17 claims.  Did not speak to Mr. Soward about any of
18 the allegations raised in the Wilson, Sonsini draft
19 complaint, the federal complaint, or their various
20 answering statements in the arbitration; core
21 litigation activity.  Respondents claimed here
22 saying.  Respondents claimed here; again litigation
23 conduct.  Respondents claimed; litigation conduct.
24 During the first phase of the proceedings,
25 Respondents claimed; litigation conduct.

135

1      Then they fail to produce the records
2 maintained by Cartesian Partners' bookkeeper;
3 litigation conduct.  Accused him of numerous
4 misdeeds; litigation conduct.  Presented the tax
5 return to the Panel as evidence; litigation
6 conduct.  Mr. Bosack told the Panel; again,
7 privileged.  Respondents falsely told the Panel;
8 again, privileged.  Respondents falsely told the
9 Panel; privileged.  Mr. Bosack and Ms. Lerner hired
10 Tom Klein of Wilson, Sonsini; that's a basis for
11 punitive damages, but it's privileged.
12 Mr. Bosack's attorneys began to prepare for
13 litigation; privileged.  So did Mr. Soward, which
14 is why he retained Mr. Kahn.
15      Sending the draft complaint for filing in
16 the Superior Court of San Francisco which accused
17 Mr. Soward of numerous misdeeds and alleged damages
18 that are over 12 million; again, privileged.  Has
19 claimed otherwise in order to protect his own
20 interest; again, privileged.  Claimed that
21 Mr. Soward had committed fraud in creation of
22 Cartesian Partners; again, communication and
23 contemplation of litigation or arbitration.  Took a
24 litigation position that was contrary to his
25 beliefs; that's again litigation conduct.

136

1      The fact that Mr. Soward spent three years
2 of his life and over $3.5 million to recover his
3 interest in Cartesian Partners is absolutely
4 irrelevant, and if that is a reflection on our
5 litigation conduct, it's privileged.  Filed suit
6 against Mr. Soward, alleged that he had no lawful
7 interest in Cartesian; again, no basis for the
8 imposition of punitive damages.
9      Mr. Bosack claimed that the position taken
10 in the tax returns is based on the advice of his
11 accountants; again, that was a position he took in
12 the arbitration in which he reiterated today.  He
13 subsequently took the position that Mr. Middleton's
14 communications with his friends at Clark-Nuber were
15 privileged; again, litigation conduct.
16      Again, they rely on the fact that he
17 testified and that he testified in some instances,
18 limited instances with inconsistency; that, too, is
19 not a basis on which to impose punitive damages.
20 You could rely on his testimony as evidence, you
21 could rely on a document as evidence, but the fact
22 that he is telling you something or even gets it
23 inconsistent is not a basis for the imposition of
24 punitive damages.
25      Then you rely on Mr. Salak's testimony,

137

1    these are discovery misdeeds, did not produce,
2    Mr. Middleton testified that no money had been
3    taken out of Cartesian and that his Cartesian
4    capital account remained unchanged.  Well, his
5    capital account did remain unchanged, and there was
6    a net positive contribution to Cartesian as a
7    result of Mr. Soward's capital infusion of 640,000.
8    Again, Mr. Bosack testified.
9        So to sum up, most of what they're
10   claiming is based on core-protected litigation
11   conduct, and if you go through their brief, you
12   will see that.  And what we have done in Appendix A
13   is we took each one of their supposed facts in
14   evidence, and we looked at the facts and we looked
15   at the evidence, and we tell you, one, where they
16   mis-cite, where they have mischaracterized the
17   evidence, and we also tell you where we believe
18   it's litigation conduct or otherwise not a
19   permissible basis for the imposition of punitive
20   damages, and that is in Appendix A.
21       Let's talk now about whether there is any
22   basis for imposing punitive damages on Sandy
23   Lerner.  The only possible basis for an award of
24   punitive damages against Lerner is the Panel's
25   finding in Interim Award Number 4 that Lerner was

138

1    personally liable through SLLB for conversion of
2    Soward's interest in Cartesian.  Not anything that
3    she did personally, but through SLLB.
4        This finding was not proper because a
5    member of the Delaware LLC is not liable for the
6    actions of the LLC; that's Hornbrook law.  Again,
7    Lerner had no personal involvement in the affairs
8    of Cartesian.  She's never been a partner of
9    Cartesian.  After Soward's termination, SLLB, of
10   which Sandy Lerner was a member, became the general
11   partner of Cartesian.  Any duty owed to Soward was
12   owed by SLLB, not by Sandy Lerner personally.
13       The Delaware LLC act makes this very
14   unequivocal, that the members have no personal
15   liability for the debts or obligations of the LLC.
16   No member or manager of a limited liability company
17   shall be obligated personally for any such debt,
18   obligation, or liability of a limited liability
19   company.  The only way to hold Sandy Lerner liable
20   for the actions of the SLLB would be to pierce
21   SLLB's corporate veil.  That's the only way.
22       However, Mr. Soward has never even argued
23   in favor of piercing SLLB's corporate veil.  The
24   Panel has never made such a finding, and there is
25   no evidence other any other justification for

139

1    piercing.  So the Panel's ruling that Lerner was
2    liable for conversion through SLLB is, therefore,
3    contrary to very fundamental principles of Delaware
4    law.  The award of compensatory damages based on
5    this finding has already been satisfied.  So the
6    Panel's ruling has resulted in no harm.  But any
7    award of punitive damages against Sandy Lerner is
8    clearly unwarranted and would be subject to
9    challenge.
10       Now, by the way, SLLB is not a party to
11   the arbitration.  So even if Lerner could be
12   personally liable for SLLB's acts, there's no
13   evidence that Lerner acted maliciously.
14       Excepting litigation conduct, Mr. Soward
15   points to only two categories of conduct that he
16   claims warrant punitive damages:  The decision to
17   terminate him and remove his signatory authority,
18   and the failure to return Soward's interest in
19   Cartesian within a reasonable time.
20       As we've already gone over, Lerner acted
21   reasonably in the face of Soward's breaches of
22   trust, and with respect to her investment vehicles,
23   she could remove him at any time for any reason or
24   for no reason.  The issue only comes up with
25   respect to Cartesian and she wasn't a member of

140

1    Cartesian at the time.
2        When she did remove him, though,
3    Clark-Nuber had identified several different
4    instances of misconduct.  Soward had control over
5    virtually all of her assets.  She was concerned
6    that Soward would engage in further misconduct, and
7    she and Mr. Bosack consulted with and acted through
8    Wilson, Sonsini.  There's nothing in this string of
9    actions that even suggests that she was acting
10   maliciously, oppressively, or fraudulently.
11       Even after SLLB became general partner,
12   there's no evidence that Lerner ever participated
13   in the affairs of Cartesian or in the decision
14   whether to pay Soward for his punitive interest.
15   There's just no evidence of that.  Despite bearing
16   the burden of proof on that issue, Soward's counsel
17   never asked Lerner about Cartesian or her role in
18   decision-making for that entity.
19       Mr. Klein testified that he consulted only
20   with Bosack regarding what action to take with
21   respect to Soward's interest in Cartesian.  The
22   question, "Did Mr. Bosack leave that to his lawyers
23   for them to make a decision or did he tell you what
24   he wanted to do with Mr. Soward's money, if any
25   money existed?

141

1    "Well, we made recommendations and we
2    talked with Len and Sandra Lerner about it, but
3    with Cartesian, just Len.  He adopted, you know,
4    one or more of our recommendations."
5        Now, Mr. Sharp relied on Mr. Middleton's
6    testimony, and when they provide you with the
7    copies of the PowerPoint, you should go back to
8    this testimony, but it's the arbitration
9    proceeding, hearing transcript on September 15,
10   2006, and it's at Page 25.  This is Middleton's
11   testimony, this isn't Sandy Lerner's testimony, and
12   there's no foundation that Middleton was aware or
13   present when any decision-making with respect to
14   Cartesian was taking place.
15       He says, "And what is SLLB, LLC?
16       "It's a limited liability company owned by
17   Mr. Bosack and Ms. Lerner.
18       "Question:  And who makes the decisions
19   for SLLB, LLC?
20       "Answer:  They do.
21       "Question:  Bosack and Lerner?
22       "Answer:  Yes, sir.
23       "Question:  Okay.  Now, so after
24   Mr. Soward was fired, Mr. Bosack and Ms. Lerner
25   became responsible for managing Cartesian Partners?

142

1        "Answer:  Yes.
2        "And if Mr. Soward, if there was a
3    decision to be made about whether Mr. Soward should
4    be paid and cashed out for his interest in
5    Cartesian Partners, that was a decision for
6    Mr. Bosack and Ms. Lerner; correct?"  And the
7    answer is, "Yes."
8        Middleton is saying that's a decision for
9    them.  That is not evidence that she actually
10   participated in a decision.  That is not evidence
11   that he was there at the time that any decision was
12   made.  There's absolutely no foundation for the
13   inference from his testimony that she participated
14   in any way in the decision to remove Mr. Soward
15   from Cartesian.
16       So take a close look at that testimony, it
17   does not support the assertion.  The only mention
18   in Award Number 4 of a connection between Lerner
19   and the Cartesian dispute related to the tax return
20   and this is what Interim Award Number 4 says at 12.
21       Bosack was kept personally apprised of the
22   transfer of the $866,101 of Soward's capital
23   interest on the tax return.  He then signed the tax
24   return under oath on behalf of SLLB.  The evidence
25   did not show whether Lerner personally knew of

143

1    these events when they occurred.  However, when
2    they surfaced in the arbitration, she did not
3    disavow them.
4        But it's not Lerner's obligation in an
5    adversarial proceeding to volunteer to disavow
6    something.  It's their responsibility to examine
7    her and elicit evidence that supports their claims
8    and they didn't do that.  So the burden is on them.
9    They never questioned her and there's no other
10   evidence in the record that indicates that she was
11   involved in the preparation of the return, nothing.
12       Now, punitive damages have to be based on
13   the Defendant's own acts, not the acts of others.
14   And the purpose of punitive damages is to punish
15   wrongdoers and thereby deter the commission of
16   wrongful acts.  Punitive damages are appropriate if
17   the Defendant's acts are reprehensible, fraudulent,
18   or in blatant violation of law or policy.
19       What Claimant has done is simply lumped
20   the two of them together indiscriminately.  They
21   use the phrase "Bosack and Lerner" without any
22   attempt to actually determine who was involved in
23   what underlying conduct and that's impermissible.
24   The presence of two respondents in this case does
25   not allow Soward to impute Bosack's conduct to

144

1    Lerner.  When punitive damages are sought against
2    multiple defendants, the reprehensibility of each
3    Defendant's conduct must be determined
4    individually, as opposed to in gross.  The evidence
5    of Ms. Lerner's own conduct just doesn't warrant
6    the imposition of punitive damages.
7        There's a couple final points.  Mr. Sharp
8    put up a slide with a statement of how liberal
9    compensatory damages are under Washington law and
10   he omitted to draw your attention to the first four
11   words.  It was exclusive of punitive damages, the
12   measure of damages is uniformly adopted by the
13   courts and recognized by the law as exceedingly
14   liberal towards the injured party.
15       Go back and take a look at this slide,
16   Washington law, this statement of Washington law is
17   recognizing the punitive damages aren't available
18   generally.  And then on the choice of law issue,
19   Washington courts don't apply a comparative
20   impairment analysis similar to California.  What
21   they do is they apply a substantial interest or
22   substantial relationship test.  So they look at the
23   circumstances surrounding the claim and they make a
24   determination as to which state has the most
25   substantial interest to the claim.

145

1    So the Supreme Court's decision to
2    recognize the application of California law under
3    that separate standard says nothing about how you
4    should rule on the comparative impairment analysis
5    that's applicable here, Number 1, and Number 2,
6    what the Court there did was simply say,
7    "California law, we recognize that California law
8    applied to the claims and to punitive damages, and
9    that under California law, punitive damages can be
10    assessed."
11    That says nothing about whether the
12    punitive damages could be assessed under Washington
13    law, and our point is Washington has the most
14    substantial interest and its law would be the more
15    impaired if California law were applied here and,
16    therefore, Washington law applies and does not
17    permit punitive damages in this case.
18    Thank you.
19    CHAIRMAN BADER: Thank you, Mr. Smith.
20    MR. SMITH: Then we will have a little
21    time to respond and then if they would like the
22    last word, they could respond to us as well.
23    CHAIRMAN BADER: Let's take a little
24    break.
25    MR. KAHN: I'm ready to go. I'm ready to

146

1    take a break.
2    CHAIRMAN BADER: All right, let's take a
3    10-minute break.
4    MR. KAHN: Sure.
5    (Whereupon, a recess is taken.)
6    CHAIRMAN BADER: Mr. Kahn, let me ask you
7    something, not necessarily just this minute, when
8    it fits the sequence of that which you are doing.
9    My understanding is the U.S. Supreme Court, and I
10    think the Cal Supreme Court picked it up, said that
11    to comply with the process as far as punitives are
12    concerned, there are three factors that had to have
13    application. The first was sort of malice. The
14    second was no more than single-digit —
15    MR. KAHN: Nine times.
16    CHAIRMAN BADER: Nine times?
17    MR. KAHN: Right.
18    CHAIRMAN BADER: The third was the amount
19    of any penal penalty for committing the same act;
20    are you familiar with that?
21    MR. MC NAMARA: I think the third factor
22    is the wealth of the defendant, and they sort of
23    throw in a fourth factor and say that you can look
24    at sort of penal violations for similar conduct.
25    CHAIRMAN BADER: Yeah, that's the one.

147

1    ARBITRATOR CLAIBORNE: That's the one.
2    MR. MC NAMARA: I was told that's a fourth
3    or sort of a 3.5 or something.
4    CHAIRMAN BADER: We'd like to know, how
5    about those things, are they factors that have to
6    be the product of findings?
7    MR. KAHN: I think the short answer is I
8    think that Mr. Smith had it right in his brief.
9    What it really goes to is amount, not whether. I
10    think the Supreme Court said in this context is
11    it's left to the good, sound judgment of the state.
12    To the extent they mention malice, malice or
13    oppression of fraud, the constellation of bad
14    conduct is a due processing kind of notion, and
15    that's satisfied here. To the extent they talk
16    about the nine times factor, that's for the next
17    phase, to the extent that they talk about the final
18    factor.
19    I will say, I was going to mention, I'll
20    mention it, I don't want to accelerate the
21    invective, but what happened here is a crime if it
22    were civilly done, they took our money and they
23    kept it and there are penalties for crime. This
24    would be a crime in a criminal context. We have no
25    interest in calling anybody a criminal, we've been

148

1    by that, but you asked, I didn't raise it.
2    The point to be made is the conduct is
3    sufficiently heinous that it would be a crime and
4    is chargeable, and more than that, what you in your
5    order said, the collateral behavior, the filing
6    false tax return, that I'm sure is some kind of a
7    crime and other kinds of behaviors that are
8    intended here. There is a constellation of really
9    evil behavior that is embedded in Order Number 4,
10    much of which an overzealous prosecutor could
11    allege to be crimes, certainly you asked, you did
12    say that he told you answers that you didn't find
13    completely to be true.
14    Mr. Libby was just found guilty of a crime
15    of not remembering; that seems a little less
16    egregious than a crime of misremembering. Fairly
17    said, the point of this that goes to the next
18    phase, the due process considerations the Supreme
19    Court raised are amply met; that's our view. I
20    didn't read their brief disagreeing with that.
21    There's going to be a theme in my remarks
22    and the theme is this: We, Ms. Claiborne,
23    Mr. Bader, Mr. Bosack, Ms. Lerner, and myself, and
24    Mr. Soward, and Mr. Sharp, have been on a journey.
25    We've been on a very, very difficult journey and

149

1  it's been characterized by really, really unfair
2  behavior and really unjust behavior of which
3  Mr. Soward has been a victim.  Today we witnessed
4  it again.
5      There were some really -- Mr. Smith has a
6  wonderful presentation and just a very nice style,
7  but he said some very ugly things and I'm going to
8  point them out to you.  More importantly, I'm going
9  to point out something that completely consistent
10  with the behavior the whole time.  There was some
11  incredibly unfair things that were suggested here.
12  I'll just point out a couple of them.
13      We desperately wanted to know what Wilson,
14  Sonsini said to them and what they said to Wilson,
15  Sonsini, every way we could.  Finally,
16  Mr. Klitgaard flat out asked him what went on and
17  he wouldn't tell us.  To this day, all we know,
18  Wilson, Sonsini told them to do seven things and
19  they wouldn't do them.  Any self-respecting
20  litigant or lawyer would not make the argument then
21  there's advice of counsel.  Forget about the legals
22  of it.
23      As Arbitrators, think about how unfair
24  that is.  How would you feel if you were David?
25  They actually said to you he followed the advice of

150

1  counsel when they wouldn't tell us what the advice
2  was.  Forget about any other aspect of the meanness
3  of that.  They actually want you to decide that he
4  is exonerated by advice of counsel that they won't
5  let us find out.  What kind of people do that?
6  That's just so ugly.
7      And I'll tell you something else that's
8  ugly, this whole business of advice of counsel.  On
9  the one hand, their position is no matter what
10  atrocity counsel commits, no matter what ugly thing
11  counsel says, no matter what ugly thing a counsel
12  does, no matter how horribly they behave, don't
13  blame me, it's litigation, privileged.
14      On the other hand they're saying,
15  "However, I can't be blamed either because I
16  followed the advice of counsel."  Think about how
17  the victim feels about that.  The victim of this
18  hideous behavior when the lawyers, our legal system
19  is making arguments that say the lawyers can run
20  rough shot over you and do horrible things to you,
21  no harm, no foul, privileged, but you are
22  exonerated from any sin you committed because of
23  advice of counsel.  By the way, we won't tell you
24  what that advice is.
25      I bring this up to you because this is a

151

1  theme, this whole behavior is consistent and
2  Mr. Smith's arguments today, I'll go one by one.
3  The most important part of these arguments, we're
4  at the end of this thing, thank the Lord, but
5  you've been through the whole thing, this is but a
6  piece, you must take into account what we've
7  experienced.  The utter unfairness of what's
8  happened here and the arguments, the unfairness of
9  the arguments being made today.
10      Let's begin at the beginning of this
11  morning.  Think of this matter from the perspective
12  of the victim.  Mr. Soward is the victim.  He's
13  been the victim from Day 1.  Think of how he feels
14  about what Mr. Smith said.  Mr. Soward has endured
15  over two years of being called a criminal, an
16  adulterer, an insurance defrauder, a cheater, a
17  liar.  He spent 22 days on the stand and he has
18  been subjected to the onslaught of really we've had
19  three phases of lawyers.
20      The biggest law firm in California first
21  attacked us.  Then they brought two prosecutors
22  from back East and attacked us, and now they bring
23  the smartest lawyers in California, to which I
24  defer, to attack us.  All I could say if you find
25  in our favor, I'm looking forward to finding out

152

1  who they'll bring next.  Probably Skadden, Arps or
2  something.
3      But think about this:  He's just got
4  little me.  It's just incredible what's happened
5  here.  At every turn they've had an unrelenting
6  effort directed by him and her to destroy him;
7  that's all this has been about.  They've taken
8  their $350 million and set out to destroy him.
9      What happened?  I'll tell you what
10  happened.  They failed.  100 percent.  We won.  The
11  entire effort, this has been a fiasco for them.
12  They spent millions and millions and millions of
13  dollars.  At the end of the day, they're paying us
14  millions, and at the end of the day, I think, if
15  fairness reigns, we'll get a lot of attorney
16  fees.  You promised we'd get attorney fees if we
17  won things we didn't want to litigate.  We won them
18  a hundred percent.
19      This has been a fiasco for them.  They
20  tried to ruin him in every way they could.  They
21  finally failed and what do they say?  "Let's
22  deescalate, let's deescalate."  I ask you
23  something, do you think if they won they would be
24  asking to deescalate?  Do you think if you found in
25  favor of Krum and Sellinger's position, they would

153

1  be up here saying, "Deescalate. Gosh, this has
2  been just a big mistake, terribly sorry, so sorry"?
3        Think about it from David's perspective as
4  a human being having been through all of this,
5  having suffered this incredible insult and to have
6  such a mean-spirited, unrepentant reaction to this
7  by coming to you and invoking -- invoking the
8  status and prestige of one of the great legal
9  institutions of America to say, "Let's just make
10  peace. Let's deescalate." Why? Because they're
11  completely and totally defeated in their purpose of
12  ruining him and now they don't want to be brought
13  to justice.
14        Let's talk about they're patting
15  themselves on the back, we're so wonderful, we
16  withdraw our punitive damages motion. Well, excuse
17  me, that's because their punitive damages motion
18  was 100 percent inconsistent with their Washington
19  law argument and there was no way with a straight
20  face they could make both arguments, and they
21  realized there was no way they could win the
22  punitive damages argument. It was such a unfair
23  vision, preposterous paper.
24        Mr. Smith, when I got his message, my
25  reaction was what a good lawyer he is, of course

154

1  they're going to withdraw that. But this isn't
2  some magnanimous gesture of deescalation, this is
3  just a white flag on the issue of uh-oh, we can't
4  win this and it's incontradictory.
5        Let's talk about the other patting of the
6  back, look at how wonderful we are, we paid
7  $1.4 million. Well, let's talk about that tactic.
8  Mr. Smith spent the burden of his arguments to you
9  were the 10 Commandments, Order 1 and Order 3, in
10  stone, functus -- what you call it -- cannot be
11  changed, not even by an order of God.
12        Guess what they say? "We're owed $500,000
13  minimum." How come they haven't paid us that,
14  where is that money? The answer to that, of
15  course, is they're still trying to ruin him, they
16  still are holding out his money, but they were
17  caught red-handed on the 1.4 million and they knew
18  we would have a punitive damages hearing on that,
19  so they send us a check for that.
20        If they were repentant, if they really
21  truly were fair and honest people, they would have
22  sent us a check for the money they owe us. They
23  know they owe us the money, it's just a matter of
24  how much. Here's $500,000, we'll chew it up later,
25  maybe it's six, maybe it's seven, but we know it's

155

1  at least five. They haven't given us that money.
2  They didn't give any money to us until you pointed
3  a gun at their head. That's okay, but in come in
4  here and say, "Let's deescalate because we're
5  really good folks, we get it now," is just really,
6  really, really, really not fair, and really
7  transparent and really ugly, which is what most of
8  this is.
9        Now, what to make of the Russian history
10  of this proceedings that we heard, what to make of
11  this you brought it on yourself, you dirty lout,
12  you dirty lout. By the way, we forgot to mention
13  that this dirty lout, Mr. Smith I'm sure just
14  forgot to mention that he made $280 million, the
15  dirty lout, that he made $25 million in one account
16  in the last year, dirty lout. That he, in fact,
17  cooperated. Forget about my God, my God, my God
18  he's going run off with all our money.
19        I felt sorry for Mr. Smith when he made
20  that argument. You were there, you saw how
21  preposterous and silly that was, how ridiculous
22  that thing was. The proof was in the pudding, what
23  did David do? The undisputed evidence was that
24  David cooperated until the cows came home. And
25  what did he do? He took out a loan to pay them

156

1  back a million dollars at a time when they owed him
2  millions. This is an incredible situation.
3        He made them $280 million. He cooperated
4  fully. He paid them a million dollars out of his
5  pocket, had to go borrow the money for it even
6  though he was owed millions as you found and they
7  say he brought it on himself. Talk about Russian
8  history. Talk about a fiction.
9        And one more on the subject of fiction,
10  Clark-Nuber, I couldn't believe what I heard. I
11  don't have to remind you of the histrionics of the
12  other side about Clark-Nuber, the false, awful
13  terrible report, and about this -- look, I think
14  it's -- what O'Melveny did here is truly Herculean.
15  They got 95 percent of the facts right.
16  Congratulations, good job.
17        You missed one big time. Passport wasn't
18  in the Clark-Nuber report. Clark-Nuber didn't
19  figure out Passport. They didn't know about
20  Passport. It had nothing to do with Passport. And
21  when Sandy Lerner was cross-examined about why she
22  terminated him, her testimony was and I quote blah,
23  blah, blah, she had no idea. She said she was
24  shocked at the conduct and couldn't figure out why
25  she was shocked. She knew nothing about Passport.

157

1　She knew nothing about nothing.
2　　　　What did Clark-Nuber say?  Clark-Nuber
3　said, "You owe David millions of dollars in fees."
4　That's what Clark-Nuber said.  And poor Dan.  I
5　mean, he almost split a gut trying to get that
6　thing in evidence and the other side couldn't amend
7　it fast enough.
8　　　　To then have Mr. Smith, poor Mr. Smith
9　come here and tell you Sandy got the Clark-Nuber
10　report and she was just horrified and terrified
11　that they were going to steal all her money, that
12　actually misses the whole deal, because in fact,
13　Clark-Nuber report supports our position
14　100 percent.  We desperately wanted it in evidence
15　and you let it in evidence and it did support our
16　position.  They ran away from it as fast as they
17　can.
18　　　　This continued smear tactic of David, you
19　know, my God, she fired him because look at all the
20　things you found four years later about Passport in
21　which they didn't know at all.  Give me a break.
22　But what I want to say about that is how would you
23　feel if you were him?  I mean, why did they do
24　that?  What a rotten thing to do and also, not very
25　smart.  They didn't think I was coming, that I

158

1　wasn't going to point it out?  This was not true,
2　this is not what happened here.
3　　　　What happened here?  Well, you know what
4　happened here.  I'm not going to repeat all of it,
5　but what I'm going to say about it is that the
6　effort to rewrite the history and to say it falsely
7　is not a neutral principle, it was an effort to
8　mislead you and to distort the record and it's not
9　fair and it's not nice, it's nasty, and in that
10　regard, it's completely consistent with the ugly
11　things they have happened and you should hold it
12　against them.  Just like you should hold against
13　them their behavior as I will come to in a bit.
14　　　　Now, what to make of Mr. Smith's
15　constructions of your orders.  I have to say
16　Mr. Smith said stuff today, again, just a nice
17　manner, he says things so nicely, he says things
18　like, "Come over here, I'll break your head."  What
19　he said was, very cheerfully, Mr. Soward had no
20　right to an accounting and no right to a
21　distribution.  That's what he said, three times:
22　No right to accounting, no right to distribution.
23　You were wrong.  That's the way it is, that's their
24　position even today, and if you weren't here to
25　intervene, his 1.4 million would be locked forever

159

1　in Sandy and Len's clutches.
2　　　　Unrepentant, they still take the position
3　that his $1.4 million is only in his pocket because
4　you made a big mistake.  I mean, how can you let
5　them talk like that at this stage of the game?  I
6　don't get it.  How could they have a partnership,
7　have his money, and Len and Sandy take the position
8　even to this minute that David is not entitled to
9　get it?  It's their position, he said it three
10　times.
11　　　　Now, of course in addition, he said, and
12　by the way, you got it completely wrong, wrong,
13　wrong, wrong, in every score, you misread the
14　contracts, your orders are wrong, which seems a
15　little out of sync with the phase of the
16　proceeding, but I'm pointing to the fairness and
17　unfairness of the argument, the amazing meanness,
18　the amazing rottenness of the position that this
19　$1.4 million in their view was locked forever in
20　their hands.
21　　　　Now, this is part of a pattern.  It's an
22　unrelenting pattern.  That argument, I would
23　suggest, that David could never get his money, he
24　had no right to a distribution, and no right to an
25　accounting ever is just the same as all the other

160

1　ugly arguments that they've been making.  It's the
2　same piece.
3　　　　I'll tell you another ugly argument
4　they've made and it's really ugly and, again, it's
5　couched by a wonderful lawyer, very smart fellow,
6　but he's saying, you, you abuse your power, that you
7　had no power to write Order Number 4, that you
8　circumvented your authority, and you abused your
9　power.  I've never heard of.
10　　　　I, frankly, never heard -- once.  I've
11　been a lawyer for 33 years.  Once I brilliantly
12　walked into Judge Simms in Placer County and I
13　said, "Your Honor, you can't join a forceable
14　detainer action without a lawful retainer action,"
15　and he looked at me and said, "Watch me."  That's
16　the last time I told a judge that he or she could
17　or couldn't do something.
18　　　　Now he's told you you have no power, you
19　have no power to do this, that's what he's accusing
20　you.  He's accusing you of abusing your power.
21　It's an incredible statement.  Why?  He said that
22　Klein would have no reason to lie.  I don't get it.
23　What's your motivation to abuse your power to go
24　issue that Order Number 4 with this scandalous,
25　ostentatious grabbing of authority, you and

161

1  Mr. Kiitgaard?  I don't understand the argument,
2  but that's the argument.
3      I make the point of it because enough,
4  you've got to hold them to account for what they're
5  doing here, what they've been doing here.  They pay
6  millions of dollars to make the most outrageous
7  that one will stick.  This is so ugly, you don't
8  have the authority, and think about this:  This is
9  an argument made by a distinguished counsel to two
10  of the most distinguished arbitrators in this
11  jurisdiction.
12      Here's what he said to you:  I, Steven
13  Smith, know what these two orders mean.  I'm
14  telling you what they mean, and you do not have
15  power to deviate from them.  I tell you what they
16  mean, functus -- whatever it is.  You do not have
17  the power to disagree with me.  That's his
18  position.
19      I got to ask a question:  How could a
20  system survive like that?  How could that argument
21  even be cognizable?  Anytime there was multiple
22  orders or other orders by arbitrators, you simply
23  say, "Look what you did last time.  You don't have
24  the power to deviate from it."  The power.  He's
25  not -- he's way beyond the please reconsider or

162

1  anything like that.  He's telling you you don't
2  have the power to do it.
3      The argument is so insidious.  If it were
4  to be accepted by anybody ever, that would be the
5  end of arbitrations, because you would be --
6  whatever you decided, and again, an example of it,
7  just to further, the attorneys' fees section.  I
8  assume we are going to be functio otatus [sic] all
9  the time.  You can't give him attorney's fees
10  because he said this.  You can't give him
11  attorney's fees because you said that.  You don't
12  have the power to do it.  Follows, make sense, you
13  are written in stone, 10 Commandments.
14      I'm not worried, maybe I'm wrong, could be
15  wrong, I have been before.  I'm not real worried
16  you are going to accept the argument.  I want to
17  make it clear to you how ugly it is, how
18  inappropriate and unfair it is.  How instead of
19  coming here and saying, "Look, we lost Order 5,
20  let's talk about what we're supposed to talk
21  about," we're coming here making this really,
22  really crummy, ugly, ugly argument which could
23  never be sustained.
24      I'm also a little dizzy, I have to say I'm
25  confused.  On the one hand, Orders 1 and 3 are

163

1  locked in stone, you cannot deviate from them in
2  any way, shape or form, but Order Number 4, if it's
3  an order, cannot be used in any way, shape, or form
4  because it would be prejudging to rely on it;
5  that's what he said.  You can't use these findings
6  you found.
7      Well, I don't get it.  Why is Order 1 and
8  3 locked in stone, you can't deviate from it, you
9  don't have the power to deviate from Powers 1 and
10  3, but Order Number 4, just kidding, it's just a
11  thought, it's sort of like my friends say about
12  Italian laws; they're not really laws, they're
13  suggestions.  This is just a suggestion in Order
14  Number 4.
15      I make that point to you to illustrate
16  what lack of integrity there is to these arguments.
17  If this functio [sic] thing mattered, you could be
18  locked into Order Number 4 because Rule 46 is over.
19  One thing is clear, Rule 46 blocks any
20  consideration, that's just clear.  So if his
21  argument was right about Orders 1 and 3, then you
22  wouldn't even have any discussion.
23      Now, I'm going to tell you right now, I'm
24  not going to make that argument, even though he
25  laid it into me.  I've been handed an argument, all

164

1  I have to do is accept his argument and I could say
2  you have no authority -- strike that, you have no
3  power not to give me punitive damages; that's his
4  argument.  I think it's just stupid.  I'm sorry, I
5  going to be disrespectful.
6      You have the power to do what you think is
7  right; that's why you were hired.  I believe in
8  doing that, you should be guided by what you've
9  done before, this is important, and that you cannot
10  reconsider what you've done before, but his
11  positions are completely contradictory.  On the one
12  hand, he said you are locked, you have no power to
13  deviate what you did before.  On the other hand,
14  when it comes to Order 4, you ignore it.  They're
15  both wrong, they're both wrong.
16      The fact is that what you've done is done.
17  You may not revisit it, you may not change it, you
18  must use it as a basis for your further decisions,
19  and then you must use your judgment, and
20  thoughtfulness and good sense to evaluate what to
21  do next.
22      What you should be doing, I believe, is
23  taking Order Number 4 and say, "What does this mean
24  in light of what's been said as to whether the
25  question of whether punitive damages should be

165

1  granted"; that's what we should be doing.  But I
2  point it out to you only to say, because I will not
3  say just anything that's useful to me, I'm going to
4  try to have a dialogue that has integrity, but
5  their position is whatever suits them as their
6  choice of law in punitive damages demonstrates.
7      Now, I want to make just a policy argument
8  because – and I don't think Mr. Smith meant this
9  as a threat, but we've unfortunately had enough
10  threats that I smelled one if you do this, then it
11  won't sustain itself.  I just want to make
12  something clear.  Every single word Mr. Smith said
13  today, every word in his slides, every word in his
14  briefs, either was or could have been made and said
15  to you before Order Number 4 was issued.  There is
16  not a single thing new.  There is not a fact,
17  there's not anything.
18      I do believe – I don't have encyclopedic
19  knowledge of every word that Mr. Sellinger and
20  Mr. Krum said.  I suspect they said a lot of what
21  Mr. Smith said.  The point I'm making is there is
22  nothing new.  This isn't like a new argument that
23  somehow is being made.  Every argument what you are
24  bound to do, what you should do, every single
25  argument either was or should have been made.  They

166

1  had their time.
2      This is – it's not even a disguise, this
3  is an explicit motion of reconsideration in
4  violation of Rule 46, it's as simple as that.  They
5  just simply ask you to ignore your rule.  If that
6  was allowed, then there would be no finality,
7  period, in awards.
8      Let's move to the next issue.  I want to
9  talk about this litigation privilege thing –
10  before I do that, I apologize, I want to talk about
11  advice of counsel one more minute.  I really feel
12  compelled because it's just so of a piece of this
13  proceeding.  We believe, we believe, Wilson,
14  Sonsini told them, "You are going to lose lots and
15  lots of money.  Give up, and for God's sake, don't
16  do these terrible things to them."  We believe they
17  were fired because they wanted to hire lawyers who
18  would abuse us.
19      We desperately wanted to ask that to
20  Wilson, Sonsini and they wouldn't let us, and they
21  never brought Wilson, Sonsini, and they never
22  showed up with them.  They had the gall to bring
23  them the very last day and then they eked out a
24  couple pieces of information, but we never found
25  out what Wilson, Sonsini said, we never found out

167

1  why they were fired, and we never found out what
2  happened, except if you look at these claims and
3  look at how it happened, it certainly makes sense.
4      There is every reason for you to jump to
5  the inference they were fired because they gave
6  advice that these people didn't like.  There is
7  every reason to believe they didn't follow their
8  advice.  It certainly is logical an inference.
9      By the way, there is no evidence I was
10  hired as litigation counsel.  I represent many,
11  many people in many, many, many things where I
12  don't do litigation.  The letter was sent to me and
13  had nothing to do with litigation in any way,
14  shape, or form, and there is no evidence of that in
15  any way, shape, or form, but this business about
16  advice of counsel and Wilson, Sonsini is ugly.
17      It's one thing to say, "None of your
18  business."  Okay, I got it.  It's been a long time.
19  I never said what I said here to you about what I
20  think happened because it's been none of my
21  business what happened between Wilson, Sonsini.
22  You made it clear you don't want to kind of
23  conjecture, but for him to say, "There's every
24  reason to believe that they followed Wilson,
25  Sonsini's advice," that's what he said, I say I

168

1  think there's every reason to believe that they
2  didn't.  I think there's every reason to believe
3  that they got into a spiff with their client and
4  the lawyer because the lawyer knew that we were
5  right.  Who knows.
6      It's just so unfair to make that argument
7  now, and it's so unfair – why did they do it,
8  Ms. Claiborne?  Why did they do it, Mr. Bader?
9  They made that argument to talk you out of punitive
10  damages.  They made this unfair argument, engaged
11  in this unfair tactic.  I want to focus on this.
12  They engaged in this unfair tactic to deprive David
13  of what he's entitled to, protect him from having
14  to pay what he had to pay.  That's ugly.  That's
15  what I'm complaining about.
16      Let's talk about the litigation privilege.
17  Look, I almost clapped when Mr. Smith said there
18  are 53 acts and 38 of them were litigation
19  privilege.  15, good enough to me.  Seems to me 15
20  are good enough to make.
21      I want to make the following very simple
22  point: They can't possibly be arguing that in the
23  middle of this arbitration, Mr. Bosack can run
24  across the room in a break, steal Mr. Soward's
25  wallet, refuse to give it back, and be insulated

169

1  from the litigation privilege because, heck, it was
2  all part of litigation. It's just preposterous.
3      We have conversion. We have a guy who had
4  independent fiduciary obligations which you found
5  which he independently breached. The fact that
6  there was a lawsuit going on at the same time is
7  irrelevant. Between many, many people, lawsuits
8  are going on all the time. Many competitors have
9  lawsuits with each other all the time; that doesn't
10 insulate their behavior with each other.
11     So the only question is, am I saying that
12 you should find them liable because they made a
13 rotten claim? The answer is no. As Dan pointed
14 out, the liability flows from the independent acts,
15 the conversion act under the breach of fiduciary
16 duty, which were not made in this courtroom, not
17 made here, and the fact that they had some
18 relationship to this is irrelevant. It does not
19 insulate. If it did, we would have chaos, because
20 they would go commit crimes left and right, it's
21 silly.
22     The other thing that's silly, very
23 frankly, is this Oren case — I'll read it to you.
24 This is why we put 53 allegations. I'll read it to
25 you slowly. It's the Supreme Court. "When

170

1  allegations of misconduct properly put an
2  individual's intent at issue, and that intent is
3  the issue here, in a civil action, statements made
4  during the course of a judicial proceeding may be
5  used for evidentiary purposes in determining
6  whether the individual acted with reckless intent."
7      All we are showing is they did this
8  terrible thing and there is a pattern and practice
9  of evil, horrible intent. It's all part of intent.
10 The Supreme Court has held that it absolutely has
11 evidentiary value. Again, I'm going to come back
12 to my theme: What an ugly argument to make to you.
13 It's okay, we could convert your money and breach
14 your fiduciary duties, but that's privilege. They
15 can't possibly mean that.
16     How would you feel if you were David? You
17 mean to say that because I, David, wanted to get my
18 money back, that subjected me to let them steal my
19 money and breach the fiduciary duties and I don't
20 even have a claim? What an ugly argument, not to
21 mention completely, totally without foundation.
22     While we are on the subject of ugly
23 arguments and dirty tricks, I want to show you a
24 dirty trick. You see, here's the dirty trick:
25 Let's talk about compensatory damages.

171

1  Compensatory damages, Delaware law and California
2  law apply, and here's what you get, here's what you
3  get. All you get is what's in this bottle, because
4  Delaware law and California law, which has
5  compensatory damages, all they have in here is
6  this: Nothing. You just get your money back,
7  sorry. No, you don't get mental suffering,
8  anguish, you don't get any of those things because
9  Delaware and California law apply. Does any other
10 law apply? No. We stipulate, that's it.
11     Now comes punitive time. Washington law
12 applies, I forgot to mention that. Here's
13 Washington law. Now, I say, "Wait a minute, look
14 in that bottle, look at all the good stuff that's
15 there. You don't get that," that's compensatory
16 damages in Washington. But you don't get punitive
17 damages because there's no punitive damages out
18 here. No lid. California has no compensatories,
19 but it has punitives, that's the California scheme.
20 Washington scheme is you get it all in
21 compensatory, no punitives.
22     Now, Dan showed you the case that you have
23 to timely raise it. You cannot let them get away
24 with this. Washington law, let me read you from
25 what Mr. Smith didn't read you the whole thing of.

172

1  Exclusive of punitive damages, that is to say no
2  cap. The measure of damages, this is Washington,
3  has uniformly adopted by — uniformly adopted by
4  the courts and recognized by the law as exceedingly
5  liberal toward the injured party. It enters the
6  domain of feeling, tenderly inquires into his
7  mental suffering, and pays him for any anguish of
8  mind that he may have experienced.
9      If they thought that law applied, they
10 should have told you and we would have gotten $10
11 million of compensatory damages. It's cheating to
12 say, "Compensatory damages apply here, and we're
13 going to sandbag you later, we're going to say it's
14 punitives, it's Washington law and the law doesn't
15 permit." We gave you the case. It has to be
16 timely raised.
17     I'm consistent with my theme. How would
18 you feel if you are David? Talk about a rotten
19 trick. What a rotten thing to do. This is all
20 about depriving him of what he's entitled to. In
21 Washington, you get it — you get all these
22 damages, they're called one thing. In California,
23 you get them, they're called another thing. They
24 engage in this hideous shell game. That's the
25 first point I want to make about punitives.

173

1    Then I want to make another point, which
2    it just seems so obvious to see, it's incredible.
3    Interest, okay.  Now, I don't live in Washington, I
4    don't know.  I have lots of friends there, I know a
5    Supreme Court justice.  I know a little bit about
6    what Washington is interested in.  We take a look
7    at the cases.  Here's California and here's
8    Washington.
9        Now, what is going on here, what is the
10   interest of jurisdictions.  California's interest
11   is to protect a citizen.  That a citizen was
12   harmed, legitimate interest, part of the law;
13   that's Number 1.  Number 2, California's interest
14   is to -- I want to get the exact wording right.
15   Yeah.  To make sake of example, they want to make
16   an example of evil people who do bad things.  It's
17   not just to punish, he read it, you saw it, it's
18   his quote.  Those are California interests.
19       California has an interest to protect him
20   from getting converted and breach of his fiduciary
21   duty.  California's interest, to protect the rest
22   of us, us 38 million other of us as a sake of
23   example so somebody from Washington can't come down
24   here and convert our money and breach our fiduciary
25   duties.

174

1    Now, what was the interest of Washington?
2    We know Washington doesn't care whether it gives
3    punitive damages in the right case to a California
4    citizen, the Kammerer says it.  They didn't even
5    talk about that, so we know that, but here's the
6    interest, here's what's going on here.  Protect,
7    and if I could have a little literary license, I'll
8    just -- sorry, but what the heck, we'll call it
9    "rotten" in this case, a rotten tort-feasor,
10   because I think you would agree that a person who
11   steals somebody's money and breaches fiduciary
12   duties could be called a rotten person.
13       Where have they shown you any Washington
14   interest in protecting rotten tortfeasors?  What's
15   Washington's interest in protecting Len Bosack,
16   what's their interest?  They have no interest here.
17   Washington doesn't want their citizens to be rotten
18   tortfeasors.  There's no interest, not a single
19   case or authority anywhere.
20       California has an interest to protect
21   their citizens and make an example of people who do
22   bad things, like Mr. Bosack, and Washington
23   couldn't care less.  In fact, if you ask everybody
24   in Washington, Legislature, the Governor, the
25   courts, they probably say, "If they're rotten

175

1    tortfeasors, they ought to get their's."  Where is
2    there an interest conflict?
3        You know, this is just such silliness.  We
4    have a solemn principle here in Washington which we
5    all live by, it's called the religion of no
6    punitive damages, and that's what we're protecting.
7    Well, excuse me, but for two years and one month,
8    these Washington citizens, Mr. Bosack was beating
9    his chest about how he was going to get punitive
10   damages against my client.  Every time we came
11   here, every argument they made, every brief they
12   filed, including up to last -- one week ago, he
13   estopped from saying he cares about punitive
14   damages, even if it mattered.
15       We have no evidence that they want to
16   protect rotten tortfeasors, and we have no evidence
17   that anybody in Washington wants to stop punitive
18   damages.  The only thing we have is of evidence of
19   one Washington citizen.  We know that one loves
20   punitive damages and he thinks that's just dandy
21   because he's been arguing for them for two years
22   and a month at every turn.  He's estopped from
23   saying it's against our policy as our violent
24   citizens.  You can't make that argument.
25       It's his position that punitive damages

176

1    should be given to him.  The only reason he
2    withdrew it because he knew he wasn't going to get
3    it, and his position in this case has always been
4    punitive damages are dandy and wonderful and
5    terrific and I should get them.  Now to come here
6    and say, "Oh, my God, it's just a sin."  You know,
7    punitive damages, it's like doing a terrible thing.
8        First of all, that's not the policy, he
9    can't make the argument.  So this whole business,
10   talk about a ugly result, everybody, we've had this
11   case, we tried to this case, we operated this case
12   on the simple assumption that if punitive damages
13   are shown, they will be awarded and have new
14   lawyers come in the very last minute seven days
15   before the end of this and make up a whole brand
16   new argument, it's just ugly.
17       It's not about whether you grant it, it's
18   the effect of doing it.  It's this:  If they were
19   honest and forthright, they would have said, "Look,
20   we think punitives aren't going to be granted
21   because Washington law applies and we need to take
22   you into account."  But once again, it's all about
23   depriving David of what's fair and that's really
24   not right.
25       Let's talk about Sandy Lerner.  The first

177

1  objection is you don't have evidence that Sandy
2  told somebody to do this or that.  Let me tell you
3  about the tax return.  Let's talk about the tax
4  return, this will give you an example.  This is
5  Mr. Bosack's testimony — let's turn the lights on,
6  it's late.  This is Mr. Bosack's testimony, it's on
7  Page 222 — I'm sorry, 221 of the 54th day,
8  9/18/2006.
9       "Question:  What happened, when was the
10  first time you saw the two Cartesian tax returns?
11       "Answer:  I think it was on Sunday, the
12  16th.  I don't know if I — if we have my signed
13  copy."
14       "Where were you?
15       "Answer:  In San Francisco.
16       "For this proceeding; where exactly were
17  you?
18       "I think in the Pan Pacific Hotel.  I
19  think it was on the 14th floor, the middle of what
20  would logically be the south side of the building.
21       "Who handed you the two different versions
22  of the tax return?
23       "I think it was Mr. Middleton.
24       "Who else was present?
25       "I think Sandy Lerner was present.  I'm

178

1  not sure there was anyone else present.  Sandy
2  Lerner was involved in every aspect of this."
3       Mr. Middleton testified, he said
4  Mr. Middleton did not have evidence of what — he
5  said there's no evidence Mr. Middleton knew what he
6  was doing.  First of all, it's a foundation
7  objection which is well past waived, but second of
8  all, it took us about 30 seconds to prove that
9  Mr. Middleton was right in the middle of this, he
10  was with Sandy Lerner, there he was, Sandy, Len and
11  the tax returns involved in this.
12       You saw Sandy Lerner testify.  You heard
13  her testimony about her involvement in this and her
14  venom and her anger and her petulance about all
15  this.  You are competent to judge her level of
16  involvement in this.  Mr. Middleton has admitted
17  that she was a decision-maker in everything that
18  happened.  Most importantly, you have found already
19  her involvement.  It is a found fact in this case.
20  They are not visiting the question of — strike
21  that.
22       They want to revisit the question of
23  whether she was involved.  They want to rescind
24  Order Number 4.  You cannot do that.  It is a found
25  fact that she was involved in all this, and her

179

1  level and extent of involvement is shown by
2  Mr. Middleton both in the tax return incident and
3  in his testimony.
4       And much more importantly, you were here
5  for 47 days or 48 days until you finally ruled
6  against her and she left.  Her deep, deep
7  involvement in every aspect of this, and Krum and
8  Sellinger's representations, "We can't do this
9  until we talk to our client," we this, we that.
10  There was never a disagreement between Len and
11  Sandy, they presented as one team, and
12  respectfully, Ms. Lerner's testimony about why she
13  did what she did was just obviously fallacious.
14       Dan and I both had a chance to
15  cross-examine her.  We asked her, "Well, what were
16  you shocked about?"  Well, she couldn't remember.
17  She couldn't give a good answer.  She couldn't —
18  she squirmed and she tried to make up things, and
19  we called her on the things she made up and she
20  finally backed off and she said, "Well, I guess I
21  was really upset."
22       You could judge that testimony as you
23  will.  I believe it is absolutely undisputed, Len
24  Bosack testified that she pushed him into it.  "I
25  was the last person, she pushed me into it."  There

180

1  is no question she was part and parcel of all the
2  decisions and the activities.  The testimony, Len
3  Bosack gave the testimony and Sandy gave the
4  testimony, and there's also no question that she
5  did it in a vindictive, nasty, horrible way.  She
6  behaved petulantly, and she has behaved petulantly
7  since you ruled against her.
8       So this brings us to the question:  Is
9  this a punitive damages case?  The first thing I
10  would say if you read anything in this case, please
11  read Order 4 because it's your order, it's a record
12  of this case.  It will be things we will live with
13  for the rest of our lives.  I cannot imagine how
14  one could read Order Number 4 and not say that
15  someone is entitled to a punitive damages.
16       If this were a judge case, we would
17  already been onto the issue.  You would have
18  already decided the issue, but in order to not give
19  punitive damages, you have to come to grips with
20  Order Number 4 and this terrible behavior that was
21  engaged in, this pattern and practice.  Remember,
22  the issue is not how much.  Mr. Smith may think
23  5 million and I may think 50 million; that's for a
24  different day.
25       The issue is this, you have two choices:

181

1  Are you going to let him get away with it by simply
2  giving back the money or are you going to hold him
3  to account? It's very simple. I point out to you
4  that you held David quite to account for far lesser
5  conduct. In quite harsh language you did. That's
6  fine, it was your right and your duty to see it,
7  but similarly, you've held Len and Sandy to account
8  and you must award punitive damages on the basis of
9  your order.
10      I'll make another point: There is no
11  case, this business of reading insurance cases for
12  bad-faith insurance. Come on, give me a break.
13  There's no case ever reported that I could find
14  anywhere where somebody who found to committed
15  malice, intended to harm somebody and filed false
16  tax returns and the court said, "Now pay their
17  damages." There aren't any such cases. There are
18  no such cases.
19      Let's pretend you didn't issue Order 4,
20  let's revisit it. What happened? What happened?
21  They kicked him out, he was a partner, they threw
22  him out. Forget all this legal nicety, whether
23  it's this contract or that contract, they kicked
24  him out. They took his money and they didn't tell
25  him anything about anything and they kicked him

182

1  out. That's what they did.
2      You could have 150 lawyers and Salomon
3  himself interpreted it, but what happened was, he
4  got a letter saying, "You no longer have an
5  interest." You, the Panel, have now held as of
6  that moment he had a million dollars' worth. They
7  use this experience, common experience of human
8  affairs. Is it common experience of human affairs
9  to take somebody's million dollars, refuse to
10  report to them what's going on, kick them out,
11  don't talk to them, and say, "Nanny, nanny, sue me
12  for it," when you were 100 percent wrong as found
13  by the Panel?
14      That's Number 1. They kicked him out,
15  they took his money. There's no doubt they took
16  his money. They cooked the books. They cooked
17  them. They took the Weisel and in California, they
18  took the Weisel number and they reduced it in order
19  to cheat us. It's cooking the books as you could
20  cook them for the effort to fool you into giving
21  him less money at the end of the day.
22      So they kicked him out, they took his
23  money, and cooked his books. They filed a false
24  tax return. You found it. They totally
25  stone-walled. You found they looked him in the eye

183

1  and they didn't even tell him the tax return, they
2  didn't even give him his K-1, you found it. They
3  did this to him, not only in September 2003, they
4  did it to him after he had cooperated and after he
5  had paid them a million dollars.
6      This was not a one-time crime. This is a
7  continuing behavior. Every day that they didn't
8  give him the money is a continued act. It's not
9  you get to do it once and keep it. We continually
10  wanted the money back and maybe you could argue,
11  oh, well, maybe there's a misunderstanding. They
12  didn't realize he only made $280 million, or they
13  didn't think he was going to cooperate, but you
14  know a year later when he had fully cooperated in
15  every, shape, or form, we were here for a lot of
16  days. Was there one word of testimony about not
17  cooperation? One syllable, one comma? Not one.
18      This man did everything in his power to
19  cooperate with these people in every way, shape, or
20  from, and they knew it, and he gave them a million
21  dollars and still they persisted in converting his
22  money and stonewalling him and running, scurrying
23  around trying to hatch a scheme to fool you.
24      The incidents that we had in the intent to
25  deceive, which the Court said you could find, the

184

1  intent, they came there and said, These claims will
2  go away because we haven't changed the books. We
3  have changed the books. Of course we looked at the
4  books and it turns out their representations were
5  wrong.
6      In every way, shape, or form they
7  attempted to deceive you. They lied to you about
8  what they were doing. You found it. You found
9  what he said was false. Bosack was a fiduciary.
10      Now, I ask you in this society that we
11  have, is that despicable? If it's not, I don't
12  know where the line is. Of course there's more
13  despicable conduct, I'm not going to sit here and
14  say this is the most despicable conduct we've ever
15  seen, that would be ridiculous. But if this isn't
16  despicable, I don't know where the line is.
17      They took his money, refused to tell him
18  about it, filed the false tax return, and cooked
19  the books and lied to you about it; how is that not
20  despicable outrageous conduct? I'm sorry, maybe
21  Mr. Smith and I travel in different circles; that
22  is not my common experience of human affairs.
23  Indeed, I think California has a darn interest in
24  being sure that its citizens are protected from
25  that behavior, and if people behave like that, that

185

1   they're made an example of.
2       What do they say?  "What's the harm?  Oh,
3   heck, he got his money back.  No harm, no foul.  He
4   got it all back, no big deal."  Well, you address
5   that.  It's in your order on Page 18.  Bosack
6   contends that Soward was not damaged by the failure
7   to make an accounting because Soward was ultimately
8   paid in the end.  One wonders how long -- does that
9   apply to 10 years from now, 20 years from now?  How
10   about if he's dead for 30 years, next generation?
11       After the Panel made its award on the
12   accounting on December 12, we find this contention
13   to be without merit.  Soward was damaged from the
14   time that he was entitled to receive the
15   distribution of his interest in Cartesian.  You
16   have found that he was damaged.  He was deprived
17   use of these funds for the support of himself and
18   his family, or for whatever purposes he might
19   choose them.
20       This business about he's wealthy, he's
21   wealthy.  Boy, I'll tell you, we'll be talking
22   about who's wealthy next time, but as to his
23   wealth, you know the evidence, what he is, because
24   of the extent of this proceeding, and he testified
25   to you, he's been unemployed and unemployable

186

1   because of the accusations of this proceeding.  The
2   fact that he received them in the end did not undo
3   the damage from not having the use of the funds in
4   the meantime.
5       This is a damage he has suffered.  The
6   suffering he has suffered, and that damage has not
7   been compensated for, and that damage was
8   intentionally inflicted in bad faith horribly, and
9   that is a damage for which punitive damages should
10   be given or not?  At the end of the day, this is
11   all about justice, and I ask you, what does it say
12   about justice if after all that happened, after all
13   they did to them, after doing these terrible
14   things, that you say, "Well, within the law, it
15   just suffices to just give him his money back"?
16       Yes, we have written that he was damaged
17   over a period of years intentionally with the
18   purpose to hurt him as a part of malicious acts,
19   but is it just good enough for him to get this
20   empty bottle?  I don't think that's justice.
21       CHAIRMAN BADER:  Let's take a short break.
22   Ten minutes.
23       (Whereupon, a recess is taken.)
24       CHAIRMAN BADER:  All right, Mr. Smith.
25       MR. SMITH:  Mr. Kahn is right, we

187

1   certainly have different styles, and his
2   presentation was very entertaining, it was
3   histrionic at places.  He did take literary license
4   with our arguments, and your job is to cut through
5   the rhetoric, figure out what the law is and apply
6   it to the facts as you establish them with the
7   evidence, that's your job.  It's not to be swayed
8   by this impassioned jury plea that our arguments
9   are ugly, our arguments are despicable, we're very
10   smart lawyers, but we're ugly, the arguments are
11   ugly.  Does that help with your analysis?  Mr.
12   Kahn's characterization of an argument as ugly?  He
13   simplifies and misconstrues what we have said.
14       Let me start with functus officio.  Mr.
15   Kahn is familiar with the term, don't let him fool
16   you.  It's a very simple concept and you all are
17   familiar with it as well as arbitration lawyers.
18   Our point is not that you can't make a ruling that
19   disagrees with me, that's not my point.  That's a
20   gross misconstruction of the point.
21       The point is, you made binding
22   determinations in Awards 1 and 3.  Once you make
23   those binding, final determinations in an award
24   that is final, binding, and confirmable, you simply
25   don't have jurisdiction to go back and change them

188

1   in the same arbitration in connection with the
2   subsequent award; that's the argument.  There's
3   nothing offensive about that.  There's nothing ugly
4   about that argument.  There's plenty of law that
5   supports the argument.
6       We went through how Awards 1 and 3 were
7   inconsistent with 1 -- I'm sorry, one and three
8   were inconsistent with four in connection with the
9   findings that support the rulings of liability for
10   breach of fiduciary duty and conversion.  We'll
11   give you the PowerPoint so that you could see that.
12   It's very, very basic.  There's nothing unfair
13   about the argument.
14       The only thing that's unfair is not
15   recognizing that there are blatant inconsistencies
16   between one and three and four, and they're trying
17   to take advantage of those inconsistencies in order
18   to unfairly impose punitive damages.  That's what's
19   unfair.  That, to use Mr. Kahn's phrase, is ugly.
20   But does that help your analysis, to call it ugly?
21   It just doesn't.
22       Now, he said in a very, very challenging
23   way, as if we were challenging the Tribunal, "You
24   don't have the power to disagree with Mr. Smith,"
25   and it's not that.  It's simply an issue of your

189

1  jurisdiction, and if you go through the functus
2  officio doctrine as set forth in the law in our
3  brief and also in our presentation, take a look at
4  the AAA rules, because they recognize the doctrine,
5  it's also enshrined in their rules, California law
6  recognizes it, it's simply you can't determine
7  liability later on the basis of findings that are
8  inconsistent with your earlier rulings. It's as
9  simple as that. It's not that difficult and
10 there's certainly no need to stumble over the Latin
11 phrase.
12      The position that we're taking is entirely
13 consistent. What we're saying is in your functus
14 officio with respect to the final findings of one
15 and three, now let's look at four. What we said
16 was this phase of the arbitration was set aside to
17 determine the party's entitlement to punitive
18 damages. I read the footnote from your order. I
19 read the portion of the transcript in which
20 Mr. Sharp stated his understanding that the
21 punitive damages phase was trifurcated under your
22 order and the phase with respect to four was to
23 determine liability. All of the evidence came in,
24 but you were to determine liability.
25      The next phase was to determine, you were

190

1  to determine entitlement to punitive damages.
2  There's nothing ugly so far about that argument; is
3  there? And in the subsequent phase, if there is
4  entitlement to punitive damages, you are entitled
5  to determine the amount of punitive damages.
6      That's the phased proceeding that you
7  ordered, and our argument with respect to four is
8  to the extent that you found malice, to the extent
9  that you found fraud, to the extent that you found
10 oppression, all of that was to be reserved for this
11 phase of the arbitration, and we were to have an
12 opportunity to present our case on it, and we did
13 in the submission that we gave you last Friday and
14 the argument we made today. All's fair.
15      We made the further point that any
16 findings with respect to malice, oppression, and
17 fraud for purposes of punitive damages would have
18 been, in essence, obiter because the purpose of the
19 ruling was to determine whether there was liability
20 for breach of fiduciary duty and conversion.
21      The next issue is what law applies to
22 punitive damages and whether under that law the
23 standard for punitive damages has been met. Now,
24 we've argued Washington law, and I'll get to this
25 in a minute, but even under California law, did you

191

1  really purport to determine under California's
2  clear and convincing standard that there had been
3  malice and oppression and fraud in connection with
4  the liability proceeding, and if so, what is the
5  purpose of this proceeding?
6      The purpose of this proceeding was to
7  argue on the evidence whether there was malice,
8  oppression, or fraud, and hence an entitlement to
9  punitive damages. That's the argument. There's
10 nothing ugly about that argument. It's a very
11 simple argument.
12      We don't presume that the Tribunal
13 prejudged those issues. There's no evidence in
14 Interim Award Number 4 that you made any
15 determinations under the clear and convincing
16 standard of California law. That's all for this
17 proceeding. There's nothing unfair about making
18 that argument. Our position on that is entirely
19 consistent.
20      On choice of law, Mr. Kahn again, with
21 spit flying, argues it's so unfair that on
22 liability we said compensatory damages were
23 governed by one law and yet in this empty bottle,
24 we're saying punitive damages are governed by this
25 law. Well, we all agree that a separate

192

1  choice-of-law analysis has to be applied to
2  punitive damages.
3      If you look at their brief, opposition to
4  Respondent's motion for punitive damages, they
5  start out with a choice-of-law analysis.
6  Respondents assume that punitive damages are
7  governed by the same state law that governs their
8  claims that resulted in liability for compensatory
9  damages. They're saying that of us, that we
10 assumed that punitive damages are governed by the
11 same laws compensatory. This assumption is
12 erroneous.
13      In California, a court must conduct a
14 separate choice-of-law analysis with respect to
15 each issue in a case, including a separate
16 choice-of-law analysis for punitive damages. Now,
17 for him to tell you to go through this
18 bottle-juggling exercise and tell you that the
19 argument that we're making, that there is a
20 separate choice-of-law analysis with respect to
21 punitive damages is ugly and unfair and designed to
22 screw David Soward, is just baseless. It's just
23 baseless histrionics. It doesn't help you at all.
24      The fact of the matter is we both agree
25 you have to go through a separate choice-of-law

193

1 analysis with respect to punitive damages. That's
2 agreed, notwithstanding what he just tried to pull
3 over your eyes. So you go through a separate
4 choice-of-law analysis and he says that without any
5 analysis, but he knows a judge in Washington so he
6 has some idea of what the interest of Washington is
7 in this case, well, he doesn't.
8      If you look at the cases that we've
9 presented, it's very clear that Washington has an
10 interest in preventing the imposition of punitive
11 damages on a resident which has already been found
12 to be a tortfeasor and where compensatory damages
13 had already been awarded; that's Washington law,
14 that's their interest.
15      What is California's interest in coming
16 into this arbitration room? Given that punitive
17 damages are disfavored under California law, they
18 provide — California recognize they provide a
19 windfall for the Plaintiff, that they provide the
20 anomaly of excessive compensation and that in
21 essence, they're there to punish.
22      Why does California law want to punish
23 Len Bosack so that Mr. Soward could get extra
24 money? Why does California have an interest in
25 that especially when punitive damages are

194

1 discretionary? So what you do under the
2 comparative impairment analysis is you look at the
3 strength and scope of a state's policy or law.
4      Here in Washington, they do not recognize
5 punitive damages because they view that as
6 repugnant to every sense of justice and they
7 disfavor them, but they want to protect their
8 citizens from the imposition of excessive damages
9 when compensatory damages have already been
10 awarded. That's Washington State's interest.
11 Whether it's a rotten tortfeasor or a really rotten
12 tortfeasor or just a tortfeasor, that's
13 Washington's interest, and it applies across the
14 board and it's a very strong policy.
15      What's California's interest? This is not
16 a case where the public health and safety is
17 involved. If this were a case where the public
18 health and safety were involved, I would say yeah,
19 California would have an interest. If this were a
20 case where we were dealing with an out-of-state
21 insurance company or some out-of-state company that
22 was doing extensive business in California and had
23 a policy in harm California resident, I would say
24 yes, California has an interest. But here in an
25 arbitration that Mr. Soward brought where there

195

1 have been claims of wrongdoing going both ways, and
2 as Mr. Kahn admitted, the Tribunal held David to
3 account with quite harsh language.
4      If you go back through Awards Number 1 and
5 3, there may have been a slight additional award of
6 money to Mr. Soward, but a lot of his claims were
7 rejected. A lot of his arguments were rejected. A
8 lot of Respondent's arguments and claims were
9 rejected, there's no question about that, but in
10 essence, it was a split decision, and you found
11 tort liability on his part, breach of fiduciary
12 duty on the basis of conduct that you found to be
13 egregious in the context of this business dispute.
14      So he's not faultless. It was his
15 malfeasance that started this. It was his
16 malfeasance that resulted in the breach of trust,
17 and particularly with respect to Sandy Lerner, she
18 could fire him for no reason or any reason and he
19 recognized that. That's in the management
20 agreement. It's in the contract with & Capital
21 Partners.
22      So does California have an interest in
23 punishing Mr. Bosack and awarding Mr. Soward
24 windfall damages? I just don't see it. It's not
25 as if this is going to deter, somehow deter future

196

1 conduct. It's not the car manufacturer, it's not
2 the insurance company that's dealing with many
3 residents in California and has continuous business
4 in the state where punitive damages are meant to
5 deter, but also to shape future conduct.
6      How is that? How are those policy
7 interests applicable here to such an extent that
8 they outweigh the interest in Washington in a
9 policy against punitive damages where the state
10 finds their imposition repugnant to every sense of
11 justice?
12      So not only was the Tribunal functus
13 officio with respect to the findings that support
14 the rulings of liability, even if you quibble with
15 that legal doctrine, the question is is it fair, is
16 it fair in an arbitration to rule one way in
17 Interim Awards Number 1 and 3, and then base
18 liability against our clients on completely
19 contrary findings in Interim Award Number 4 and
20 then to use that as a basis for the imposition of
21 punitive damages? Is that fair and that is an ugly
22 argument. That isn't fair to do that and to not
23 recognize that the legal analysis is correct, that
24 you were functus officio and that it would be
25 unfair to impose punitive damages on the basis of

197

1  Interim Award Number 4.
2      Now, let me turn to the Sandy Lerner
3  evidence that Mr. Kahn presented to you. I mean,
4  doesn't that show you just how egregiously
5  overreaching their case is generally and also with
6  respect to Sandy Lerner; doesn't it? What he said
7  was he pulled out testimony that Len Bosack was in
8  a room when he was presented with the two versions
9  of the tax return in October 2005 and that Sandy
10  Lerner may have been in the room. She may have
11  been in the room; therefore, she was involved in
12  all of this, you can't deny that, and she's
13  petulant and she doesn't show up for the hearings.
14      Do you know any better basis for the
15  imposition for punitive damages than that? That's
16  a ridiculous argument, and yet it's said with such
17  spit and fervour as if you were a jury and so naive
18  that you would be influenced by that, that you
19  would disregard the evidence. What you have to do
20  is put his rhetoric aside and take a hard look at
21  the law, which is presented in our brief and in the
22  PowerPoint, and we'll give you a copy of that, and
23  then take a look at evidence.
24      Now, again, there was a lot of spit and
25  fervour about the tax return, but I don't care how

198

1  ugly he says this argument is, that tax return is
2  legally irrelevant to a finding of punitive
3  damages, and that is because what you found was
4  that there was a conversion and a breach of
5  fiduciary duty as of September 30, 2004. That's
6  what you found. After that date, he got interest.
7  To the extent that he wasn't already compensated
8  for the amount, he would have to pay and true up
9  the damages, but he had paid and they excoriate him
10  for paying.
11      The fact is he paid. What's so wrong with
12  that? He paid. It's not an admission of
13  wrongdoing, he paid. The tax return was a
14  submission to the IRS, had no impact on Mr. Soward.
15  It didn't affect the transfer of his interest,
16  there was no representation to Mr. Soward in the
17  tax return. I mean, he was oblivious to it,
18  absolutely oblivious to it. So how could it
19  possibly have harmed him? It didn't. He couldn't
20  articulate the distinct harm as a result of the tax
21  return.
22      Now, he could say, "Well, you didn't pay
23  me my money and, therefore, I was harmed because I
24  was deprived of the use of my money." He made that
25  argument, but that has nothing to do with the tax

199

1  return. Nothing. The tax return has nothing to do
2  with the conversion claim or the breach of
3  fiduciary duty. Nothing.
4      On the issue of litigation conduct, what
5  we did say, that of the 53 distinct items that we
6  had counted that they were relying on, that I
7  think, what was it, 38 were core litigation
8  conduct, most of the rest are litigation conduct as
9  well because they're either in contemplation of
10  litigation or otherwise related to the dispute
11  between parties in the arbitration or the
12  litigation.
13      They cite the Oren case for the
14  proposition that you can use litigation conduct to
15  support a finding of a subsequent tort in a
16  subsequent proceeding, and it's Oren Royal Oaks
17  Venture, it's 42 Cal.3d. 1157, and they use Oren to
18  try and distinguish Palmer, and Palmer is very
19  clear. Palmer says, "You cannot use litigation
20  conduct to support a subsequent action for a tort
21  or punitive damages or in the same action."
22      Well, what Oren involves is an attorney
23  who was being sued for abuse of process. So of
24  course you use his prior litigation conduct to
25  support the subsequent claim of abuse of process

200

1  and this is Palmer's discussion of Oren.
2      It says, "Plaintiff also contends Oren
3  authorizes consideration of an attorney's
4  litigation tactics as proof of an underlying
5  intent." However, the attorney there was the
6  defendant and the issue was whether he had
7  requisite intent for abuse of process. The opinion
8  does not consider whether the attorney's intent may
9  be imputed to the client. So the case they rely on
10  is completely distinguishable and doesn't affect
11  the force of application of the litigation
12  privilege in the string of cases that we've
13  presented.
14      This is De Anza and it is an interesting
15  case as Mr. Sharp pointed out at the beginning of
16  the hearing. The plaintiff was a home – I'm
17  sorry, a mobile home homeowner's association made
18  up of retirees and elderly people on fixed income.
19  So very sympathetic plaintiffs.
20      The defendant was the owner of the mobile
21  home park which was seeking to apply a new law that
22  allowed the owner to decouple the rent from utility
23  charges. The utility charges had been in the rent,
24  but when utility rates went up, the landlords went
25  to the Legislature and said, "Look, we need relief

201

1  because we can't raise the rent, it's
2  rent-controlled, but we need to have some relief
3  for the higher utility."
4      So they decoupled them, and the new law
5  was somewhat complicated and it was not known
6  exactly how it was applied, but he was doing it in
7  a way he was obtaining unlawful profits, unlawful
8  rents from the homeowners.
9      This is what the Court says: "In addition
10  to stressing that the De Anza MHC Defendants were
11  always appealing or going to another forum, the
12  association relied on evidence that De Anza MHC
13  employed hardball tactics designed to intimidate
14  and discourage the association from pursuing the
15  lawsuit so that De Anza MHC could continue to take
16  the legal profits.
17      "Evidence was introduced at an early
18  hearing in this matter, David Spangenberg, the
19  attorney for De Anza, confronted Rossman,
20  representative for the mobile home homeowners
21  association in the hallway of the courthouse and
22  told Rossman he would destroy the homeowners
23  association.
24      "Spangenberg warned Rossman and the
25  attorney for the association that they were playing

202

1  with fire and he threatened to run up massive
2  attorney's fees that they would have to pay.
3  Spangenberg informed the association's attorneys
4  several times in strong language that he was going
5  to play hardball in this litigation.  He predicted
6  that the association will be unable to withstand
7  the pressure and the residents, most of whom were
8  retirees or elderly persons with fixed incomes,
9  would be liable for large amounts of attorneys'
10  fees and would be at risk of losing their home.
11  Rossman and the association's attorneys, as well as
12  other residents in the park, understood these
13  statements as threats.
14      "During argument, counsel for the
15  association summarized examples of De Anza
16  litigation tactics and argued that there was
17  hardball played as part of this tactic.  He
18  explained that in order to award punitive damages,
19  the jurors were to look at the reprehensibility of
20  that conduct and that the strong-arm tactics that
21  were used were reprehensible.  They were ugly.
22  Counsel spoke of the threats and intimidation of
23  counsel for De Anza and told the jurors it was up
24  to them to determine if the standard was hardball
25  in this community."

203

1      So those were very egregious facts.  What
2  did the Court find?  The Court found that all of
3  that was legally irrelevant to a determination of
4  whether there was a proper basis for the imposition
5  of punitive damages.  It's De Anza, and we discuss
6  it in our brief, and we discussed it in our
7  PowerPoint.  But it's legally irrelevant to whether
8  a party acted with malice, oppression, or fraud
9  with respect to conduct giving rise to tort
10  liability.
11      That's what you have to do here.  You have
12  to determine what is the conduct that gave rise to
13  tort liability.  What is it, define that, and then
14  in that conduct, was there malice, oppression,
15  fraud; that's your task.
16      CHAIRMAN BADER:  In the mobile homeowners
17  case, would there be a difference if the one who
18  made those statements was the client, as opposed to
19  the attorney?
20      MR. SMITH:  The answer would be no, that
21  it would be still subject to the litigation
22  privilege if it was in contemplation of litigation.
23  The dispute arises, the homeowners association is
24  taking the position that the rents being charged
25  and the utility are unlawful.

204

1      The homeowner, with or without counsel,
2  says, "I'm going to fight this.  I'm going to get
3  an attorney.  I'm going to use hardball tactics.
4  I'm going to put you through the ringer.  I'm going
5  to force you to litigate this.  I believe strongly
6  in my rights.  You're not going to be able to pay
7  your attorney's fees.  You're going to lose your
8  mobile homes," that would all be litigation
9  privilege in the same way as when it was done by
10  the attorney.
11      I have nothing further at this time.
12      CHAIRMAN BADER:  Thank you, Mr. Smith.
13  All right.  Mr. Kahn, how long are you going to be?
14      MR. KAHN:  Not very long.
15      CHAIRMAN BADER:  Good.
16      MR. KAHN:  About two hours.
17      CHAIRMAN BADER:  Again, proving that
18  everything is relative.
19      MR. KAHN:  The first thing I'd like to
20  observe is that I'm sorry that Mr. Smith was not
21  around when my sister was dating.  I don't think
22  you would have thought that she was ugly either.
23  We seem to have different views of what's ugly and
24  what's not ugly.  And in that regard, I'll point
25  out that I did spit, and I did get excited, and I

205

1  did give you the same speech I would give you if
2  you were a jury.
3      See, the difference between me and
4  Mr. Smith is I respect juries. I think the
5  California that we're talking about here is the
6  people, is the juries. That's who you are. You
7  aren't some pointy-headed professors. You are a
8  representative of the people. I'm not appealing to
9  you only with your head. I think I'm a pretty good
10  lawyer, I probably could go toe to toe with these
11  folks. I'm appealing to your heart, too, that's
12  our job.
13      In our system of government in California
14  and in Washington, where California -- where
15  punitive damages are granted, it is the juries who
16  grant punitive damages, not the judges. That's not
17  true, by the way, in the rest of the world. In our
18  jurisprudence, the reason juries make this decision
19  is because juries are permitted to say, "That's
20  ugly, that's horrible, that's despicable," and
21  they're allowed to use their head and their heart.
22  That is an argument I plead guilty to being
23  emotional and spitting and outraged. That's the
24  test. Was it outrageous, was it despicable?
25      And so the difference between me and

206

1  Mr. Smith is clear. He would like you not to be
2  like a jury. He would like you not to respond like
3  the people. He would like you to pretend that this
4  is all just one clinical, antiseptic little
5  environment, and, oh, what the heck. I agree, I
6  completely plead guilty to everything he said
7  because I think that's your role. That's your job.
8      Under our system of laws -- and who are
9  these people that he says in Washington, it's
10  just -- poor Mr. Klitgaard is ringing in my ear,
11  "Don't say 'with all due respect.'" I won't say
12  "with all due respect" in respect of Mr. Klitgaard,
13  but the notion that the people of the State of
14  California wish to protect their tortfeasors who
15  come into California and convert other people's
16  property from punitive damages, it's just
17  ridiculous, it's just preposterous.
18      But who are these people who have decided
19  that? What they've decided in Washington is a very
20  liberal system of compensatory damages, and if you
21  have a case involving another state where somebody
22  does something evil in another state like the
23  Kammerer case, you will apply the punitive damages
24  laws and you grant punitive damages.
25      But I have to say the notion, and I appeal

207

1  to your head, heart, and sense of decency, but the
2  notion that the State of California wishes to
3  protect his rotten conduct, no matter how rotten,
4  that's their interest, think about what they're
5  asking you to write.
6      We decide that it is in the interest of
7  the State of Washington to protect Mr. Bosack's
8  right to come to California to convert property, to
9  breach his fiduciary duties, and that the State of
10  California has an interest in allowing that, and
11  California has no interest in protecting Mr. Soward
12  because Mr. Bosack is not a car company. You got
13  to be kidding.
14      You know, we have an interest in
15  California, we the people, for sake of example, in
16  protecting our citizens against car companies,
17  insurance companies, and zillionaires who come to
18  California and do bad things, that's a class of
19  people, too. But the notion that there's no
20  interest here, just, I have to say, befuddles me.
21  I'm just going to pick up a few random points and
22  then I'll conclude.
23      The tax return incident. I don't blame
24  you for being so obsessed about the tax return
25  incident. I would be, too. It is evidence of a

208

1  really evil intent. That's what you found. That's
2  all this is about. The tax return is not
3  liability-rising conduct. We all agreed to that.
4      Mr. Smith, and I might say -- let me call
5  a time-out for a moment and say to Mr. Smith, thank
6  you for the most pleasant day we have had in this
7  arbitration.
8      CHAIRMAN BADER: We join.
9      MR. KAHN: You and your team are a breath
10  of fresh air and civility. I cannot tell you, it's
11  the first time I'm going to go home without having
12  to take three Valium, but we suffered this
13  suffering on what the effect of the tax return was.
14      We litigated it vigorously. You
15  understood it at the time, you said out loud, the
16  tax return is not about liability giving rise, it's
17  about intent, and now you found it. You found it
18  was malicious intent in connection with this
19  Cartesian activity. You found it. Perfectly
20  appropriately it's found. I can't see how you get
21  around it, and I don't blame him for saying it's
22  irrelevant. I would say it's irrelevant, too.
23  He's desperate on that point.
24      The point is it's already been litigated.
25  It's been decided that it's evidence of their

209

1  intent in this process.  It was their intent to
2  deceive you, to deceive the government.  It was
3  malice and it's perfectly evidentiary relevant.  My
4  gosh, what could be more evidentiary relevant than
5  part of their scheme?  That's what the tax return
6  is, and the notion, the effort to get it aside
7  again, the effort that they put into it is evidence
8  of how important and valuable it is as showing
9  intent.
10      I got a tummy ache here thinking of future
11  ugly proceedings we're going to have.  So let me
12  just lay my marker down right now and Mr. Smith
13  could start getting out his computer and counting,
14  the two points he made.
15      I'm going to say this:  If I would tell
16  you that I'm a big UCLA Bruin fan, if I would -- we
17  won last night, we beat Pittsburgh.  If I would
18  tell you that Pittsburgh won and I would convince
19  you that Pittsburgh won, and I would ask you to
20  rely on the fact that Pittsburgh won and pay me
21  money on the fact that Pittsburgh won, I would
22  think that is ugly.  I think that would be an ugly
23  thing to do when UCLA won.
24      He said this investment, that somehow it's
25  a split decision on the investment.  I quote,

210

1  "split decision."  I'm going to talk about the
2  investment.  I just want to make something clear,
3  so it's clear.
4      There were hundreds of investments
5  involving hundreds of millions of dollars.  Exactly
6  one investment was found to be a mistake.  Yes, he
7  made -- he made one bad investment, but you also
8  rejected any aspersion on all the rest of them.
9  They specifically said they weren't approved and
10  they weren't okay.  And he, in excruciating detail,
11  we won the investment case overwhelmingly, we
12  slaughtered them, one investment, I agreed, one
13  investment out of hundreds, hundreds of millions of
14  dollars, we made the amount of money invested.
15  Sure, it's probably a billion dollars.  Out of the
16  billion dollars of investments, 1.5 million of
17  which 10 percent was his, you found he made a
18  mistake.  That's not a split decision.
19      We proved overwhelmingly that he did a
20  magnificent job.  We may disagree, he may not think
21  my sister is ugly, I think she's ugly.  He may not
22  think that's ugly argument, I think that's ugly
23  argument.  We won that overwhelming.  We proved
24  overwhelmingly that he was a tremendous, tremendous
25  employee, made one mistake.  We're going to have a

211

1  big fight about this.
2      The other thing is he said David made lots
3  of claims, that he lost a bunch of them.  That is
4  completely false.  Here's the percent, Mr. Smith,
5  of the claims we won that we made.  This is the
6  percent:  100.  We won every single claim.
7  Sometimes we didn't get all the money we wanted,
8  every single claim you could look it up, every
9  claim, 1, 2, 3, 4, 5, 6, for Mr. Soward.  Every
10  claim.
11      The only thing that was issued as to a
12  couple of them was the amount was because there
13  wasn't enough information.  This was not a split
14  decision.  We slaughtered you.  We won every one of
15  our claims.  As to your claims, we won 95 percent.
16  You won Passport, that's it.
17      As to the things we spent most of our time
18  on, Goldman, Sachs; Union Bank, hour after hour,
19  day after day, we won all of that completely,
20  totally, unequivocally.  This is sort of the
21  notion, well, this is really hard-fought, it's
22  split.  It's not true, not in any way, shape, or
23  form.
24      We won all of our claims.  We won all of
25  their claims except for one, and on this point

212

1  today on the punitive damages claim, Order Number
2  4, your findings form the basis for which you must
3  look, and on the basis of your findings, punitive
4  damages are required.
5      Thank you very much for your patience, as
6  usual.  Thank you very much, Mr. Smith, your team,
7  to your courtesies.
8      CHAIRMAN BADER:  You said you have five
9  minutes.
10     MR. SMITH:  I'll just respond very, very
11  quickly.
12     On the issue that you are a jury, you're
13  not the jury.  The parties decided to opt instead
14  to have arbitration, not to go to court, whether
15  with a jury or not with a jury, but they decided to
16  go to arbitration, and one of the reasons why
17  businessmen go to arbitration is they think that
18  they can obtain a more rational, reasoned,
19  dispassionate result, and not one that is inflamed
20  by the passions of the party or the lawyer.  That's
21  what arbitration is about.  You need to keep that
22  in mind when going through the law, the facts, and
23  the evidence.
24     Mr. Kahn said that I made the argument
25  that California has no interest here.  I didn't

213

1  make the argument that California has no interest
2  here. California has an interest. Washington has
3  an interest.
4        Under the comparative impairment analysis,
5  our argument is very simply that the interest of
6  California has to bow to the stronger interest of
7  Washington given the scope and strength of their
8  policy against punitive damages, weighed against
9  the interest of California in imposing punitive
10  damages when they're disfavored by the law, where
11  this is just simply an economic dispute between
12  sophisticated parties, it's a one-off dispute, and
13  the imposition of punitive damages, even if all the
14  requirements are met, is discretionary in
15  California. That's why Washington's policy, which
16  is at issue in the comparative impairment analysis,
17  is stronger.
18        I didn't mean to imply they haven't done
19  well in the arbitration, I'm sure they did a
20  marvelous job, but I'm not going to argue with Mr.
21  Kahn about the percentages of who won what when.
22  Go back and read Interim Awards 1, 2, 3. When I
23  say they won some, we won some, maybe we lost more
24  than they did, that's a fair comment, but go back
25  and read it. It's not nearly as one-sided as he

214

1  makes out, and the economic result of all of this,
2  after you take into consideration that Mr. Bosack
3  has already paid the 1.45 million, is that there's
4  not a significant amount of money flowing to
5  Mr. Bosack – to Mr. Soward, there just isn't.
6        This is an economic dispute. It is not
7  the type of case that warrants the imposition of
8  punitive damages. Now, I agree there's a separate
9  issue as to attorney's fees and costs, that may or
10  may not have to be litigated. You may take into
11  account the litigation conduct in determining the
12  allocation of attorney's fees and costs; that's
13  perfectly within your discretion. But, you can't
14  take it into account in considering whether
15  Respondents are guilty of malice, oppression, or
16  fraud for the purpose of imposing punitive damages.
17        CHAIRMAN BADER: Could I just ask you one
18  question?
19        MR. SMITH: Yes.
20        CHAIRMAN BADER: The arbitration clause,
21  the Arbitrators shall have the authority to make an
22  award based on the equities of the dispute. Does
23  that in any manner change what our traditional
24  function ought to be in connection with the
25  resolution of these issues?

215

1        MR. SMITH: The jurisprudence on punitive
2  damages has been developing for 200 years, and I
3  don't find any justice in your making an award of
4  punitive damages based on the supposed equities
5  that's inconsistent with the law.
6        In fact, you've recognized that in the way
7  you structured this proceeding. You've asked us to
8  brief and argue entitlement to punitive damages
9  under California law. We've done the choice-of-law
10  analysis and you are interested in what the U.S.
11  Supreme Court's recent decisions say about the
12  imposition of punitive damages. This should be
13  decided in accordance with the law, and it wouldn't
14  be fair, and it wouldn't be equitable, and it
15  wouldn't be just to veer from the law and come up
16  with some other decision.
17        MR. KAHN: May I respond to that?
18        CHAIRMAN BADER: Yes, you should have some
19  time with that.
20        MR. KAHN: I think that I really, really
21  disagree with that, and I think you are a hundred
22  percent right that you can and should, and let me
23  give you an example of why.
24        Take the Passport litigation. The
25  Passport litigation was an artifact of this

216

1  arbitration. Had we been in court, over a couple
2  subpoenas, few days, in, out, whole different
3  result. This went on, we unfolded it, you
4  exercised authorities, you, yourselves. In a court
5  you don't have the arbitrator saying, "We want to
6  see witnesses, we want to do this."
7        You, perfectly and legitimately, as you
8  proved to me, but you interposed yourselves on the
9  basis of what you thought was equitable. You
10  didn't follow the law which said, "You, as judges,
11  have to be passive people." You said we are – our
12  role is to seek and do the truth. You told us that
13  and you said, "We're not neutral finder's of fact."
14  When I had the stupidity to say that, I said,
15  "you're neutral finders of fact," you said, "No,
16  we're not. We have an obligation to go figure this
17  out and to do the right thing," and you told us.
18  It's just not consistent, that's how you behaved
19  during this entire proceeding.
20        You asked us to do things on your own
21  motion. You rejected stipulations of the party
22  because you wanted to see witnesses, even though
23  both parties – because you have done what you
24  thought was right, equitable. You must continue
25  that.

Arbitration Proceeding  3/23/2007  4:00:00 PM

217

1    It would be so unfair to David to come
2    this way, I believe -- I have a lot of confidence
3    in you.  I don't think you are going to do anything
4    illegal, that's not the case.  Of course if
5    punitive damages were prevented.  Nobody said,
6    "Give me punitive damages for other things here."
7    We are not asking anything illegal.  You must take
8    the equities into account of this situation,
9    because you've done that in every phase of this
10   proceeding.  You must take into account what's
11   happened here.
12        For on thing, just to give you a very
13   minor, but very poignant example, I don't have a
14   right to appeal what you've done here in Passport
15   on damages.  I do think, you know, I'll be honest,
16   I didn't see it coming or I would have argued
17   damages differently, and I don't think you would
18   have given damages because I think the damages were
19   not linked.  What you did was made him an insurance
20   company.  That's fine, you did it, my fault of bad
21   lawyering, but you did it in an environment where I
22   don't have an appeal.  It was final and it was over
23   and I had to move on.
24        Now, it's getting to, incredibly, now he's
25   saying you have the economic effect of this is

218

1    you've lost because the Panel may David an
2    insurance company for the Passport mistake.  Okay,
3    that was an equitable decision, that's the result
4    of it.  In your equitable conclusion, you decided
5    to make him an insurance company for that.
6        By the same token, you can't just say,
7    "I'm not going to apply the equities to this
8    decision," that really wouldn't be fair, and so I'm
9    not suggesting in any way, shape, or form that you
10   should do anything illegal.  Indeed, I believe as a
11   matter of law, and I try to avoid saying that, I
12   believe as a matter of law and for penny and for
13   pound, I believe as a matter of law, you are
14   required to get punitive damages here.
15        I don't think you could take Order 4 as a
16   competent legal paper and square it with not giving
17   the punitive damages.  Then you could decide
18   whether it should be a thousand dollars, as opposed
19   to 15 million.  I could see that debate, but I
20   don't see how you could write what you've written
21   as a matter of law, but I'm not saying you are
22   required to, but I don't think that would be
23   appropriate.  On the other hand, I think that it
24   would just be really a deviation from everything
25   you've done here not to take the equities into

219

1    account.
2        CHAIRMAN BADER:  Thanks, Mr. Kahn.
3        MR. SMITH:  I'll let him have the last
4    word.
5        ARBITRATOR CLAIBORNE:  We must be
6    finished.
7        CHAIRMAN BADER:  Thank you very much,
8    Mr. Smith.  As Mr. Kahn suggested, you've been a
9    breath of fresh air.
10        ARBITRATOR CLAIBORNE:  It's been a very
11   good day, Mr. Smith.
12        MR. SMITH:  I'm glad.
13        CHAIRMAN BADER:  Thank you, Mr. Kahn,
14   Mr. Sharp, Mr. McNamara.
15        (Arbitration is adjourned at 5:12 p.m.)
16
17
18
19
20
21
22
23
24
25

220

1
2    State of California      )
3    County of San Francisco      )
4
5        I, MARYANN H. VALENOTI, a Registered
6    Professional Reporter and Certified Shorthand
7    Reporter, hereby certify that the hearing in the
8    foregoing matter was taken in shorthand by me, a
9    disinterested person, at the time and place therein
10   stated, and that the testimony of the said parties
11   was thereafter reduced to typewriting, by a
12   computer, under my direction and supervision.
13        I further certify that I am not of counsel
14   or attorney for either or any of the parties to the
15   said hearing, nor in any way interested in the
16   event of this cause, and that I am not related to
17   any of the parties thereto.
18
19        DATED: APRIL 6, 2007
20
21        _____
22        MARYANN VALENOTI, RPR, CSR
23        NO. 11266
24
25